---

**JANE DOE**,

     *Plaintiff,*

v.                                 Case No.: 20-CV-00856 - WMC

**BOARD OF REGENTS, THE UNIVERSITY OF
WISCONSIN,** and **REBECCA BLANK**, as an individual.

     *Defendants.*

---

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS

    Plaintiff Jane Doe, by and through her undersigned counsel, hereby responds to Defendant University of Wisconsin ("UW") and Defendant Rebecca Blank's Motion to Dismiss (the "Motion") as follows.

### I.   INTRODUCTION

    This case arises from the Defendants' decision to yield to gender-based pressure and discard their Title IX disciplinary process to allow a UW football player, who was repeatedly found responsible for sexually assaulting Plaintiff, to return to UW's campus and the school's football team. Months after four separate Title IX determinations concluded that the student-athlete, PLAYER 1, had both sexually assaulted and harassed Plaintiff, Defendants vacated the school's entire Title IX process following a deliberately secretive re-opening of the case conducted in private with PLAYER 1's counsel—to the exclusion of Plaintiff. As Plaintiff's Amended Complaint (the "Complaint") alleges, in doing so, UW violated her rights under Title IX of the Educational Amendments of 1972 ("Title IX") and UW's Chancellor, Rebecca Blank, violated Plaintiff's due process rights under the Fourteenth Amendment.

Defendants UW and Chancellor Blank now attempt to shut out Plaintiff once again and have filed a Motion to Dismiss all of Plaintiff's claims, contending that Plaintiff's allegations fail to adequately state such claims. To the contrary, Plaintiff's Complaint and the reasonable inferences that must be drawn therefrom plausibly state viable claims under Title IX based on deliberate indifference and erroneous outcome theories of liability, and under the Fourteenth Amendment based on Plaintiff's right to procedural due process. Defendants' Motion must be denied.

## II.    FACTUAL BACKGROUND

On April 22, 2018, Plaintiff, a University of Wisconsin ("UW") student was sexually assaulted by PLAYER 1, a football player at UW, while PLAYER 2, another UW football player, took photographs. (Dkt. 26 at ¶¶30-31; 34). Plaintiff immediately reported the assault to UW (Dkt. 26 at ¶36). In May 2018, UW's Title IX office commenced an investigation against PLAYER 1 and PLAYER 2. (Dkt. 26 at ¶39). The investigation continued throughout the summer of 2018 and into the fall. (Dkt. 26 at ¶49). During that time, Plaintiff was subjected to an educational environment that became increasingly hostile due to ongoing support for PLAYER 1 and PLAYER 2 and the risks of running into both players on campus. (Dkt. 26 at ¶¶45-48).

On October 30, 2018, UW's Assistant Dean Ervin Cox issued a written Title IX decision regarding Plaintiff's assault. (Dkt. 26 at ¶49). He found by the preponderance of the evidence that PLAYER 1 had sexually assaulted Plaintiff and PLAYER 2 had committed sexual harassment against her. (Dkt. 26 at ¶49). In finding PLAYER 1 responsible for sexual assault, Assistant Dean Cox determined PLAYER 1's presence on campus created an "intimidating, offensive, and hostile learning environment," that "would have a significant negative effect on [Plaintiff's] educational experience," and recommended that PLAYER 1 be expelled. (Dkt. 26 at ¶51). Following this

outcome, PLAYER 1 initiated a series of appeals of the Title IX determination. First, PLAYER 1 sought a hearing before a hearing committee. (Dkt. 26 at ¶53). After reviewing the evidence, the hearing committee unanimously determined that PLAYER 1 had sexually assaulted Plaintiff and that a hostile educational environment existed for Plaintiff if PLAYER 1 remained on campus. (Dkt. 26 at ¶57). PLAYER 1 then appealed to the Chancellor's Office. (Dkt. 26 at ¶58). Defendant Chancellor Blank reviewed all the evidence, found the established record supported the hearing committee's findings and denied the appeal. (Dkt. 26 at ¶59). PLAYER 1 then sought a second appeal with the Board of Regents. (Dkt. 26 at ¶61). The Board of Regents assigned the matter to a Board Committee on Student Discipline and other Student Appeals, which also found that the record showed that PLAYER 1 had assaulted Plaintiff. (Dkt. 26 at ¶62). PLAYER 1 was then expelled. (Dkt. 26 at ¶63). In conjunction with this decision, PLAYER 1 was given notice that he had the right under Wisconsin Law to seek judicial review—but he chose not to. (Dkt. 26 at ¶64). At each stage of the appeals, the Chancellor and Board Committee based their decisions on the record created by the University during the investigation and hearing process, in which Plaintiff and PLAYER 1 were afforded an equal opportunity to participate, including in the presentation of evidence, a review of relevant information, and an opportunity to respond. (Dkt. 26 at ¶55).

A month prior to Dean Cox's initial determination that PLAYER 1 sexually assaulted Plaintiff, the Dane County District Attorney charged PLAYER 1 with criminal sexual assault. (Dkt. 26 at ¶65). The case went to trial in July 2019 and, applying the heightened standard of proof beyond a reasonable doubt, the jury found PLAYER 1 not guilty. (Dkt. 26 at ¶68). The public response to the verdict was swift and clear. Following this verdict, there was significant outcry suggesting that the not guilty verdict meant PLAYER 1 had been falsely accused and should immediately be allowed to return to UW. (Dkt. 26 at ¶69). Public sentiment also became

increasingly hostile and discriminatory towards Plaintiff, including calling her gender-based slurs and perpetuation of gender-based stereotypes such as Plaintiff being a promiscuous liar. (Dkt. 26 at ¶70). The UW football program quickly joined the efforts to pressure UW into allowing PLAYER 1 to return to school. (Dkt. 26 at ¶¶71-72). As this public pressure mounted, PLAYER 1 submitted a petition for restoration of his rights pursuant to Section 17.18 of the UWS Code. (Dkt. 26 at ¶79). Section 17.18 does permit an expelled student to ask to re-enroll, presumably as a type of commutation of punishment in exceptional circumstances. (Dkt. 26 at ¶78). Under Section 17.14, the findings of the Title IX process are final, and the only recourse is appeal to the Chancellor and, at their discretion, the Board of Regents. (Dkt. 26 at ¶80). PLAYER 1's Petition attempted to use Section 17.18 in a new and unauthorized manner to circumvent both the Title IX outcome and findings of the Chancellor and the Board of Regents. (Dkt. 26 at ¶79). This misuse of Section 17.18 violated the UWS Code. (Dkt. 26 at ¶83-84).

Despite being unauthorized by the UWS Code, UW allowed PLAYER 1 to submit additional private evidence for Chancellor Blank to weigh. (Dkt. 26 at ¶85). As Plaintiff would learn months later through open records requests, some of the evidence consisted of information that had previously been in PLAYER 1's possession but that he had simply declined to submit during UW's original investigation. (Dkt. 26 at ¶86). Plaintiff was neither notified of this petition nor was she offered an opportunity to review or respond to the "new" evidence. (Dkt. 26 at ¶90). In fact, when Plaintiff's Title IX advisor contacted UW after hearing about the petition through a football press conference, the advisor was informed that UW would not permit Plaintiff to have any information or involvement in the process despite the submission of new evidence. (Dkt. 26 at ¶91). At the same time, UW also took the unprecedented measure of attempting to gather additional evidence that would support PLAYER 1's petition and help justify his readmission,

including requesting that the District Attorney provide an accounting of the evidence presented at trial. (Dkt. 26 at ¶¶96-99). UW indicated to the District Attorney that its request was urgent because football season was about to start. (Dkt. 26 at ¶¶99). During this time, UW was continuing to receive significant pressure from the media and the UW community to readmit PLAYER 1. (Dkt. 26 at ¶93). Members of the UW football team even held a press conference to publicly lobby for PLAYER 1's reinstatement. (Dkt. 26 at ¶92).

