**Chancellor's Decision**
**Appeal of a Non-Academic Misconduct Committee Decision**
**Regarding Quintez Cephus**
**March 13, 2019**

I. **Background**

Chapter 17 of the University of Wisconsin System Administrative Code (UWS 17) governs non-academic misconduct on the University of Wisconsin-Madison campus and authorizes appeals to the Chancellor in certain circumstances. On February 12, 2019, the Office of the Chancellor received an appeal in the above referenced matter from Quintez Cephus, an undergraduate student at the university and the Respondent in this non-academic misconduct case.

This matter involves charges brought against the Respondent alleging that he committed one act of sexual assault and one act of sexual harassment against Complainant 1 and two acts of sexual assault and one act of sexual harassment against Complainant 2, both also undergraduate students. Specifically, it has been alleged that on April 21-22, 2018, Respondent had sexual intercourse with Complainant 1 without her consent and that afterward he created a hostile environment for Complainant 1 through the effects of the sexual assault. Further, it has been alleged that on April 21-22, 2018, Respondent had sexual intercourse with Complainant 2 while he had actual knowledge that she was too intoxicated to give her consent, that he had sexual intercourse with Complainant 2 without her consent, and that he harassed Complainant 2 by creating a hostile environment for her through the effects of the sexual assault.

The allegations were investigated by Lauren Hasselbacher, the university's Title IX Coordinator, who issued the Final Investigative Report on October 9, 2018. In preparing her Report, the Title IX Coordinator interviewed both Complainant 1 and Complainant 2. The Title IX Coordinator offered the same opportunity to Respondent. While Respondent's attorneys submitted written statements from other individuals and legal filings, Respondent declined to participate in an interview with the Title IX Coordinator, stating that it may prejudice him in his pending and parallel criminal proceedings. The Title IX Coordinator also reviewed documents and text messages provided by the Complainants. Following receipt of the Title IX Coordinator's Report and an opportunity to review the Title IX Coordinator's investigative file, Assistant Dean Ervin Cox, the Investigating Officer in this case, issued a letter dated October 30, 2018 charging

1

BOR_020954



Respondent with the following violations of the university's non-academic misconduct code (Chpt. UWS 17, Wis. Admin. Code):

Charges related to Complainant 1:
1. UWS 17.09(2) Sexual Assault: Third Degree defined in s. 940.225(3)(a)
2. UWS 17.09(19) Sexual Harassment: Conduct defined in UW-Madison Policy on Sexual Harassment and Sexual Violence

Charges related to Complainant 2:
1. UWS 17.09(2) Sexual Assault: Second Degree defined in s. 940.225(2)(cm)
2. UWS 17.09(2) Sexual Assault: Third Degree defined in s. 940.225(3)(a)
3. UWS 17.09(19) Sexual Harassment: Conduct defined in UW-Madison Policy on Sexual Harassment and Sexual Violence

The Investigating Officer further recommended a sanction of University Disciplinary Expulsion. UWS 17.11(4)(c)2 requires that a hearing be held in cases involving the sanction of expulsion unless a respondent waives the right to the hearing. Respondent did not waive his right to hearing in this case and, as such, a hearing was scheduled for January 15, 2019. Present at the hearing were members of the Non-academic Misconduct Hearing Committee ("Committee"), legal counsel to the Committee, the Investigating Officer, Complainant 1 and her advisor, Complainant 2 and her advisor, and Respondent and his advisor. The Committee had access to a number of documents submitted by the parties and received oral statements from the Investigating Officer, the Complainants and their advisors, and Respondent's advisor. In addition, the Investigating Officer presented the Title IX Coordinator as a witness and brought Detective Schirmacher from the UW-Madison Police Department (UWPD) to show several security videos.

