# *Quintez Cephus*
## Case Number 201769601
## Petition for Readmission



**EXHIBIT**
BLANK
9
3/25/22, MVC

# MEYER LAW OFFICE

10 EAST DOTY STREET
SUITE 800
MADISON, WISCONSIN 53703

STEPHEN J. MEYER
ATTORNEY AT LAW

TELEPHONE (608) 255-0911
FACSIMILE (608) 441-5707

August 6, 2019

Chancellor's Office

AUG 0 6 2019

UW-Madison

Rebecca Blank, Chancellor
University of Wisconsin-Madison
Office of the Chancellor
161 Bascom Hall
500 Lincoln Drive
Madison, WI (sent via email: rblank@chancellor.wisc.edu )

> Re: *Quintez Cephus*
> Case number 201769601
> Petition for Readmission

Dear Chancellor Blank,

Pursuant to UWS 17.18, Quintez R. Cephus petitions for re admission to the University of Wisconsin-Madison.  The bases for this petition are set forth below but include new evidence that was developed at the criminal trial held the week of July 29 through August 2, 2019 and in preparation for that trial. It is critical that this petition be addressed as quickly as possible as with the passing of each day, Quintez's ability to attend a Division I university and participate in athletics is compromised if not completely eliminated.  We expect a favorable no later than Thursday, August 8.

## I.  Introduction

### A.  The Verdict

After a week of testimony in the criminal case, a Dane County jury composed of six men and six women deliberated for about 35 minutes before returning a verdict of not guilty to the charges of 2nd degree sexual assault (Complainant 2) and not guilty to the charge of 3rd degree sexual assault (Complainant 1). (Tab 1) Following the verdict, a spokesperson for the jury told the Milwaukee Journal-Sentinel: "We really wanted to say to Quintez that we support you." (Tab 2)

1

Confidential

## B. Summary

The history of the Title IX proceedings are well known. Repeated requests by the advisors to Mr. Cephus to delay the hearing in the matter until completion of the criminal trial were denied even though there was or going to be significant evidence developed for presentation at the criminal trial and at the criminal trial itself. In essence, the evidence heard by the Panel on January 15, 2019 was less extensive than that produced at trial and less authoritative. Some of the best evidence for the defense came from the mouths of the State's witnesses on cross-examination under circumstances where it could be properly done, unlike that at the hearing where the questions were re-worked and controlled by the Committee Chair. In addition, the accusers' lawyers interposed "expert" opinions, not based in fact, about a number of important issues. In contrast, real experts testified at the trial about the issues. Evidence used by Mr. Cephus at the criminal trial that was available to the Panel was limited to the surveillance videos from Sellery and Ogg halls, the departure surveillance video from 1216 Spring St. (the apartment of Mr. Cephus), and the 3:22 a.m. text from ██ to Mr. Cephus asking about her Juul with two heart based affection emoji's. The evidence produced at trial contradicted the State's evidence and included voluminous information on Mr. Cephus's behalf.

That evidence was wide ranging in nature. It included surveillance video from City Cameras on University Avenue and Frances St., interior and exterior surveillance videos from the UU recording the arrival of ██ and MR; the departure of ██ and ██, as well as Quintez, DD, and MR; and surveillance video at the Humbacher apartments located at 1216 Spring St. recording the arrival of all five. There was additional evidence in the nature of statements made by various witnesses, including ██ and ██, the testimony of Mr. Cephus, medical evidence, and other physical, psychological and forensic evidence. While the two complainants manipulated the disclosure of evidence to the police during the investigation and the disclosure of evidence to the Title IX investigator, the trial held them to account for this conduct.

During the course of trial a clear demonstration of racial bias arose. You may recall that during the course of the Title IX proceedings, Mr. Cephus repeatedly asked for a person of color to be involved in the investigation and determination. The inclusion of Ms. Horace appeared to be a transparent attempt to address that issue. Based on Mr. Cephus's direct experience as well as advisor Stephen Meyer, it appeared that Ms. Horace's role was limited to that of being a note taker for Ms. Hasselbacher.

