**From:** ▮▮▮▮▮▮▮▮ <▮▮▮▮▮▮▮▮gmail.com>
**Sent:** Mon, 08 Mar 2021 18:05:40 -0600
**To:** ▮▮▮▮▮▮yahoo.com
**Subject:** oh
**Attachments:**
· Quintez-Cephus-Complaint 2021.pdf *(873 kb)*

DOE 0215

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

QUINTEZ CEPHUS,

      Plaintiff,

    v.                                Case No. _3:21-CV-126

BOARD OF REGENTS OF THE
UNIVERSITY OF WISCONSIN SYSTEM,
LAUREN HASSELBACHER, in her
individual and official capacity, and
REBECCA BLANK, in her individual
and official capacity,

      Defendants.

---

## COMPLAINT AND JURY DEMAND

---

      Plaintiff Quintez Cephus (hereinafter referred to as "Plaintiff"), by his attorneys Nesenoff & Miltenberg, LLP, and Gimbel, Reilly, Guerin & Brown, LLP, as and for his complaint against Defendants the Board of Regents of the University of Wisconsin System ("UW-Madison" or the "University"), Lauren Hasselbacher ("Hasselbacher"), and Rebecca Blank ("Blank") (hereinafter collectively referred to as "Defendants"), respectfully alleges as follows:

### <u>THE NATURE OF THE ACTION</u>

    1.    Plaintiff is an innocent male who has been used as a scapegoat by UW-Madison, seeking to push for harsh male prosecutions in order to remedy its long-standing failure to address sexual assault complaints in the past. Plaintiff, being a well-known college football player on campus, was the perfect candidate for the University to prove its investigative efforts and punish accused males in a high-profile way.

1

DOE 0216

2. An egregious miscarriage of justice was committed against Plaintiff when he was subjected to a rushed, flawed and biased Title IX sexual misconduct process, which was carried out under the presumption of Plaintiff's guilt. The University refused to stay the Title IX disciplinary investigation against Plaintiff despite knowing that a concurrent criminal case stemming from the same allegations was ongoing and that relevant and exculpatory evidence was in the possession of the state prosecutor, which would not be released until after the criminal matter was closed.

3. The University even acknowledged the fact that it had previously *attempted to obtain* said critical evidence from the District Attorney's Office, but was advised that the evidence could not be obtained for use in the University proceeding until the resolution of the criminal proceeding. In short, the University had *actual knowledge* that it lacked the relevant evidence to proceed forward with the University disciplinary hearing, yet refused to stay the proceedings and instead moved forward with a wholly one-sided record. The University may hold itself out to promote fairness in its proceedings, yet took the opportunity to plow ahead in order to improperly find Plaintiff guilty, a conclusion that could have never been plausibly been reached had the University stayed the proceeding to incorporate *all* of the relevant evidence.

4. On May 31, 2018, Plaintiff was notified by Defendant Hasselbacher that the University was initiating an investigation concerning a consensual sexual encounter that took place in the early morning of April 22, 2018, between Plaintiff and two female University of Wisconsin students (hereinafter, "Complainant 1" and "Complainant 2"). That same month, Plaintiff learned that the Dane County District Attorney was investigating allegations against him arising from the same events.

2

5.      From the start, the University's Title IX investigation was plagued with bias and a lack of transparency. For example, the credibility of Complainant 1 and Complainant 2 was never questioned by University investigators, but instead their claims were consistently taken at face value. This is because UW-Madison officials are guided by principles of trauma-informed investigatory techniques, which discourages thorough questioning of complainants in the sexual misconduct process to avoid "further trauma."

6.      In Plaintiff's case, the Title IX investigator attributed full credibility to the varying statements of Complainant 1 and Complainant 2. Moreover, Complainant 1 and Complainant 2 were permitted to cherry-pick what pieces of evidence to hand over to the investigator, clearly holding back evidence which would point to Plaintiff's innocence, without ever being questioned by the investigators as to whether there was more evidence.

7.      While the Title IX investigators readily accepted any evidence that Complainant 1 and Complainant 2 would hand over, they refused to take into account that there was an abundance of evidence obtained in the criminal investigation that could be available to them upon the conclusion of the criminal proceeding. Despite numerous requests from the Plaintiff, the University refused to stay the proceeding and continued the investigation without obtaining relevant, exculpatory evidence.

8.      Nevertheless, the University proceeded forward, issuing a final investigative report and holding a hearing based off of the one-sided record. Plaintiff was subsequently found responsible due to his inability to defend himself and expelled from the University, notwithstanding the fact that the University *knew* it did not consider all of the relevant evidence.

9.      Plaintiff's case highlights the problem of colleges and universities, including UW-Madison, investigating and adjudicating allegations against students prior to the conclusion of a

Doe Deposition Exhibit 3 - 4

DOE 0218

parallel criminal case, and the dangers that arise when colleges and universities usurp the role of law enforcement and impose harsh sanctions where all of the evidence has not been taken into account. Although the Department of Education's Title IX regulations generally permit a school to respond even while a criminal investigation is pending, Plaintiff's situation is unique in that UW was expressly aware that the prosecutor had considerable relevant evidence, including photos and video footage from that night, and that such evidence would not be released until after the trial.

10.     Had the University investigators waited until the end of Plaintiff's criminal trial, they would have been able to evaluate *all* of the relevant evidence that was gathered in the case, and not just the limited, skewed, and deliberately sparse evidence submitted by the Complainants to the University. Indeed, the full evidence collected in the criminal trial was so plainly exculpatory that it resulted in Plaintiff being acquitted on all charges after a remarkably short jury deliberation of just ***thirty minutes***.

11.     Indeed, the evidence that the University could have had so plainly demonstrated Plaintiff's innocence that following Plaintiff's acquittal in the criminal matter, the University almost immediately *reversed Plaintiff's expulsion, thereby admitting its prior decision was made in error.* Notably, the University made this decision based upon the very evidence that could have been in the University's possession had the University proceeding been stayed, as requested by Plaintiff numerous times.

12.     Instead, the University rushed to judgment on a matter for which it knew there was additional, relevant evidence, eager to harshly punish Plaintiff in order to prove that it takes allegations of sexual assault seriously, after being criticized for years for purportedly failing to do so.

4

DOE 0219

13.     UW-Madison's investigation and adjudication of Complainant 1 and Complainant 2's allegations were tainted by gender bias resulting from federal and local pressure to protect female victims of sexual violence, and to reform UW-Madison's policies to take a hard line against male students accused of sexual misconduct. As a result, Plaintiff was deprived of a fair and impartial hearing with adequate due process protections, as mandated by the United States Constitution.

14.     Plaintiff therefore brings this action to obtain relief based on claims for violation of his Fourteenth Amendment Procedural Due Process rights, violation of Title IX of the Education Amendments of 1972, and state law breach of contract.

## THE PARTIES

15.     Plaintiff is a natural person and a resident of the state of Georgia.

16.     Defendant Board of Regents of the University of Wisconsin System consists of eighteen members who are responsible for establishing policies and rules that govern the University System. It is governed by Chapter 36 of the Wisconsin Statutes.

17.     Defendant Hasselbacher is a natural person and, upon information and belief, a resident of the State of Wisconsin. Hasselbacher was the Title IX Coordinator of the University of Wisconsin-Madison at all relevant times herein.

18.     Defendant Blank is a natural person and, upon information and belief, a resident of the State of Wisconsin. Blank was the Chancellor of the University of Wisconsin-Madison at all relevant times herein. As Chancellor, Blank was responsible for implementing the policies and procedures pursuant to which the investigation against Plaintiff was to be carried out, and was the decision-maker for Plaintiff's appeal.

5

DOE 0220

## JURISDICTION AND VENUE

19.     This Court has federal question and diversity jurisdiction pursuant to 28 U.S.C. § 1331 and § 1332 because (i) the federal law claims arise under the constitution and statutes of the United States; and (ii) Plaintiff and Defendants are citizens of different states.

20.     This Court has personal jurisdiction over Defendant Board of Regents on the ground that it is conducting business within the State of Wisconsin.

21.     This Court has personal jurisdiction over Defendant Hasselbacher on the ground that she was employed by University of Wisconsin-Madison as Title IX Coordinator at all relevant times herein.

22.     This Court has personal jurisdiction over Defendant Blank on the ground that she was employed by University of Wisconsin-Madison as Chancellor at all relevant times herein.

23.     Venue is proper in this Court because the actions and omissions leading to this action took place in this district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

I.     **BACKGROUND**

A.     **UW-Madison Faces Federal Pressure to Respond Aggressively to Complaints of Sexual Misconduct**

A.     **The April 2011 "Dear Colleague Letter": The Office for Civil Rights Places Pressure on Universities to Aggressively Pursue Sexual Misconduct Complaints**

24.     On April 4, 2011, the Department of Education's Office for Civil Rights ("OCR") issued a guidance letter to colleges and universities in receipt of federal funding, which became widely known as the "April 2011 Dear Colleague Letter" (the "DCL").

25.     The DCL advised recipients that sexual violence constitutes sexual harassment within the meaning of Title IX of the Education Amendments of 1972 and its regulations, and the

6

DOE 0221

DCL directed schools to "take immediate action to eliminate the harassment, prevent its recurrence and address its effects." DCL at 4.

26. The DCL responded, in part, to a special investigative report published by National Public Radio and the Center for Public Integrity, which proclaimed a campus rape epidemic and criticized the OCR for its lax response to what the report characterized as a social problem of critical importance. *See* Joseph Shapiro, *Campus Rape Victims: A Struggle for Justice*, National Public Radio (Feb. 24, 2010), http://www.npr.org/templates/story/story.php?storyId=124001493. The report described in detail the obstacles faced by sexual assault victims in obtaining redress though college disciplinary proceedings, and how victims who did engage in the college disciplinary process suffered additional trauma as a result. Much of the report focused on underreporting, re-traumatization of victims, rape myth adherence on college campuses (e.g., that women invite rape, that rapes are just drunk hook-ups, and that women routinely lie), and young men's cultural adherence to the sexual aggressor role.

27. The OCR further relied on faulty statistics in sounding its "call to action" for campuses nationwide—that "about 1 in 5 women are victims of completed or attempted sexual assault while in college." DCL at 2. The researchers behind this study subsequently invalidated that statistic as a misrepresentation of the conclusions of the study, and warned that it was "inappropriate to use the 1-in-5 number as a baseline . . . when discussing our country's problem with rape and sexual assault on campus." *See* Christopher Krebs and Christine Lindquist, *Setting the Record Straight on "1 in 5"*, Time Magazine (Dec. 14, 2015), http://time.com/3633903/campus-rape-1-in-5-sexual-assault-setting-record-straight/.

28. Relying on the faulty one-in-five statistic, the OCR, through the DCL, minimized due process protections for the accused by, among other things, mandating the adoption of a

Doe Deposition Exhibit 3 - 8

DOE 0222

relatively low burden of proof—"more likely than not"— in cases involving sexual misconduct, expressly prohibiting colleges from applying a higher standard of proof.  (DCL at 10-11).

29.     The DCL advised that schools responding to Title IX complaints should "minimize the burden on the complainant" (DCL at 15) and focus on victim advocacy.  For example, it stated (DCL at 12) that schools should give both parties the right to appeal a decision – in other words, if an accused student was found not responsible, the complainant could then appeal and force the respondent to defend the charges all over again, functionally constituting double-jeopardy. Additionally, the DCL stated that schools must take steps to protect the complainant, as necessary, including taking interim steps before the final outcome of the investigation.  Such steps include transferring alleged perpetrators, if necessary, away from shared courses or housing. (DCL at 15-16).

30.     The DCL (p. 12) also strongly discouraged allowing cross-examination because it "may be traumatic or intimidating" to the alleged victim.

31.     Despite its purported purpose as a mere guidance letter, the Department of Education treated the DCL as a binding regulation and pressured colleges and universities to aggressively pursue investigations of sexual assault on campus.

32.     Before the DCL, colleges and universities generally did not use their disciplinary procedures to adjudicate sexual misconduct cases and certainly not in the manner and frequency that they have since the issuance of the DCL.

33.     After the DCL was published, schools changed their sexual assault and sexual harassment policies and procedures.

34.     On April 29, 2014, OCR issued additional directives to colleges and universities in the form of a guidance document titled *Questions and Answers on Title IX and Sexual Violence*

8

DOE 0223

("OCR's April 2014 Q&A") which was aimed at addressing campus sexual misconduct policies, including the procedures colleges and universities "must" employ "to prevent sexual violence and resolve complaints" and the elements that "should be included in a school's procedures for responding to complaints of sexual violence." https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf  (OCR's April 2014 Q&A at 9, 12.)

35.     The OCR's April 2014 Q&A advised schools to adopt a trauma informed approach, advising, for example, that hearings should be "conducted in a manner that does not inflict additional trauma on the complainant." *Id.* at p. 31.

36.     In addition, OCR's April 2014 Q&A continued OCR's quest to hamper students' ability to defend themselves by reducing or eliminating the ability to expose credibility flaws in the allegations made against them.  For example, the document states that schools:

        a.   "must not require a complainant to be present" at sexual misconduct disciplinary hearings (p. 30);

        b.   may decide to eliminate all opportunities for "cross-examination" (p. 31); and

        c.   must avoid "revictimization" by minimizing the number of times a victim is interviewed so "complainants are not unnecessarily required to give multiple statements about a traumatic event" (pp. 30, 25).

37.     Neither OCR's April 2014 Q&A nor the DCL were subject to notice-and-comment rulemaking, and both the OCR's April 2014 Q&A and the DCL constituted substantive decision-making.

38.     In the same month that the OCR issued its April, 2014 Q&A on Title IX, the White House issued a report titled *Not Alone*, which included a warning that if the OCR finds a school in violation of Title IX, the "school risks losing federal funds." *See* White House Task Force to Protect Students from Sexual Assault, *Not Alone* (Apr. 2014), *available at* https://obamawhitehouse.archives.gov/sites/default/files/docs/report_0.pdf.   The report further

9

DOE 0224

advised that the Department of Justice ("DOJ") shared authority with OCR for enforcing Title IX, and could therefore initiate investigation, compliance review, and/or litigation against schools suspected of violating Title IX.

39.     In June 2014, then-Assistant Secretary of Education Catherine Lhamon testified before the United States Senate, warning that if the OCR could not secure voluntary compliance with the DCL from a college or university, it could elect to initiate an administrative action to terminate federal funds or refer the case to the Department of Justice.  *See* Testimony of Catherine E. Lhamon, Assistant Secretary Office for Civil Rights, U.S. Department of Education (June 26, 2014), https://www2.ed.gov/about/offices/list/ocr/correspondence/testimony/20140626-sexual-violence.pdf.

40.     To support its enforcement of the DCL, the OCR hired hundreds of additional investigators.  To date, OCR has conducted over five hundred investigations of colleges for the potential mishandling of complaints of sexual misconduct. *See Title IX: Tracking Sexual Assault Investigations*, Chronicle of Higher Education, https://projects.chronicle.com/titleix/ (last visited June 7, 2020).

41.     The threat of revocation of federal funds—the ultimate penalty—was a powerful tool in motivating colleges to aggressively pursue and punish male students accused of sexual misconduct.  In that regard, Anne Neal, of the American Council of Trustees and Alumni, observed: "There is a certain hysteria in the air on this topic, . . . .  It's really a surreal situation, I think."  *See* Tovia Smith, *How Campus Sexual Assaults Came to Command New Attention*, National Public Radio (Aug. 12, 2014), https://www.npr.org/2014/08/12/339822696/how-campus-sexual-assaults-came-to-command-new-attention.  Neal explained that "schools are

10

DOE 0225

running so scared of violating the civil rights of alleged victims that they end up violating the due process rights of defendants instead."

42.    Likewise, on September 1, 2014, the Chronicle of Higher Education noted that colleges were facing "increasing pressure from survivors and the federal government," including claims that college campuses had become "hazardous places" for female students.  *See* Robin Wilson, *Presumed Guilty: College Men Accused of Rape Say the Scales are Tipped Against Them*, Chronicle of Higher Education (Sept. 1, 2014), https://www.chronicle.com/article/Presumed-Guilty/148529.  For example, the article noted that different standards were being applied to male students versus female students: "Under current interpretations of colleges' legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no.  That is because in heterosexual cases, colleges typically see the male student as the one physically able to initiate sex, and therefore responsible for gaining the woman's consent." *Id.*

43.    Notably, a study by the National Bureau of Economic Research found that opening more Title IX investigations benefits colleges in their application submission rates, and has no negative impact on securing donations.  *See* Jason M. Lindo et al., *Any Press is Good Press? The Unanticipated Effect of Title IX Investigations on University Outcomes, National Bureau of Economic Research*, Working Paper No. 24852 (July 2018), http://www.nber.org/papers/w24852.

44.    The study found "no evidence [that] federal Title IX investigations reduce students' interest in a university.  Instead, [it found] evidence that these investigations increase freshman applications and enrollment, for both female and male students." *Id.*  The study further found that "[f]ederal Title IX investigations appear to have no effect on student retention, as the enrollment of continuing students is unaffected," and that "analysis of . . . data suggests that federal

11

DOE 0226

Title IX investigations have no detectable effects on donations." *Ibid.* In other words, colleges and universities have everything to gain from aggressively pursuing Title IX cases, and nothing to lose.

45. Colleges and universities, including UW-Madison, were fearful of and concerned about being investigated or sanctioned by the DOE and/or of potential Title IX lawsuits by the DOJ. In response to pressure from OCR and DOJ, educational institutions, like UW-Madison, have limited procedural protections afforded to respondents, like the Plaintiff, in sexual misconduct cases.

46. To support its enforcement of the DCL, the OCR hired hundreds of additional investigators. To date, OCR has conducted over five hundred investigations of colleges for the potential mishandling of complaints of sexual misconduct. See Title IX: Tracking Sexual Assault Investigations, Chronicle of Higher Education, https://projects.chronicle.com/titleix/ (last visited Sept. 15, 2020).

47. UW-Madison has found itself on the receiving end of such investigations *four times* since 2015, after complaints were lodged against it with the OCR on February 24, 2015, August 8, 2015, November 11, 2015, and May 20, 2016, for allegedly mishandling allegations of sexual assault. On information and belief, the complainants in the OCR investigations were female and the respondents were male. On information and belief, at least three of the OCR investigations were still pending during the underlying events that give rise to this action.