On August 19, 2019, UW granted the football player's Petition for Restoration of Rights. (Dkt. 26 at ¶109). Additionally, despite having no authority to do so, Chancellor Blank publicly vacated the actual Title IX finding that PLAYER 1 sexually assaulted Plaintiff and changed UW's official determination of Plaintiff's Title IX complaint to "incapable of resolution," leaving Plaintiff's sexual assault complaint permanently unresolved. (Dkt. 26 at ¶¶101-102). Notably, UW's Student Athlete Discipline Policy does not permit a student who has been found responsible for sexual assault to participate in athletics. (Dkt. 26 at ¶105). Thus, granting PLAYER 1's petition for restoration of rights alone would have been insufficient to allow PLAYER 1 to return to football. In order to allow PLAYER 1 to rejoin the football team, UW had to take the unprecedented and unauthorized step to vacate the sexual assault finding of the Chancellor and the Board of Regents, and downgrade PLAYER 1's misconduct from sexual assault to sexual harassment. (Dkt. 26 at ¶108). Chancellor Blank did leave in place a finding that PLAYER 1 sexually harassed Plaintiff, which UW had previously acknowledged "had the effect of creating a hostile environment for [Plaintiff]." (Dkt. 26 at ¶103). UW imposed no consequence on PLAYER 1 for sexually harassing Plaintiff. (Dkt. 26 at ¶103). UW immediately sent out a press release to the media announcing their new decision. (Dkt. 26 at ¶109).

Plaintiff only learned about any of this process after she received a press release from UW on August 19, 2019 that PLAYER 1 had petitioned UW and UW had reversed the Title IX finding on sexual assault. (Dkt. 26 at ¶109). PLAYER 1 was once again able to star on the UW football team. (Dkt. 26 at ¶118). While PLAYER 1 celebrated, Plaintiff was harassed for what was now being labeled a false allegation. (Dkt. 26 at ¶¶110-111). Because PLAYER 1's readmission came only days before the start of the fall semester, Plaintiff did not have time to transfer schools and was forced to either attend school with PLAYER 1 or drop out of UW, despite UW's prior acknowledgement that his presence on campus created a hostile educational environment for her and had a negative impact on her education. (Dkt. 26 at ¶¶113-114). UW offered no protection and refused to provide her any accommodations and Plaintiff spent the semester in fear of running into PLAYER 1 on campus. (Dkt. 26 at ¶116-117). Plaintiff missed classes, avoided areas of campus, lived in a constant state of stress, and struggled to maintain her education. Ultimately, Plaintiff required an additional semester to complete her degree as a result (Dkt. 26 at ¶120).

Chancellor Blank's decision to readmit PLAYER 1 also implicated a number of the promises and obligations UW had made to Plaintiff as its student, including the statement in the UW application materials that states, "The UW System is committed to equal opportunity for all. No student may be denied admission to, participation in or the benefits of, or be discriminated against in any service, program, course or facility of the system or its institutions because of the student's race, color, creed, religion, sex, national origin, disability, ancestry, or age." (Dkt. 26 at ¶122). The UW Policy on Discrimination, Harassment, and Retaliation provides in part, "The purposes of this policy are to: express the Board of Regents' commitment to providing an environment free of discrimination, harassment, and retaliation." (Dkt. 26 at ¶123). The same policy commits UW to follow Wisconsin state law in language that mirrors the application

materials. (Dkt. 26 at ¶124). The UWS Code further acknowledges that "The missions of the University of Wisconsin System and its individual institutions can be realized only if the university's teaching, learning, research and service activities occur in living and learning environments that are safe and free from violence, harassment…. In promoting such environments, the university has a responsibility to address student nonacademic misconduct." (Dkt. 26 at ¶126). These policies and promises were provided to Plaintiff via email and the UW website both before and during her matriculation to the UW. (Dkt. 26 at ¶128). In return for these promises, among others, Plaintiff paid the UW substantial tuition monies and also promised to abide by the UW code of conduct. (Dkt. 26 at ¶¶130,131).

## III. ARGUMENT

### A. Defendants' Motion Fails Under Rule 12(b)(6).

A motion to dismiss under Rule 12(b)(6) merely tests the sufficiency of the complaint; it does not rule on the merits of the case. *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 750 F.3d 811, 820 (7th Cir. 2011). A complaint need not contain detailed allegations of fact. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To survive a motion to dismiss, a plaintiff simply needs to provide enough information to state a claim that is plausible on its face – *i.e.,* one from which the court may draw a reasonable inference of liability. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The task for the court is "not to determine what allegations are supported by the evidence but to determine whether [the plaintiff] is entitled to relief if everything that he says is true." *Doe v. Purdue Univ.,* 928 F.3d 652, 656 (7th Cir. 2019). Accordingly, motions to dismiss "must receive careful scrutiny and [are] not often granted." *Sidney S. Arst Co. v. Pipefitters Welfare Educ. Fund*, 25 F.3d 417, 420 (7th Cir. 1994).

As a threshold matter, Defendants' Motion runs far afield of these standards and asks the Court, inter alia, to consider disputed facts concerning the school's conduct and the underlying motivations for Chancellor Blank's decisions. In so doing, Defendants' Motion goes beyond the "four corners of the complaint" and instead seeks to address the underlying merits of Plaintiff's claims before the start of discovery. Defendants' Motion is improper under Rule 12(b)(6) and, at this nascent stage in the proceedings, should be denied out of hand.

     **B.**      <u>**Plaintiff's Complaint Plausibly States A Claim for Deliberate Indifference Under Title IX.**</u>

Plaintiff's Complaint sets forth facts sufficient to establish a deliberate indifference claim under Title IX, and thus "state[s] a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. For over two decades, the U.S. Supreme Court has recognized that plaintiffs may bring claims for monetary damages under Title IX where a school official with authority to institute corrective measures is deliberately indifferent to known peer-on-peer harassment that is so severe, pervasive, and objectively offensive so as to deprive a victim of access to an educational opportunity or benefit. *Davis v. Monroe County Board of Education,* 526 U.S. 632, 633 (1999); *Doe v. St. Francis. Sch. Dist.,* 694 F.3d 869, 871 (7th Cir. 2012). Defendants' Motion does not dispute that numerous school officials were on notice of PLAYER 1's sexual assault of Plaintiff, and the "intimidating, offensive, and hostile learning environment" created by PLAYER 1's presence on campus. Instead, Defendants argue that Plaintiff has not sufficiently alleged that their conduct was so clearly unreasonable as to rise to the level of deliberate indifference or that her harassment was so severe or pervasive as to deprive Plaintiff of equal access to educational opportunities. Though Defendants allege factual disputes with the Complaint surrounding Defendants' response to this known sexual harassment as well as the nature of the harassment

itself, those allegations in the Motion do not change the fact that Plaintiff has sufficiently alleged facts supporting each of the elements of her claim.