The parties were informed of the Committee's decision via email immediately following its deliberations on January 15, 2019. A written decision dated January 28, 2019 and containing the Committee's rationale was emailed to the parties on January 29, 2019. The Committee unanimously concluded that a preponderance of evidence existed to find Respondent responsible for violating the following provisions of the non-academic misconduct code:

For Complainant 1: 17.09(2) Sexual Assault Third Degree and 17.09(19) Sexual Harassment
For Complainant 2: 17.09(2) Sexual Assault Third Degree and 17.09(19) Sexual Harassment

2

BOR_020955

The Committee determined that there was not a preponderance of the evidence to support the charge that Respondent violated 17.09(2) Sexual Assault Second Degree regarding Complainant 2. In a 2 (yes) to 1 (no) vote, the Committee upheld the recommended sanction of expulsion. The Committee's decision reviewed the facts as presented at the hearing and explained how the basis for the Committee's conclusions.

## II. Appeal

Respondent's appeal focuses on several challenges to the university's non-academic misconduct process. He suggests that the portions of the process provided for in UWS 17 as applied to his case are inconsistent with federal guidance and that the university did not follow its process in certain aspects. Essentially Respondent argues that the process was unfair, arbitrary and subject to bias such that he was unable to adequately present a defense to the allegations of non-academic misconduct without prejudicing his concurrent criminal case. Accordingly, he claims the Committee's findings and sanction of expulsion should be vacated and he should remain an enrolled student at the university.

## III. Analysis

UWS 17.13 allows for an appeal to the Chancellor in matters involving suspension or expulsion. My consideration of the appeal is based on a review of the record, including all materials submitted as part of the hearing, the audio recording of the hearing, and the Committee's written decision. UWS 17.13 also requires that I sustain the Committee's decision unless I find one or more of the following:

a) The information in the record does not support the findings or decision.
b) Appropriate procedures were not followed which resulted in material prejudice to the respondent or complainant.
c) The decision was based on factors proscribed by state or federal law.

If I make any finding under (a)-(c), I may return the matter for consideration or invoke an appropriate remedy of my own. Under 17.13(3), I must issue a decision within 30 days of receipt of the appeal.

3

BOR_020956

3/23/22, 8:42 AM
Case: 3:20-cv-00856-wmc Document #: 94-7 Filed: 04/06/22 Page 4 of 16
BOR_020954_00179548_Chancellor&#39;s Appeal Decision.pdf

Respondent's submission specifically raises an appeal under both (b) and (c) above and my decision appropriately addresses those bases. My review of Respondent's appeal does not indicate any argument under (a). To the extent one could be interpreted to exist, I find that there is sufficient evidence using the required preponderance of evidence standard under UWS 17.12(4)(f)(3) to support the conclusion that Respondent violated two counts of UWS 17.09(2) and two counts of UWS 17.09(12). After careful consideration of the record and the appeal overall, I find that the Committee's decision must be sustained in its entirety.

The Committee's decision outlines in detail the specific factual findings upon which it based its decision to find Respondent responsible for sexual assault and sexual harassment. A summary of the pertinent findings follows:

- Complainant 1's immediate response to the assault, in reporting the assault to peers, medical staff, and police.
- Consistency of Complainant 1's recollection of the evening during the entire non-academic misconduct process, including reports to police and medical staff hours after the sexual assault, her interview with the Title IX Coordinator during the investigation, and her testimony at the hearing.
- The existence of text message shortly following the incident from Complainant 1 to a friend stating she had been "raped."
- The testimony by a UWPD detective who stated that Complainant 1 appeared to have just been subjected to a traumatic event.
- That Complainant 1 had consented to the sensitive and intrusive Sexual Assault Nurse Exam [SANE] exam.
- The review of the SANE report showed that Complainant 1 had physical injuries consistent with a non-consensual sexual intercourse.
- Complainant 1's recounting to police, medical staff, the Title IX Coordinator, and the Committee of several specific refusals to engage in sexual activity with the Respondent or at his direction.
- Complainant 1's specific recollection of Complainant 2's instances of verbal non-consent to sexual activity by Respondent.

The record supports these findings and the Committee's decision. My analysis of the Respondent's particular claims on appeal follows below.

4

BOR_020957

A. "Guidelines for my appeal as set forth in Ms. Schmidt's January 29, 2019 correspondence are erroneous and seeks [sic] the scope of my appeal as prescribed by UWS 17.13(3)."