2

Confidential

BOR_018459

### C. The Jump Drive

A jump drive is included with this submission. That jump drive contains **all** of the video which was played at trial. These video excerpts (found on the jump drive under Cephus Exhibits-Prepared Clips) were admitted at trial as Exhibit 1. (The time lines for the excerpts that are not on the video clip itself are set forth in Tab 3—Arrival and Departure time from the Humbacher and detailed time line of Ogg and Sellery introduced at trial through Det. Schirmacher as trial Exh. 91) One of the jurors interviewed yesterday by WKOW, Channel 27, told a reporter, "All of us on the jury support the 'MeToo' movement," but you can't just say that, you have to look at all the evidence and do what is right and fair. (Tab 4). That juror went on to state that "[the] surveillance video and other evidence, combined with witness testimony, convinced her to vote to acquit Cephus." Juror April Weir-Hauptmann asserted "I thought the answer was clear."

Also on the jump drive is the audiovisual testimony given by Jackson Ciancuilli, a friend of ██ and ██. His deposition in lieu of appearance at trial was taken on June 25, 2019. The transcript is also included. (Tab 5). While ██ told Title IX and law enforcement that she was unable to walk straight and was dying drunk after she left Brats bar, Mr. Ciancuilli contradicted the amount ██ claimed to have drank and her claimed physical condition.

## II. The Trial

The press of time does not allow for preparation of the trial transcript. We will recount the evidence at trial while referencing the evidence not available to the Title IX process. The backup material is attached to this submission. Periodically, the backup material will identify ██ as AB, the required acronym during pre-trial proceedings.

██ and ██ became best friends at UW and are still best friends. At the UW, ██ met AJ Taylor and was in an "on again, off again" relationship with AJ Taylor, a black football player. He cheated on her, which is why the relationship would go off for a while. However, even though he saw other girls, he didn't want her to see other guys. She also had a casual "hookup" relationship with Dan Ufearo, a black track athlete. They only got together for sex and they did not date or spend time with friends. (Tab 6) He is the student who received the Snapchat message.

██ is a bigger person – 5"11" and 156 lbs. at the time – and can handle alcohol fairly well. She can handle more alcohol than ██, who is only 5'2" and 115 lbs. ██ often remembers everything or mostly everything after a night of drinking. On the other hand, ██ "always blacks out" and remembers nothing the next day. (Tab 7)(Transcript, Interview of AB/██, p. 50, Exhibit 41 at trial). ██ knew that because ██ was her best

3

BOR_018460

friend.

**April 21, 2018**

AJ asked ▮ to go bowling with him and friends. She initially thought it was a date but then two teammates from the football team showed up. ▮ and Quintez discussed the idea of *"setting up"* friends with Quintez and DD (Tab 7, Tr. p. 4). ▮ told Quintez "I'll set you up with my best friends ▮▮▮▮". She told DD "I'll **set you up** with my friend Marissa" and think you will get along really well. ▮ said that she told Quintez that she was **setting him up** with her best friend. (Tab 7, Tr. p. 7). I was **setting up** Danny and Q with my friends ▮▮▮▮ and Marissa (Id., Tr. p. 7). At trial ▮ tried to characterize these attempts as "introducing the parties" but was impeached with the contents of earlier interview with Detective Johnson. (Id.) ▮ clearly believed that AJ would be there that night as her companion. She really wanted to hang out with AJ but he never showed.

**Texting plans**

▮ admitted texting ▮ and MR during the afternoon and telling ▮ and MR that she was setting them up with AJ's teammates. DD testified that ▮ was on her phone constantly at bowling making these plans. There was already an idea that everyone would go back to Quintez's apt at the end of the night. ▮ and ▮ discussed the possibility that there might be a hook up with ▮ and Quintez before they all got together. ▮ believed there was a possibility of a "hook up" between ▮▮▮▮ (Tab 7, Tr. at 41). ▮ also told police there was a discussion about not having to hookup. It was clear this was a discussion about hooking up.