48. UW-Madison was well aware of these OCR investigations. *See, e.g.,* Nico Savidge, *On Campus: 4th federal investigation launched into UW-Madison's handling of sexual assault*, Wisconsin State Journal (Jul. 25, 2016).

12

DOE 0227

49.     While the OCR investigations were ongoing, OCR investigators attended on-campus events and directly engaged with the student body to assess UW-Madison's compliance and, consequently, its eligibility for federal funding. *See* John Hart, *Federal investigators to host talks at UW-Madison on climate around sex assault*, Wisconsin State Journal (Mar. 24, 2016).

50.     On information and belief, at least three of the OCR investigations remain pending to date.

### B. The 2017 Revocation of the DCL and UW-Madison's Refusal to Update its Policies Accordingly.

51.     On September 7, 2017, Department of Education Secretary Betsy DeVos vowed to replace the "failed system" of campus sexual assault enforcement to ensure fairness for both accusers and the accused, proclaiming that "one person denied due process is one too many." Press Release, *Secretary DeVos Prepared Remarks on Title IX Enforcement* (Sept. 7, 2017), *available at* https://www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement.

52.     DeVos explained, "[t]he truth is that the system established by the prior administration has failed too many students;" specifically, "[t]he notion that a school must diminish due process rights to better serve the 'victim' only creates more victims." *Id.*

53.     Acknowledging the massive pressure placed on universities and educational programs, by the DCL, DeVos stated, "[n]o school or university should deprive any student of his or her ability to pursue their education because the school fears shaming by – or loss of funding from – Washington." *Id.*

54.     With respect to the rights of the accused, DeVos declared, "[e]very student accused of sexual misconduct must know that guilt is not predetermined," and that "any school that uses a system biased toward finding a student responsible for sexual misconduct also commits

13

DOE 0228

discrimination." *Id.* She continued, "Due process is the foundation of any system of justice that seeks a fair outcome. Due process either protects everyone, or it protects no one." *Id.*

55. On September 22, 2017, the OCR formally rescinded the DCL and the April, 2014 Q&A, and put in place interim guidance (the "2017 Q&A"), while the current administration reviewed and revised its practices regarding the adjudication of complaints of sexual misconduct on college campuses. *See* Dep't of Ed., Dear Colleague Letter (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf; *see also* Dep't of Ed., *Q&A on Campus Sexual Misconduct* (Sept. 2017), https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

56. In rescinding the 2011 DCL, the OCR noted that it had placed "improper pressure upon universities to adopt procedures that do not afford fundamental fairness," and "lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and *are in no way required by Title IX law or regulation*." Dep't of Ed., Dear Colleague Letter (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf. (citations omitted) (emphasis added).

57. In that regard, the 2017 Q&A prohibits universities from relying on fixed rules or assumptions that favor complainants over respondents.

58. The 2017 Q&A cautions that "[t]raining materials or investigative techniques and approaches that apply sex stereotypes or generalizations may violate Title IX and should be avoided so that the investigation proceeds objectively and impartially," and the same standard applies for "[d]ecision-making techniques or approaches." 2017 Q&A at 4, 5.

59. The 2017 Q&A requires universities to "adopt and publish grievance procedures that provide for a prompt and equitable resolution of complaints of sex discrimination, including

14

DOE 0229

sexual misconduct." *Id.* at 3 (emphasis added). In that regard, the "elements in evaluating whether a school's grievance procedures are prompt and equitable[] includ[e] . . . ensur[ing] an *adequate, reliable, and impartial* investigation of complaints." *Ibid.* (emphasis added).

60.     The 2017 Q&A also requires investigators to "synthesize *all available evidence*— including both inculpatory and exculpatory evidence—and take into account the unique and complex circumstances of each case." *Id.* at 4 (emphasis added).

61.     The 2017 Q&A also requires that "[a]ny rights or opportunities that a school makes available to one party during the investigation should be made available to the other party on equal terms." *Id.* at 4.

62.     Likewise the 2017 Q&A, in a significant departure from the DCL, states: "The findings of fact and conclusions should be reached by applying either a preponderance of the evidence standard or a clear and convincing evidence standard," as long as the standard for evaluating claims of sexual misconduct is the same as that applied in other student disciplinary proceedings. *Id.* at 4; *see also id.* footnote 19 at 4.

63.     The 2017 Q&A suggests that the policies and procedures in place at UW-Madison at all times relevant to this lawsuit—which were tailored in such a way as to comply with the DCL under the threat of loss of federal funding—were unfair and, ultimately, contrary to the goal of gender equality in Title IX proceedings.

64.     Despite the sweeping changes caused by the rescission of the 2011 DCL and the implementation of the 2017 Q&A, UW-Madison administrators, including Defendant Blank, stated that UW-Madison would not change its policies and procedures. *See Update from Chancellor Rebecca Blank on Title IX,* University of Wisconsin-Madison, available at https://news.wisc.edu/update-from-chancellor-rebecca-blank-on-title-ix/.

15

DOE 0230

65.     On November 16, 2018, the Department of Education released proposed Title IX regulations, subject to "notice-and-comment rulemaking." https://www.ed.gov/news/press-releases/secretary-devos-proposed-title-ix-rule-provides-clarity-schools-support-survivors-and-due-process-rights-all.

66.     Despite a different direction announced by the Trump Administration, colleges, universities, and educational programs including UW-Madison have mostly continued with victim-centered practices and policies in place during the Obama Administration, holding on, as a matter of ideological commitment, to what is a gender biased enforcement of Title IX.

67.     In January 2020, NASPA, the national organization of Student Affairs Administrators in Higher Education, which has 15,000 members representing more than 1500 institutions, issued a study, "*Expanding The Frame: Institutional Responses to Students Accused of Sexual Misconduct.*" (available at https://www.naspa.org/report/expanding-the-frame-institutional-responses-to-students-accused-of-sexual-misconduct) The study, intended to refute "the common narrative that institutions are not concerned with responding parties' rights in sexual misconduct cases," essentially evidenced to the contrary that widespread institutional bias against the accused starts at the very inception of a complaint, prior to any investigation or adjudication.

68.     In a process governed by the enforcement of Title IX gender equality, and in which the overwhelming majority of accused students are male, the survey reported that only 5% of schools have even one full-time employee to assist accused students; 85% have no budget dedicated specifically to providing services for accused students; and for accused students "no established best practices currently exist, and most institutions are only just developing these programs, identifying what specific services are needed, and exploring what is equitable or equal." While alleged victims have entire departments of advocates funded by the institution dedicated to

16

Doe Deposition Exhibit 3 - 17

DOE 0231

their needs, only 13% of colleges and universities have a staff member reach out "directly to responding parties about support services available." The study suggests that accused students are left to defend themselves by administrators "due to perceived pushback from members of the campus community who disagree with providing respondent services."

### C. UW-Madison Faces Years of Criticism for Failing to Adequately Address Claims of Sexual Misconduct Allegedly Committed by Male Students and/or Faculty

69.     The OCR investigations were not the only pressure on UW-Madison to strengthen its response to complaints by female students of sexual misconduct.

70.     For several years leading up to the investigation and adjudication of the allegations involving Plaintiff, UW-Madison students openly accused the University of not taking allegations of sexual misconduct seriously enough and failing to adequately punish perpetrators of sexual assault, particularly UW-Madison's failure to protect female students on campus.

71.     In 2015, UW-Madison released the results of a sexual assault climate survey, which highlighted the fact that "more than one in four (27.6 percent) undergraduate female students reported experiencing nonconsensual penetration or sexual touching" and that "perpetrators were overwhelmingly identified as fellow students who are male, often a friend or acquaintance."

72.     In September of 2015, the UW Police launched a campaign called "Don't Be That Guy," along with a YouTube video and a hashtag for the movement, #ThatGuy, again clearly pointing to the notion that sexual assaults are committed by men and that women are the victims.

73.     The University, including Defendant Blank, demonstrated support for the "Don't Be That Guy" campaign as well as the general notion that men are the cause of sexual assault in

DOE 0232

the University's Sexual Assault Climate Survey Task Force Report[1]. The Task Force Report, featuring a statement from Defendant Blank on the very first page explaining the necessity to address sexual assault on campus, states in the "Recommendations to Address Key Survey Findings" section that "Addressing potential perpetrators must remain a priority. Continue to engage *men* as allies to prevent gender-based violence." (emphasis added).

74.     Incredibly, the Task Force Report states that in order to achieve this, the University would "Support evidence-based programming and social norming efforts that foster healthier expressions of *masculinity*, reduce homophobia and increase empathy for victims of gender-based violence. Continue to implement public awareness efforts such as 'It's On Us' and 'Don't Be That Guy'" in an "ongoing" manner. (emphasis added). Clearly, Defendant Blank, as well as the Vice Provost and Dean of Students, among other pertinent University officials that signed off on the Task Force Report, supported and condoned fostering an environment which painted men as perpetrators and women as victims.

75.     These reports garnered attention from media outlets, with public newspapers noting that in 2015, only 5% of sexual assaults reported to the university were investigated, and from 2010-2015, of the 67 cases investigated, only 27 students were found responsible, and only 3 students were expelled.

76.     This data coupled with the pending OCR investigations sparked outcry from student advocacy groups including Promoting Awareness, Victim Empowerment (PAVE), calling out UW-Madison for a "lack of follow-though" and calling for increased expulsions. *See* Pat

---

[1] *See* UW-Madison Sexual Assault Climate Survey Task Force Report (Jan. 15, 2016), available at https://kb.wisconsin.edu/images/group171/63714/602-ReportfromUW-MadisonSexualAssaultClimateSurveyTaskForce.pdf.

Doe Deposition Exhibit 3 - 19

DOE 0233

Schneider, *UW-Madison now under federal investigation for handling of three sex assault cases*, The Cap Times (Dec. 24, 2015).

77.     In response to the call for more investigations and punishments, UW-Madison hired a full-time Title IX coordinator within the Office of Compliance, which is responsible for coordinating the University's response to reports of sexual misconduct.

78.     In 2016, hundreds of UW-Madison students marched down Bascom Mall in protest of sexual assault, drawing attention to the issues on campus. That same year, the university responded by hiring two additional "victim advocates," for a total of three in their Survivor Services, which "provides confidential support to UW-Madison student victims/survivors of sexual assault, sexual harassment, dating violence, and/or stalking."

79.     The University also implemented an online training program called Tonight, which showed re-enactment videos that dissect interactions at parties in order to teach students about situations which could lead to sexual assault as well as the "bystander effect." New students were required to do this online training as well as attend workshops. Upon information and belief, these re-enactment videos demonstrated males being the perpetrators and women being the victims in most, if not all the videos.

80.     News outlets noted this training was making "more students, especially men, realiz[e] they no longer can stand by in situations which raise red flags." *See* Karen Herzog, *More men stepping up to prevent college sexual assaults*, Milwaukee Journal Sentinel (Nov. 18, 2016).

81.     In May 2017, UW-Madison drew national attention in People Magazine for its handling of sexual assault cases, when a Washington D.C. attorney spoke out about her experience of reporting a sexual assault to the University and having it dropped due to lack of evidence. *See* Natasha Stoynoff, *D.C. Attorney Fights Back on Behalf of Women Everywhere After She Was*

19

DOE 0234

*Sexually Assaulted in College: 'I Fought for Myself'*, People Magazine (May 24, 2017). Although UW-Madison's statement to People stated that the OCR had found it in compliance with the law at the time, this undoubtedly put UW-Madison under fire in the public eye yet again in regards to its investigation of female sexual assault allegations.

82.    In July 2017, the University amended its policies yet again to show support of alleged victims by stating that all employees would be required to complete an online prevention program called "Promoting Equity at UW-Madison by Preventing Sexual Harassment and Sexual Violence." This training focuses on UW-Madison's trauma-informed approach and is required in order for employees to be eligible for wage advancements.

83.    Also in 2017, UW-Madison hired Lauren Hasselbacher as its Title IX coordinator. Defendant Hasselbacher has extensive experience as an advocate for women who have experienced domestic violence and sexual assault. Prior to her time at UW-Madison, Defendant Hasselbacher worked as a senior investigator at CU Boulder, where she investigated allegations of sexual misconduct on campus and worked with campus partners, one of which was the Office of Victim Assistance. Defendant Hasselbacher also worked at Domestic Abuse Intervention Services in Dane County as a legal advocate and worked in a variety of advocacy settings that addressed issues related to sexual assault during law school.

84.    University news outlets demonstrated the idea that had been ingrained on campus: that males are the perpetrators of sexual assault and women are the victims, and that reducing sexual assault comes down to controlling males' natural behavior. *See* Abigail Steinberg, *Increasing conversation about hypermasculinity, male libido central to fight against sexual assault,* Badger Herald (Dec. 12, 2017).

20

DOE 0235

85.     Attacks on men further went on with campus news outlets publishing statements such as "if you, as a man, have tried to exonerate yourself from blame by saying, 'I realize it's a problem, but I'm not part of the problem,' then you are part of the problem." *See* Letter to the Editor, *If you're shocked by #MeToo, you're actively contributing to the problem*, The Badger Herald (Oct. 17, 2017).

86.     In 2018, still trying to address the issue, UW-Madison implemented its campus-specific Policy on Sexual Harassment and Sexual Violence and hired two full-time Title IX/Equal Opportunity investigators in the Office of Compliance.

87.     Local news outlets then outed UW-Madison's coverup of sexual misconduct by male faculty, sparking further outrage. *See* Mark Sommerhauser, *State paid $591k to settle misconduct, harassment claims at UW-Madison*, Wisconsin State Journal (Apr. 9, 2018).

88.     These news outlets reported that from 2014-2017, nearly 100 formal complaints of sexual misconduct were made against the UW system, and only 7 of those complaints were investigated. *See* Parker Schorr, *In response to faculty sexual misconduct allegations, UW recognizes need for improvement,* The Badger Herald (Feb. 13, 2018).

89.     University Health Services' Violence Prevention Manager, Sam Johnson, who leads a team of violence prevention specialists in crafting sexual violence prevention trainings for incoming students stated that sexual assault is committed by a "small number of serial perpetrators." She clarified this statement to mean *male* perpetrators by stating, "we know most men in their lifetime and in college will not perpetuate sexual assault. But for some reason this small number of people are hiding in plain sight." *Id.*

90.     Once again perpetuating the idea that men are the problem, Sam Johnson also helped in forming the UW Men's Project, a six-week program that "challenges men to reevaluate

Doe Deposition Exhibit 3 - 22

DOE 0236

ideas of masculine identity" with the goal of "preventing future violence by teaching participants to recognize warning signs of unhealthy interactions." Pat Schneider, *Advocates for survivors of sexual abuse blast Steve Nass for politicizing UW anti-violence effort*, The Cap Times (Jan. 7. 2017).

91.     On April 19, 2018 students and members of the Madison community protested around the Capitol for "Take Back the Night" in support of sexual assault awareness month and the #MeToo movement, demanding an end to sexual violence.

92.     That same year, within weeks of when the University issued charges against Plaintiff, UW-Madison drew national news once again when a student was sentenced to three years in prison for a series of sexual assaults near campus. The sentencing sparked anger from students and advocacy groups that the former student's sentencing was not harsh enough. While not sentenced by the University, this student was perpetually tied to UW-Madison and this case brought UW-Madison's sexual assault problem to national news once again. *See* Karen Herzog, *Lawmakers call 3-year sentence for Alec Cook's sex crimes lenient for 'men with privilege'*, Milwaukee Journal Sentinel (Jun. 27, 2018).

93.     In 2019, the University released another sexual assault climate report, which again highlighted that one in four undergraduate women reported experiencing sexual assault since entering college, indicating that the University had not made any progress in preventing assaults since 2015.

94.     Chancellor Black publicized UW-Madison's dedication to the cause in that report by stating "going forward, we must strengthen our efforts to reduce sexual assault in our community" and "when sexual assault occurs, we will respond swiftly and with compassion, providing resources and support." The report noted that in 2019, the university became a joint

Doe Deposition Exhibit 3 - 23

DOE 0237

member of the National Academy of Sciences and Engineering's Action Collaborative on Preventing Sexual Harassment. The report further stated that part of the University's next steps was to hire an additional counselor in UHS Survivor Services and support a trauma-informed care initiative in UHS to support those who have suffered trauma.

95.     The University also invited ████ Burke, the founder of the #MeToo movement, to speak on campus.

96.     Upon information and belief, the combination of federal pressure resulting from the OCR investigations, along with years of student criticism regarding UW-Madison's failure to protect female students and UW-Madison's failure to address male perpetrators, resulted in UW-Madison's employment of gender-based decision-making that infiltrated the entire Title IX process and constituted discrimination against Plaintiff because of his male gender.

## II.     CHRONOLOGY OF EVENTS

### A. Plaintiff

97.     Plaintiff Quintez Cephus, an African American male, was raised along with two siblings by a single mother and grandmother in a disadvantaged area in Macon, Georgia. Plaintiff attended an under-performing public school and, due to Plaintiff's quiet demeanor and eagerness to learn, his guidance counselor was concerned his success would be hindered by the school's culture and educational opportunities, and suggested he apply to college preparatory school Stratford Academy. It was there where his life as a student athlete began to thrive.

98.     Plaintiff's mother worked two jobs and often had to drop Plaintiff off late to school. When the Stratford Basketball Coach noticed this, he took Plaintiff under his wing. He made an agreement with Plaintiff that each morning at 6 a.m. he would pick Plaintiff up and take him to school. Since this got Plaintiff to school well before the start of classes, Plaintiff had time to work

23

out and study before school, which allowed him to excel both athletically and academically, despite his learning disabilities.

99.     Plaintiff's athletic talents were noticed by UW-Madison, which recruited him as a wide receiver for the University of Wisconsin football team with the class of 2020.

100.    The University's football team at the time of Plaintiff's recruitment, and still today, is a highly-ranked national collegiate team. As a star wide receiver, Plaintiff was a strong candidate to be a high draft pick in the National Football League ("NFL").

101.    Plaintiff matriculated at the University in June of 2016, at which time the University provided him with the policies and procedures related to academic and non-academic misconduct.

**B.  April 21-22, 2018**

102.    On April 21, 2018, Plaintiff went bowling with two of his teammates, "Teammate 1" and "Teammate 2." Teammate 1 brought along the girl he was "on-again, off-again" dating, Complainant 1. While bowling, Complainant 1 continuously talked about "setting up" Plaintiff with her friend, Complainant 2, and setting up Teammate 2 with her other friend, Friend 1, who are all Caucasian females. Complainant 1 showed Plaintiff and Teammate 2 pictures of her friends, again stating that she wanted to "set them up" that night.