### i. Plaintiff Has Alleged Clearly Unreasonable Conduct by UW.

Under Title IX, a school acts with deliberate indifference where its conduct is "clearly unreasonable in light of the known circumstances." *Davis,* 526 U.S. at 648-649. A clearly unreasonable response "causes students to undergo harassment or makes them more vulnerable to it." *Pogorzelska v. VanderCook College of Music,* 442 F. Supp. 3d 1054, 1062 (N.D. Ill. 2020) (citing *Hill v. Cundiff,* 797 F.3d 948, 973 (11th Cir. 2015)). Plaintiff's first Title IX claim alleges UW acted with deliberate indifference where it made the clearly unreasonable decision to vacate the outcome of PLAYER 1's expulsion and the underlying finding of sexual assault based upon a new evidentiary process that was hidden from Plaintiff and allowed PLAYER 1 to return to campus without any protection for Plaintiff despite knowledge that doing so would subject Plaintiff to a hostile educational environment.

In support of this claim, Plaintiff has alleged facts to show that UW vacated its entire Title IX process and knowingly subjected her to a hostile educational environment based upon both public and internal pressure to readmit PLAYER 1. UW had conducted an exhaustive Title IX investigation into PLAYER 1's assault of Plaintiff. That investigation determined that by the preponderance of the evidence PLAYER 1 had sexually assaulted Plaintiff and that PLAYER 1's presence on campus created a hostile educational environment for Plaintiff. This determination was upheld through three additional levels of appeal and PLAYER 1 was expelled. Following a jury's finding of not guilty in PLAYER 1's criminal trial based on an entirely different standard of proof, and in response to mounting pressure from the football team and community, UW made the ex parte decision to readmit PLAYER 1 and then overturned the established Title IX sexual

assault finding so that PLAYER 1 could continue to play football for UW. This decision was made via an unauthorized decision of the Chancellor that excluded Plaintiff from consideration of evidence submitted by PLAYER 1 and violated UW's established processes and procedures. More importantly, it entirely ignored UW's prior determination that PLAYER 1's presence on campus created a hostile educational environment for Plaintiff, and that Plaintiff was entitled to continued protection on campus given this hostile environment and UW's revised finding that PLAYER 1 had sexually harassed her. As a result, Plaintiff was forced to attend school in this clearly hostile environment or abandon her education and suffered from a hostile educational environment as a result. *See, e.g., Pogorzelska,* 442 F. Supp. 3d at 1063-1064 (holding plaintiff alleged deliberate indifference claim where school did not act or provide accommodations to keep victim of sexual assault safe from encountering assailant); *Kelly v. Yale Univ.,* 2003 WL 1563424 at \*3-4 (D. Conn. Mar. 26, 2003) (holding a jury could find a school's failure to provide protection for a student alleging assault by a classmate could constitute deliberate indifference).

In attempting to attack Plaintiff's deliberate indifference claim, Defendants' Motion fundamentally misstates the claim. For example, Defendants first argue that Plaintiff cannot show deliberate indifference because she has acknowledged that UW "conducted exhaustive Title IX proceedings" as to her initial report of assault, and therefore it is undisputed that UW acted "swiftly and appropriately upon learning of the harassment." Mot. at 15; *see also* 18-19. But Plaintiff does not contend that UW was deliberately indifferent during the Title IX process. Quite the opposite – Plaintiff alleges that UW's deliberate indifference arises from its clearly unreasonable and unsupported decision to vacate the result of the exhaustive Title IX process without procedural or substantive justification, thereby subjecting her to a hostile educational environment upon PLAYER 1's return to campus. And while UW's Title IX process was exhaustive, this cannot be

used as a defense to UW's clearly unreasonable actions taken later on. UW's subsequent decision to subject Plaintiff to a hostile educational environment in response to pressure from the football team and PLAYER 1 cannot be cured by now standing behind the very process that UW discarded.[1]

Likewise, Defendants also argue that Plaintiff's allegations are insufficient to state a Title IX claim because Title IX does not permit vicarious liability. Mot. at 9-10. Defendants contend that Plaintiff is alleging that UW should be held responsible for PLAYER 1's sexual assault of Plaintiff or the bullying that she experienced on social media and in public forums, and that UW had no responsibility for the conduct of third parties outside of its control. *Id.*; *see also* Mot. at 20. Here again, this argument misstates the Complaint. Plaintiff does not allege in her Complaint that UW should be held responsible for PLAYER 1's sexual assault. Nor does she allege that UW is responsible for failing to respond to the horrific bullying and shaming she experienced on social media prior to PLAYER 1's readmission. What Plaintiff has alleged in her Amended Complaint is that UW's decision to vacate its own Title IX process and allow PLAYER 1 back on to campus with no protections for Plaintiff was clearly unreasonable and made her more vulnerable to harassment. In this vein, Defendants made an "official decision . . . . not to remedy" the hostile environment they knew that Plaintiff would experience; this is precisely the type of liability the Supreme Court in *Gebser* authorized. *Gebser v. Lago Visa Indep. Sch. Dist.,* 524 U.S. 274, 290 (1998); *see also Feminist Majority Foundation v. Hurley,* 911 F.3d 674, 689 (4th Cir. 2018)

---

[1] UW also insinuates that Plaintiff has not sufficiently alleged substantial control because "much of the negative publicity and social media bullying occurred outside the UW's sphere of influence or control." Mot. at 11. Again, this argument misunderstands the basis for Plaintiff's hostile educational environment. As UW itself acknowledged in its Title IX determination, Plaintiff's hostile educational environment arose from having to attend school with her perpetrator, a situation that was fully within UW control and which UW had the authority to prevent had it abided by its original Title IX findings. *See* Mot. at 11; *Doe-2 v. McLean Cty. Unit Dist. No. 5 Bd. of Directors,* 593 F.3d 507, 512 (7th Cir. 2010).

(noting that schools must engage in efforts "reasonably calculated to end [the] harassment" and finding Plaintiff sufficiently alleged school did not act to remedy known harassment); *Zeno v. Pine Planes Cent. Sch. Dist.,* 702 F.3d 655, 669 (2d Cir. 2012) (holding "responses that are not reasonably calculated to end harassment are inadequate"); *Doe ex rel. Doe v. Derby Bd. Of Educ.,* 451 F. Supp. 3d 438, 448 (D. Conn. 2006) (holding that school's failure to make any effort to reduce survivor's vulnerability to interactions with her attacker or "otherwise reach out to her to offer protection" could constitute deliberate indifference).

Similarly, UW's Motion also erroneously suggests that the Complaint is based on a request for a particular remedy by UW, which is not a basis for Title IX liability. Mot. at 11-13. Plaintiff does not allege that Defendants must have provided her with a specific remedy. Rather, Plaintiff alleges that UW acted in a clearly unreasonable manner when it failed to take *any* action to address the hostile educational environment that it knew Plaintiff would experience if PLAYER 1 returned to campus. For this reason, Plaintiff's allegations are entirely distinguishable from the cases cited by Defendants. In each of those decisions, all of which addressed summary judgment rather than motions to dismiss, school officials did take some form of action aimed at addressing harassment, although their efforts were not always successful. *See Gabrielle M. v Park Forest-Chi. Heights, IL Sch. Dist,* 315 F.3d 817, 825 (7th Cir. 2013); *N.K. v St. Mary's Springs Acad. Of Fond du Lac Wis., Inc.,* 965 F. Supp. 2d 1025, 1036 (E.D. Wis. 2013); *Johnson v. Ne. Sch. Corp.,* 972 F.3d 905, 912-913 (7th Cir. 2020). Here, Plaintiff has alleged that UW made decisions that actively placed her at risk of further harassment and refused to do anything to mitigate such risk or protect Plaintiff from further harm, which was clearly unreasonable under the circumstances and amounted to "doing nothing" at all. *See Johnson,* 972 F.3d at 912 (citing *Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.,* 511 F.3d 1114, 1122 (10th Cir. 2008)). Knowing that it had previously concluded

PLAYER 1 had sexually assaulted Plaintiff and that it was undisputed that PLAYER 1 sexually harassed Plaintiff, UW could have maintained PLAYER 1's expulsion, instituted a modified suspension, offered PLAYER 1 virtual educational opportunities, provided Plaintiff on campus protections, put in place a no-contact order, or any number of other remedial measures aimed at ensuring Plaintiff's safety and access to equal educational opportunities. Instead, UW did nothing.