While conducting my review and analysis of this appeal, I have remained cognizant of the requirements of UWS 17.13(3). As indicated in the beginning of this section, I have applied the bases for appeal as stated by UWS 17.13(3), not as stated by Ms. Schmidt in her January 29, 2019 correspondence. Further, Ms. Schmidt cited UWS 17.13(3) in her correspondence in a manner in which Respondent and his advisors could easily find, and in fact did find, the appropriate bases for appeal. As a result, Respondent has suffered no harm and the scope of his appeal has not been limited. Therefore, I find this claim without merit.

B. "Procedural errors occurred that adversely impacted the outcome of the hearing."

1. Claim – "The University's failure to hold in abeyance its Title IX investigation pending my criminal trial, stemming from Complainants' allegations was in violation of UWS 17.01."

Respondent alleges that the university's decision to move forward with its non-academic misconduct process before the conclusion of his criminal case violates UWS 17.01 and its statement that "The University of Wisconsin System is committed to respecting students' constitutional rights…." Specifically, Respondent argues that the pending criminal matter prevented him from participating fully in the investigation and deprived him of a meaningful opportunity to be heard.

I do not find merit to Respondent's allegations. Under Title IX, universities have an obligation to perform prompt investigations into sexual harassment and sexual assault allegations.[1] The U.S. Department of Education 2001 Revised Sexual Harassment Guidance directly addresses this issue, stating, "However, because legal standards for criminal investigations are different, police investigations or reports may not be determinative of whether harassment occurred under Title IX and do not relieve the school of its duty to respond promptly and effectively."

---

[1] 20 U.S.C. 1092(f)(8)(B)(iv)(I)(aa); 34 CFR 668.46(k)(2)(i) and (3)(i)(A); DoE 2017 Q&A on Campus Sexual Misconduct (still in effect) Questions 4 and 5 https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf; DoE 2001 Revised Sexual Harassment Guidance (still in effect) https://www2.ed.gov/about/offices/list/ocr/docs/shguide.html

5

BOR_020958

By citing to UWS 17.01, Respondent is presumably claiming that the university has failed in its commitment to respecting students' constitutional rights. He suggests that the university violated his Fifth Amendment right against self-incrimination by refusing to pause its Title IX investigation and hearing until the final disposition of his criminal case. This position is unsupported in the law. A review of federal case law identifies several court decisions addressing the exact issue of whether postponement of a college disciplinary hearing until resolution of related criminal charges is constitutionally required. The courts have specifically rejected this argument and found that a student does not face an unconstitutional choice about whether to testify at a student disciplinary hearing that occurs during a related criminal proceeding. Instead, courts have determined that where a student can remain silent during a hearing and have no adverse inference drawn from the silence, any testimony the student provides is entirely voluntary and no Fifth Amendment concerns are implicated. *See*; *Hart v. Ferris State College,* 557 F.Supp. 1379 (W.D. Mich. 1983), *Gabrilowitz v. Newman*, 582 F.2d 100 (1st Cir. 1978), *DeVita v. Sills,* 422 F.2d 1172, 1178-80 (3rd Cir. 1970) (Fifth Amendment does not require postponement of civil proceedings whenever related criminal charges are pending). Even where a student's testimony at a hearing is considered compelled because of the threat of expulsion, courts have found that any such testimony would not be admissible in the parallel criminal proceeding, and therefore no Fifth Amendment right is implicated. *Furutani v. Ewigleben*, 297 F. Supp. 1163 (N.D. Cal. 1969).

Respondent had numerous opportunities to provide information to the Title IX Coordinator during the initial investigation, including any exculpatory information provided to him by the District Attorney's office that the District Attorney would not provide the University. While Respondent did not accept the request from the Title IX Coordinator to interview him as part of the investigation, the record shows that Respondent provided written statements from other individuals for consideration. Respondent also had an opportunity to testify at the hearing. As indicated in the testimony at hearing and in the Committee's decision, the Investigating Officer and ultimately the Committee respected Respondent's decision to remain silent during the investigatory process and drew no adverse inference from his limited participation. This is consistent with the training provided to the university's student conduct staff and hearing panel members. Likewise, it is consistent with the way courts have interpreted similar situations. Accordingly, I find that Respondent's silence was voluntary and the university did not infringe on his Fifth Amendment rights by conducting a prompt investigation into his conduct, despite the

6

BOR_020959

existence of an ongoing related criminal process. Moreover, Respondent could have testified and provided any necessary information to the investigation, claiming that any information given should not be admissible in his parallel criminal proceeding as has been successfully argued in other court cases.