**Manipulation of the process – selecting texts**

During the police investigation the girls did not show the police texts between the girls when they discussed plans for the night and where they discussed the possibility of a hook up between ▮ and Quintez. The police never asked for them. They only asked for ▮ and ▮ to give them what they thought was relevant. Testimony by ▮ at trial established that she showed the police an Instagram message from Quintez and made a point about of telling the detective that she had not responded to it. She withheld from the police the 3:22 a.m. Juul text, did not tell them about it and admitted at trial that she had deleted texts related to the case. (Tab 8)

**Pre-gaming**

Jackson Cianciulli testified that he was with ▮ in the dorms and ▮ only had one or two miniature bottles of wine while pre-gaming. (Tab 5, Tr. at 7) He also testified that she was in better shape than many of their other friends. (Tab 5, Tr. at 10-11) In contrast,

4

██ testified that she was already drunk before left to go to Brats (1st bar) (Tab 7, Tr. at 25). She told police that it would have been obvious to everyone that she was drunk. (Tab 7, Tr. at 26). She referred to it as "dying," but clarified at trial that she was not actually in the process of dying. She asserted that she could not walk straight, said a lot of weird things, and laughed a lot (Tab 7, Tr. at 49).   Summarizing to the contrary, Ciancuilli testified that ██ was not stumbling or falling down, her speech was not slurred and made sense when conversing. (Tab 5, Tr. at 27)

Brats

██ claimed that she got even drunker at Brats than she was at the dorms. However, Cianciulli also testified that he had seen ██ drunk before, and when he last saw her at 10:30 p.m., she looked fine and normal for someone who had been drinking and that she appeared less drunk to him than their other friends and less drunk than he had seen her at other times. (Tab 5, Tr. at 10-11) On cross-examination, ██ conceded that she did not trip or fall while walking to the UU and after watching a video (Jump drive, Prepared clips, UU outside, Camera 6 entering line) conceded that she was able to walk a pretty straight line while texting, that she spotted Quintez and DD a half block away and that she was able to get through barriers without tripping. (Jump drive, Prepared Clips, Fluno-UU, Fluno 1, leaving line-circle at 11:40 p.m.)(Tab 7, Tr. at 6) She and Marissa met Quintez and DD at the door and they got in. (Prepared Clips, Fluno -UU, Fluno 1 leaving line and UU Outside, Camera 16 leaving line and Camera 15 entering at main door) Quintez testified that he saw ██ with one drink throughout the 40 minutes they were together, saw ██ with one beer during the same time and did not see them drink anything else. He did not believe either girl was drunk as they didn't slur their words, stumble or appear confused or unable to communicate clearly. He did not buy them any drinks or have any alcohol at the house. DD, ██ and ██ confirmed that. Both Quintez and DD testified that Quintez does not drink alcohol.

Before ██ and Marissa left Brats to meet Quintez and DD at the UU, he had invited ██ to come over to the apartment to hang out after the bars. She replied "Yes!". (Tab 9, p.4-text exchange at 9:57 p.m., Exhibit 42 at trial) (Tab 7, Tr. at 6).

██████'s reaction to Q

██ was instantly attracted to Quintez. She said "Kiss me" to him.  (Tab 7, tr. at 8). At the trial several pictures of ██ and Quintez dancing were shown to Marissa and she testified that the pictures demonstrated the "body language" that she had felt was flirtatious. (Exhibits 51-53 at trial, only one of which used as Attachment D to the initial investigative report filed by Ms. Hasselbacher) She based this opinion on the way they were dancing, most likely the behavior depicted in the pictures. Quintez testified that ██ was feeling his butt and leaning against him in the bar. Marissa also testified that she

5

thought ██ was flirting with Quintez at the bar. (Tab 10, MR interview, p.30)

AJ

██ always assumed that AJ would come to the bar with Quintez and DD. She was very disappointed that he did not come. She started by texting him from the dorms with pair of lips in a kiss at 9:09 p.m. When he did not respond, she messaged him from Brats at 10:20 p.m. to ask if he was going out. He did not respond until 12:00 a.m. when she texted him a picture of herself with Eric Burrell. Then he wrote one word – "Aye". The she said to come to the UU, "Plz" to which he replied "Aight". She wrote "Plz" again and he did not respond at all until almost 1:41 when she was at Quintez's apartment, after the sexual encounter. (Attachment B to the initial investigative report) ██ claimed at trial that she didn't think he was with another girl but then admitted she learned later he was. She tried to get Dan Ufearo to come out but she was unsuccessful with him as well. ██ denied trying to convince Dan to come out that night but Ufearo testified that she did contact him and he told her 'No."