103.    After bowling, Complainant 1 and Plaintiff continued to talk via Instagram to set up plans with her and her friends that night. The plan was to meet at a local bar, The UU. Plaintiff also suggested that Complainant 1, Complainant 2, Teammate 2, and Friend 1 could all go back to hang out at Plaintiff and teammate 2's apartment afterwards, to which Complainant 1 replied, "Yes!"

104.    That night, Complainant 1 and Friend 1 met Plaintiff and Teammate 2 at The UU. Complainant 1 later introduced Plaintiff to Complainant 2, who was already at the bar. Plaintiff

24

DOE 0239

and Complainant 2 paired off and Teammate 2 and Friend 1 paired off, leaving Complainant 1 without a partner. Despite multiple texts and snapchat messages to get Teammate 1 to come out with her, Teammate 1 ignored Complainant 1. Upon information and belief, this led Complainant 1 to believe that Teammate 1 was being unfaithful, as had been the case in the past.

105.    While at The UU, Complainant 1 and Complainant 2 were drinking alcoholic beverages. Complainant 2 was aggressively physically affectionate towards Plaintiff, trying to kiss Plaintiff and put her hands down his pants, but Plaintiff put her off, saying that he did not want her to do that at the bar. Shortly thereafter, Complainant 2 suggested that they go have a "sleepover." Plaintiff, Complainant 1, Complainant 2, Teammate 2, and Friend 1 all went back to Plaintiff and Teammate 2's apartment in Plaintiff's car.

106.    Upon the group's arrival at Plaintiff's apartment building, Complainant 1 (who would later claim that she was *incapacitated* by alcohol at this point in time) gave Teammate 2— a six-foot tall football player—a "piggyback ride," carrying the large student on her back without so much as a stumble through the apartment lobby. Complainant 2 was walking in front of the rest of the group, holding hands with Plaintiff.  As they proceeded towards Plaintiff's apartment, Complainant 2 turned around and gave the rest of the group a "victory" sign with her hands, as in, she was victorious in winning over Plaintiff's affections.

107.    Once the group entered the apartment, Plaintiff showed them around and Complainant 2 immediately walked toward Plaintiff's bedroom, signaling for him to follow. Plaintiff asked Complainant 1 if she wanted to come, since she was alone and Teammate 2 and Friend 1 were in Teammate 2's room. Plaintiff then walked into Plaintiff's bedroom, and Complainant 1 followed Plaintiff into his room on her own accord.

25

DOE 0240

108.    In Plaintiff's room, Complainant 1 and Complainant 2 both removed their own clothes and Plaintiff had consensual sexual activity with Complainant 2 and then with Complainant 1.  Both asked Plaintiff if he had a condom before engaging in intercourse, clearly indicating that each woman was aware of her situation and actively participating and approving. Plaintiff said yes and put a new condom on before he had intercourse with Complainant 1 and Complainant 2. Admittedly, Plaintiff paid more attention during this encounter to Complainant 2.

109.    The whole time, Teammate 2 was in his room with Friend 1, and Plaintiff's other roommate, Teammate 3, was in his room which shares a wall with Plaintiff's room.[2]

110.    After the fully consensual sexual encounter with Complainant 1 and Complainant 2, Plaintiff, texted Teammate 2 to come to his room.

111.    When Teammate 2 came to Plaintiff's room, he took a picture of the girls on his phone.

112.    Complainant 1 immediately got up and started yelling at Plaintiff and Teammate 2 about the photo.

113.    Complainant 1 instructed Plaintiff and Teammate 2 to delete the photo from the phone, which they did.

114.    Complainant 1 then showed Plaintiff and Teammate 2 how to delete the photo from the "recently deleted" folder on the phone, clearly completely aware of her surroundings and in full control of her faculties.

---

[2] Teammate 3 would later testify to the University that he did not hear anything the night of the alleged incident.

26

DOE 0241

115.    Afterwards, Complainant 1 left the room angrily and began crying, concerned that Plaintiff and Teammate 2 were going to think she was a "slut" and that Teammate 1 would find out that she had sex with Plaintiff.

116.    Plaintiff told Complainant 1 that they would not tell Teammate 1 and she needed to calm down. Plaintiff then went back into his bedroom with Complainant 2.

117.    Complainant 1 then went into Plaintiff's room to get Complainant 2 to leave, but Complainant 2 refused. Complainant 1 grew angry, stating "are you really going to have sex with someone who just talked to me like that?" Notably, Complainant 1 was only upset about the way she was allegedly *spoken* to, despite her later claims.

118.    Complainant 1, infuriated at her own embarrassment and infidelity, and jealous that Complainant 2 was receiving more attention from Plaintiff, continued to pull on Complainant 2's arm in an attempt to interrupt Complainant 2's time with Plaintiff. Complainant 2 grew annoyed with Complainant 1's actions, and eventually got up and left the apartment without Complainant 1 in order to avoid arguing. Complainant 1 voluntarily remained in the apartment with Plaintiff, clearly in no rush to leave. On information and belief, arguments were commonplace between Complainant 1 and Complainant 2 and often ended up in a hostile night out.

119.    When Complainant 2 left Plaintiff's apartment, despite later allegations that she was incapacitated by alcohol, she navigated the stairwell in Plaintiff's apartment, which is dark, narrow, requiring one to walk down the stairs to the bottom floor before walking up more stairs to get to the exit door. Upon exiting from the stairwell door, which opened to an unlit back parking lot, Complainant 2 was able to navigate her way to the main road and locate her Uber (which had to be called using an application on her phone) to get back to her dorm room at Sellery Hall.

Doe Deposition Exhibit 3 - 28

DOE 0242

120.     Shortly after Complainant 2 left, Plaintiff was concerned about Complainant 2 and ran down the stairwell to try and find her.

121.     When he could not find her, Plaintiff went back to his room and told Complainant 1, Friend 1 and Teammate 1 that it was time to go and they all went to Plaintiff's car. On the drive back, they looked for Complainant 2 on the road to make sure she wasn't walking alone but did not see her.

122.     Plaintiff dropped off Complainant 1 at her dorm room in Ogg Hall and then drove Friend 1 to her dorm room at Sellery Hall.

123.     When dropping Friend 1 off at Sellery Hall, Plaintiff expressed concern about Complainant 2, and Friend 1 said she would take Plaintiff and Teammate 2 to Complainant 2's room to make sure she was okay. Friend 1 then led Plaintiff and Teammate 2 to Complainant 2's room. The group spent a few minutes in Complainant 2's room. Plaintiff and Complainant 2 exchanged phone numbers before leaving. A few minutes later, Complainant 2 sent a heart and a kiss face emoji to Plaintiff.

124.     Upon arriving back to Ogg Hall, Complainant 1 was visibly upset about her fight with Complainant 2. Complainant 1 came across a floormate, Friend 2, who asked her what was wrong. Friend 2 stated that Complainant 2 originally did not say anything was wrong, but that he had to pry the information out of her. Complainant 1 then fabricated a rape allegation but advised Friend 2 – likely because she knew it was a lie – that she did not want to call the police. Friend 2 convinced Complainant 1 to contact the police. Notably, Complainant 1 was not the one who called in to report the sexual assault, but rather Friend 2 called the police department.

Doe Deposition Exhibit 3 - 29

DOE 0243

125.    When the police arrived, Complainant 1 spoke with an officer and gave a statement. The officer then drove Complainant 1 to get a SANE exam.[3]

126.    Upon arriving at the hospital in the early morning of April 22, Complainant 1 was interviewed by a police investigator. When being interviewed by the investigator, Complainant 1 was continually directed or corrected in her statements by the rape crisis advocate. In the recording of the interview, the investigator and the rape crisis advocate can be heard joking about "some of these people I just think what was your mother thinking in naming you that," in reference to Plaintiff's name.

127.    Further, Complainant 1 fabricated her intoxication from the night, claiming that she had been throwing up in her residence hall due to her intoxication level prior to calling the police. However, this claim was never corroborated by any witness, video, or physical evidence.

128.    That same morning, Complainant 1 texted Complainant 2 to tell her that she should get a SANE exam done as well. Complainant 1 used this opportunity to make Complainant 2 falsely believe that she was raped the night before.

129.    Complainant 2 also got a SANE exam done that day but did not decide whether she wanted to report it to law enforcement or not.

**C.  The Investigation**

130.    On the afternoon of April 22, 2018, officers from the Madison Police Department executed a search warrant of Plaintiff's apartment, stemming from allegations concerning the events of the previous evening.

---

[3] A SANE exam is a sexual assault forensic exam performed by a Sexual Assault Nurse Examiner.

29

DOE 0244

131.    Notably, the Complainants were not the ones to report the alleged incident to the University. Complainant 1's father contacted the University on April 23, alleging that his daughter had experienced a sexual assault over the weekend. At that time, both Complainants refused to speak with the University about the matter. As a result of the Complainants refusing to cooperate, the University elected not to commence an investigation.

132.    On April 26, 2018, the Student Athlete Disciplinary Committee suspended Plaintiff from the football team when the Athletic Department was advised by Defendant Hasselbacher that criminal charges were imminent.

133.    On April 27, Plaintiff retained criminal defense attorney Stephen Meyer ("Meyer").

134.    On April 30, Plaintiff received a No Contact Order from Hasselbacher notifying him that he was prohibited from having contact with Complainant 1.

135.    On May 1, Plaintiff received a No Contact Order from Hasselbacher notifying him that he was prohibited from having contact with Complainant 2.

136.    On May 24, over one month after the alleged incident, Complainant 1 submitted a two-page statement to the University alleging that Plaintiff sexually assaulted her. The statement contained the wrong date of the alleged incident. Complainant 2 did not submit a written statement regarding the allegations.

137.    The University then showed Complainant 1's inaccurate letter to Complainant 2. Despite having incorrect information, the University asked Complainant 2 to "confirm the accuracy of the statement to the best of her recollection" rather than asking Complainant 2 for her own statement first.

138.    On May 28, 2018, five full weeks after the University first learned of the alleged incident, Hasselbacher sent Plaintiff a Notice of Charge letter which indicated the Office of

Doe Deposition Exhibit 3 - 31

DOE 0245

Compliance received information alleging a violation of the University of Wisconsin Administrative Code (UWS Chapter 17). Specifically, Plaintiff was alleged to have engaged in sexual activity with Complainant 1 and Complainant 2 on May 22, 2018 while they were incapacitated from alcohol and unable to provide consent.

139.   With respect to Complainant 1, the University issued Notice of Investigation stated that Plaintiff was alleged to have engaged in sexual assault in the second degree in violation of UWS 17.09(2), sexual assault in the third degree in violation of 17.09(2), sexual assault in the fourth degree in violation of UWS 17.09(2), capturing an intimate photo without consent in violation of 17.09(12), and sexual harassment in violation of UWS 17.09(19). With respect to Complainant 2, Plaintiff was alleged to have engaged in sexual assault in the second degree, sexual assault in the third degree, capturing an intimate photo without consent, and sexual harassment (collectively, the "Charges").

140.   Defendant Hasselbacher sent a revised Notice of Charge letter on May 31, 2018, which changed the date of the alleged incident from May 22, 2018 to April 22, 2018 and eliminated the allegation of fourth degree sexual assault as to Complainant 1. Defendant Hasselbacher requested that Plaintiff contact her to schedule a meeting during which he could respond to the allegations.

141.   Later that day, Plaintiff's criminal defense attorney, Meyer, contacted Defendant Hasselbacher by email to schedule the requested meeting.

142.   Hasselbacher responded that she would be willing to meet with Plaintiff and his advisor at any point to discuss the investigation process and answer any questions, however she advised that she would likely "have more questions for [Plaintiff] after I'm further along in the investigation process, so if it is your preference we can wait to meet until then."

Doe Deposition Exhibit 3 - 32

DOE 0246

143.     On June 4, 2018, Hasselbacher emailed Plaintiff and Meyer to notify them that she would contact both of them when she "would like to schedule a time to discuss the allegations with [Plaintiff]."

144.     By letter dated June 6, 2018, Meyer advised Hasselbacher of critical, exculpatory information obtained by law enforcement which refuted the allegations of the Complainants. Such evidence included toxicology reports, security camera footage, a forensic examination of Plaintiff's phone and the results of the execution of a search warrant of Plaintiff's apartment.

145.     Nearly two weeks later, on June 19, 2018, Hasselbacher responded to Meyer's June 6 letter, indicating that she had requested the Madison Police Report. Failing to address the exculpatory and substantive evidence referenced in Meyer's June 6 letter, Hasselbacher wrote:

> "Also, I want to clarify that [Plaintiff] can provide information relevant to the investigation at any time which could include participating in an interview. You can also provide names of witnesses or other documentation (text messages, photos, etc.) that you believe may be relevant. Otherwise, it is my intention to alert you when I am nearing the conclusion of the investigation and provide an opportunity to meet with me at that time."

146.     By letter dated June 21, 2018, Meyer notified Defendant Hasselbacher that "despite the pending criminal investigation, it is still our (Quintez and myself) intention to cooperate and participate in your investigation." He also reiterated that there was critical evidence in the possession of the police department, none of which Defendant Hasselbacher had obtained.

147.     The next contact from Defendant Hasselbacher came more than one month later. Again, failing to address the critical evidence identified by Meyer, on July 26, 2018, Defendant Hasselbacher emailed the following:

> "Please let me know if [Plaintiff] would like to provide any additional information via an interview, written statement (or answers to questions via email) or other evidence that may be relevant (text messages, photos, etc.). If there are any specific witnesses you would like me to contact, please let me know that as well."

32

DOE 0247

148.     On July 27, 2018 Meyer acknowledged this request by email and explained that they would need to have a discussion about Plaintiff's participation in light of his learning disabilities.

149.     On July 31, 2018, as no criminal charges had been filed against Plaintiff, he was reinstated to the football team and permitted to attend practice beginning on August 1.

150.     On August 1, 2018 Meyer met with Defendant Hasselbacher and co-investigator Jennifer Horace, during which they inquired whether Plaintiff would participate in an interview. Meyer advised that Plaintiff would first need to meet with the investigators to discuss the University's process.

151.     As of August 1, 2018, it was Plaintiff's belief that the Dane County District Attorney's office did not intend to pursue criminal charges against him.

152.     On August 8, 2018 Plaintiff and Meyer met with Investigators Hasselbacher and Horace so that the Investigators could explain the University process to Plaintiff. Plaintiff did not make a statement and did not answer any questions at this focused meeting. During this meeting, an interview with Plaintiff was tentatively scheduled for August 23, 2018. Due to scheduling conflicts, Plaintiff's counsel subsequently requested that this interview be moved to August 27, 2018, which was granted. During all these interactions with Plaintiff's counsel, at no point did Defendant Hasselbacher ever advise them that she would be issuing her Investigative Report, regardless of the Plaintiff's participation, by August 31, 2018.

153.     On August 17, 2018, Plaintiff's attorney, Stephen Meyer was advised that the Dane County District Attorney's Office would now be filing charges against the Plaintiff.

154.     On August 18, 2018, Plaintiff issued a statement informing the public that he was forced to take a leave of absence from the football team while these charges were being pursued.

33

DOE 0248

155. Consequently, by letter dated August 22, 2018, Plaintiff, through separate counsel retained for the Title IX process, informed Defendant Hasselbacher that Plaintiff would now be constrained from participating in the University proceeding as he was now being criminally prosecuted, and that requiring him to answer questions or make statements about the underlying events would impair his Fifth Amendment rights, as invoking his right to remain silent would undoubtedly result in a "conviction" in the University proceedings.

156. On information and belief, Hasselbacher had already decided, regardless of Plaintiff's participation, that she was going to issue her report by the end of August.

157. Defendant Hasselbacher, prior to her employment with the University of Wisconsin, held a similar position as the Title IX Coordinator with the University of Colorado at Boulder. While at UC-Boulder, Defendant Hasselbacher maintained a Memorandum of Understanding with the Boulder County District Attorney's Office.

158. Based upon this prior experience, Defendant Hasselbacher understands the relationship between a public university and the local District Attorney's Office and is well informed on the various conflicts that arise when both offices pursue an investigation arising from the same allegations.

159. As significant, critical, and potentially exculpatory evidence would become available over the next few months in the criminal proceeding, Plaintiff's counsel advised Defendant Hasselbacher that the collection of such evidence would likewise be critical to the Title IX proceeding, further warranting a stay of the University's process until the criminal matter was resolved.

160. Although the University had actual knowledge of the allegations against Plaintiff in April 2018, Defendant Hasselbacher elected to wait nearly four months to request an interview

34

DOE 0249

with Plaintiff. Accordingly, given the apparent lack of urgency on the part of the University, Plaintiff's counsel in a correspondence dated August 23, 2018, suggested that Defendant Hasselbacher's interview with Plaintiff "be conducted on a date to be agreed upon" after the criminal matter was resolved.

161.    Raymond P. Taffora, the University's Vice Chancellor for Legal Affairs, responded by letter dated August 30, 2018, misconstruing Plaintiff's counsel's letter of August 23, 2018, as "a refusal to participate in the University's Title IX investigation while the criminal process is ongoing."

162.    Taffora acknowledged that the University attempted to obtain potentially relevant and germane information from the Dane County District Attorney's Office, but was advised "that the District Attorney's Office will not provide the University access to additional information prior to the resolution of the criminal proceeding." As such, UW-Madison had *actual knowledge* that they lacked relevant evidence pertaining to the accusations against Plaintiff, and that such evidence would become available in the near future. Yet, Defendant refused to stay the proceedings and deliberately insisted on moving forward on a deficient and completely one-sided record.

163.    Virtually acknowledging that UW was going to prosecute Plaintiff despite his inability to defend himself without compromising his criminal defense, Taffora wrote, "UW-Madison strives to provide a fair and impartial investigation in a timely matter and will consider **available** information. That being said, the University's process is separate from the criminal process, has different legal requirements, has different potential consequences and **is expected to move more swiftly** than criminal proceedings. Accordingly, the University **will not delay the conclusion of its Title IX process until the resolution of the concurrent criminal proceedings**." (Emphasis added.)