The only arguments Defendants offer that address Plaintiff's *actual* allegations in her Complaint go to weighing the merits of Plaintiff's claims and not the sufficiency of her allegations. Defendants ask the Court to find that their decision to readmit PLAYER 1 and allow him to rejoin the football team was reasonable and their actions to exclude Plaintiff justified under UWS Code. Mot. at 16. This argument ignores the court's responsibility to accept Plaintiff's allegations as true and instead asks this court to resolve factual disputes concerning what UW was or was not authorized to do under its UWS Code. While Defendants try to analogize the reasonableness of their actions to cases such as *Gabrielle M.* and *N.K.*, these are cases where the court was addressing motions for summary judgment and considered the merits of the plaintiffs' claims. Such contentions are improper at the motion to dismiss stage and do not constitute a basis for dismissal of Plaintiff's deliberate indifference claim.

### ii. Plaintiff Has Alleged Severe and Pervasive Harassment.

Although UW purports to argue that Plaintiff has not sufficiently alleged harassment, UW does not take issue with Plaintiff's actual allegations that she was subjected to severe, pervasive and objectively offensive harassment in the form of a hostile educational environment and vulnerability to future harassment resulting from PLAYER 1's return to UW.

Under Title IX, Plaintiff must allege that she was subjected to "harassment that is so severe, pervasive and objectively offensive that it effectively bars the victim's access to an educational

opportunity or benefit." *Davis,* 526 U.S. at 633. Evaluating whether harassment rises to the level of severe and pervasive "depends on a constellation of surrounding circumstances, expectations, and relationships." *Davis*, 526 U.S. at 651. While "simple acts of teasing and name-calling" may not rise to the level of severe and pervasive, a hostile educational environment, and the vulnerability to future harassment, are sufficient where they deny a victim full access to an education. *See Farmer v. Kansas State Univ.,* 918 F.3d 1094, 1104-1105 (10th Cir. 2018); *Hernandez v. Baylor Univ.,* 274 F. Supp. 3d 602, 613 (W.D. Tex. 2017); *Joyce v. Wright State Univ.,* 2018 WL 3009105 at *8 (S.D. Ohio Jun. 15, 2018); *Kelly,* 2003 WL 1563424 at *3.

Here, Plaintiff has alleged that after PLAYER 1 was readmitted to UW, Plaintiff 1) lived in fear of running into him, 2) had to limit her activities on campus, and 3) had to ask friends to escort her while walking to classes. [Dkt 26 at ¶¶117, 120]. Even UW's own Title IX findings, on both the original sexual assault and the sexual harassment, acknowledged that requiring Plaintiff to attend school with PLAYER 1 would create a hostile educational environment. [Dkt 26 at ¶51]. Plaintiff has additionally alleged she experienced "concrete negative effect[s]" on her education. *See Davis,* 526 U.S. at 654. She alleged that the constant state of stress created by PLAYER 1's presence on campus and the threat of running into him made it difficult for her to participate in classes and caused her to have to work harder and longer hours to attain the same grades. [Dkt. 26 at ¶120]. As a result, she had to take a lower course-load and required an additional semester to complete her degree. [Dkt. 26 at ¶120]. This hostile environment and the threat of continued contact with PLAYER 1 following her sexual assault constitutes severe and pervasive harassment. *See S.G. v. Rockford Bd. Of Educ.,* 2008 WL 5070334 at *3 (N.D. Ill. Nov. 24, 2008); *Farmer,* 918 F.3d at 1104-1105.

Rather than address the sufficiency of these allegations, UW instead attempts to argue that even if Plaintiff sufficiently alleged the severe and pervasive harassment detailed above, it is not responsible for other harassment Plaintiff experienced, like the sexual assault itself or off-campus social media attacks because UW "is responsible only for *its* action or inaction." Mot. At 15. As discussed above, Plaintiff is not seeking to hold UW liable for her sexual assault or the social media attacks she experienced, though UW's actions certainly contributed to the hostility. Rather, Plaintiff's Complaint documents the numerous offensive comments made on social media and gender-based name calling in order to detail the gender-based motivations that are required for her erroneous outcome claim. For purposes of evaluating the sufficiency of Plaintiff's allegations of severe, pervasive and objectively offensive harassment, UW's argument is irrelevant and its motion to dismiss on this basis should be denied.

### C.     Plaintiff has Sufficiently Alleged an Erroneous Outcome Claim.

In addition to her deliberate indifference claim, Plaintiff has also alleged a Title IX erroneous outcome claim against UW. An erroneous outcome claim alleges that a disciplinary decision by a university was improperly motivated by gender bias. *Doe v. Purdue Univ.,* 928 F.3d at 657. To plead an erroneous outcome claim, a plaintiff "must first allege particular facts sufficient to cause some articulable doubt on the accuracy of the outcome of the disciplinary proceeding." *Doe v. Columbia Coll. Chicago,* 299 F. Supp. 3d 939, 953 (N.D. Ill. 2017), *aff'd*, 933 F.3d 849 (7th Cir. 2019). The plaintiff must "next allege particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." *Id.* A plaintiff must allege facts to show not only why a school might be motivated by gender bias, but also facts raising the inference that the school acted at least partly on the basis of sex in his or her particular case. *Purdue Univ.,* 928 F.3d at 669. As the Second Circuit noted in *Doe v. Columbia Univ.*, a university "that adopts,

even temporarily, a policy of bias in favoring one sex over the other in a disciplinary dispute, doing so in order to avoid liability or bad publicity, has practiced sex discrimination, notwithstanding that the motive for the discrimination did not come from ingrained or permanent bias against that particular sex." 831 F.3d 46, 58 n. 11 (2d Cir. 2016). In reviewing a Title IX erroneous outcome claim, other circuits have noted that the temporary presumption of discrimination applied in Title VII cases also applies in the Title IX context as well. *Id.* at 55-56. As a result, "a complaint under Title IX, alleging that the plaintiff was subjected to discrimination on account of sex in the imposition of university discipline, can be sufficient with respect to the element of discriminatory intent, like a complaint under Title VII, if it pleads specific facts that support a minimal plausible inference of such discrimination." *Id.* at 55.