2. **Claim – "The University's use of the preponderance of the evidence standard was improper and violated the current OCR guidelines."**

UWS 17.12(4)(f)(3) states, in pertinent part, "[a] hearing examiner's or committee's finding of nonacademic misconduct shall be based on one of the following . . . A preponderance of the evidence, regardless of the sanction to be imposed, in all cases of sexual harassment, sexual assault, dating violence, domestic violence, or stalking." Respondent was charged with two counts of second degree sexual assault, one count of third degree sexual assault, and two counts of sexual harassment. As a result, I find that the Hearing Committee complied with the requirements of UWS 17.12 (4)(f)(3) by using the preponderance of the evidence standard. Respondent claims that applying the preponderance standard in UWS 17.12 (4)(f)(3) violates his federal rights because, under the most recent federal Office for Civil Rights (OCR) interim guidance, "The findings of fact and conclusions should be reached by applying either a preponderance of the evidence standard or a clear and convincing evidence standards, as long as the standard for evaluating claims of sexual misconduct is the same as that applied in other student disciplinary hearings."[2] Respondent asserts that since UWS 17.12(4)(f)(1) requires a committee's findings of nonacademic misconduct in cases not involving sexual assault and harassment claims that result in either enrollment restrictions, suspension or expulsion to meet the burden of clear and convincing evidence, so too must findings in cases involving sexual assault and harassment claims. I do not find merit to Respondent's position. As an administrative code provision, UWS 17 maintains the force of law in Wisconsin and as it applies to the university. The Department of Education has not completed its process for issuing new binding rules and the interim guidance is not binding. The university strives to follow the interim guidance but must yield to the provisions of UWS 17 where the guidance conflicts with the provisions of UWS 17. Without formal Department of Education rules requiring a different standard, the university is obligated to have its Title IX proceedings governed and bound by UWS 17 as required by law. Therefore, I find that the use of the preponderance of the evidence standard for findings of fact in Respondent's case was appropriate and in compliance with current law.

---

[2] Q&A on Campus Sexual Misconduct, DEPARTMENT OF EDUCATION, September 2017, https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf, at 5

7

BOR_020960

3. **Claim – "The Investigating Officer, Assistant Dean Cox, violated UWS 17 by allowing two unnamed, unidentified "colleagues" to influence his decision of responsibility."**

Respondent claims that the Investigating Officer violated his responsibilities under 17.05 by consulting with two members of the Office of Student Conduct and Community Standards (OSCCS) about the case prior to issuing his charging decision. There is no provision in UWS 17 that prohibits the OSCCS's practice of Investigating Officers seeking input and review from others prior to making their final decision regarding whether to issue charges. Here, the record clearly establishes that while the Investigating Officer stated that he consulted with two other members of OSCCS, the final decision was that of the Investigating Officer. He issued the notice of charges and presented the case at the hearing. There is no information indicating that the Investigating Officer's actions violated UWS 17.

4. **Claim – "The Chair of the Hearing Panel violated UWS 17.12(4)(b) by refusing to allow my advisor to directly cross examine the Complainants."**

Under UWS 17.12(4)(c)(3), the hearing examiner or committee is granted the authority to "take reasonable steps to maintain order, and to adopt procedures for the questioning of a witness appropriate to the circumstances of that witness's testimony . . ." In this case, the Committee concluded that the most appropriate procedure for Respondent's advisor to question the Complainants was to have the Committee Chair receive the questions from Respondent's advisor and then direct those questions to the intended Complainant. Nothing in the record of the hearing suggests that Respondent and his advisor were prohibited from effectively questioning the Complainants. The hearing recording indicates that the Committee Chair and the Respondent's advisor sat next to each other and carefully discussed the questions to be asked, including at times specific information from Respondent's advisor about what she was trying to accomplish by the particular question to provide context to the Chair about how to ask the question. I find no evidence in the record to support Respondent's claim that the Chair "completely changed the tenure [sic], meaning and effect of respondents' cross-examination questions in such a bias slant in favor of the complainants." Respondent's advisor was free to object to or correct the Chair's phrasing of any of the proposed questions. At no point during the hearing did Respondent's advisor complain about, object to, or correct the phrasing of the questions or the manner in which the Committee chair asked her questions to the Complainants. Respondent asserts that the Chair's statement "Okay. I know your -- your recollection of the hospital is -- is fuzzy. Do you recall