The "Victory" Lap

During the entire trip from the UU to Quintez's apartment, ██ held his hand, linked arms with him or had her arm around him. The surveillance videos from Frances Street verified that ██ did not need any assistance and wanted to maintain physical contact. At the trial both ██ and Marissa testified that ██ walked backwards for a period of time on Frances Street. The video confirmed this fact.  Everyone else ambulates without difficulty. (See Jump drive, Prepared Clips, Frances-Highlighted)

Evidence at trial also included the surveillance video from the Humbahcer apartment. This demonstrates that as ██ and ██ enter the Humbacher and head to Apt. 201, they both ambulated down stairs and halls without difficulty—not needing the use of any railing. ██ and DD skipped down the hall without stumbling and ██ half carries DD (200 lbs.) on her back without falling. On the way down the hall to Quintez's apartment, ██ is seen leaning back and flashing a "V" for victory sign to ██ as she holds Quintez by the arm. They enter the apartment. (See Jump Drive, Prepared Clips, Spring St. Arrival- all clips viewed sequentially) (Still Shot of "V" is at Tab 11)

Quintez testified that he believed that that ██ was interested in him, too. She had told him how handsome he was more than once during the afternoon while AJ was bowling. DD confirmed ██'s flirtations with Quintez. She rubbed his neck in the car at which point he reached back and held her hand, something she described to the investigator. When they got in the apartment, ██ quickly asked him to show her his room. She walked back and he followed. At the door he turned and asked ██ if she wanted to join them and she said, "Yes." She came into the room and laid on the bed. Meanwhile, ██

6

BOR_018463

undressed and got on the bed.

Quintez also testified that he confined the sex acts to what they requested and volunteered to the police that he put his hand on ██'s neck because she asked him to do that. AJ confirmed in his statement that she enjoyed this activity (previously provided to the Title IX investigator, an edited excerpt of that statement appears in the investigative report and the AJ is identified as Witness 6—complete interview is attached as Tab 12). Dan Ufearo confirmed that rear entry sex was ██'s favorite position (Tab 3) and Quintez testified that he was just going along with what she wanted. ██ testified that she asked him if he had a condom but could not remember the answer. Quintez testified that he used a separate condom with both ██ and ██ and that both girls asked him if he had a condom before they had sex. This answer was corroborated by the DNA expert, Lauren Schubert, who testified that the very small amounts of DNA were consistent with the use of a condom. The police also testified that Quintez pointed out two condoms, which they recovered.

**Apartment**

██ told police and testified that she remembered nothing from the car ride until finding herself naked in bed. She had no idea how she got in the apartment, how she got in the room, how she got in the bed, how her clothes came off or how she got from the bed to the floor. In contrast she gave a high degree of detail about the sex acts. In short, she was only lacking in memory about the points in time when she would be making a decision to move forward with sex. She was wearing a sheer, sparkly top made of stretchy net. She testified that she did not take it off even though she had no memory about how it came off. The top was displayed to the jury and was very form fitting and fragile. There was one very small hole at the neck and no other damage. The lack of damage was inconsistent with her claim that someone had taken it off her limp dead weight body.

Although ██ testified that she had no memory of how she got in the bedroom, she gave an explanation to Oliver Gannon at 2:50 am. (State Discovery, Bate stamp 33-34). She told Gannon that Quintez made her and ██ go into his bedroom, forced them on the bed and tried to talk them into a threesome. She denied saying that at trial and was impeached. At 3:05 a.m., she told PO Leeper that Quintez invited them into his room. (Lepper UWPD 3:00 am (State Discovery, Bate stamp 119)). She denied that statement and was impeached at trial.