35

DOE 0250

164.    The following day, August 31, 2018, the Initial Investigative Report (the "Report") was issued by Defendant Hasselbacher. As anticipated, based upon the University's Vice Chancellor's admission that the University had been unable to obtain the information from the DA's office, the Report failed to include the substantial evidence obtained to date in relation to the criminal matter despite Plaintiff's repeated requests that this critical information be included in the University's investigation.

165.    The Report included statements from six witnesses, in addition to the two complainants, none of which Plaintiff was able to directly respond to prior to issuance of the Report in light of the criminal proceeding.

166.    On September 14, 2018, Plaintiff submitted a brief procedural response to the Report, highlighting the failure to include exculpatory evidence, addressing his inability to speak freely, and again requesting that the University stay their investigation pending the conclusion of the ongoing criminal matter.

167.    On September 21, 2018, Defendant Hasselbacher issued a Draft Amended Initial Investigative Report.

168.    On September 25, 2018, Plaintiff submitted a brief procedural response to the Amended Initial Investigative Report, again highlighting the failure to include exculpatory evidence, addressing his inability to speak freely, and once again requesting that the University stay their investigation pending the conclusion of the ongoing criminal matter.

169.    On October 2, 2018, Defendant Hasselbacher issued a Second Amended Initial Investigative Report.

170.    On October 7, 2018, for the third time, Plaintiff submitted a brief procedural response to the Report, highlighting the failure to include exculpatory evidence, addressing his

36

DOE 0251

inability to speak freely, and once again requesting that the University stay their investigation pending the conclusion of the ongoing criminal matter.

171.   On October 9, 2018, Plaintiff received an email from Defendant Hasselbacher which stated in part as follows:

> I'm writing to inform you that I've provided the Final Investigative Report to the Office of Student Conduct and Community Standards (OSCCS) for decision making. Assistant Dean Tonya Schmidt, the Director of OSCCS, is copied on this email. Upon receiving the report, Assistant Dean Schmidt will assign the report to an investigating officer for decision-making; in this instance that person will be Assistant Dean Ervin Cox, also copied.
>
> If you have questions about the status of the report, you can contact me or Dean Cox. **Otherwise, the next communication you receive will likely be the Finding Letter.** (emphasis in original).

172.   In the final investigative report, Defendant Hasselbacher felt it appropriate to attach the completely one-sided Dane County Criminal Court Complaint, a document which was not created by the University.

173.   Notably, the criminal court complaint is a document created for the express purpose of prosecuting a defendant and is deliberately written to include only inculpatory evidence and to skew the facts in the light least favorable to the defendant.

174.   Conversely, while including the unreliable and one-sided criminal complaint in the investigative report, Defendant Hasselbacher refused Plaintiff's request to include a copy of Plaintiff's Motion to Dismiss the Criminal Complaint and the accompanying documents submitted on Plaintiff's behalf in the criminal proceeding, which served to counter the unsupported and one-sided narrative in the criminal complaint.  This disparate treatment cannot be explained by any sound reasoning, but rather is a clear indication of the prosecutorial and biased nature of UW's Title IX process.

37

DOE 0252

175. On information and belief, the University's actions were taken in direct response to both internal pressures to find male athletes accused of sexual misconduct responsible, and external pressures initiated by the father of Complainant 1, Charles Roe.[4] Mr. Roe had considerable financial ties to, and influence at, the University.

176. Upon information and belief, in response to what he viewed as the University's failure to aggressively pursue his daughter's complaint, Mr. Roe communicated directly with the University's Administration throughout the summer of 2018, compelling them to move forward with their proceedings and find Plaintiff responsible on all charges. As an individual with considerable influence at UW-Madison, Mr. Roe pressured the University into expediting the investigation against Plaintiff, at the expense of Plaintiff's due process rights.

177. It was not until two months later, on October 30, 2018, that Cox issued the University's finding of responsibility and proposed the sanction of expulsion. Cox found it more likely than not that Plaintiff was responsible for sexual assault in the third degree and sexual harassment with respect to Complainant 1, and responsible for sexual assault in the second degree, sexual assault in the third degree, and sexual harassment with respect to Complainant 2.[5]

178. In making his finding, Cox stated that he had two unidentified colleagues review the report with him and provide him with their thoughts. However, nowhere in University policy does it allow for the Investigating Officer to be influenced by outside opinions.

179. During this entire 6-month period (April 23-October 30, 2018), with the full knowledge of the seriousness of the allegations, UW-Madison took no action to keep Plaintiff off

---

[4] Complainant 1's father is identified pseudonymously as "Charles Roe."

[5] Cox stated that there was insufficient evidence to support a finding of responsibility of sexual assault in the second degree in regard to Complainant 1 as well as capturing an intimate photo without consent in regards to both Complainants as Plaintiff did not personally take the picture.

38

DOE 0253

campus, demonstrating that the University believed that Plaintiff did not present a threat to the campus or community.

180.    In Cox's October 30 email, he unilaterally decided to empanel two separate hearing panels to adjudicate his findings even though Defendant Hasselbacher conducted a single investigation and issued a single report. In response, Cox issued two separate findings of responsibility and empaneled two separate hearing committees.

181.    Plaintiff's attorneys responded, objecting to the use of two separate panels. Plaintiff also requested that the hearings be delayed until the beginning of the Spring semester instead of being held over winter break.

182.    Cox responded by stating that a delay must be consented to by all parties and that the Complainants agreed to delay the hearing until the start of the new year, but not until the beginning of the spring semester. In doing so, Cox took it upon himself to consider the wishes of the Complainants even though it was nowhere required by statute or policy. In fact, UWS 17 only requires consent among the respondent and the investigating officer in scheduling hearings. While the policy requires consent of the respondent, Cox deliberately ignored the policy and did the exact opposite, prioritizing the female students' wishes over Plaintiff's rights under the policy.

183.    The hearing was then scheduled for January 15, 2019: a date on which Plaintiff's chosen advisor made clear in an earlier email that he would not be available. Defendants refused to reschedule the hearing for a date when Plaintiff's chosen advisor would be available.

184.    In scheduling the hearing, the University also noted that "Complainants will appear at the hearing via Skype or other video conferencing method and cross-examination questions directed to them will be funneled through the hearing committee chair."

**D.  The Biased Hearing**

39

DOE 0254

185. On January 15, with his advisor of choice unavailable, Plaintiff appeared at the University hearing with one of his criminal defense attorneys, Kathleen Stilling.

186. Stilling acknowledged her lack of familiarity with Title IX proceedings, stating

> "I am one of his criminal lawyers. And I have no experience in Title IX. So while the respondents have—I'm sorry, while the complainants have their advisor of choice, Mr. Cephus does not…."

> "…So I subbed in at the last minute. As you can tell, I wasn't as familiar with investigative reports and what you had in this investigation, as I am with my criminal case. So I was at somewhat of a disadvantage."

187. Furthermore, at the start of the Title IX process, Hasselbacher told Plaintiff that in light of the parallel criminal case as well as Plaintiff's learning disabilities[6], Plaintiff would be permitted to have two advisors present during the process.

188. However, the University reversed this promise at the hearing when Plaintiff was not permitted to have his religious support person, Bishop Grant, accompany him at the hearing.

189. During the hearing, Cox repeatedly cited to the criminal court complaint which was included in the final investigative report.

190. Although Plaintiff's motion to dismiss was ultimately contained in the final hearing packet, it was added too late in time for Cox to have the opportunity to review all the documents and deficiencies in the Complainants' story.

191. Plaintiff's advisor was not allowed to cross-examine the Complainants, who did not appear in-person, but rather by video conference. Instead, Plaintiff's advisor had to funnel her questions through a University Chairperson, who materially altered the questions.

192. By way of example, Plaintiff's advisor proposed questioning Complainant 1 whether she had a blood alcohol test done at any point when the nurses came in to give her

---

[6] Plaintiff was a client of the McBurney Center at UW-Madison and received special accommodations in the classroom.

40

DOE 0255

medication. The Chairperson turned that question into "Okay. I know your—your recollection of the hospital is--is fuzzy. Do you recall interacting with any nurses or receiving medication or anything to that effect?" Not only did this rewording materially alter the substance of the proposed question – which was asking about blood alcohol – it also effectively suggested to Complainant 1 an excuse for not remembering critical details of events.

193.    The University Chairperson also fed Complainants with what needed to be said to find Plaintiff responsible by prefacing questions for Complainant 2 with "I guess what I'm -- what I'm getting at and, again, not -- not trying to rush you or anything to that effect, is, you know, the elements of second degree sexual assault require a respondent or a person who's accused to have actual knowledge that the victim was unable to consent."

194.    In saying this, the Chairperson deliberately told Complainant 2 what she would need to say so that Plaintiff could be found responsible. Clearly, the hearing panel went into this meeting with a preconceived notion of guilt for Plaintiff, and just needed the Complainants to say what they wanted to hear in order to support a finding of responsibility. The Chairperson did this with complete disregard for the lack of evidence on the record to support a finding that Complainant 2 was incapacitated, but rather believed anything the female complainants said.

195.    Furthermore, during the hearing it came to light for the first time that Defendant Hasselbacher put a newly-hired investigator on the case midway through her investigation, stating in the hearing transcript,  "[A]nd in this case, I did have a second investigator, but she was a new employee at the time. I believe she started in June or July 2018. So she assisted me on the back end of the case. But I wouldn't say it would necessarily have helped speed anything long."

196.    Plaintiff, as the University had now known for months, could not participate in the hearing at the risk of undermining his defense in the pending criminal matter. The hearing

41

DOE 0256

committee therefore was able to hear everything that the Complainants wanted to say without being able to hear Plaintiff's side of the story.

197.    The University's policy expressly states that at a disciplinary hearing, the respondent is expected to answer questions and speak on his own behalf. Furthermore, the policy contains no provision stating that no negative inference will be drawn from non-participation. As a result, the University punished Plaintiff for asserting his constitutional right to remain silence.

198.    Upon completion of the hearing, the committee found Plaintiff responsible for sexual assault in the third degree and sexual harassment in regards to Complainant 1 and responsible for sexual assault in the second degree, sexual assault in the third degree and sexual harassment in regards to Complainant 2, and was expelled from the University.

199.    Plaintiff then filed a timely appeal to Defendant Blank on February 12, 2019, outlining the many procedural errors that plagued the investigation and the hearing committee's decision.

200.    In response to Plaintiff's appeal, Blank rubber-stamped the findings of the hearing panel and ignored all the procedural errors that had occurred, and upheld Plaintiff's expulsion.

201.    Subsequently, Plaintiff submitted his request for review of Blank's decision to the Board of Regents.

202.    On June 7, 2019 the Board of Regents notified Plaintiff that it denied Plaintiff's request for review.

203.    As a result of the expulsion, Plaintiff was forced to miss the entire Spring 2019 semester. This put his NFL draft eligibility, as well as his ability to get an education, in jeopardy.

204.    After expulsion, Plaintiff was isolated in Wisconsin, neither able to attend class nor go to football practice. When the criminal proceeding was adjourned from February 2019 to

42

DOE 0257

August 2019, Plaintiff returned home to Georgia. He spent his time helping his community by doing public service, taking online classes, and training for football, holding onto his dream of one day playing professionally.

205.    On July 29, 2019, Plaintiff's week-long criminal trial commenced. Plaintiff, now able to speak and present a defense, presented the jury with exculpatory evidence that the University **could have had**, and **knew** it could have had, if it had stayed the proceedings until the end of the criminal trial. This evidence included, but is not limited to:

   a. Photos of Complainant 2 smiling and snuggled up to Plaintiff in the bar;

   b. Video footage of the group leaving the bar which shows Complainant 1 and Complainant 2 walking unassisted, with steady gait and without stumbling, in direct contrast to their allegations that they were so intoxicated that they were stumbling;

   c. Video footage of the group entering Plaintiff's apartment, showing Complainant 1 carrying Teammate 2 on her back without stumbling;

   d. Video footage of Complainant 2 holding hands with Plaintiff and looking back at the group and giving the victory sign with her other hand;

   e. Video footage of Complainant 2 again, walking unassisted and without stumbling, leaving Plaintiff's apartment as she was going to get her Uber;

   f. Text messages between Complainant 1 and Complainant 2 showing Complainant 1 convincing Complainant 2 that they had both been sexually assaulted;

   g. The complicated exit out of Plaintiffs apartment which Complainant 2 was able to navigate despite allegations that she was "too intoxicated to consent," and the Uber receipt for the ride she was able to get from her phone;

   h. Video footage of Complainant 2 entering Sellery Hall, using the door keys and walking without stumbling;

   i. Video footage of Complainant 1 entering Ogg Hall, using the door keys and walking without stumbling;

43

DOE 0258

j. Video footage showing Plaintiff, Teammate 2 and Friend 1 entering Complainant 2's dorm room and Complainant 2 leaving to go to the bathroom down the hall and coming back without stumbling;

k. Toxicology reports from Complainant 1 and Complainant 2;

l. Expert testimony regarding the SANE exams and toxicology reports.

206. The above exemplifies just some of the evidence that *could have been* available to the University, evidence which, on August 2, 2019, led the jury to reach a **30-minute acquittal** of Plaintiff on all charges because it so unequivocally demonstrated Plaintiff's innocence.

207. Instead, the University chose to rush its adjudication and make its decision based almost exclusively on the reliance on two women's statements, knowing that the male respondent could not defend himself, due to the pressure to expel and punish male perpetrators.

**E. UW-Madison Readmits Plaintiff in Acknowledgment of its Flawed and Wrong Decision on his Title IX Case**

208. Following the acquittal, Plaintiff petitioned the University for readmittance, citing the exculpatory evidence that was obtained during the criminal investigation that the University refused to wait for.

209. On August 21, 2019, Blank **changed her previous decision** regarding Plaintiff and reinstated him at the University due to information **"that was not provided to the university during the student conduct process."** Blank stated the sanctions against Plaintiff were reduced and his expulsion had been lifted, but "there were findings of responsibility of the student non-academic misconduct code that were upheld."

210. Notably, the evidence Blank relied upon in making this change was exactly what Plaintiff had repeatedly asked UW-Madison to wait until the close of the criminal proceedings for. It was also the same evidence that was acknowledged by Taffora in plowing ahead with the investigation anyway.

44

211.    In essence, Blank finally acknowledged what Plaintiff spent months trying to tell UW-Madison – that he was innocent, and that there was considerable evidence to prove it.

212.    Two days later, on August 23, 2019, Plaintiff was deemed eligible to play on the football team. The team's first game was scheduled for August 30, 2019, just seven days later. Plaintiff played for the team without having the opportunity to attend summer practices with his teammates.

213.    Despite not being able to practice prior to the season, Plaintiff was a standout in the 2019-2020 season, going on to declare for the NFL draft at the end of the season.

214.    Upon entering the draft, NFL scouts expressed skepticism about Plaintiff. Due to the expulsion, Plaintiff was absent from college football for an entire season, not able to practice with a team nor play a game. The time gap inevitably affected the NFL scout's perception of Plaintiff as well as Plaintiff's ability to prepare physically.

215.    As a result, Plaintiff was selected as a 5th round NFL draft pick rather than an earlier 2nd round draft pick, as he would have been absent coaches' apprehensions surrounding Plaintiff's off-the-field allegations and media coverage.[7]

216.    Even after being selected, Plaintiff still has to face questions regarding his expulsion and the allegations against him. Plaintiff's life was put on hold for 15 months stemming from the university's refusal to stay the Title IX proceeding, and that 15-month period – and initial false finding and baseless expulsion – affected his position in the NFL draft.

## III.    AGREEMENTS, REPRESENTATIONS, COVENANTS & WARRANTIES BETWEEN PLAINTIFF AND DEFENDANT UW-MADISON.

---

[7] See Athlon Sports, *2020 NFL Draft Profile: Quintez Cephus,* Athlon Sports (Apr. 1, 2020) ("More importantly, there are some character-related questions he must answer. But if his background checks out, Cephus has the tools and showed enough at Wisconsin for a team to take a chance on him, perhaps as early as the second round.")

45

DOE 0260

217. Upon Plaintiff's matriculation into UW-Madison, Plaintiff and UW-Madison became mutually bound by the University of Wisconsin System Regulations ("UWS" or "the Statute"), which contains various policies on student conduct, discipline, and students' rights and responsibilities, as well as the UW-Madison Policy on Sexual Harassment and Sexual Violence ("The Policy") (collectively "the Policies").

218. On information and belief, the Policies are updated and/or reviewed each new school year.

219. On information and belief, the Policies are available online and available on the UW-Madison website.

220. The Policies constitute and represent a contract between students and the University, and in particular, between Plaintiff and UW-Madison.

221. Throughout the Title IX process in this case, Defendants breached their contractual obligations and the implied covenant of good faith and fair dealing by failing to abide by the Policies and by permitting gender bias to infect and taint the proceedings.

222. The Policies describe certain prohibited conduct which is defined in Wisconsin Statutes, including different types of sex discrimination and sexual misconduct.

223. According to UWS 17.01, which states in pertinent part: "The University of Wisconsin System is committed to respecting students' constitutional rights...."

224. UW-Madison violated the Statute when it violated Plaintiff's due process rights. Defendants deprived Plaintiff of due process, inflicting tremendous reputational damage upon Plaintiff and changing his legal status from a student in good standing to one expelled, thereby causing Plaintiff's stock in the NFL draft to plummet, effecting a deprivation of Plaintiff's constitutionally protected liberty interests without due process.

46

DOE 0261

225. According to the Policy, "[t]he offices and University officials responding to a report of sexual harassment or sexual violence pursuant to this policy will endeavor to resolve the matter in a prompt and equitable manner in accordance with the applicable procedures, taking into consideration the nature and complexity of the report and procedural due process requirements."

226. UW-Madison breached this provision throughout the entire investigation and adjudication process as this matter was not resolved in an equitable manner. Rather than acknowledging the importance of exculpatory evidence and the reputational damage that would result from an erroneous finding of responsibility, the University proceeded with the investigation under a predetermined presumption of guilt. University officials ignored any evidence that would call into question the credibility of the Complainants and rather allowed the Complainants to submit skewed, incomplete, and one-sided "evidence."