Contrary to UW's suggestion, Plaintiff has pled extensive facts that show far more than a "minimal plausible inference" that UW engaged in gender-based discrimination when it made the decision to take the unprecedented action of allowing PLAYER 1 to return to UW, despite four prior Title IX findings that PLAYER 1 had committed sexual assault. As in *Columbia University,* here Plaintiff has plausibly alleged that UW circumvented its own disciplinary policies and vacated the Title IX findings against PLAYER 1 in deference to gender-motivated public pressure and also in order to aid the UW men's football team by creating a means for PLAYER 1 to return to the team. Specifically, Plaintiff has asserted that following a not guilty verdict in the criminal trial against PLAYER 1, which applied the heightened standard of proof of "beyond a reasonable doubt," there was significant gender-based public pressure placed on UW. [Dkt. 26 at ¶69]. In news articles, social media, and messages to UW, Plaintiff was accused of lying about her assault, accused of gender-based stereotypes, and subjected to gender-based harassment, including being called a "slut" and "whore." [Dkt. 26 at ¶70]. The UW Head Football Coach Paul Chryst and

members of the football team placed pressure on UW and Chancellor Blank to readmit PLAYER 1, with players submitting a letter placing additional pressure on the administration. PLAYER 1 and his teammates even scheduled a public press conference on the issue, which resulted in social media messages encouraging fans to call Chancellor Blank and "express their outrage" about PLAYER 1's expulsion and UW's support of Plaintiff's alleged lies. [Dkt. 26 at ¶93]. The dominant narrative was that UW had wrongly caved to the "#MeToo movement," a movement identified by women finally being believed when making allegations of gender violence, and UW needed to correct that wrong. [Dkt 26 at ¶73]. As a result, UW and Chancellor Blank adopted a gender bias in support of PLAYER 1 to refute criticism that it was too quick to punish PLAYER 1 in the wake of the #MeToo movement. Plaintiff has alleged this bias is evidenced in UW's failure to act in accordance with its own procedures, its unprecedented reversal of its own Title IX findings, and its wholesale exclusion of Plaintiff from a consideration of additional evidence. *See Purdue Univ.,* 928 F. 3d at 669; *Columbia Univ.,* 831 F.3d at 56. UW's efforts to readmit PLAYER 1 were not, as UW implausibly suggests, to stop the public gender-based shaming of plaintiff, but to assuage the gender-based criticism the school was receiving from both inside and outside of the university regarding its expulsion of PLAYER 1. Indeed, as Plaintiff has alleged, PLAYER 1's readmission did not quell the harassment that Plaintiff was experiencing. [Dkt. 26 at ¶111]. Predictably, it made it worse by seemingly confirming outrage throughout the UW community that Plaintiff was a liar and emboldening others to continue to threaten her. [Dkt. 26 at ¶111].

UW also argues that even if Plaintiff does sufficiently allege gender-motivated bias, UW had justification for the disciplinary decision that it made and, therefore, there is no reason to doubt the accuracy of the proceedings. *Columbia Coll.,* 299 F. Supp. 3d at 953. Here again, UW argues the *merits* of Plaintiff's claim, rather than the sufficiency of her allegations, and attempts to create

factual disputes that are inappropriate for a motion to dismiss. Whether Chancellor Blank followed established procedures, and whether she was justified in relying on a jury verdict based on an entirely different standard of proof, are heavily disputed issues that are not appropriate for the motion to dismiss stage. Likewise, to the extent that UW argues that there were other plausible non-discriminatory motivations for its decision to readmit UW, such as bending to public pressure, this argument misunderstands the court's obligation at the motion to dismiss stage. "*Iqbal* does not require that the inference of discriminatory intent supported by the pleaded facts be *the most plausible* explanation of the defendant's conduct. It is sufficient if the inference of discriminatory intent is plausible." *Id.* at 57. Here, as Plaintiff has sufficiently alleged discriminatory intent, Defendant's motion to dismiss Plaintiff's erroneous outcome claim should be denied.

### D.   Plaintiff Sufficiently States Her Due Process Claim.

Plaintiff's Complaint sets forth facts sufficient to establish a reasonable inference of liability based on Defendant Chancellor Rebecca Blank's violation of her procedural due process rights, and thus "state[s] a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. In the Motion to Dismiss, Defendant Blank correctly notes that evaluation of a procedural due process claim requires a two-step inquiry which first asks "whether there exists a liberty or property interest which has been interfered with by the State." *Ky. Dep't of Corr. V. Thompson*, 490 U.S. 454, 460 (1989). Plaintiff has alleged sufficient facts to answer in the affirmative.

She has identified extensive language provided to her in the UW's application materials—as well as the policies and code sections circulated to enrolled students—promising her meaningful access to education through redress of barriers created by sexual harassment and misconduct. These gender equity-based obligations and promises are concrete and specific and form the basis of a contract between Plaintiff and the UW, which in turn establishes a protected property right, as

established by Seventh Circuit case law. Although Defendants erroneously assert that Plaintiff is claiming a property right in adherence to procedure itself, the plaint text of the Complaint shows otherwise. It invokes procedure not as a right in itself but as the means by which the UW promised—but ultimately failed—to ensure Plaintiff's contract-based right to meaningfully access her education.

The causal relationship between Defendant Blank's actions and the deprivation that Plaintiff suffered is clearly spelled out. The UW's own findings repeatedly concluded that the mere presence of Plaintiff's perpetrator on campus "created an intimidating, offensive, and hostile learning environment" that materially impacted her education. [Dkt. 26 at ¶ 51]. Chancellor Blank's misuse of UWS 17.18 did not just modify PLAYER 1's disciplinary sanction; it unilaterally overturned the finding of responsibility upheld through the multiple appeals prescribed by University policy, returning him to Plaintiff's educational environment on a wave of sentiment that painted her as a liar with no protections in place for her safety or well-being. Defendant Blank's attempt to recast Plaintiff's claims regarding her own hostile educational experience as somehow inserting herself into a process meant only for PLAYER 1 only underscores the impermissible nature of Defendant Blank's approach all along: that a sexual assault survivor's rights and experiences are wholly secondary to those of her perpetrator. Defendant Blank's ex parte decision to vacate the Title IX findings and insert PLAYER 1 back into campus with no protections to Plaintiff immediately deprived her of her right to meaningful access to education.

The second step of a procedural due process inquiry "examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454 at 460. Here, where Plaintiff was wholly excluded from Defendant Blank's consideration of additional evidence and arguments, it is clear that even the most basic touchstones

of due process—notice and opportunity to respond—were not just insufficient, but completely non-existent. Defendant Blank lastly points to a state law procedure for review of administrative action as the appropriate remedy for Plaintiff's procedural due process claim. However, the timing of the review, lack of notice of Plaintiff's right to avail herself of it, and the nature of the remedy itself make it a fundamentally inadequate means of vindicating Plaintiff's rights.

### i. Plaintiff alleges with sufficient specificity the language establishing a contract-based property interest.

"In the context of higher education, any property interest is a matter of contract between the student and the university." *Doe v. Purdue Univ.*, 928 F.3d at 660 (citing *Bissessur v. Ind. Univ. Bd. Of Trs.*, 581 F.3d 599, 601 (7th Cir. 2009)). Such a contract may be implied, but in order to establish a constitutionally protected right, the "student must first show that the implied contract establishes an entitlement to a tangible continuing benefit and "point to an identifiable contractual promise that the [university] failed to honor." *Bissessur*, 581 F.3d at 602 (citing *Bd. Of Regents of State Colleges v. Roth,* 408 U.S. 564, 574 (1972)). In evaluating contract formation, the Seventh Circuit has followed the widely recognized view that "the catalogues, bulletins, circulars, and regulations of the institution made available to the matriculant become a part of the contract" between university and student. *Ross v. Creighton Univ.*, 957 F.2d 410, 416 (7th Cir. 1992) (quoting *Zumbrun v. University of Southern California,* 25 Cal.App.3d 1 (1972)).