8

interacting with any nurses or receiving medication or anything to that effect?" was inappropriate and "gave the Complainant an explanation for not remembering the details of these critical events...." This allegation is inaccurate and Respondent takes the statement out of context regarding the questions and answers leading up to it. The hearing recording indicates that in the immediate questions leading up to this question, the referenced Complainant had independently stated that she did not remember very much of her time in the hospital. The Chair's later acknowledgement, as part of a question, that the Complainant's memory of the hospital was "fuzzy" did not feed an excuse or explanation to the Complainant as the Complainant had already made it clear that she did not remember much of her time in the hospital. Having reviewed the hearing audio and the requirements of UWS 17, I find no merit to Respondent's claim.

5. **Claim - "The Investigating Officer, Dean Cox violated UWS 17.12(2) by considering, and relying solely on the Complainants [sic] wishes in determining the date of my hearing."**

Respondent claims that the Investigating Officer (Assistant Dean Cox) violated UWS 17.12 when he scheduled the nonacademic misconduct hearing for January 15, 2019 because the Investigating Officer refused to postpone the non-academic misconduct hearing until after the conclusion of Respondent's criminal proceedings. Respondent also claims that the Investigating Officer impermissibly relied too heavily on Complainants' scheduling preferences and did not weigh the Respondent's preferences equally.

UWS 17.12 (2) provides; "If . . . a hearing is required to be scheduled under s. UWS 17.11(4)(c)(2) [as it was in this case] the student affairs officer shall take the necessary steps to convene the hearing and shall schedule it within 15 days of receipt of the request or written report. The hearing shall be conducted within 45 days of receipt of the request or written report, unless a different time period is mutually agreed upon by the respondent and investigating officer, or is ordered or permitted by the hearing examiner or committee." (Emphasis added). The university is also required by certain amendments to the federal Clery Act to designate reasonably prompt timeframes for the major stages of its investigatory and disciplinary procedures for cases involving sexual assault and to treat complainants and respondents equitably through those procedures.

Through a variety of mechanisms, Respondent's advisors sought to delay the university's disciplinary process and hearing until the conclusion of the parallel criminal process. As noted in

9

a previous section of this decision, Respondent is not entitled to postpone the university's disciplinary process until his criminal case is completed. The university, however, is obligated to provide a prompt process and to treat complainants and respondents equitably during that process. Consistent with its obligations, the university expects that parties, their advisors, and others involved in the process will reasonably make themselves available for proposed hearing dates. The Investigating Officer began attempting to schedule the hearing in November 2018 and on November 9 offered Respondent's advisors specific hearing dates in December. On November 12, Respondent's advisors responded by email with a request that the "hearing(s) in question be adjourned until sometime after the New Year." They further cited scheduling conflicts and inadequate time to prepare before then for a hearing due to business travel in November, religious holiday in December, and a trial "scheduled for four (4) days in early January, 2019." They did not identify the specific days in early January. In a November 14 email, the Investigating Officer noted that he had confirmed with the Complainants that they were willing to postpone the hearing until January 2019, but that they wanted to complete the hearing before classes resumed on January 22. As they are parties to the process, Complainants' wishes are taken into account. Considering both parties' requests, the Investigating Officer offered 1/14, 1/15, 1/16, 1/18, 1/22, 1/24, and 1/25 as possible hearing dates.