UWPO Lepper was asked at trial whether he made any observations about signs of intoxication. He said he had not seen any evidence of intoxication after consulting his report. He also did not observe any sign that ██ was ill or noticed any indication that she had vomited in her room as she claimed in her testimony and to the police. Oliver

7

BOR_018464

Gannon, who was with her the entire time, also never said he witnessed any vomiting. The signs of "trauma" may have been simply her reluctance to talk with the officer and indeed her statement was inconsistent with her later claims of non-memory. ▮▮ also testified that both Gannon and Lepper were wrong when they said that she gave an explanation as to how she got into Quintez' bedroom.

In contrast, PO Needelman saw ▮▮ at Meriter hospital at 5:30 a.m. and said she appeared highly intoxicated, pointing to the smell of alcohol and slurred speech. He testified that if he had known that another officer had seen her 2-3 hours earlier and seen nothing to suggest intoxication, he might have considered that she was a reluctant witness. He conceded the smell of alcohol was not a definitive sign of intoxication and reflected more about oral hygiene.

**▮▮ Injuries were superficial and would require no treatment**

When ▮▮ arrived at Meriter Hospital a nurse took her vitals and pain assessment at about 4 a.m. (Tab 13-Schmidtke ER notes). The only pain ▮▮ reported was a headache at level 3. No vaginal pain was reported. (Id.) A nurse later performed an FNE exam. The blood test for alcohol taken as part of the exam and the urine sample, tested for drugs, came back negative. ▮▮ was able to remember Quintez's name, grade status, and other information about him. (She later claimed she could not remember if his name was Quintel or Quintez). (Tab 7, Tr. at 17). The nurse performed an exam which she described as being very similar to a pelvic exam that women receive on a yearly basis. She found a small tear, and 4 small abrasions, two very close to the tear and two near the urethra. At trial, Dr. Timothy Raichle testified. He is an OB/GYN whose curriculum vitae has been attached. He testifies occasionally but his primary (99%) of his employment involves seeing women in a clinical practice. He testified that ▮▮'s tear was very small, roughly the size of the top of a Qtip and the nearby abrasions were even smaller. He also testified that the two bumps near the urethra did not appear to be abrasions at all but merely bumps of some kind. He sees many women with the same kinds of injuries, in the same locations, after consensual sex. In fact, unlike the FNE nurse, who only sees patients reporting an assault, Dr. Raichle sees many women with similar injuries who are reporting consensual sex. **Contrary to the findings in the Title IX decision, the doctor testified unrebutted that there is no reliable pattern of injuries that demonstrates whether the sex is consensual or non-consensual.** Any studies to the contrary have flaws that render them unreliable. The consensus in the research is that there is no pattern that tells the examiner what is consensual or non-consensual. In her testimony the FNE nurse agreed with that opinion. Dr. Raichle's opinion is consistent with what the literature has demonstrated many times and is consistent with what he has seen in his clinical practice.   (Tab 14, CV of Dr. Raichle and pretrial submission describing his testimony.

8

Back to the Apartment

It also came out at trial that the long Snapchat message ▮▮ sent to Dan Ufearo at 1:13 a.m. contained a number of other entries including nonsense and things unconnected with the idea of rape. ▮▮ also testified that she was in Quintez's bed and that she had no reason to believe he had attempted to stop her from texting or take away her phone. The room was dark and the phone would have lit up the room, making it obvious what she was doing. Even more remarkable, it appears that Quintez was also texting. He was answering a text from a friend and trying to text and call DD at 1:13 to 1:16 a.m., the same time as ▮▮ was drafting and sending her Snapchat to Dan Ufearo. (Tab 15, Extraction Report of forensic download of Quintez's phone provided to defense counsel on July 25, 2019)

Dan Ufearo had no idea why she would have written to him if there was an emergency because they were not close. ▮▮ conceded at trial that she could have dialed 911 or hit her emergency button but she did not want police involvement. She also conceded that she knew that Marissa was in the apartment and had a phone. The texts she sent throughout the night when she claimed to be dying were coherent and logical. In addition, she consistently corrected her errors on the following lines.