227. Under UWS 17.05, the chief administrative officer is to designate an investigating officer (or officers) for allegations of student nonacademic misconduct, who is to investigate and initiate procedures in accordance with the Policy. The Handbook further states that in allegations dealing with sexual assault, the investigating officer is to involve the Title IX coordinator in these procedures.

    a. UW-Madison violated the Statute when Cox obtained and relied on the opinions of two unidentified colleagues in determining to put the allegations against Plaintiff to a hearing. These individuals were not designated as investigators and should not have been permitted to sway the opinion of the designated officer, let alone do so undocumented. The policy clearly states who should be involved (the designated officer and the Title IX coordinator), and two unidentified individuals are not permitted by the Handbook.

    b. In addition, by involving two unidentified individuals in the process, UW precluded Plaintiff from being able to object on the grounds of bias or conflict of interest, interfering with his right to an impartial adjudication.

228. Under UWS 17.12(4)(b),

47

DOE 0262

The respondent shall have the right to question adverse witnesses, the right to present information and witnesses, the right to be heard on his or her own behalf, *and the right to be accompanied by an advisor of the respondent's choice*. The advisor may be a lawyer. In cases where the recommended disciplinary sanction is identified in s. UWS 17.10 (1) (a) to (h), the advisor may counsel the respondent but may not directly question adverse witnesses, present information or witnesses, or speak on behalf of the respondent except at the discretion of the hearing examiner or committee. ***In cases where the recommended disciplinary sanction is identified in s. UWS 17.10 (1) (i) or (j), or where the respondent has been charged with a crime in connection with the same conduct for which the disciplinary sanction is sought, the advisor may question adverse witnesses, present information and witnesses, and speak on behalf of the respondent.*** In accordance with the educational purposes of the hearing, the respondent is expected to respond on his or her own behalf to questions asked of him or her during the hearing. The complainant shall have all the rights provided to the respondent in this subsection. (Emphasis added).

   a. UW-Madison violated the Statute when it refused Plaintiff's ability to cross examine the Complainants through his advisor. The Statute clearly mandates that students facing expulsion must be given the opportunity to have their adviser directly question the witnesses. Instead, UW-Madison funneled the questions of Plaintiff's advisor through a University Chairperson, who materially altered the questions and biased the proceeding in favor of the Complainants.

   b. UW-Madison violated the Statute when it scheduled Plaintiff's hearing on a date that UW-Madison knew his advisors of choice were not available, in spite of letters from Plaintiff's advisors stating that they would not be able to make the hearing on the scheduled date.

229.   According to UWS 17.12(2), "The hearing shall be conducted within 45 days of receipt of the request or written report, *unless a different time period is mutually agreed upon by the respondent and investigating officer, or is ordered or permitted by the hearing examiner or committee.*" (emphasis added). UW-Madison violated the Statute when Cox relied solely upon the Complainant's wishes in scheduling the hearing. Cox stated that "the complainants consented to your request to have these hearings be postponed until the New Year, but do not consent to delaying them into the start of the spring semester. Accordingly, the hearings will be scheduled

48

DOE 0263

for 1/15 and 1/8, for which you have not identified conflicts." This reasoning is directly in violation of the Handbook. Plaintiff never agreed to this date as his requested advisor was out of town on those dates, yet Cox only complied with the Complainants' wishes.

230.     According to the Policy, "[i]nvestigations regarding alleged violations of this policy will be conducted using the applicable University investigatory or disciplinary procedures. Before any sanctions can be imposed, the disciplinary procedures that will be used will be based on the relationship of the respondent with the University." The footnote to that rule states,

> The University procedures pertaining to faculty, academic staff, and University staff are currently being revised. While these revisions are being completed, the University will ensure that its response to complaints pursuant to this policy include the required elements of equal treatment. Specifically, in all investigatory and disciplinary proceedings for sexual harassment or sexual violence, the determination of whether this policy was violated will be based on the preponderance of available evidence. The complainant and the respondent will be afforded an equal opportunity to present information to be considered during the process, to identify other sources of information to support their position, *to be accompanied by a support person of their choosing throughout the process*, and to receive a written notice of the outcome of each stage of the process. Where appeal rights are provided, the complainant and the respondent will have equal appeal rights.

UW-Madison violated the Policy when it denied Plaintiff the ability to have his support person present during the hearing. Defendant Hasselbacher agreed with Plaintiff's then-advisor and criminal defense attorney, Steven Meyer, that Plaintiff would be permitted to have two advisors as a result of the pending criminal investigation and an ADA accommodation. Not only did Defendant Hasselbacher not allow Plaintiff to have two advisors as she promised, but UW-Madison refused Plaintiff's ability to be accompanied by his religious support person during the hearing, in violation of the Handbook.

## IV.     PLAINTIFF'S DAMAGES

49

DOE 0264

231. As a direct and proximate result of Defendants' biased, unlawful, negligent and improper conduct, Plaintiff was wrongly found responsible for engaging in sexual assault and sexual harassment, and such a finding has been made part of Plaintiff's educational records.

232. These notations of responsibility forever mar Plaintiff's records, especially in the wake of the powerful #MeToo movement, characterizing him as a sexual predator.

233. Even as Plaintiff entered the NFL draft, his draft stock plummeted as a result of these allegations—which were initially "confirmed" by UW's bogus and deficient process, putting an institutional stamp of approval on the Complainant's false accusations—as many NFL coaches do not want to get involved with bad media coverage, especially in situations of alleged sexual assaults.[8] As a result, Plaintiff was a much lower pick in the NFL draft than he would have been, causing his salary to be drastically less than what it would have been if he was drafted in an earlier round.

234. Due to Defendants' biased, unlawful, negligent and improper conduct, Plaintiff was subjected to an unfair, biased, improper investigation and adjudication process which destroyed his reputation and will permanently impact his future.

235. Due to Defendants' biased, unlawful, negligent and improper conduct, Plaintiff was treated as a perpetrator and presumed guilty from the start.

---

[8] Multiple sources have noted that past sexual assault allegations hurt an athlete's NFL draft stock. *See* Matt Slovin, *Experts: Rape allegation hurts A.J. Johnson's draft stock,* Tennessean (Jan. 30, 2015) (projected to be 3rd round pick then went undrafted due to sexual assault allegations); Shawne Merriman, *Shawn Oakman's Rape Allegation Hurts Draft Stock... Even If He's Innocent,* TMZ Sports (Apr. 8, 2016) ("Even if it's not true, or even if he is acquitted, teams still look at him as a bad apple and nobody really wants that in an organization."); Sander Phillips, *Why did not one draft La'el Collins, while everyone wanted him after the draft?,* Bucs Nation (May 16, 2015) (Collins seen as a top 15 pick before the 2015 NFL draft, but then had his stock collapse and went undrafted after police wanted to question him in connection to a murder of his ex-girlfriend, even though he was not a suspect); *NFL's Gareon Conley Sues Rape Accuser: You Cost Me Millions and A Nike Deal,* TMZ Sports (Jul. 5, 2018).

Doe Deposition Exhibit 3 - 51

DOE 0265

236. Due to Defendants' biased, unlawful, negligent and improper conduct, Plaintiff has been falsely labeled as a perpetrator of sexual assault. Even after his sanction was lifted, Plaintiff's records are, on information and belief, still marked with findings of sexual assault and he will forever be labeled as a perpetrator by many throughout the country who believe the "victims" as bolstered by UW's initial baseless findings.

237. Due to Defendants' biased, unlawful, negligent and improper conduct, Plaintiff's academic file is now marred by a false and baseless finding of sexual misconduct, which, on information and belief, will be forever noted on Plaintiff's transcript.

238. Due to Defendants' biased, unlawful, negligent and improper conduct, Plaintiff has suffered and will continue to suffer ridicule, reputational damage, economic losses, and damage to his future educational and career prospects.

## AS AND FOR A FIRST CAUSE OF ACTION
### 42 U.S.C. §1983: Denial of Fourteenth Amendment Procedural Due Process – Stigma Plus (Against Defendants Hasselbacher and Blank)

239. Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

240. The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

241. In this case, the individual Defendants are state actors subject to the Fourteenth Amendment.

242. Section 1983 of Title 42 of the U.S. Code provides in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

51

DOE 0266

243.     A person has a protected liberty interest in his good name, reputation, honor and integrity, of which he cannot be deprived without due process.

244.     A person has a protected property interest in pursuing his education, as well as in future educational and employment opportunities and occupational liberty, of which he cannot be deprived without due process.

245.     Fourteenth Amendment Due Process may be violated if a school (1) inflicts reputational damage to a student, accompanied by (2) a student's change in legal status that (3) deprives the student of a right he previously held. *Doe v. Purdue Univ.*, 928 F.3d 652, 661 (7th Cir. 2019).

246.     The right to pursue the career of one's choice is well established as a liberty interest within the Fourteenth Amendment. *Lawson v. Sheriff of Tippecanoe Cty., Ind.*, 725 F.2d 1136, 1138 (7th Cir. 1984).

247.     Defendants have inflicted reputational damage to Plaintiff by wrongly branding him as a sex offender.

248.     Throughout the entire Title IX process, Plaintiff was presumed guilty. Defendants failed to collect and objectively evaluate all evidence that could have been available. Instead, Defendants forged ahead in the investigation, despite actually knowing that it lacked significant evidence, to find Plaintiff responsible for sexual assault.

249.     As a result of the University's findings, Plaintiff was expelled and plastered across the media as a sex offender.

250.     Even though the University reversed Plaintiff's expulsion, it was done too late to undo the reputational damage that had been done. Moreover, even after Blank reversed the

52

DOE 0267

expulsion, she went out of her way not to exonerate Plaintiff, stating "there were findings of responsibility of the student non-academic misconduct code that were upheld."

251.    When the University reversed the expulsion, Plaintiff still had to face the growing fraction of the country that "believes all women" regardless of evidence to the contrary.

252.    While the UW-Madison may have reversed the expulsion (which only took place as a result of the University's flawed Title IX process in the first place), Plaintiff still suffers from the reputational damage that was inflicted by the biased investigation and unduly harsh sanction.

253.    Plaintiff also suffered a change in legal status coupled with this reputational damage because Plaintiff went from a student in good standing to one expelled from the University.

254.    As a result, Plaintiff was deprived of a right he previously had when this reputational damage deprived Plaintiff from the full ability to pursue the career of his choice.

255.    The reputational damage inflicted upon Plaintiff as a result of the University's expulsion and wrongful branding of Plaintiff as a sex offender caused him to lose value in the NFL draft.

256.    Even after the expulsion was overturned, many coaches did not want to get involved with a tainted individual who "may or may not have" committed sexual assault.

257.    Especially in the height of the #MeToo movement, coaches are not clamoring to have someone on their team who was publicly accused and disciplined for sexual assault, as the optics look terrible for media purposes due to the fact that many still "believe all women."

258.    Both leading up to and after the NFL draft, media outlets noted that Plaintiff's "potential off-field character issues" played a detrimental part in determining his draft stock. *See* Harrison Freuck, *Football: Look at Quintez Cephus' draft stock before NFL Draft,* The Badger

Doe Deposition Exhibit 3 - 54

DOE 0268

Herald (Feb. 11, 2020); *see also* Carlos Monarrez, *Detroit Lions get C for picking Wisconsin WR Quintez Cephus in Round 5 of NFL draft,* Detroit Free Press (Apr. 25, 2020).

259.    Further, due to the false findings and expulsion, Plaintiff could not play in the 2018 football season or practice with the team, and as a result was not in top shape for the NFL draft. Missing the 2018 season also caused him to not be in front of NFL scouts as much as he would have if he was able to play the whole season.

260.    This caused Plaintiff's draft stock to plummet, as Plaintiff, who on information and belief would have been a 2nd round pick in the NFL draft but for the reputational damage inflicted by Defendants, was not drafted until the 5th round.

261.    Defendants, as well as other agents, representatives, and employees of the University of Wisconsin-Madison, were acting under color of state law when they showed intentional, outrageous, and reckless disregard for Plaintiff's constitutional rights.

262.    Defendants all agreed to, approved and ratified this unconstitutional conduct as described above.

263.    On information and belief, Defendant Blank is the University official responsible for hiring and overseeing the work of Hasselbacher and was the decision-maker for Plaintiff's appeal.

264.    On information and belief, Defendant Hasselbacher, as the University's Title IX Coordinator, is responsible for overseeing and implementing the policies and procedures identified in UW-Madison's Policies.

265.    Defendants, as well as other agents, representatives, and employees of UW-Madison, intentionally, willfully, wantonly, oppressively and maliciously violated Plaintiff's due process rights.

54

DOE 0269

266. Defendants deprived Plaintiff of Due Process because, by way of example and not limitation:

    a. Defendants denied Plaintiff a meaningful opportunity to be heard, as Hasselbacher deliberately waited until Plaintiff was hamstrung by the parallel criminal investigation to invite him for an interview;

    b. Defendants denied Plaintiff an opportunity to be heard by refusing to stay the hearing in light of the pending parallel criminal prosecution, essentially punishing Plaintiff for exercising his Fifth Amendment privilege and forcing him to choose between his Fifth Amendment right and his ability to participate in UW's process;

    c. Defendants denied Plaintiff a meaningful opportunity to present evidence in his own defense, as they knew that substantial, relevant, exculpatory evidence would be available after the criminal trial, but deliberately forged ahead without this evidence;

    d. Defendants denied Plaintiff a meaningful opportunity to be heard and violated his rights as clearly established by Chapter 17 to have his advisor cross-examine the witnesses at his hearing;

    e. Defendants denied Plaintiff an opportunity to be heard by a neutral arbiter, as the hearing board members went out of their way to rephrase Plaintiff's proposed cross-examination questions in ways that changed their meaning and were improperly beneficial to Complainants;

    f. Defendants denied Plaintiff an opportunity to be heard by a neutral arbiter, as Dean Cox invited two unidentified individuals to interfere with the decision-making process, ultimately sending the case out for a hearing based on the opinions of undisclosed and potentially biased/conflicted individuals.

267. Additionally, Defendants, as well as other agents, representatives, and employees of UW-Madison deprived Plaintiff of the requisite due process because the University had a pecuniary interest in the outcome of the adjudication: UW-Madison was under OCR investigation at the time of the investigation into the Complainants' allegations and potentially risked the loss of federal funding or other penalties if Plaintiff was not found responsible and sanctioned.

55

DOE 0270

268.     Accordingly, Defendants are liable to Plaintiff in violation of 42 U.S.C. § 1983 for violations of the Due Process Clause of the Fourteenth Amendment, for violations of his clearly established rights, and for all damages arising therefrom.

269.     As a result of these due process violations, Plaintiff continues to suffer ongoing harm, including, without limitation, emotional distress; loss of educational, athletic and non-athletic career opportunities; economic injuries; and other direct and consequential damages. In particular, Defendants damaged Plaintiff's reputation and deprived him of his full right to pursue the career of his choice.

270.     Defendants' conduct as described herein was malicious, reckless, and/or callously indifferent to Plaintiff's rights such that Plaintiff is entitled to an award of punitive damages.

271.     As a result of the foregoing, Plaintiff seeks damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, loss of future career prospects, together with punitive damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing UW-Madison to clear Plaintiff's record of any findings of responsibility.

## AS AND FOR A SECOND CAUSE OF ACTION
### Violation of Title IX of the Education Amendments of 1972
### (Against UW-Madison)

272.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

273.     Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied

56

DOE 0271

the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

274.     Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, including Defendant UW-Madison.

275.     UW-Madison is part of the University of Wisconsin system, with its principal administrative offices in Madison, Wisconsin. UW-Madison is authorized, supervised and funded by the State of Wisconsin.

276.     On information and belief, UW-Madison receives federal funding, including in the form of federal student loans given to students and subject to the provisions of Title IX. According to UW-Madison's Annual Financial Report for the period ending June 30, 2018, UW-Madison received nearly $600 million in government grants and contracts. In addition, UW-Madison receives additional federal assistance in the form of tax breaks, student loans, and Pell grants.

277.     Title IX is enforceable through a private right of action.

278.     Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the *prompt and equitable resolution* of student… complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice) (emphasis added).

279.     The "prompt and equitable" procedures that a school must implement include, at a minimum: "[n]otice . . . of the procedure, including where complaints may be filed; [a]pplication of the procedure to complaints alleging harassment; . . . [a]dequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence; . . . [and] [d]esignated and reasonably prompt timeframes for the major stages of the complaint

57

DOE 0272

process." Dep't of Ed., *Office for Civ. Rights, Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX* (Jan. 19, 2001), at 20.

280.    Title IX may be violated by a school's imposition of university discipline where the University discriminated against Plaintiff on the basis of sex.

281.    UW-Madison engaged in gender bias in its Title IX proceedings. The actions of the University in the flawed investigation and sanction demonstrate that Plaintiff was discriminated against on the basis of his gender.

282.    UW-Madison failed to conduct an adequate, reliable, and impartial investigation of the Complainants' complaints because, without limitation:

    a.    From the start, the investigation was slanted in favor of the Complainants. The Complainants' stories were deemed credible from the beginning and given more weight in the final analysis and determination in what occurred that night. In that regard, Defendants primarily relied on inconsistent, hearsay statements from the Complainants and took their statements at face value;

    b.    Rather than conducting an impartial inquiry, the process was skewed at all times to guide and bolster the Complainants' claims against Plaintiff. For example, rather than asking Complainant 2 for her own statement, she was improperly shown Complainant 1's statement first, and then asked to corroborate it. By this process, UW deliberately sought to minimize conflicting facts as between the two Complainants' stories;

    c.    Defendants failed to question Complainants' credibility and presumed them to be credible from the start;

    d.    Defendants failed to take into consideration the timing of the complaint and possible falsity of the complaint due to the fact that Complainants refused to speak to the University for over one month after the alleged incident;

    e.    Defendants failed to conduct a thorough investigation: specifically, the investigators only interviewed and collected evidence that Complainants deemed significant, while refusing to independently seek out relevant evidence, and deliberately refused to wait to be able to collect evidence that Plaintiff deemed significant, which evidence UW *knew* would be available at a later time;

58

DOE 0273

f. Defendants failed to apply the presumption of innocence and presumed Plaintiff guilty from the start as a male accused;

g. Defendants drew adverse conclusions against Plaintiff based upon his inability to present a defense at the hearing, yet did not draw adverse conclusions against the Complainants for failure to produce complete text conversations and blood alcohol tests to support their allegations;

h. Defendants failed to provide Cox with all relevant material that was available from the criminal proceeding, including the Plaintiff's motion to dismiss, in adequate time for Cox to review the material before he issued his decision;

i. Cox went against University policy and complied with the Complainants' wishes in scheduling a hearing date, thereby denying Plaintiff the opportunity to have his advisor of choice present;

j. Defendants failed to stay the university proceeding until the conclusion of the criminal proceeding so that all evidence could be reviewed;

k. Defendants delayed interviewing Plaintiff until *after* the criminal charges were filed;

l. Defendants waited four months to even request an interview with Plaintiff, treating his side of the story as an afterthought rather than a crucial first step of the investigation;

m. Defendants included the skewed criminal complaint but not Plaintiff's motion to dismiss and other exculpatory evidence;

n. The evidence collected in the criminal investigation – including video footage which clearly refuted the Complainant's accounts, did not support the complainant's account. Rather, the evidence supported Plaintiff's account of a consensual interaction as evidenced by Plaintiff's thirty-minute acquittal. Nevertheless, the University deliberately went forward with one-sided evidence favoring the Complainants;

o. Defendant Hasselbacher had a conflict of interest in her role because part of her responsibilities within the Office of Compliance was to ensure UW-Madison's compliance with Title IX, and she was also involved in conducting interviews and preparing the final report;

p. Defendants' refusal to conduct any genuine investigation that could reveal exculpatory evidence, for example, looking at the Complainants' phones for text messages rather than allowing the Complainants to cherry pick what to hand over;

59

DOE 0274

q. Defendants' refusal to allow Plaintiff's support person to attend the hearing;

r. Defendants' channeling of Plaintiff's questions through a University Chairperson who materially changed the questions to provide an explanation for Complainants not remembering the events and to feed the Complainants the responses needed to be said in order to find Plaintiff responsible;

s. Defendants' failure to afford Plaintiff the presumption of innocence, as such would require Defendants to view equivocal evidence in favor of Plaintiff, which they did not do.