Here, Plaintiff's Complaint is replete with direct citations to multiple UW policies, regulations, and other materials distributed to students that acknowledge sexual harassment, discrimination, and violence as harmful to an educational environment and commit the University to addressing such misconduct in order to provide an experience in which students can meaningfully engage with academics. These include the UWS Code statement that "[t]he missions of the University of Wisconsin System and its individual institutions can be realized only if the

university's teaching, learning, research and service activities occur in living and learning environments that are safe and free from violence, harassment…. In promoting such environments, the university has a responsibility to address student nonacademic misconduct." [Dkt. 26 at ¶ 126]. UW application materials received by Plaintiff state in part, "no student may be denied admission to, participation in, or the benefits or, or be discriminated against in any service, program, course or facility of the [UW] system or its institutions because of the student's… sex." [Dkt. 26 at ¶ 122]. The UW Policy on Discrimination, Harassment, and Retaliation further serves to express the University's "commitment to providing an environment free of discrimination, harassment, and retaliation," and the UW-Madison Policy on Sexual Harassment and Sexual Violence codifies the University's dedication "to creating and maintaining a campus community that is free from sexual harassment and sexual violence." [Dkt. 26 at ¶¶ 123-24]. The UW's statements fall squarely within the category of "catalogues, bulletins, circulars, and regulations" contemplated by the Seventh Circuit as the basis for contract formation, and taken together, they constitute a contractual promise to Plaintiff to address sexual assault, harassment, and discrimination in recognition of its impact on students' ability to fully and fairly access their education. Plaintiff has further identified the promises she made in return, including payment of tuition and other fees and agreement to be bound by the UW's rules and regulations. [Dkt. 26 at ¶¶ 130-31].

The specificity with which Plaintiff has pled the source of her contract with the UW makes this case readily distinguishable from those occasions where Seventh Circuit courts have dismissed much more general and conclusory claims to a student's right to education. *See Bissessur*, 581 F.3d at 602-04 (affirming dismissal for failure to state a claim where the expelled student's complaint stated only that "[a]n implied contract existed" and that the university "breached the implied contract that existed," and contained "no facts concerning: (1) what, if any, promises the

University made to [plaintiff]; (2) how these promises were communicated; (3) what [plaintiff] promised in return; or (4) how these promises created an implied contract"); *Charleston v. Bd. Of Trustees of Univ. of Illinois at Chicago*, 741 F.3d 769, 773 (7th Cir. 2013) (finding an expelled student's attempt to establish a protected property interest in continued education insufficient where he simply alleges a violation of "university statutes" without identifying which statutes the statutes being referenced or their contents); *Williams v. Wendler*, 530 F.3d 584, 589 (7th Cir. 2008) (dismissing the due process claim of suspended students that was premised "entirely on the bald assertion that any student who is suspended from college has suffered a deprivation of constitutional property" without citing any specific language pointing to the existence of a contract).

Plaintiff's detailed recitation of facts clearly lays out the promises that the UW made to her, how those promises were communicated, what she promised in return, and the consequent existence of an implied contract, all of which establishes the kind of contract-based property right in her education contemplated by the Seventh Circuit. *Bissessur* at 603-04; *Doe v. Purdue Univ.*, 928 F.3d at 660. Her Complaint further alleges a breach of that contract—interfering with her property right—due to Chancellor Blank's actions. There is nothing "general" about her detailed allegations, which are more than sufficient to survive a motion to dismiss Plaintiff's procedural due process claim.

### ii. Plaintiff's property interest is in her right to meaningfully access her education and is in no way purely procedural.

Defendant's suggestion that Plaintiff is claiming a property interest in the UW's adherence to nonacademic misconduct procedures is without support. Plaintiff's facts, as indicated above, clearly establish a legal entitlement grounded in the promises the UW made to Plaintiff regarding her educational environment and access to academic programs. Attempts to analogize this to

22

unsuccessful procedural due process claims that asserted a property interest in procedure itself are simply inapposite. Plaintiff acknowledges that "[p]rocess is not an end in itself." *Charleston*, 741 F.3d at 773 (quotation omitted). Rather, its "constitutional purpose" is to protect a property interest "to which the individual has a legitimate claim of entitlement." *Olim v. Wakinekona,* 461 U.S. 238, 250 (1983). Chancellor Blank publicly rescinded the finding that Plaintiff was sexually assaulted while still upholding the finding that he sexually harassed her. [Dkt. 26 at ¶¶ 101-103]. In spite of the UW's finding that PLAYER 1's very presence on campus harmed Plaintiff's education, Chancellor Blank not only returned him to campus but also declined to impose any conditions or afford Plaintiff any protections to address the resulting hostile educational environment. In doing so, Chancellor Blank interfered with Plaintiff's contract-based property right. Plaintiff's Complaint discusses Chancellor Blank's misapplication of UWS 17.18 and attendant procedural failings because they are relevant as the deficient means by which the Defendant arrived at an unconstitutional end: interference with Plaintiff's right to meaningfully access her education.

### iii. Chancellor Blank's decision to readmit PLAYER 1 and overturn the finding of responsibility impacted Plaintiff's contract-based property right in her education.

When Chancellor Blank unilaterally decided to readmit PLAYER 1 and vacate the finding of responsibility, she did so after previously acknowledging the detrimental impact of PLAYER 1 on Plaintiff's education, choosing to return him to her academic environment anyway. In recommending PLAYER 1's expulsion following an extensive investigation, Assistant Dean Cox found that PLAYER 1's mere presence on campus created an "intimidating, offensive, and hostile learning environment" for Plaintiff and "would have a significant negative effect on [her] educational experience." [Dkt. 26 at ¶ 51]. Chancellor Blank reviewed these findings and concurred with them when she denied PLAYER 1's initial appeal of his expulsion. [Dkt. 26 at ¶ 59]. In addition, the sustained campaign on the part of the UW football program, alumni, and wider

community to lobby Chancellor Blank for PLAYER 1's readmission included virulent hostility towards Plaintiff, who many suggested had lied about being sexually assaulted. [Dkt. 26 at ¶ 70]. When she subsequently decided to not only readmit PLAYER 1 but also overturn the finding of responsibility, she did so with full knowledge and understanding that doing so would validate the dangerous narrative that Plaintiff's allegations were false. In light of the harassment Plaintiff suffered as a result, Chancellor Blank's decision further impacted Plaintiff's ability to meaningfully access her education as promised by the UW.

While Defendants attempt to mischaracterize the disciplinary process and outcome as only concerning the rights of PLAYER 1, they ignore consideration for the significant, inescapable impact on Plaintiff's access to education. "When a right is protected by the Due Process Clause, a state 'may not withdraw [it] on grounds of misconduct absent[ ] fundamentally fair procedures to determine whether the misconduct has occurred.'" *Doe v. Purdue Univ.*, 928 F.3d at 663 (citing *Goss v. Lopez*, 419 U.S. 565, 574 (1975)). The impact of Chancellor Blank's reversal and readmission decision on Plaintiff's above-mentioned property right entitled Plaintiff to "fundamentally fair" procedures—and she received none. Chancellor Blank's misapplication of the UWS Code is no defense here.

The provision used to readmit PLAYER 1, UWS Section 17.18, is most analogous to a commutation of punishment. The plain text of the section addresses only the potential readmission of a suspended or expelled student, contemplating only a change in the *disciplinary outcome* of an already-adjudicated case. [Dkt. 26 at ¶ 78]. Nowhere does Section 17.18 permit the Chancellor to revisit the underlying finding of responsibility, as Chancellor Blank did with PLAYER 1. [Dkt. 26 at ¶ 80]. In contrast, 17.14 outlines the appropriate appeals process for nonacademic misconduct cases, in which students found responsible may appeal both the finding of responsibility and the

disciplinary outcome to the chancellor, whose decision is final except for a discretionary review by the Board of Regents. [Dkt. 26 at ¶ 80]. PLAYER 1 exhausted this process in his initial round of appeals, and his expulsion for sexually assaulting Plaintiff was upheld at each level. [Dkt. 26 at ¶¶ 58-63]. As part of this proper appeals process, the Chancellor and Board of Regents based their decisions on a record created under circumstances where Plaintiff and PLAYER 1 were afforded equal opportunity to present and respond to evidence, question witnesses, and review relevant information. [Dkt. 26 at ¶ 55].