Respondent's advisors informed the Investigating Officer by email on November 15 that they would review the proposed dates and get back to him. After receiving no further response from Respondent's advisors, the Investigating Officer emailed again on November 26, 2018 indicating he had hearing panels available on January 14, 15, 16, and 18 and asking Respondent's advisors to indicate their availability. Receiving no response again from Respondent's advisors, he emailed them on December 5 indicating the hearings would be scheduled for January 14 and 18. Respondent's advisors emailed the same day indicating that they "were unavailable for the dates set forth in your email below. We will be in California attending a Privilege and Tenure hearing on January 11, 12, 14, and 24th." Since they indicated a conflict on the proposed hearing date of January 14, the Investigating Officer responded on December 5 to offer January 15 as an alternate date while keeping the other hearing set for January 18. The Investigating Officer again received no response and emailed Respondent's advisors on December 11 stating that the hearings would be scheduled for January 15 and 18 because they had not identified any conflicts with those particular hearing dates. He again received no response and opted to email Respondent's advisors on December 18 regarding details for the hearing. Respondent's advisors did not respond until

10

BOR_020963

December 21, at which time they again indicated a work conflict on January 14 and repeated their request to delay the hearing until after the criminal proceedings.

I find that the Investigating Officer made good faith efforts to strike a balance and accommodate the availability of the Committee, the Respondent and his advisors, the Complainants and their advisors, and witnesses in scheduling the hearing. I find no evidence that he scheduled the hearing solely based on the Complainants' wishes. The Investigating Officer accommodated the Respondent's request to wait until after January 1, 2019 to schedule the hearing and accommodated the Complainants' request to complete the hearings before the start of the Spring 2019 semester. In addition, the January 15 and 18 dates did not conflict with the dates Respondent's advisors indicated they were unavailable.

6. **Claim – The University violated my rights by scheduling my hearing for a date that my advisors of choice were not available.**

Respondent claims that he was unfairly prejudiced during the non-academic misconduct hearing itself because the hearing was scheduled for a date on which the advisor of his choice could not attend the hearing. Respondent claims that his advisor of choice could not attend the hearing due to involvement in separate litigation occurring in California on January 11, 12, 14, and 24, and therefore was unable to travel to Wisconsin to be present and provide effective legal counsel for him during the hearing. Further, Respondent asserts that the University intentionally scheduled the hearing on this date to disadvantage him.

I refer to my response in Section (5) above for the timeline of scheduling communications. A review of the hearing record indicates that Respondents claim is factually inaccurate. The hearing was scheduled on a day that was not noted by Respondent's advisors as one for which they had a conflict. One of Respondent's criminal attorneys, Attorney Kathleen Stilling, served as his advisor during the hearing. She noted on the record that she was contacted by Respondent's other attorneys to serve as a last-minute substitute for Respondent's preferred advisor because one of his preferred advisors was currently in California and the other was unable to attend the hearing due to illness. This statement indicates that one of Respondent's advisors of choice intended to participate in the hearing, and would have done so but for an unforeseen illness. Additionally, while Attorney Stilling noted that she was appearing instead of Respondent's chosen advisor, the record shows she did not request any action by the Committee with regard to the hearing. Moreover, the hearing recording indicates that Attorney Stilling was an active participant in the

11

BOR_020964

hearing process raising objections or questions at various times and engaging in cross-examination of witnesses. As his criminal attorney, Attorney Stilling was also familiar with the facts of the case and the legal standards and definitions for the alleged sexual assault violations in that they are based on the criminal statutes. For these reasons, I find that there is no merit to Respondent's claim.

7. **Claim – "The University violated UW-Madison's Policy on Sexual Harassment and Sexual Violence by not allowing my support person to accompany me during the hearing."**

Respondent asserts that he was entitled to have both an advisor and a support person in the hearing, and that the university's refusal to allow the presence of Bishop Tavis Grant as his support person in the hearing room violated university policy. Respondent asserts that his criminal attorney and the Title IX Coordinator agreed that Respondent could have two advisors due to the pending criminal investigation and an ADA accommodation.