▮▮ claimed at trial to be "passed out" on the floor after the sex but then said that she might have simply been sleeping. She was aroused by the sound of a phone camera clicking and the flash of light. Both Dr. Thomson, the psychologist, and the FNE nurse testified that it was unlikely that she would have been easily aroused by a soft sound if she were passed out. (Tab 16, CV of Dr. Thomson and pretrial submission describing testimony)

Instead, she immediately jumped up and confronted the two men. She testified that she demanded that they delete the picture, delete the trash and show her it was gone. They sheepishly complied with her request. She testified that she cursed at Quintez, used tough language and showed her anger at the picture, not a word was said about an assault. ▮▮ got dressed and sat in the living room with DD and Quintez, talking. DD testified that ▮▮ was saying things like "I am mad at myself for hooking up with Q", "You will think I am a slut", "AJ is going to find out". Quintez tried to reassure her by telling her that "We won't tell AJ", meaning Quintez and DD. She was quite upset but calmed down after a while.

Quintez testified that he went back in the room to tell ▮▮ that her friend was crying and he should take them home. ▮▮ asked him to come back to bed and he did. They started making out again and ▮▮ entered and told ▮▮ had to leave right now. Quintez said to come back in 20 minutes and ▮▮ said "What do you need 20 minutes for?" and ▮▮ said "Sex." ▮▮ testified that the two statements were not made together, however, she was

9

BOR_018466

impeached by her earlier interview with Det. Johnson. (Tab 7, Tr. at 12-13) The testimony was that after a few minutes of the girls going back and forth, Quintez told ■ to leave and asked DD to come get her. ■ said to ■ "Are you really going to have sex with someone who just talked to me like that?" (not after the way he assaulted us) and stormed out. (Id. at 13)

■ told Quintez, words to the effect, that's the way ■ gets and she had better leave. She dressed, grabbed her phone, called an Uber and left. As she exited the apartment, she said "Don't be mad at me" to ■. There is substantial video of ■ showing her physical competence shortly after ■ claims that ■'s eyes were rolling back in her head, her arms were limp, and she looked possessed. In her statement, ■ said she left the room with DD, "then" ■ ran out. There is little doubt that only a few minutes passed. ■■■■ testified that as ■ ran out, she said "I could kill someone!". There seemed little doubt that the someone was ■.

Marissa was interviewed and a transcript prepared. She said that her impression was that the girls were arguing with each other. She thought both were flirting with Quintez and had no idea anything was wrong until the girls argued. (Tab 10, Tr. at 30-31) She testified that when ■ left the car that ■ was not upset but "not polite". She also said that ■ "usually" doesn't end her nights well. (Id. at 28) She tried to take that statement back but at trial, she conceded that "usually" in her mind means a pattern of something.

After ■ left, Quintez ran out after her but did not realize that she had run down the stairs. In fact, ■ left the apartment at 2:28 a.m., ran down three half flights of stairs, down a short hall, and up another short flight before exiting the back door. ■ then found herself in a parking lot and had to navigate her way to the Uber over on Dayton almost a block away. She did all this in 2 minutes. (Tab 16, Introduced at trial as Exhibits 76-82)

**To Ogg and Sellery**

■ arrived at the dorm, found the key card, and keyed herself into the elevator without missing a beat. She made it to her room by 2:40 a.m. Quintez, DD and Marissa arrived 2 minutes later and ■ had already changed clothes and started making mac n cheese. They spent about a half hour chatting in ■'s room and then they left. After the three students left, ■ reached out to Quintez and texted "Hi", then she texted about sleeping, asked him to let her know if he found her Juul, and closed with a kissy face emoji and a heart. She did not conclude her texts to him until 3:23 a.m. forty-five minutes after she arrived home.