283. Particular circumstances suggest that gender bias was a motivating factor behind the erroneous finding and the decision to impose an unjustly severe penalty upon Plaintiff. These circumstances include, without limitation:

a. Beginning in 2015 and through the time when Complainants' complaints were investigated, UW-Madison was subject to immense federal, local and campus pressure to take measures to protect female victims of sexual assault, adopt a trauma-informed approach to investigating sexual misconduct claims, and issue more severe sanctions to those found responsible for sexual misconduct. Such pressure included the multiple ongoing OCR investigations, student outcry regarding UW-Madison's compliance with Title IX and lack of follow-through, and the public announcement that the OCR was investigating UW-Madison;

b. Internal pressure from the student body and/or media after years of harshly criticizing UW-Madison for its alleged failure to sufficiently prosecute and punish male students and faculty accused of sexual misconduct;

c. The institutionalized bias embracing gender stereotypes, such as female victims and male assailants, as evidenced by UW-Madison's "re-enactment" videos and UW Police Department's "Don't Be That Guy" campaign;

d. Defendant Blank's public support of the "Don't Be That Guy" campaign in the Task Force Report and notion that only males need to be addressed in order to stop sexual assault on campus;

e. Statements from the head of the UW violence prevention program, Sam Johnson, explicitly voicing gender bias and the idea that males are the problem;

f. UW's formation of a six-week program for males to understand their masculinity in order to prevent violence without feeling the need to offer women the same;

DOE 0275

g.  Upon information and belief, Defendant Hasselbacher received trauma-informed investigation training, which perpetuated the idea that victims of sexual assault should never be questioned, that trauma excuses all memory lapses and credibility issues and that complainants always tell the truth. This approach caused Hasselbacher to overlook exculpatory evidence and profound inconsistencies in the Complainants' accounts of what happened;

h.  The investigators credited the inconsistent statements of the female Complainants over consistent statements of Plaintiff and other male witnesses;

i.  Defendant Hasselbacher had a lengthy career as a women's advocate, working with victims of domestic violence and sexual assault;

j.  Failure to include Plaintiff's criminal motion to dismiss in the Report despite including the criminal complaint, which only told Complainants' side of the story;

k.  Failing to question the females' credibility despite inconsistencies in their stories;

l.  Elevating the wishes of the female students over the male student's express rights under the policy;

m.  Interviewing female complainants right after a report was made, but waiting four weeks to ask Plaintiff for an interview, treating the male student's interview as an afterthought and apparently unnecessary to the evidence-gathering process.

284.  On information and belief, UW-Madison's mishandling of the Complaint was informed by internal pressure, ongoing OCR investigations, and the threat of recission of federal funds.

285.  On information and belief, UW-Madison has engaged in a pattern of unfair investigations and adjudications resulting in serious sanctions being imposed on male students, while not making comparable efforts with respect to allegations of sexual violence and abusive conduct against non-male students.

286.  Based on the foregoing, Plaintiff was subjected to a biased, prejudiced and explicitly unfair process in violation of Title IX.

DOE 0276

287. This unlawful violation of Title IX caused Plaintiff to sustain substantial injury, damage, and loss, including, but not limited to, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

288. In light of the foregoing, Plaintiff's damages are an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, loss of future career prospects, together with punitive damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing UW-Madison to clear Plaintiff's record of any findings of responsibility.

## AS AND FOR A THIRD CAUSE OF ACTION
### Breach of Contract
### (Against UW-Madison)

289. Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

290. At all times relevant hereto, a contractual relationship existed between UW-Madison and Plaintiff through UW-Madison's policies and procedures governing the student disciplinary system, including but not limited UWS and the Policy. Through the documents it publishes, UW-Madison makes express contractual commitments to students involved in a disciplinary process.

291. The contracts contained an implied covenant of good faith and fair dealing. They implicitly guaranteed that any proceedings would be conducted with basic fairness.

DOE 0277

292. UW-Madison committed numerous breaches of its agreements with Plaintiff during the investigation and adjudication of the Complainants' allegations against him, including but not limited to:

    a. Failing to protect Plaintiff's constitutional rights;

    b. Failing to ensure an equitable opportunity for Plaintiff throughout the Title IX process;

    c. The investigating officer's decisions being influenced by two "unidentified" colleagues;

    d. Failing to provide Plaintiff with the opportunity to cross-examine witnesses;

    e. Failing to schedule the hearing for a time when Plaintiff's advisor of choice could attend;

    f. Failure to obtain consent from the respondent in scheduling the hearing

    g. Failing to provide the Plaintiff with the opportunity to have his support person present at the hearing;

293. This unlawful breach by UW-Madison of the University's contractual agreements with Plaintiff caused Plaintiff to sustain substantial injury, damage, and loss, including, but not limited to, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

294. In light of the foregoing, Plaintiff's damages are an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, loss of future career prospects, together with punitive damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing UW-Madison to clear Plaintiff's record of any findings of responsibility.

Doe Deposition Exhibit 3 - 64

DOE 0278

## AS AND FOR A FOURTH CAUSE OF ACTION
### Estoppel and Reliance
### (Against UW-Madison)

295.     Plaintiff repeats and re-alleges each and every allegation above as if fully set forth herein.

296.     UW-Madison's various policies constitute representations and promises that it should have reasonably expected to induce action or forbearance by Plaintiff.

297.     UW-Madison made express promises that it would provide an equitable process to resolve any alleged violation of UW-Madison's Policy. Plaintiff relied on those promises when he made the decision to enroll at UW-Madison, and such a reliance was expected or should have been expected by UW-Madison.

298.     Plaintiff relied to his detriment on these promises and representations by UW-Madison.

299.     As a direct and proximate result of the above conduct, Plaintiff sustained tremendous damages including loss of educational and career opportunities, reputational damages, economic injuries, and other direct and consequential damages.

300.     Thus, Plaintiff is entitled to damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, loss of future career prospects, together with punitive damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing UW-Madison to clear Plaintiff's record of any findings of responsibility.

DOE 0279

## **PRAYER FOR RELIEF**

**WHEREFORE,** for the foregoing reasons, Plaintiff demands judgment against

Defendants as follows:

(i)      on the first cause of action against Defendants Hasselbacher and Blank for violation of constitutional due process under 42 U.S.C. § 1983, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, loss of future career prospects, together with punitive damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing UW-Madison to clear Plaintiff's record of any findings of responsibility;

(ii)     on the second cause of action against UW-Madison for violation of Title IX of the Education Amendments of 1972, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, loss of future career prospects, together with punitive damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing UW-Madison to clear Plaintiff's record of any findings of responsibility;

(iii)     on the third cause of action for breach of contract against UW-Madison, a judgment awarding Plaintiff damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iv)     on the fourth cause of action for estoppel and reliance against UW-Madison, a judgment awarding Plaintiff damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements; and

(v)     awarding Plaintiff such other and further relief as the Court deems just, equitable and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury of all issues presented herein that are capable of being

tried by a jury.

65

DOE 0280

**Dated:** **New York, New York**
<u>February 23, 2021</u>

**Respectfully submitted,**

**Nesenoff & Miltenberg LLP**
*Attorneys for Plaintiff Quintez Cephus*

By: <u>/s/Andrew T. Miltenberg, Esq.</u>
Andrew T. Miltenberg, Esq., *pro hac vice*
*admission pending*
Stuart Bernstein, Esq., *pro hac vice*
*admission pending*
Adrienne Levy, Esq*., pro hac vice*
*admission pending*
363 Seventh Avenue, 5th Floor
New York, New York 10001
212-736-4500 (telephone)
212-736-2260 (fax)
amiltenberg@nmllplaw.com
sbernstein@nmllplaw.com
alevy@nmllplaw.com

**Gimbel, Reilly, Guerin & Brown, LLP**
*Attorneys for Plaintiff Quintez Cephus*
By: <u>Electronically signed by Jason D. L</u>uczak
Jason D. Luczak, Esq.
330 E Kilbourn Ave
Suite 1170
Milwaukee, WI 53202
414-271-1440 (telephone)
414-271-7680 (fax)
jluczak@grgblaw.com

66

DOE 0281

**From:** ▮▮▮▮▮▮▮▮ <▮▮▮▮▮▮▮▮gmail.com>
**Sent:** Tue, 09 Mar 2021 15:48:13 -0600
**To:** cbuggy5@gmail.com
**Subject:** Fully
**Attachments:**
· 20-0915 Complaint - file stamped.pdf *(472 kb)*

CONFIDENTIAL

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

JANE DOE,

*Plaintiff,*

v.                                              Case No. 20-cv-856

BOARD OF REGENTS, THE UNIVERSITY OF
WISCONSIN, and REBECCA BLANK, as an individual,

*Defendants.*

## COMPLAINT

Plaintiff Jane Doe ("Ms. Doe" or "Plaintiff") for her Complaint against Defendants, THE

UNIVERSITY OF WISCONSIN ("UW" or "the University") and REBECCA BLANK, states as

follows:[1]

### NATURE OF THE LAWSUIT

1.      Plaintiff bring this civil rights action alleging that the University of Wisconsin

discriminated against her, in violation of Title IX, through its deliberate indifference to known

sexual violence and for itsr gender motivated failure to provide even basic due process to Plaintiff.

Plaintiff also asserts a claim against Rebecca Blank for violating her procedural due process rights

under 42 U.S.C. § 1983.

2.      Abandoning state and federal law as well as its own policies, UW succumbed to

gender-based pressures in summarily reversing a fourteen-month Title IX process to readmit a

male football player with neither notice nor due process to Plaintiff in breach of both the civil

---

[1] Due to the sensitive nature of the abuse contained herein as well as the ages of the students
involved, Plaintiff has moved this Court to permit her to proceed under the pseudonym of "Jane
Doe" and permit her to refer to the students who assaulted her as "PLAYER 1" and "PLAYER 2."

DOE 0283

rights and school policy obligations afforded to all students at UW.  As a result, Plaintiff was denied the equal opportunity to participate in education free from harassment and discrimination.

3.     In April of 2018, Plaintiff was sexually assaulted by a male football player and fellow student at UW, PLAYER 1, while another football player, PLAYER 2, photographed.

4.     Both men were starting members of the much-celebrated UW football team.

5.     The day following the rape, Plaintiff went to the hospital for an examination and called her parents who came to Madison to be with her.  Given the physical and emotional state of their daughter, Plaintiff's parents took her back to her hometown.  The rape was then reported to UW.

6.     UW spent fourteen months investigating and resolving the reported sexual assaults, conducting an exhaustive Title IX process that afforded numerous rights and due process to all parties.

7.     In June 2019, UW finally concluded its Title IX proceedings and appeal processes and found that PLAYER 1 had sexually assaulted Plaintiff and that PLAYER 2 was responsible for sexual harassment. As a result, UW expelled PLAYER 1 from the University and PLAYER 2 was given probation with an educational requirement on sexual harassment and abuse.

8.     Through an exhaustive Title IX process and subsequent appeals, the UW Office of the Dean of Students, the Title IX Hearing Committee, the Chancellor's Office and the Board of Regents made four independent determinations that PLAYER 1 had raped Plaintiff, and that she was highly intoxicated during the assault.

9.     PLAYER 1 was also prosecuted criminally for the rape and a judge held that probable cause existed that PLAYER 1 had raped Plaintiff.  Following the final Title IX outcome,

2

DOE 0284

that criminal matter went to trial and the jury found that the state failed to prove that PLAYER 1 was guilty beyond a reasonable doubt.

10.     In the wake of the verdict, a fast-spreading public call to readmit PLAYER 1 to the UW arose, stoked by PLAYER 1's counsel as well as UW employees, members of the UW football program, and members of the UW community generally.

11.     Media and social media alike were replete with gender-based smears suggesting that Plaintiff was merely an additional example of a promiscuous woman falsely accusing men of rape.

12.     Soon thereafter, PLAYER 1's counsel lobbied and pressured the Defendants to replace the school's Title IX finding with that of the criminal jury, utilizing public sentiment that the athlete must have been falsely accused.

13.     The UW, after being highly criticized for its prior Title IX finding and discipline, quickly readmitted PLAYER 1 and allowed him to rejoin the football team, violating both school policy and federal law.

14.     Plaintiff learned of this lobbying and reconsideration process only through media reports as the UW refused to provide her any information about what the school was contemplating behind closed doors.

15.     Days before the Fall 2019 semester was to begin, the UW and Chancellor Blank simply reversed the finding that PLAYER 1 had committed sexual assault and allowed him to re-enroll in the University.

16.     On information and belief, this reversal is the only one of its kind at the UW.

Doe Deposition Exhibit 3 - 71

DOE 0285

17.     Defendants claimed their decision was based on "new information" learned in the criminal trial, despite the fact that UW officials neither attended nor ordered a transcript of the trial.

18.     According to one administrator involved in the decision, the rushed nature of the decision was due to the impending start of the football season.

19.     As a UW student, Plaintiff thereafter suffered from a highly hostile educational environment where she was forced to walk to class in fear of running into her rapist and his accomplice.

20.     On information and belief, Defendants' actions were the result of gender bias and in response to specific and substantial gender-based pressures from the UW community as well as the media.

21.     Such gender bias and deliberately subjecting a female student to a known hostile educational environment in the interest of football is exactly the types of discrimination that Title IX was designed to prevent.

## PARTIES, JURISDICTION AND VENUE

22.     Plaintiff is an individual and brings this claim in her individual capacity.

23.     Plaintiff is a student matriculating at the University of Wisconsin.

24.     Defendant THE UNIVERSITY OF WISCONSIN MADISON ("UW" or "the University" or "the school") is a government educational institution with its primary campus in Madison, Wisconsin.

25.     UW receives federal funding in many forms, including federal student aid, and as such is subject to Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681(a) ("Title IX").

4

DOE 0286

26.     Defendant Rebeca Blank ("Chancellor Blank" or "Dr. Blank") is the Chancellor of the UW and is a Wisconsin resident.

27.     This Court has jurisdiction over this action under 28 U.S.C. §1331 and 28 U.S.C. §1367.

28.     Venue is proper in this Court under 28 U.S.C. §1391(b)(1) and (2).

<u>**GENERAL ALLEGATIONS COMMON TO ALL CLAIMS**</u>
<u>**THE SEXUAL ASSAULT OF PLAINTIFF**</u>

29.     Plaintiff Jane Doe had longed dreamed of going to college at the University of Wisconsin.  As a high school student, she worked hard to get high enough grades to give herself the chance for admission to UW.   When it finally happened, she could not have been more excited and prouder to be a Wisconsin Badger.  Tragically, the events marking the end of her freshmen year turned her dream into a nightmare.

30.     In the early morning hours of, April 22, 2018, Plaintiff was sexually assaulted by PLAYER 1.

31.     PLAYER 1 was sober the night she was assaulted while Plaintiff was heavily intoxicated.

32.     Plaintiff had been out with friends at a bar known as the "Double U."

33.     After a night of drinking, a group of students went back to the apartment of PLAYER 1 and 2.  Later that evening, Player 1 sexually assaulted Plaintiff and during which time Player 2 took photographs of Plaintiff.

34.     Due to her intoxication, Plaintiff does not recall going back to the football players' apartment.

35.     The next day, Plaintiff left Madison and went home and told her parents what had happened.  The assault was immediately reported to the UW.

5

DOE 0287

36.    Plaintiff finished the semester at her parents' house out of fear of attending school with the two men.

37.    After receiving the report, the matter was assigned to the school's Title IX office that, along with the Dean of Students office, is specifically trained in the investigation and resolution of sexual assault complaints on campus.

38.    By May 2018, the Title IX office had sufficient information to begin the investigation into PLAYER 1 and PLAYER 2. The Title IX coordinator notified the players of the investigation and began inquiring of witnesses.

39.    Plaintiff was cooperative in all stages of the proceedings.

40.    To the contrary, PLAYER 1 and PLAYER 2 refused to be interviewed.

41.    Though of no help to the Plaintiff, in July 2018, the UW Athletic Department decided that the two men should be suspended from the UW football team indefinitely based upon the UW Student Athlete Discipline Policy.

42.    The day before the August 2018 UW football media day, the Athletic Department reversed that suspension and reinstated the two athletes offering no explanation.

43.    Later that month, Plaintiff was set to return to campus for the Fall 2018 academic semester.  No resolution of the matter was imminent, and no meaningful interim measures were put in place to protect Plaintiff.

44.    Meanwhile, as the media had already learned of the allegations and the football season was set to start, the tenor around campus was very hostile towards Plaintiff. Public comments in social media, news media, and University football message boards expressed very hostile and disgusting comments about the Plaintiff, including threats of physical harm.  One such

6

DOE 0288

message stated that Plaintiff should be "stoned to death." As PLAYER 1 was one of the biggest stars on the football team, the hostile talk around this matter was rampant both on and off campus.