In contrast, Chancellor Blank's use of UWS 17.18 to readmit PLAYER 1 and vacate the Title IX findings abandoned the due process touchstones of notice and the opportunity to be heard. *Mathews v. Eldridge*, 424 U.S. 319, 348–49 (1976). She conducted a one-sided examination of evidence put forward by PLAYER 1, which Plaintiff was not permitted to see or respond to. [Dkt. 26 at ¶¶ 85, 91]. Such action was wholly inconsistent with the stated purpose of UWS 17.18, the evidentiary procedures afforded under UWS 17.12, and procedurally insufficient to afford Plaintiff the due process rights to which she was constitutionally entitled.

Defendants' assertion that Plaintiff "already had access to most of the information" considered as part of the readmission decision is inaccurate and unavailing. At the time of Chancellor Blank's decision, Plaintiff had no knowledge of what information was being considered and was consequently unable to respond to it. [Dkt. 26 at ¶ 85]. She did not discover the nature of the information until months later through open records requests, and even then, some of the "evidence" consisted of information that had previously been in PLAYER 1's possession but that he chose not to submit during the UW's original investigation. [Dkt. 26 at ¶ 86]. Given these facts, there is no question that Plaintiff was deprived of her due process rights.

iv. **Plaintiff properly seeks relief in federal court, as a petition for judicial review under Chapter 227 of the Wisconsin Statutes would have provided a fundamentally inadequate remedy.**

Defendant Blank incorrectly argues that Plaintiff's claim must be dismissed because "she has not exhausted available state procedures." The Supreme Court has long dismissed this line of reasoning, holding "categorically that exhaustion is not a prerequisite to an action under § 1983." *Patsy v. Bd. of Regents of State of Fla.*, 457 U.S. 496, 501 (1982). The Seventh Circuit has explicitly adopted this position as well. *Veterans Legal Def. Fund v. Schwartz*, 330 F.3d 937, 941 (7th Cir. 2003) (citing *Wudtke v. Davel*, 128 F.3d 1057, 1063 (7th Cir. 1997)).

In addition, "[e]ven if the... statutory review procedure is intended by the legislature to be exclusive, the exhaustion doctrine will not be applied if the review procedure prescribed in the statute is, for any reason, inadequate." *Sauk Cty. v. Trager*, 346 N.W.2d 756, 761 (1984). The remedy that Defendant would have Plaintiff avail herself of could not address the harms at issue. The availability of alternative remedies is relevant where they are "plain, speedy, and adequate." *State v. Green Bay*, 86 Wis. 2d 760, 273 (Ct. App. 1978) (citing *State ex rel. First Nat. Bank of Wisconsin Rapids v. M & I Peoples Bank of Coloma*, 82 Wis. 2d 529, 538–39 (1978)). On these facts, the relief offered under Wisconsin Stat. § 227.52 is none of the above, so it cannot properly be considered the appropriate remedy available. *Id.*

Given the incredibly time-sensitive nature of the injury to Plaintiff, judicial review under § 227.52 would have been wholly inadequate to address her needs. Chancellor Blank's ex parte readmission of PLAYER 1 came just days before Plaintiff was to begin her fall semester classes on campus. As the UW had acknowledged in its previous findings, each day that Plaintiff was forced to share a campus with PLAYER 1, she endured an "intimidating, offensive, and hostile learning environment," which had a "significant negative effect" on her educational experience. [Dkt. 26 at ¶ 51]. Upon returning to campus, PLAYER 1 was omnipresent as the star of the much-

vaunted UW football team. [Dkt. 26 at ¶ 118]. The immediate and irreparable nature of the harm to Plaintiff's educational experience was beyond remedy, at least with regard to Wisconsin state law. The remedy prescribed by § 227.52, judicial review or administrative decisions, would have subjected Plaintiff to a lengthy state court proceeding affording procedural rights to responding parties such as Defendant Blank, during which the harm she suffered would be active and ongoing. In 2019, the median age of administrative agency review cases at disposition was 190 days post-filing.[2] Here, the alleged procedural defects in the administrative record (i.e. Plaintiff's complete exclusion from participation) would likely have necessitated taking additional testimony, depositions, and written interrogatories in order to conduct a fair assessment—making the process even lengthier than typical cases where agency action is reviewed based solely on the existing administrative record. Wis. Stat. Ann. § 227.57(1). Given the necessarily deliberate speed of the justice system, Plaintiff would likely have endured a months-long state process, possibly lasting the entirety of her remaining time on campus with PLAYER 1 and thus rendering any outcome practically meaningless.

What's more, the unique harm caused by Defendant's actions, which included perpetuating a stigma-riddled hostile educational environment, could not be undone by pursuing review under § 227.52. In her response to PLAYER 1's petition, Chancellor Blank not only readmitted him— she also reversed the UW's finding that he was responsible for sexually assaulting Plaintiff. [Dkt. 26 at ¶ 101]. This decision came on the heels of a sustained, aggressive campaign during which UW football players, staff, fans, and community members lobbied the school to readmit PLAYER 1, portraying his "not guilty" verdict in the criminal trial as evidence that he had been falsely

---

[2] WISCONSIN COURT SYSTEM, CIVIL DISPOSITION SUMMARY BY DISPOSING COURT OFFICIAL STATEWIDE REPORT (2020), https://www.wicourts.gov/publications/statistics/circuit/docs/civildispostate19.pdf.

accused by Plaintiff. [Dkt. 26 at ¶¶ 69-73, 92-93]. In an open letter to Chancellor Blank, members of the UW football team publicly exhorted her to clear PLAYER 1's name by granting his petition. [Dkt. 26 at ¶ 72]. While the Chancellor did not create the uproar, her response in the face of this pressure cemented the narrative that PLAYER 1 had been wrongfully accused and that Plaintiff had lied. Plaintiff suffered additional harassment as a result, including from a friend of PLAYER 1, who threatened that Plaintiff was lucky that the friend didn't know her real identity until after the trial. [Dkt. 26 at ¶ 111].

Chancellor Blank's visibility and leadership position at the UW made her the face of PLAYER 1's readmission, with social media users circulating the phone number for her office so that people could call to weigh in on his case. [Dkt. 26 at ¶ 93]. Her decision to overturn the finding of responsibility against PLAYER 1 was announced as part of a press release, which reflects both the high degree of public attention it commanded and UW's motivation to respond to critical sentiment in the UW community as they made their decision. [Dkt. 26 at ¶ 109]. The ruling of a state court, likely issued months after the furor around PLAYER 1 subsided, would do little, if anything, to change the public sentiment calcified against Plaintiff by Chancellor Blank's decision. The state-prescribed remedy under Chapter 227 empowers the court to "reverse or remand" an agency decision—here the readmission and reversal of the finding of responsibility—but this is no remedy for the irreversible harm caused by Chancellor Blank's public "exoneration" of PLAYER 1.