UWS 17 clearly provides that the Respondent and Complainant are entitled to a single advisor in the hearing. University policy allows for **one** support person or advisor to accompany both complainants and respondents throughout the investigation and hearing process. The university policy uses the terms support person and advisor interchangeably. Neither complainants nor respondents are entitled to **both** a support person and an advisor during the hearing process. Additionally, the hearing record indicates that the Committee denied Respondent's request in part because it was not made in a timely manner so that the Complainants could also have arranged to have more than one advisor with them as well. Moreover, as this was a closed hearing, there were also confidentiality concerns about allowing more people than necessary to be present for the hearing. The record also indicates that the Committee stated that it was more than willing to allow Respondent to take as many breaks as needed throughout the hearing process in order to get support from Bishop Grant, which I find is a reasonable response to Respondent's last-minute request.

Respondent presents no evidence that the Complainants were accompanied by anyone other than their respective advisors. While in a separate room, they were connected by video conferencing to the Committee, the Respondent and his advisor. In addition, the hearing recording notes at least one occurrence of Ms. Schmidt going back and forth between the hearing room and the separate

12

room for the Complainants to address a technology issue with no concerns expressed regarding the presence of anyone in the separate room other than the Complainants and their advisors.

Regarding Respondent's disability accommodation, he was provided CART real-time captioning at the hearing and the ability to take breaks when needed. Ms. Hasselbacher did not evaluate any ADA accommodation request as part of the Title IX investigative process. The university denied the request for two advisors because Respondent's advisors did not provide any explanation as to how that would mitigate Respondent's disability or provide documentation to support the request, even when offered an additional opportunity to do so. Accordingly, I find no merit to Respondent's claims.

8. **Claim – "The University violated my rights making unilateral decisions concerning how many Hearing panels would be empaneled regarding Dean Cox' [sic] October 30, 2018 findings."**

Respondent asserts that the decision to hold one panel, as opposed to two or more was an arbitrary and unilateral decision by the University. He argues that because of the unilateral nature of the decision, he is entitled to the relief he seeks, namely that the Committee's decision should be vacated.

When notified that there would originally be two panels empaneled to resolve this matter, Respondent's advisors sent a letter on January 4, 2019 objecting to the use of two panels on the grounds that the issues covered in both arose from a single fact pattern and were materially and substantially related. In addition, Respondent's advisors considered the decision to have two separate hearing committees was "simply to increase the University's odds of achieving its preconceived responsibility finding." Acknowledging this objection, the university notified Respondent's advisors that it was granting its request to consolidate the matters into a single hearing before one hearing panel to occur on January 15. Respondent's appeal suggests that this concession to consolidate was also problematic, stating that he did not request one panel, but merely objected to the use of two separate panels.

Respondent's assertion is nonsensical. I find no merit to this claim and believe the university acted reasonably in this matter. When Respondent objected to the use of two panels, the university made an effort to accommodate him by consolidating the original two hearings into one. Respondent did not indicate any concern with that decision until this appeal and his advisors

13

offered no information in the January 4 letter indicating that consolidation would be problematic or inappropriate in their view. Therefore, I find this claim lacks merit.

### 9. Claim – "The University violated my civil rights by the lack of racial diversity throughout the University's Title IX Investigation and adjudication process."

Respondent asserts that he was entitled to a hearing committee composed of his peers to include a black male. The university creates pools for hearing committees from nominations and volunteers from the university's governance bodies for students, faculty, and academic staff for those individuals to serve a specified term. When a hearing committee is necessary, OSCCS sends a request to the pool of panelists to see who is available on the proposed hearing dates and traditionally assigns the first individuals to respond. For more complex cases, OSCCS requires the hearing committee members to have served on a prior hearing committee. All hearing committee members are required to undergo a three-hour training regarding unconscious bias. There is no indication in the record that the university took any action to exclude persons of color from the hearing process.

Further, race is not a valid basis for objecting to hearing panel members. Courts have rejected the argument that racial makeup of a student disciplinary hearing body is evidence of discrimination. *See, e.g., Yusuf v. Vassar College,* 35 F.3d 709 (2d Cir. 1994). Accordingly, I do not find any merit to this claim.

### 10. Claim – "The University's additional procedural violations render their Title IX Investigation and adjudication process inherently untrustworthy and warrant the vacating of the Hearing Panel's findings."