Meanwhile, ■, who did not go with them to check on ■, text her or try to help her fellow "rape victim" in any way, went back to her floor in Ogg hall. MR had told police

10

BOR_018467

that ▮ wasn't upset but "not polite" (Tab 10, Tr. at 29). She looked competent and smooth, not drunk, as she navigated the halls and elevator. The investigator noted that ▮ had her arms wrapped around herself. The temperature outside was 32 degrees Fahrenheit so that is not surprising. (Tab 19)(See also Jump Drive, Prepared Clips, Fluno 1-UU and UU Outside, Cameras 15 (entering at main door) and 16 (leaving line)).

▮ ran into Oliver Gannon who saw she was upset. He asked what was wrong and she insisted on going to her room before disclosing. Gannon did not think she was very intoxicated and described her as "buzzed" to the investigator. He never said she was traumatized at trial but just upset. No one but ▮ says she vomited or noticed that there was vomit in the room. Gannon was with her the whole time and never said anything about it, nor did PO Leeper. She barely knew Gannon and told him a story of rape because the threesome where she came second, the revenge hookup that she found embarrassing, the guy she really liked who had ditched her for another girl were not things you tell a stranger. What she did not know is that he would get the police involved despite her objection. ▮ did not make a quick report Gannon did. ▮ thought she could just talk to Gannon and it would go no further. Once he got the police involved things got out of her control.

**Meriter Hospital**

At the hospital, ▮ managed to avoid giving a complete statement to the police until after she woke ▮, found out she had blacked out like she often did and filled her in. ▮ was probably confused to find the 3:14 a.m. series of texts to and from Quintez with the emoji's. So she deleted them and never told the officers about them. She showed them the text from Quintez earlier in the day that she did not answer but not the ones where she coyly reached out to Quintez after their encounter. Who knows what else ▮ and ▮ deleted?

The Meriter medical records had a number of interesting features. As noted in the emergency room, ▮ reported only a 3 level of pain to her head, none in the vaginal area. (Tab 13) She was asked about her history that night of neurological events and reported no slurring, no loss of consciousness, no paralysis, no dizziness, and no weakness. This is in contrast to symptoms she reported to the police and testified to at trial.

▮ reported to the hospital and went thru a FNE exam as her friend suggested. She has only a few fragments of memory. Dr. Thompson, a board certified forensic psychologist, testified that alcohol disrupts the movement of memory from working memory to long term storage. Thus, a person is not necessarily incapacitated just because they don't remember events after consuming alcohol. Alcohol affects memory before it affects gross and fine motor skills, therefore someone can appear to be acting in a purposeful

11

BOR_018468

and intentional way but not remember the events later. Other people observing them may not even know that the person is in a black out because they may talk, walk and do complex actions in an apparently normal way.

Dr. Thompson also testified that it is possible for someone to have an impact on someone's memory. Post event information told to someone can incorporate with the memory "gist" or thread and create a new memory. Negative information given to someone can also impact memory. Thus, ██'s memory of being scared, rather than angry, likely came from ██'s story about the alleged assault.

When Quintez, DD and Marissa arrived at 2:42 a.m., the events of the night were still in ██'s working memory so she invited them in, sat and chatted and made an effort to set up a connection with Quintez for the future. By 7:00 a.m., when ██ called, it was all gone. ██ knew ██ blacked out frequently and was able to take advantage of that fact. ██ would black out frequently (as much as 2-3 times a month) even after she switched to beer to lessen the frequency of her blackouts.

██'s behavior after the so-called rape strongly suggests that there was no rape. She did not ask anyone to go check on ██ even though she knew the "rapist" was in her room. She did not ask Gannon to help ██, she did not even confirm that ██ was the other "victim" to UW PO Lepper, his report says "*Possibly* ██ ██". ██ did not call her or text her until the morning when she knew from experience that ██ would have blacked out. If ██ had told the police to check on ██ right away at 3:05, Quintez and the others would have been there. If they had been alerted any time before 3:23 a.m. when she quit texting Quintez, ██ would have remembered that she liked him and had a good experience with Quintez. In fact, at 2:55 a.m. the 911 dispatcher asked whether the assailant was still in the area and was told no by Gannon on behalf of ██. That was a lie. She knew that Quintez, DD and Marissa were in the dorm next door in ██'s room. ██ knew ██ didn't need help.