45.    Plaintiff began to withdraw from nonessential educational and various social opportunities due to the hostility and blind support for the football players.

46.    On one of the first days of class for that semester, Plaintiff was in a classroom when PLAYER 2 walked in, noticed Plaintiff, and took a seat. Though the school had instructed the PLAYERS 1 and 2 that it was their responsibility to vacate any area where the Plaintiff was located, PLAYER 2 refused to leave the classroom. The interaction left Plaintiff in a panic and she felt as though the message was being sent to her that PLAYERS 1 and 2 were not going to abide by any restrictions and that UW was not going to help her.

47.    The hostile environment on campus became nearly inescapable for Plaintiff with both PLAYERS having no restrictions other than to refrain from directly contacting her. Plaintiff began either having to walk to classes with a friend or if that was not possible, talking to her parents on the phone while she was walking. Plaintiff began avoiding certain areas of campus and altered her walking route to class to limit the likelihood of running into either men. Plaintiff would occasionally skip certain classes altogether out of fear of encountering the men.

48.    Plaintiff's fear of these two men on campus was overwhelming. On at least one other occasions, Plaintiff ran into PLAYER 2 on campus which sent her into a panic and greatly increased her anxiety and fear of walking to and from her classes.

### PLAYER 1 AND PLAYER 2 FOUND RESPONSIBLE BY UW

49.    On October 30, 2018, following a five-month investigation by the Title IX office, Assistant Dean Ervin Cox issued his written decision on the complaint. Assistant Dean Cox found

DOE 0289

that PLAYER 1 had sexually assaulted Plaintiff and that PLAYER 2 had committed both Sexual

Harassment, a violation that would constitute a felony in criminal court.[2]

50.     In the context of these Title IX findings, Sexual Assault and Sexual Harassment are

defined by the University of Wisconsin Policy on Sexual Harassment and Sexual Violence.

51.     In finding PLAYER 1 responsible for sexual assault, the Assistant Dean's

recommended sanction for PLAYER 1 was expulsion.  In particular, Assistant Dean Cox found

that PLAYER 1's very presence on campus "would have a significant negative effect" on

[Plaintiff's] educational experience" due to Plaintiff's fear of him.

52.     The consequence for PLAYER 2's behavior was probation with requirements that

he stay out of bars, not consume alcohol underage, and complete an education program entitled

RESPECT, which is for students who have been found responsible for sexual harassment.

## AN IN-PERSON HEARING PANEL AND TWO ADDITIONAL APPEAL PANELS FIND THE PLAYERS RESPONSIBLE FOR SEXUAL ASSAULT AND HARASSMENT

53.     Following this outcome, PLAYER 1 set the matter for a hearing in front of a hearing

committee ("Committee") made up of three individuals.  All parties were present and represented

by advisors.

54.     At the hearing, despite being ordered to stay away from Plaintiff, PLAYER 1 saw

Plaintiff and began deliberately walking toward her in an effort to intimidate her.  Plaintiff's

advisor had to step in front of PLAYER 1 and stop him from physically coming in contact her.

Plaintiff suffered a panic attack as a result of PLAYER 1's behavior.

55.     At this hearing, both parties had the right to hear and respond to all evidence to be

used in the Committee's consideration and to present their own witnesses and evidence.  The

---

[2] PLAYER 2 was not charged criminally only due to an immunity agreement with the prosecution to testify in the criminal case against PLAYER 1.

Doe Deposition Exhibit 3 - 76

DOE 0290

committee heard from witnesses, considered all evidence provided by the parties, and accepted arguments from the parties' counsel.

56.     Plaintiff testified in person and was subject to cross examination by PLAYER 1's counsel.

57.     Conversely, PLAYER 1 skipped out of the hearing just before he was to be cross examined by Plaintiff's counsel.

58.     Following the hearing, the Committee unanimously confirmed that PLAYER 1 sexually assaulted Plaintiff.

59.     The Committee also found that a hostile educational environment had been created for the Plaintiff and that Plaintiff should not be further subjected to this hostile learning environment during the duration of her education at UW.  In essence, the Committee determined that PLAYER 1's very presence on campus created a hostile learning environment for Plaintiff.

60.     Having now been independently found responsible by both the Title IX Office and the Hearing Committee, PLAYER 1 appealed to the Chancellor's Office.

61.     Defendant Chancellor Blank reviewed all of the pertinent documents submitted by PLAYER 1 and denied the appeal, affirming the same factors that supported PLAYER 1's original disciplinary outcome.  Overall, the Chancellor found that the established record supported the findings and the Committee's decision.

62.     The Chancellor's decision also indicated that "this is the final decision in this matter" but that if PLAYER 1 wished to seek a procedural review, he would need to petition the Board of Regents.

63.     Having been found independently responsible by the Dean of Students, the Hearing Committee, and the Chancellor, PLAYER 1 next sought final review permitted in the UW process

9

DOE 0291

from the Board of Regents, which assigned the matter to the specific Board Committee on Student Discipline and other Student Appeals ("Board Committee").

64.     The Board Committee conducted "careful examination of the record" and on June 7, 2019, concluded that PLAYER 1's request was denied.  In doing so, the Board Committee made over six pages of specific findings of fact all consistent with the Hearing Committee's and Chancellor's findings that the record showed that PLAYER 1 sexually assaulted Plaintiff, including but not limited to the following:

- Plaintiff was very intoxicated.

- PLAYER 1 was sober.

- Plaintiff communicated her unwillingness to engage in sexual intercourse with PLAYER 1.

65.     With the Board Committee decision, the UW process was final.

66.     The Board Committee advised PLAYER 1 that he had a right under Wisconsin law to seek judicial review of UW's decision, but PLAYER 1 chose not to.

**THE CRIMINAL VERDICT AND THE BACKLASH AT UW**

67.     In the fall of 2018, The Dane County District Attorney charged PLAYER 1 with criminal sex assault.

68.     At the July 2019 trial on those charges, Plaintiff testified consistent with the information she provided to UW.

69.     PLAYER 1 and PLAYER 2 both chose to testify and did so falsely, with PLAYER 2 overtly changing his prior statement that Plaintiff was intoxicated.

70.     Applying the heightened standard of proof beyond a reasonable doubt, on August 2, 2019, the jury found PLAYER 1 not guilty.

10

DOE 0292

71.     Following the verdict, massive local outcry poured into the University suggesting that the not guilty verdict meant that PLAYER 1 had been falsely accused and that he should be let back into school and allowed to play on the football team.

72.     Much of the outcry involved gender-based epithets and was directly hostile towards Plaintiff, who many now believed had lied about being raped out of regret or shame, a common gender stereotype of women who report rape.  This harassment included sexual and gender-based name calling, including calling her a "slut" and "whore," as well as verbal taunts perpetuating gender stereotypes that Plaintiff was a promiscuous liar.  The hostility towards Plaintiff ranged from threatened acts of violence such as suggesting she be "stoned to death" to calls to be imprisoned for lying. These statements showed up in comments to news articles, social media, football message/chat rooms and calls to the UW administration.

73.     Upon seeing this rise in public pressure, the UW football program also started pressuring the school with Head Football Coach Paul Chryst planting the seed that he would like to have PLAYER 1 back on the team which was then widely reported in the media.

74.     A host of UW football players also attempted to influence the school, writing a letter to the Chancellor imploring her to readmit PLAYER 1.  That letter was also widely distributed to the media.

75.     The media coverage of these hostile gender-based narratives spread quickly and pervasively.  A dominant message around the UW community was that PLAYER 1 had been wrongly expelled as an example of a school caving to the #MeToo movement and that the UW now needed to right a wrong.

76.     In addition, the UW was being openly criticized by students, alumni, donors and the media for expelling PLAYER 1 and ending his football tenure at UW.

11

DOE 0293

77.    The UW was aware of and was sensitive to these criticisms and on more than one occasion, and in violation of the Federal Educational Rights and Privacy Act, ("FERPA"), publicly commented on its handling of Plaintiff's Title IX matter.

78.    At the time, UW had three separate unrelated federal investigations pending at the Department of Education's Office of Civil Rights for its poor handling of Title IX/sexual assault matters and on information and belief, was sensitive to the related criticism.

79.    As such, UW had motivation to readmit PLAYER 1 both to quell the hostility and the suggestion that it discriminates against male students on the basis of gender and also to avoid the renewal of PLAYER 1's lawsuit against UW alleging the same.

## PLAYER 1'S PETITION FOR RESTORATION OF RIGHTS

80.    In coordination with a media campaign, PLAYER 1 and his counsel sought to circumvent the fully adjudicated Title IX outcome against PLAYER 1 by submitting a "Petition for Restoration of Rights After Suspension or Revocation," a seldom used provision in the University of Wisconsin Administrative Code designed to permit disciplined students to ask to return to class.

81.    Chapter 17 of the University of Wisconsin System Administrative Code ("Chapter 17") applies to student disciplinary action throughout the University of Wisconsin System, including procedures for student nonacademic disciplinary matters.

82.    Among other provisions, UWS 17.14 provides that absent the granting of an appeal by the Board of Regents, the disciplinary decision by the Chancellor shall be final.

83.    Similarly, the University website walks UW students though all of the stages of the Title IX process -- a process which concludes with any appeal decision made by the Board of Regents.  "Appeal decisions by the chancellor or designee are final, except that the Board of

12

DOE 0294

Regents may, at its discretion, grant a review upon the record, upon written request submitted by any party within 14 days of the appeal decision. The non-appealing party will receive notice of the appeal to the Board of Regents." https://compliance.wisc.edu/titleix/student/

84.    Separately from the Title IX process, UWS 17.18 provides the school the opportunity to re-admit a student who has been suspended or expelled as a type of commutation of the punishment where appropriate.

85.    Nowhere in UWS 17.18 is the University authorized to reverse its own underlying Title IX factual findings

86.    Moreover, allowing the University to reverse its prior Title IX factual findings without providing both parties with the right to receive a written report summarizing all of the evidence collected by the University and the right to a hearing on that evidence necessitating reversal of factual findings would violate the University's own explicit Title IX procedures and policies, and the due process protections of those procedures and policies.

87.    The rights to receive a written report and right to a hearing are consistent with the then-existing guidance from the US Department of Education, which requires that in a sexual assault disciplinary matter, "[t]he decision-maker(s) must offer each party the same meaningful access to any information that will be used during informal and formal disciplinary meetings and hearings, including the investigation report" and that "[a]ny process made available to one party in the adjudication procedure should be made equally available to the other party." Department of Education, Q and A on Sexual Misconduct, page 5, September 1, 2017.

88.    Nevertheless, UW permitted PLAYER 1 to privately offer additional evidence to which Plaintiff could not respond, in violation of the University's own policies.

13

DOE 0295

89.     On August 6, 2019, PLAYER 1 filed his Petition for Restoration of Rights, which contained exhibits that, although mislabeled as "evidence presented at trial," consisted almost entirely of information previously presented by PLAYER 1 during the Title IX process or other information that was in PLAYER 1's possession but which he strategically chose not to submit during the Title IX process.

90.     According to the Chancellor, such new evidence included but was not limited to items such as:

- Select pieces of evidence from the trial;[3]
- Select text messages;
- Media accounts;
- Notes of the closing argument from PLAYER 1's attorney; and
- A lengthy written argument from PLAYER 1's attorney in support of the petition.

91.     The Chancellor also noted, however, that PLAYER 1 still refused to provide certain information requested by the Chancellor and only submitted self-selected material.

92.     The Petition itself extensively focused on gender-based stereotyping and shaming. The Petition also relief upon gender-based animus in making irrelevant allegations pertaining to sexual history and sexual preferences, something prohibited in the University's Title IX process.

93.     Meanwhile, the school was still receiving pressure from the media and broader UW community including pressure from at least one significant donor to readmit the star football player.  Social media members were also posting the phone number to Chancellor Blank's office

---

[3] No actual evidence from the trial was submitted.

14

DOE 0296

so members of the public could call in and "express their outrage" that PLAYER 1 was still expelled, along with other gender-based comments calling Plaintiff a "Lying Whore."

94.     On August 12, 2019, PLAYER 1, his attorneys, and 18 members of the UW football team, held a press conference to place further pressure on the University announcing their petition to seek PLAYER 1's reinstatement.

95.     Still, the University did not even notify Plaintiff that it was considering additional "new" evidence and contemplating allowing PLAYER 1 to return to the school and its football program.

96.     While the Petition for Restoration of Rights was pending, Plaintiff's Title IX advisor contacted the UW Chancellor's office asking for information about what was going on. The advisor was informed that Plaintiff and her advisor were not allowed to participate in any pending process and that she was not entitled to have or respond to any new information provided by PLAYER 1.

## UW VIOLATES THE ATHLETIC DEPARTMENT DISCIPLINE POLICY TO GET PLAYER 1 BACK ON THE FIELD

97.     Despite UW's motivation to readmit PLAYER 1, merely readmitting him to the school would not have made him eligible to return to play for the football team.

98.     On information and belief, rejoining the football team was the only reason that PLAYER 1 wanted to return to UW and the only way that Defendants could end the pressure being placed on them.

99.     According to the UW Student Athlete Discipline Policy, a student must be suspended from all team activities if there has been a finding of sexual assault.

15

DOE 0297

100. The policy and related mandatory suspension apply where:

"A student-athlete is found responsible either by the Office of Student Conduct and Community Standards (if the student-athlete waives the student-athlete's right to a subsequent hearing under Chapter UWS 17) or by the hearing committee or examiner under Chapter UWS 17 (if the student-athlete proceeds to the hearing) for misconduct, where the sanction is either suspension or expulsion."

101. "Sexual assault" carries a sanction of suspension or expulsion at UW.

102. Though in some conduct matters under the policy, the Athletic Department may make its own inquiry and findings, in the case of sexual assault the department must rely on the findings from the Title IX process. "The Athletic Department shall not conduct independent investigations or make findings in cases involving allegations of sexual harassment or sexual violence and, instead, will defer to the findings of the investigation conducted by the Title IX Coordinator (or designee)."

103. Thus, granting PLAYER 1 a restoration of rights to attend UW, was not enough to get him back on the football team.

### THE PROCESS WAS CUT SHORT DUE TO THE LOOMING FOOTBALL CALENDAR

104. School Vice President of Legal Affairs Ray Taffora was a part of the Chancellor's team that considered the Petition.

105. As the administration did not have anyone present in the criminal trial, Mr. Taffora had to verify the "new evidence" now being offered by PLAYER 1 via a transcript of the proceedings.

106. On August 12, 2019, in response to media coverage of PLAYER 1's Petition, the University publicly tweeted the following statement,

"UW-Madison is committed to performing a complete and thorough review of any petition for reinstatement that it receives. In most cases this involves a full review

16

DOE 0298

of all relevant court records, which in this case were not provided in the petition. We are working to gather this information currently and will complete our review of the petition as quickly as possible once we have it.  No decision on this matter has been made at this time."

107.    This tweet went out publicly to the media while the University still chose to not even notify Plaintiff that her 14 month Title IX outcome was being reconsidered.

108.    The very next day, Mr. Taffora called the court reporter who presided over the criminal trial insisting on a rushed transcript.  The Court reporter informed him that he would provide a transcript, but it could not be rushed as there were other transcript requests that either predated Mr. Taffora's or had higher priority such as defendants serving prison time for their convictions.

109.    Mr. Taffora next called the Office of the District Attorney with some urgency and spoke with Deputy District Attorney Bill Brown and demanded that Brown give him a summary of the trial.  Mr. Brown refused and indicated that Mr. Taffora would have to order a transcript.

110.    Mr. Taffora stated to Mr. Brown that the University could not wait for an actual transcript because football season was about to start.

111.    On August 19, 2019, and without having so much as ordered the trial transcript, the University not only granted PLAYER 1's Petition to come back to school, but also reversed the underlying Title IX finding of sexual assault, thus clearing the way for PLAYER 1 to return to the football team.

112.    Notably, in reversing the outcome, the school did not conclude that the rape never occurred. Instead, UW's new official determination was that by the preponderance of the evidence, the Title IX matter was somehow "incapable of resolution" Functionally, the UW determined that the preponderance of the evidence showed neither a sexual assault nor the lack of a sexual assault.

17

DOE 0299

113.    Left in place however was the separate determination that PLAYER 1 had sexually *harassed* Plaintiff.   For that count of sexual harassment that Defendant Chancellor Blank previously acknowledged "had the effect of creating a hostile environment for [Plaintiff]," UW imposed no further sanction, not even the "RESPECT" educational program.

## THE FIRST AND ONLY NOTICE TO PLAINTIFF

114.    Plaintiff, having heard nothing from the school since the final Title IX outcome in early June, 2019, received a new notice on August, 19, 2019, from the University notifying her that PLAYER 1 had petitioned the school for readmission, submitted new evidence and that the Chancellor had reversed the Title IX findings on sexual assault.  The University sent this notice to Plaintiff at the same time that it sent out a press release announcing its decision.  The press release, which violated Plaintiff's student privacy rights under "FERPA," was designed for no legitimate purpose other than to quell the gender-hostile pressure on the school.

115.    On information and belief, the Chancellor's decision to overturn a Title IX finding of rape and readmit a student through a Petition for Restoration of Rights is the only decision of its kind at the UW.

116.    Shortly after the Chancellor's decision, PLAYER 1 publicly celebrated and expressed gratitude that he was now able to continue at the University, which itself received very favorable press and public comments.  Editorials such as "Blank made the right decision" and "In [PLAYER 1's] case, Wisconsin is one program doing things the right way" showered praise on the school for righting the publicly perceived wrong, as did comments to the articles and social media.

18

117.    Meanwhile, due to UW's reversal of the finding of sexual assault, Plaintiff was harassed for what was now labeled a false allegation.  On August 22, 2019, a friend of PLAYER 1 messaged Plaintiff threatening that she was lucky that the friend didn't know her real identity until after the trial."

118.    Meanwhile, PLAYER 1 stated to the press "I'm ready to win football games and start back getting my education and I expect to do it at a very high level."[4]

## HOSTILE EDUCATIONAL ENVIRONMENT

119.    The Chancellor's ex parte and unprecedented decision to re-admit PLAYER 1 could not have come at a worse time for Plaintiff, as the fall 2019 semester was days away from beginning.  As previously stated, and noted by the Dean of Students, Plaintiff greatly feared being on campus with the two men involved with her rape.