Finally, Plaintiff should be allowed to proceed with her federal claim, as she was never even given notice of her ability to seek judicial review under Chapter 227. Wisconsin courts have held that statutory review would be an inadequate remedy "where statutory notice was not given and the aggrieved party did not receive actual notice until after the time to seek review had

expired." *State v. Green Bay*, 86 Wis. 2d 760 (Ct. App. 1978). State law outlines two types of administrative decisions that are reviewable under Chapter 227: "those that arise out of 'contested cases' and those that do not." *Hedrich v. Bd. of Regents of Univ. of Wisconsin Sys.*, 2001 WI App 228, ¶ 20, 248 Wis. 2d 204, 213, 635 N.W.2d 650, 654. In a contested case, the administrative proceeding at issue "typically involves two or more clearly identified adverse parties, in addition to some type of fact-finding." *Id*. (citing *Collins v. Policano*, 231 Wis. 2d 420, 427 (Ct. App. 1999)). Under Chapter 227, where the agency decision that is the subject of the petition for review is a "contested case," then "the decision must include notice of the right of the parties to petition for judicial review." *Habermehl Elec. v. State Dep't of Transp.*, 260 Wis. 2d 466, 483 (Ct. App. 2003); Wis. Stat. Ann. §§ 227.48(2) and 227.53(1)(a)(2). In contrast, where the subject of the petition is not a contested case, there is no requirement that parties receive notice of their right to seek judicial review. *Id*. Here, Plaintiff was shut out of participation in what would properly have been a contested case, and Defendant Blank's failure to notify her of her right to petition for judicial review renders Chapter 227—a remedy she did not even know was open to her—totally inadequate.

PLAYER 1 was properly notified when he was advised by the Board Committee of his right under Wisconsin law to seek judicial review of their decision to uphold his expulsion. [Dkt. 26 at ¶ 64]. In stark contrast, Plaintiff was shut out of the readmission decision despite its material impact on her rights, and in keeping with its insistence on characterizing PLAYER 1's readmission as an issue that affected only him, the UW gave Plaintiff no notice of her rights under Chapter 227. [Dkt. 26 at ¶¶ 90-91, 109]. As Plaintiff contends above, the UW's decision to exclude her from an ex parte process in which the finding of responsibility in her own Title IX case was reversed was an inappropriate and unprecedented departure from the University's own stated procedures. [Dkt.

26 at ¶¶ 80, 83-84]. Had she properly been permitted to do so, Plaintiff would have vigorously contested PLAYER 1's petition for readmission and appropriately been entitled to notice of her right to request judicial review under Chapter 227. Instead, while Plaintiff learned of the UW's decision at essentially the same time as the general public, Defendant Blank gave her no notice—and no reason to know—of a time-sensitive state law remedy that she might pursue.

Parties' time limit for petitioning for review under Chapter 227 is tied to when they receive notice of that right. Wis. Stat. Ann. §§ 227.48(2) and 227.53(1)(a)(2). This makes sense, as someone who has no notice of her right to seek judicial review cannot logically be expected to vindicate it. Plaintiff's case is a particularly egregious example of this truth, and Defendant's assertion that she should have availed herself of a remedy that they themselves failed to alert her to must fail.

**E.      Plaintiff's Contract-Based Educational Property Right is Well-Established in Seventh Circuit Law.**

The Seventh Circuit has acknowledged that addressing qualified immunity at the motion to dismiss stage is largely inappropriate. *See Alvarado v. Litscher*, 267 F.3d 648, 651 (7th Cir. 2001) ("We note that a complaint is generally not dismissed under Rule 12(b)(6) on qualified immunity grounds. Because an immunity defense usually depends on the facts of the case, dismissal at the pleading stage is inappropriate"); *Jacobs v. City of Chicago*, 215 F.3d 758, 775 (7th Cir. 2000) (Easterbrook, J., concurring) ("Rule 12(b)(6) is a mismatch for immunity and almost always a bad ground for dismissal… and when defendants do assert immunity it is essential to consider facts in addition to those in the complaint"). Here, Defendant Blank's assertion of qualified immunity is both premature and contrary to Seventh Circuit case law establishing the existence of the right that she violated.

A government official's ability to avail herself of a qualified immunity defense to the violation of a constitutional right hinges on "whether the constitutional right was clearly established at the time of the alleged violation." *Rainsberger v. Benner*, 913 F.3d 640, 647 (7th Cir. 2019). Defendant Blank attempts to narrow the definition of "clearly established" to "factually identical," asserting that Plaintiff must "point to cases establishing that there is a violation of procedural due process when a university official decides to readmit a student after the student was acquitted in the criminal proceedings." However, a right is "clearly established" when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quotation omitted).

Seventh Circuit precedent has long contemplated that a student could have a property right in her education via contract. *Doe v. Purdue Univ.*, 928 F.3d at 660. And here, the contractual basis for Plaintiff's property right in meaningful access to her education is directly analogous to that pled in *Ross v. Creighton University*, where a basketball player was recruited to an academically rigorous university with the promise that he "would receive a meaningful education" if he attended. 957 F.2d 410, 411 (7th Cir. 1992). When the University failed to support the plaintiff in his academic endeavors, he left reading at a fourth-grade level, and the Seventh Circuit held that his complaint "fairly alleged" that the university breached its contract when it denied him "any real opportunity to participate in and benefit from the University's academic program." *Id.* at 416. In *Ross*, the University went so far as to identify the impediment to the basketball player's academic success before failing to remedy it, noting that he would need tutoring and other assistance in order to benefit from college-level courses but not providing it. *Id*. Similarly, the UW explicitly acknowledged the detrimental impact of PLAYER 1's presence on Plaintiff's education before choosing to return him to her academic environment—with foreseeable consequences. [Dkt.

26 at ¶ 51]. By consigning Plaintiff to this reality, Chancellor Blank deprived Plaintiff of the contractually-promised "opportunity to participate, in a meaningful way, in the academic program of the University" already recognized by the Seventh Circuit in *Ross*. *Id.* at 416.

In addition, multiple cases in the higher education context have put university officials on notice that ill-conducted student disciplinary procedures may violate a contract-based property right like the one Plaintiff has in her education. In *Purdue*, the Seventh Circuit found that qualified immunity barred the plaintiff's procedural due process claim because it was not clearly established that university discipline could deprive a student of a *liberty* interest in the due process context. 928 F.3d at 665. However, the opinion noted that "our cases in this area have considered only whether students have a *property* interest in their public university education." *Id.* (emphasis in original). The implication is that the answer is without question: yes, if properly pled as it is here.

When the Seventh Circuit dismissed an expelled medical student's procedural due process claim for failure to articulate a property interest, it noted that he "could establish that he has this legitimate entitlement" threatened by the expulsion process "by pleading the existence of an express or implied contract with the medical school." *Charleston*, 741 F.3d at 773. Similarly, the procedural due process claim brought by college students expelled for hazing failed because they based it on a generalized property right in education, but the court offered a clear counterexample: "Suppose a student had a contract with the college in which he promised to pay tuition, in an amount specified by the college, on the first day of each quarter, and in exchange the college promised not to suspend him unless he hazed another student. The contract would create an entitlement." *Williams*, 530 F.3d at 589. The Seventh Circuit's case law is clear: once a property right is established in contract, university disciplinary proceedings may give rise to a procedural due process violation.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff has properly alleged each of her three claims and respectfully requests that this Court deny Defendants' Motion to Dismiss in its entirety.

Dated:  January 25, 2021.

<div style="margin-left:40%">

Respectfully submitted,

HUTCHINSON BLACK AND COOK, LLC

By:  */s/ John Clune*
    John Clune
    Lauren Groth
    Christopher Ford
    921 Walnut Street, Suite 200
    Boulder, CO  80302
    Telephone: (303) 442-6514
    clune@hbcboulder.com
    groth@hbcboulder.com
    Ford@hbcboulder.com

DAVIS & PLEDL, SC

By:  */s/ Robert Theine Pledl*
    Robert (Rock) Theine Pledl
    Victoria Davis Davila
    1433 N. Water Street – Suite 400
    Milwaukee, WI 53202
    Telephone: (414) 488-1354
    rtp@davisandpledl.com
    vldd@davisandpledl.com

 Attorneys for Plaintiff

</div>