Respondent cites three additional procedural concerns: 1) the Title IX Coordinator ignored or rejected Respondent's request to include his motion to dismiss and accompanying exhibits in the criminal proceedings as part of the investigative report; 2) the Title IX Coordinator used a second investigator to assist her who was a new employee; and 3) the Committee used a script for the hearing which created an unfair and biased hearing process.

I find no merit to any of these claims.

a. During the investigative stage, Respondent submitted to the Title IX Coordinator several legal filings from other related court matters. These documents contained primarily legal argument with some factually substantive information. The materials were included in the investigative file but not specifically appended as an exhibit to the Title IX investigative

14

report that is focused on collecting and summarizing factually substantive information related to the allegations. Not all submitted materials are appended to the final investigative report. Regardless of whether the investigative report incorporated the legal filings, the information was in the Title IX Coordinator's investigative file which is available to the Investigating Officer to review as part of the decision making process in determining whether to issue charges of non-academic misconduct. Respondent concedes that he submitted the referenced materials as part of his contribution to the final hearing packet for consideration by the Committee. There is no evidence that Respondent was prejudiced or adversely impacted because the parties and the Committee were able to review and consider the submission and give it the appropriate weight.

b. Respondent states that the Title IX Coordinator enlisted assistance from a newly hired employee investigator midway in the investigation, but presents no information to explain or identify the issues or concerns. According to the hearing testimony, the investigation started in May, before the additional investigator was hired. The additional investigators started assisting midway in the investigation because that is when she was hired. Respondent's statement provides no basis for an appeal. While the Title IX Coordinator had assistance from another investigator with some aspect of the investigation, the Title IX Coordinator issued the investigative report and provided testimony regarding her investigation at the hearing.

c. Respondent states that the Committee Chair's use of a script at the hearing "demonstrates the unfairness and bias of the hearing process" but fails to provide any support for this claim. The script used by the Committee Chair was included in the hearing packet given in advance to all the parties. The script's purpose at non-academic misconduct hearings is to ensure that the appropriate legal statements are made for the record and to assist the Committee Chair with following the proper order for the hearing.

Respondent's appeal lacks any foundation for these additional allegations of procedural issues. Accordingly, I find no merit to these claims.

IV. **Conclusion**

For all the foregoing reasons, I find that the record supports the Committee's decision that there was a preponderance of the evidence to support the findings that Respondent violated UWS 17.09(2) and UWS 17.09(19) with respect to both Complainant 1 and 2. Further, I find that the process was conducted according to the university's obligations under UWS 17, state and federal

15

BOR_020968

law, and the United States Constitution. As such, I uphold the Committee's decision and recommended sanction of University Disciplinary Expulsion.

As this is the final institutional decision in this matter, Respondent's expulsion from the university is effective as of the date of this decision but the exclusion from campus provisions noted below will not be enforced until March 16. UWS 17.02 defines expulsion as the "termination of student status with resultant loss of all student rights and privileges." Under UWS 17.17, students who are expelled may not enroll in any of the institutions within the University of Wisconsin System and may not be present on any campus within the University of Wisconsin System for any reason without consent of the chief administrative officer of that campus. A copy of this decision will be shared with the Office of Student Conduct and Community Standards, and will become part of the official record in this matter.

Either Complainants or Respondent may seek further review of this decision by the UW System Board of Regents. The Regents may, in their discretion, grant an appeal on the record. (UWS 17.14). Any appeal to the Regents must be submitted in writing to the Board's Executive Director and Corporate Secretary, presently Jess Lathrop. The deadline for filing an appeal with the Regents is fourteen (14) calendar days from the date of this decision. Further information about a potential Regent appeal can be found in the Wisconsin Administrative Code (UWS) Chapter 17, which is available here: https://docs.legis.wisconsin.gov/code/admin_code/uws/17, or by contacting board@uwsa.edu. As noted above, the sanction of expulsion remains in effect notwithstanding any request for further review by the Board of Regents.

Respectfully submitted this 13th day of March 2019,

*Rebecca Blank*
Rebecca M. Blank
Chancellor

BOR_020969