At the hearing and in the hearing packet, ██ repeated several times that ██ told her that DD took a picture of her when she was in the nude and passed out on the bed. That was a lie. ██ had previously told Det. Johnson that ██ was completely covered and only her hair was showing. (Tab 7, Tr. at 11)

**Quintez's Cooperation**

During the afternoon of April 22nd, Det. Johnson called Quintez on his cell phone and said she needed him to return because she needed to speak with him. She refused to identify the reason. He told her he would be back in the afternoon. When he contacted Coach Gilmore, he was told to cooperate with the police and tell the truth. There was no effort by the Athletic Department to shield Quintez or to interfere with the

12

BOR_018469

investigation. He returned home and agreed to an interview without counsel after being read his Miranda rights. He answered all the questions she asked him and then signed consent forms for a buccal swab (DNA), the search of his apartment and seizure of any evidence, and the search and seizure of his phone. (Tab 18) He provided the pass code to the phone to make the examination easier. He also showed the police the location of the condoms he used with the complainants. In short, he did everything they asked of him, unlike the complainants, who hid and destroyed evidence and lied about key aspects of the investigation. (The argument between the girls, inconsistent statements, a naked ■ in the picture, flirting with Quintez, discussing a hookup before they went out, ■'s condition at the apartment, ■'s level of intoxication to name a few).

**Racial Bias**

Race entered the investigation early. The Rape Crisis Counselor apparently was joking with ■ about Q's name. "We've been joking about what's the worst name yet?" (Tab 7, Tr. at 18). Det. Johnson then chimed in saying – "People make stuff up right?", meaning black people. If that were not clear enough, Det. Johnson explained, "I mean some of these people, I'm like what? "What was your mom thinking?" Det. Johnson testified that she thought everyone laughed, including herself, ■, and the Rape Crisis Advocate.

During testimony, the state had ■ read for the court the text exchanges between herself and Quintez that took place before they met at the UU. (Tab 9).  While reading Quintez's texts, ■ used a fake southern drawl.

**Quintez's testimony at trial and ■'s Selective memory**

At trial, Quintez testified that the two girls gave consent to all the activities. They had intercourse and he used a separate condom with each girl. He did not attempt to force oral sex or to force the girls to interact with each other sexually. In fact, his testimony was consistent with his statement to the police and his constant assertion of innocence.

In contrast, ■ had a selective memory of only the events that supported the claim of assault and "forgot" all the transitions that would have demonstrated her consent or the argument with ■. Her testimony that ■ was "passed out" at Quintez's apartment was rebutted by the video of her dashing out of the apartment fully dressed and calmly and collectedly walking into the dorm. The quick timing with which ■ accomplished a series of complex activities further rebuts ■'s claim. ■'s behavior in failing to summon help for her friend (the second "victim"), failing to even tell the police who she was for hours, and waiting until she talked to ■ to confirm the blackout to give a full statement demonstrate her dishonesty. ■ probably does not remember much but she destroyed evidence that contradicted ■'s claim of assault and did not tell law enforcement about it.

13

Confidential

Similarly, ■ never told the committee about the argument with ■ or ■'s plea not to be mad at her. She never told the committee that she said "Are you really going have sex with him after the way he talked to me?" even though she told the police about it. No one ever mentioned the laughter about the funny names "these people" give their children. The State refused to turn the reports over to the university. **Now that the whole story is out in the open, the university should take a careful and close look at the entire body of evidence without the implicit and explicit racial and gender bias that permeated the police and university investigation. Both cases depended on the stereotype that black males are sexually aggressive and don't care about the willingness of their partners to have sex. The jury rejected the stereotype and so should the university.**

Conclusion

Quintez Cephus deserves to be re-instated as a student at the University of Wisconsin in good standing with the finding of responsibility and the sanctions vacated.

Thank you.

Sincerely,

/s/ *Stephen J. Meyer*

Stephen J. Meyer

/s/ *Kathleen Stilling*

Kathleen Stilling

/s/ *Quintez R. Cephus*

Quintez Cephus

14

BOR_018471