120.    Due to the Chancellor's timing in deciding on PLAYER 1's Petition, Plaintiff did not have time to transfer schools before the start of the academic year just days away and was forced to either to attend school with her assailant or leave school.

121.    After great consideration, Plaintiff returned for her third year of school.  The very day Plaintiff returned to campus, she ran into PLAYER 2 in her building and was terrified.

122.    Plaintiff and her Title IX advisor met with school officials and the UW Police Department to ask what the school could do if she again ran into one of the Players or experienced retaliation from other students.  The school officials refused to help her in any way.  The clear

---

[4] A few days following the football team's bowl game that season, PLAYER 1 dropped out of the University and entered the NFL draft.

19

DOE 0301

message to Plaintiff was that the school was not there to help her. She was told in that meeting that if she needed help, she should call the police.

123.    The remainder of the fall of 2019 was miserable for Plaintiff. After running into PLAYER 2 on her first day back to school in her apartment building and being told that the school would do nothing to help her, Plaintiff limited her activities and presence on campus in fear of running into PLAYER 1 or PLAYER 2.

124.    PLAYER 1 was again a star of the football team and led the team in receptions, gaining constant adulation and praise in the media.

125.    Just as the Dean of Students' findings had stated, Plaintiff's educational environment and daily existence at UW was now extremely hostile.

126.    As a result of her fear of PLAYER 1 on campus, Plaintiff was forced to miss classes out of fear of PLAYER 1, avoid areas of campus out of fear, ask friends to escort her while walking to classes or calling her parents to have them on the phone if no one could walk with her. Plaintiff was also living in a constant state of stress as a result which required her to work harder and longer hours to attain the same grades and take a lower course-load. Plaintiff will now likely require an additional semester to complete her degree.

### FACTS IN SUPPORT OF DUE PROCESS CLAIM AGAINST DEFENDANT BLANK

127.    UW Madison's legal relationship with its students is contractual in nature. *Doe v Purdue*, 928 F.3d 652, 660 (2019).

128.    Communicated to all prospective students, including Plaintiff, the UW states in their application materials that "The UW System is committed to equal opportunity for all. No student may be denied admission to, participation in or the benefits of, or be discriminated against

Doe Deposition Exhibit 3 - 88

DOE 0302

in any service, program, course or facility of the system or its institutions because of the student's race, color, creed, religion, sex, national origin, disability, ancestry, or age"

129.   In developing a series of Title IX policies in conjunction with the UWS Code on Student Discipline, students at UW are promised a non-discriminatory educational environment.

130.   The UW is bound by both their policies and Chapter 17 of the UWS Code and has made promises to all students that it follows the same.

131.   The UW Policy on Discrimination, Harassment, and Retaliation provides, "The purposes of this policy are to: express the Board of Regents' commitment to providing an environment free of discrimination, harassment, and retaliation; codify in Board of Regents policy the statutory prohibitions against discriminatory conduct; and assign oversight responsibility."

132.   The UW Policy on Discrimination, Harassment, and Retaliation also cites to Wisconsin state law that provides that "No student may be denied admission to, or participation in or the benefits of, or be discriminated against in any service, program, course or facility of the UW System or its institutions on the basis of race, color, creed, religion, age, sex, sexual orientation, gender identity or expression, national origin, ancestry, disability, pregnancy, marital or parental status, or any other category protected by law, including physical condition or developmental disability as defined in Wisconsin Statutes §51.01(5)."

133.   Additionally, in the UW-Madison Policy on Sexual Harassment and Sexual Violence disseminated to all students including Plaintiff, the UW commits "to creating and maintaining a campus community that is free from sexual harassment and sexual violence."

134.   In exchange for these promises, among others, Plaintiff along with many other UW students, with the help of federal student-aid, pay the University substantial moneys for her tuition and fees at the University.

21

DOE 0303

135.    Additionally, in response to these promises regarding sexual harassment and discrimination, UW students agree not to violate the UWS Code, including prohibitions against sexual harassment.

136.    The UWS Code and its procedures are provided generally to the students via the school's website and specifically to each student, including Plaintiff, via email at the start of her or his education and at various points throughout her or his time at the UW.

137.    On information and belief, the same references are provided to students in mandatory sexual assault and dating training required for all new UW students.

138.    Also, under the school's policies, students who make complaints about sexual assault, including Plaintiff, are promised the same rights under the school procedures as those held by any accused student.

139.    Included in those guaranteed rights, the students are entitled to be provided 1) a written report which must include a written description of all the information available to the university, and 2) a hearing on that information.

140.    At such a hearing, the students have the right to be heard on the matter, to question witnesses relevant to the information gathered by the University, and to provide their own information or witnesses.

141.    The UW breached the above-described promises to Plaintiff by withholding all evidence from Plaintiff upon which the UW and Chancellor Blank relied when it and she considered PLAYER 1's Petition.

142.    The UW Title IX policies also specifically state that the result of any disciplinary outcome is final following a student's appeal to the UW Board of Regents.

22

DOE 0304

143.    The UWS Code more specifically provides that in regard to proceedings involving the presentation of any evidence, the right to respond to evidence, question witnesses, present witnesses, and have the student's advisor question witnesses, "a complainant shall have all the same rights as the respondent in this subsection." UWS 17.11(2)

144.    There is no provision in either the UWS code or the UW Title IX policy that allows for one party, during any phase of the process, to provide any evidence that is kept secret from the other party.

145.    Also, through the Title IX Process policy and the UW-Madison Policy on Sexual Harassment and Sexual Violence, the UW commits to students, prospective students and their parents alike, that they are committed to providing a non-sexually hostile environment for their students.

146.    The UWS Code assures that "The missions of the University of Wisconsin System and its individual institutions can be realized only if the university's teaching, learning, research and service activities occur in living and learning environments that are safe and free from violence, harassment, fraud, theft, disruption, and intimidation. In promoting such environments, the university has a responsibility to address student nonacademic misconduct." Chapter UWS 17.01.

147.    In addition, all incoming students including Plaintiff, receive a Security and Safety Report from the Associate Vice Chancellor's office providing them with the school's disciplinary policy and procedures, including the policies at issue in this case. The Safety Report from that office provides a detailed breakdown of the policies in UWS Chapter 17 which include a) a timeline of the number of days that each step is expected to take including all stages of the appeal process, b) that both the complaining students and accused students have equal right to provide

23

DOE 0305

and respond to evidence presented by the other party, and that any outcome of an appeal to the Board of Regents is the final decision in the matter. UWS 17.18 is noticeably not mentioned.

148.     In August of 2018, Plaintiff was also advised through an email from the Vice Chancellor of Student Affairs, Lori Reesor, of the UW's revamped 2018 Sexual Harassment policy.[5]  The revamped policy language further advised Plaintiff of all reporting and disciplinary processes for such matters.  The advisement makes no reference to a Petition for Restoration of Rights as being a part of such process.

149.     The aforementioned UW policies and procedures, together with University's obligation to comply with Chapter 17 of the UWS Code, constituted contractual obligations and promises by UW to the Plaintiff.

150.     By virtue of excluding Plaintiff entirely from information and participation in the school's "rehearing" of the Title IX findings, and the Chancellor's decision regarding PLAYER 1's petition, the UW breached its contractual obligations and promises to Plaintiff, causing her damages in the form of impact to her education and emotional distress.

**FIRST CLAIM FOR RELIEF**
**Violation of Title IX, 20 U.S.C. § 1681(a) -**
**Deliberate Indifference - Against the UW**

151.     Plaintiff incorporates the preceding paragraphs by reference.

152.     UW, as a public university, receives federal funding and is therefore subject to the conditions set forth in Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a).

---

[5] Sexual Assault and Rape are considered by the UW as well as the US Department of Education to be extreme forms of Sexual Harassment.

DOE 0306

153.    Defendants were on actual notice of extreme gender-based harassment in the form of sexual assault following Plaintiff's report and cooperation with the UW Title IX office which was subsequently reviewed by defendants during PLAYER 1's appeals.

154.    Following the not guilty verdict at PLAYER 1's criminal trial, Defendant UW faced significant gender-based public and internal pressure to re-admit PLAYER 1 and reverse the sexual assault finding to permit him to play men's football.

155.    As a result of this pressure, Defendant UW initiated, adjudicated, and implemented a new and unauthorized disciplinary finding and outcome, finding PLAYER 1 *not* responsible for two counts of sexual assault.  Plaintiff was wholly excluded from that process in violation of UW Title IX policies and procedures, as well as the UWS Code.

156.     Reversing not only the outcome of expulsion but also the underlying Title IX finding of sexual assault based upon a process hidden from Plaintiff was clearly unreasonable where four prior determinations that involved all parties over a fourteen-month time frame found that PLAYER 1 had sexually assaulted Plaintiff.

157.    The discriminatory process was implemented to quell rampant gender-based animus and return PLAYER 1 to the men's football program.

158.    Such behavior by the UW subjected Plaintiff to discrimination on the basis of sex and made her more vulnerable to further harassment and abuse by requiring her to either attend school in a clearly hostile educational environment or abandon her education at the UW entirely. The UW has acknowledged that the very presence of PLAYER 1 and PLAYER 2 on campus created a hostile educational environment for Plaintiff.

Doe Deposition Exhibit 3 - 93

DOE 0307

159.     As a result of the UW's gender-based discrimination, Plaintiff has been forced to suffer from a hostile educational environment created by UW which led to forego educational opportunities such as classes, on campus academic resources, and extracurricular activities.

160.     The UW's decision to re-admit PLAYER 1 to the detriment of Plaintiff constituted deliberate indifference to gender-based harassment.

161.     Plaintiff has suffered damages as a result of the UW's violations of Title IX in an amount to be proven at trial.

**SECOND CLAIM FOR RELIEF**
**Violation of Title IX, 20 U.S.C. § 1681(a)-Discrimination on the Basis of Gender**
**Erroneous Outcome - Against the UW**

162.     Plaintiff incorporates the preceding paragraphs by reference.

163.     The UW, as a public university, receives federal funding and is therefore subject to the conditions set forth in Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a).

164.     Following the not-guilty verdict at PLAYER 1's criminal trial, Defendant UW faced significant gender-based public and internal pressure to re-admit PLAYER 1, reverse the sexual assault finding, and permit him to play men's football.

165.     As a result of this pressure, Defendant UW initiated, adjudicated, and implemented a new and unauthorized disciplinary finding and outcome while wholly excluding Plaintiff from the process in violation of UW Title IX policies and procedures, as well as the UWS Code.

166.      Reversing not only the sanction of expulsion but also the Title IX finding of sexual assault based upon a process hidden from Plaintiff, in violation of school policy and practice,  due to specific gender-based pressure and to aid the UW men's football team, created an erroneous outcome after four prior determinations found that PLAYER 1 had sexually assaulted Plaintiff.

26

DOE 0308

167.     The discriminatory process was implemented to quell rampant gender-based animus and return PLAYER 1 to the men's football program.

168.     Such behavior by Defendant UW subjected Plaintiff to discrimination on the basis of sex and made her more vulnerable to further harassment and abuse by requiring her to either attend school in a hostile educational environment or abandon her education at UW entirely.  UW has acknowledged that the very presence of PLAYER 1 and PLAYER 2 on campus created a hostile educational environment for Plaintiff.

169.     As a result of Defendant's gender-based discrimination, Plaintiff suffered from a clearly hostile educational environment created by UW which led her to forego educational opportunities such as classes, on campus academic resources, and extracurricular activities.

170.     Defendant UW's decision to re-admit PLAYER 1 to the detriment of Plaintiff was the result of deliberate discrimination against Plaintiff on the basis of her gender.

171.     Plaintiff has suffered damages as a result of UW's violations of Title IX in an amount to be proven at trial.

### THIRD CLAIM FOR RELIEF
**Procedural Due Process Violation Under 42 U.S.C. § 1983 Against Chancellor Blank**

172.     Plaintiff incorporates the preceding paragraphs by reference.

173.     In her role as Chancellor of a public state university, Chancellor Blank was at all times acting under the color of state law.

174.     Plaintiff had legally protected property rights based upon obligations and promises made by the UW under its Title IX policies, trainings, and the UWS Code to a continued education free from discrimination and sexual harassment and to full and fair access to a disciplinary process designed to remedy and/or prevent that harassment and discrimination.

27

DOE 0309

175.     The UW Policy on Discrimination, Harassment, and Retaliation provides that "[t]he purposes of this policy are to: express the Board of Regents' commitment to providing an environment free of discrimination, harassment, and retaliation; codify in Board of Regents policy the statutory prohibitions against discriminatory conduct; and assign oversight responsibility."

176.     The UW Policy on Discrimination, Harassment, and Retaliation also cites to Wisconsin state law that provides that "[n]o student may be denied admission to, or participation in or the benefits of, or be discriminated against in any service, program, course or facility of the UW System or its institutions on the basis of race, color, creed, religion, age, sex, sexual orientation, gender identity or expression, national origin, ancestry, disability, pregnancy, marital or parental status, or any other category protected by law, including physical condition or developmental disability as defined in Wisconsin Statutes §51.01(5)."

177.     Communicated to all prospective students, including Plaintiff, the UW states in its application materials that "[t]he UW System is committed to equal opportunity for all. No student may be denied admission to, participation in or the benefits of, or be discriminated against in any service, program, course or facility of the system or its institutions because of the student's race, color, creed, religion, sex, national origin, disability, ancestry, age."

178.     As set forth above, through its website, mandatory student trainings, and literature disseminated by the UW to its students, the University formed a contract with Plaintiff in which it promised certain procedural protections outlined in the UWS as well as an educational environment free from discrimination on the basis of gender.

179.     By virtue of Chancellor Blank's actions in controverting the Title IX investigation and disciplinary process in order to improperly re-admit PLAYER 1 without any notice to or

28

DOE 0310

involvement of Plaintiff, Plaintiff was deprived of these legally-protected entitlements without due process of law.

180.    Chancellor Blank's discriminatory decision was motivated by gender as it was in direct response to and designed to quash the public gender-based animus fueled by the not guilty verdict in the criminal case as well as the desire to benefit and succumb to the pressure of the men's football team.

181.    In particular, due process was not afforded to Plaintiff as doing so would have prohibited PLAYER 1 from starting the men's football season, which would have triggered significant further outrage and pressure from the community.

182.    Plaintiff was consigned to an educational environment filled with fear and trepidation, not knowing when she might encounter her assailant and not able to trust that the University would make any effort to help her.

183.    Plaintiff was promised an equal right to the disciplinary process but was forced instead to watch in silence as the Chancellor Blank reversed the four previous Title IX findings and welcomed the assailant back with open arms in a display that, given the already-hostile atmosphere surrounding her, created an environment in which Plaintiff was regarded as a liar and subjected to gender-based slurs and threats.

184.    The right to a fundamentally fair grievance procedure to determine the outcome of the grievance process was clearly established at the time of Chancellor Blank's actions.

185.    The right to attend school free from a known hostile educational environment was clearly established at the time of Chancellor Blank's actions.

186.    Plaintiff suffered significant damages as a result of these violations of 42 U.S.C. § 1983, as set forth above.

Doe Deposition Exhibit 3 - 97

DOE 0311

## PRAYER FOR RELIEF

On her claims for relief, Plaintiff seeks the following:

A.    An award of damages to be determined at trial, including, without limitation, reimbursement and prepayment for all of Plaintiff's expenses incurred as a consequence of the Defendants' actions; damages for deprivation of equal access to the educational benefits and opportunities provided by UW; and damages for past, present and future emotional pain and suffering, and enjoyment of life in an amount to be determined by the jury;

B.    An award of punitive damages under 42 U.S.C. § 1983 with respect to Defendant Chancellor Blank;

C.    Statutory and mandatory pre- and post-judgement interest on all sums awarded;

D.    Injunctive relief in the form of reversing the Chancellor's discriminatory action and reinstating the Title IX finding of sexual assault against PLAYER 1.

E.    An award of costs and attorney fees (pursuant to 42 U.S.C. § 1988(b)); and

F.    Any other relief as is proper.

**PLAINTIFF DEMANDS A JURY TRIAL OF ALL ISSUES SO TRIABLE**

30

DOE 0312

Dated:  September 15, 2020

Respectfully submitted,

HUTCHINSON BLACK AND COOK, LLC

By: ___*Pro Hac Vice Admission Forth Coming*___
    John Clune
    Christopher Ford
    Lauren Groth
    921 Walnut Street, Suite 200
    Boulder, CO  80302
    (303) 442-6514
    clune@hbcboulder.com
    ford@hbcboulder.com
    groth@hbcboulder.com


DAVIS AND PLEDL S.C.

By: ___*/s/ Robert Theine Pledl*_____
    Robert (Rock) Theine Pledl
    Victoria L Davis Davila
    1433 N Water Street, Suite 400
    Milwaukee Wi 53202
    (414) 488-1351
    rtp@davisandpledl.com

Doe Deposition Exhibit 3 - 99

DOE 0313

**From:**
**Sent:** Tue, 15 May 2018 23:01:49 +0000
**To:** Christopher Coe
**Subject:** Re: Psych 450

Dear Professor Coe,

I have been working on this paper today and plan on finishing it by tomorrow. I want this to be done as soon as possible since I need to send a copy of my finalized transcripts to other schools that I am looking to transfer to next semester, due to safety concerns at Wisconsin. I hope my paper meets your standards but ultimately my main focus is completing my work so I can move on from this semester. I was not under the impression that a short paper meant 6-10 pages, but I will do my best to complete it. Thanks for understanding.

**From:** Christopher Coe
**Sent:** Monday, May 14, 2018 5:12:34 PM
**To:**
**Subject:** Re: Psych 450

I am very glad to hear that you are already feeling OK to think about school work.

Your topic is fine.

Perhaps try to present it from both perspectives — the good and the bad.

How early life events can provide strength and engender resilience. As well as the potential to create some vulnerabilities.

Because parents and family are a source of emotional security, in their absence, a young animal does not have the support that it usually depends on.

If you like biology, there is a lot known about the physiological changes that occur during the separation response.

As well as a lot known about some of the genetic risk factors. For example, an allele polymorphism associated with the serotonin transporter is a risk factor in both monkeys and humans.

But its your call about how much basic physiology to include.

How about a paper in the 6-10 page range with about 10 citations?   Does that sound reasonable?

Please feel free to e-mail if you need any initial leads or have questions along the way.

DOE 0314