IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JANE DOE,

       Plaintiff,

       v.                              Case No. 20C0856

BOARD OF REGENTS OF THE
UNIVERSITY OF WISCONSIN SYSTEM,

       Defendant.

**DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY
JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ....................................................................................4

STATEMENT OF FACTS ......................................................................6

    A.    The University of Wisconsin-Madison. ............................................6

    B.    UW-Madison's Policy on Sexual Harassment and Sexual Violence. .......................................................................................7

    C.    Plaintiff Jane Doe's sexual assault allegations. .............................9

    D.    The nonacademic misconduct investigation, the findings, and the criminal charges. ........................................................... 14

    E.    The nonacademic misconduct hearing. ........................................ 20

    F.    Player 1's appeal to the Chancellor. ............................................ 22

    G.    Player 1's request for review to the Board of Regents. ................ 24

    H.    The criminal trial. ........................................................................ 25

    I.    Player 1's Petition for Restoration of Rights. ............................... 25

    J.    Communications and media reports about the acquittal and petition. ....................................................................................... 33

    K.    Player 1's return to the football team. ......................................... 34

    L.    Doe's September 10, 2019 meeting with UWPD Director of Threat Intervention Services. ....................................................... 35

    M.    Doe never saw Player 1 on campus again and she continued to receive support services and accommodations during the fall 2019 semester. ....................................................................... 37

LEGAL STANDARD ........................................................................... 39

ARGUMENT ....................................................................................... 39

    I.    Doe's deliberate-indifference claim fails because the record evidence does not reach the high bar required to show that UW-Madison's response to known harassment was clearly unreasonable. ................................................................................ 41

        A.    The sexual harassment Doe experienced during the night and early morning hours of April 21 and 22 did not deprive her of access to educational opportunities. ..... 42

B.  Far from deliberately indifferent, UW-Madison conducted a prompt Title IX investigation that ended in Player 1's expulsion, but which was missing—through no fault of the University's—critical information that would later become available to UW-Madison. ............................................................... 44

C.  Chancellor Blank did not act clearly unreasonably when she upheld Player 1's expulsion before responding to new, material information by reducing the sanction to a suspension. ............................................... 48

D.  There was nothing indifferent about UW-Madison's response to Doe's sexual-harassment allegations. ............. 51

II.  Doe's erroneous outcome claim fails because the Chancellor decided Player 1's Petition according to proper procedure and because the record evidence is barren of particularized facts showing that Chancellor Blank was motivated by sex bias. ................................................................................ 56

A.  Doe was not excluded from or denied the benefits of an educational program. .......................................................... 57

B.  Chancellor Blank reached her decision on the Petition by using proper procedure and weighing the relevant evidence, not by discriminating against Doe on the basis of sex. ......................................................................... 59

C.  There is no evidence that the Chancellor allowed her decision on Player 1's Petition to become infected with sex bias at the behest of third parties. ............................... 65

CONCLUSION ................................................................................ 71

**INTRODUCTION**

The University of Wisconsin-Madison (UW-Madison or University) found one of its former student-athletes (Player 1) responsible for sexual assault and harassment of Plaintiff Jane Doe, and expelled him based on information submitted during campus Title IX proceedings. Player 1 declined to participate in these proceedings—despite UW-Madison urging him to do so—because of a then-pending criminal case against him based on the same underlying conduct.

After the jury in his criminal case returned a not-guilty verdict—dissipating his Fifth Amendment concerns—Player 1 submitted new, material information to UW-Madison's Chancellor Rebecca Blank as part of a petition to be readmitted pursuant to UWS Chapter 17 of the Wisconsin Administrative Code. The new information included surveillance footage and police reports previously unavailable to UW-Madison officials. Based on this significant and newly presented information, Chancellor Blank vacated the third-degree sexual assault finding and sanction of expulsion, upheld the sexual harassment finding with a five-month suspension, and maintained the no-contact directive between Player 1 and Doe.

At every step in this process, UW-Madison allowed the available evidence to guide its decision-making. Both Doe and Player 1 have nevertheless filed Title IX lawsuits against the University, making conflicting claims of bias. As to Doe's suit, the record evidence now shows that her two Title IX claims—the first claiming UW-Madison's deliberate indifference to the peer-on-peer sexual harassment of Doe, the

4

second claiming that sex-bias motivated an allegedly erroneous decision by Chancellor Blank to readmit Player 1—are without merit.

Her deliberate-indifference claim fails because UW-Madison's response to Doe's sexual harassment was not "clearly unreasonable in light of the known circumstances." *Johnson v. Ne. Sch. Corp.*, 972 F.3d 905, 911 (7th Cir. 2020) (quoting *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. Of Educ.*, 526 U.S. 629, 648 (1999)). After receiving a report that Doe was subject to sexual misconduct, UW-Madison conducted a fulsome nonacademic-misconduct investigation, provided Doe various academic and social supports, issued an order prohibiting Player 1 from contacting Doe, and ultimately expelled Player 1. Then, upon being given access to new information that cast serious doubt on the Title IX decision, Chancellor Blank reduced Player 1's sanction from expulsion to a suspension, but kept in place Doe's academic and social supports, as well as the no-contact directive. Despite Player 1 eventually returning to campus, Doe never say nor heard from him again. All things considered, this was far from "a situation where the school learned of a problem and did nothing." *Id.* at 912.

Doe's erroneous-outcome claim fares no better. Chancellor Blank's decision to downgrade Player 1's discipline from an expulsion to a suspension was consistent with the newly available evidence. And even were there reason to doubt the accuracy of this outcome, the record contains no "particularized facts"—as opposed to unfounded speculation—that Chancellor Blank's decision was motivated by sex bias. *Doe v. Columbia Coll. Chi.*, 933 F.3d 849, 856 (7th Cir. 2019). The Chancellor was

aware of Doe's sex when she upheld Player 1's Title IX expulsion. As with that decision, there is no evidence the Chancellor's later decision to readmit Player 1 was made "on the basis of sex." *Doe v. Purdue Univ.*, 928 F.3d 652 (7th Cir. 2019) (quoting 20 U.S.C. § 1681(a)).

This Court should grant Defendant, Board of Regents of the University of Wisconsin System (Board), summary judgment on both of Doe's Title IX claims.

## STATEMENT OF FACTS

### A. The University of Wisconsin-Madison.

The University of Wisconsin-Madison (UW-Madison) is part of the UW System, which is governed by the UW System Board of Regents. The UW System is comprised of 13 four-year schools, including UW-Madison. UW-Madison serves 46,000 students, from all 50 states and 134 countries, with 22,000 faculty and staff, and has a mission of education, research and outreach. UW-Madison is organized into schools and colleges, each headed by a dean. The university has several governance groups and works closely with a number of affiliate organizations.[1]

As Chancellor, Rebecca "Becky" Blank is the chief executive of the University. The leadership team at UW-Madison reports to Chancellor Blank and is composed of six vice chancellors, the chief diversity officer and deputy vice chancellor for diversity and inclusion, the chief strategy officer and chief of staff (Matt Mayrl). The director of athletics reports also reports to Blank.[2]

---

[1] Defendant's Proposed Findings of Fact (DPFOF) ¶¶ 1-5.

[2] DPFOF ¶¶ 6-9.

UW-Madison's football program is regulated by the NCAA bylaws and Big Ten conference rules. The Big Ten conference rules, the NCAA bylaws, and the UW-Madison regulations do not prohibit a woman student-athlete from being part of the UW-Madison football team. Since at least 1998, no women have tried out for the football team at UW-Madison. Other NCAA college football programs have had women players, including Vanderbilt, another Division I school, which recently had a female kicker: Sarah Fuller.[3]

Chancellor Blank attends the home games of the football team. Football is important to the Chancellor because it brings people to campus, it creates a sense of cohesion and excitement on campus among the students, it provides a national platform for the university when the team is doing well, and it's one way the university is visible on the national stage.[4] Chancellor Blank also attends several women's athletics events, including volleyball, hockey, basketball, softball, soccer, and crew. She attended a lot of volleyball games this past year, given the UW-Madison women's volleyball team were national champions.[5]

## B. UW-Madison's Policy on Sexual Harassment and Sexual Violence.

As a recipient of federal funding, one way UW-Madison implements Title IX on campus is through the enforcement of the UW-Madison Policy on Sexual

---

[3] DPFOF ¶¶ 31, 33-35.

[4] DPFOF ¶¶ 32, 36-37.

[5] DPFOF ¶ 38.

Harassment and Sexual Violence (January 2018).[6] Among other things, the Policy establishes the disciplinary procedures used to investigate claims of sexual harassment and sexual assault. Relevant here, the Policy dictates that when the respondent is a student, UW-Madison uses the investigatory and disciplinary procedures outlined in the Wisconsin Administrative Code chapter UWS 17 (Register June 2016, No. 726) ("UWS 17").[7] UWS 17 is titled "Student Nonacademic Disciplinary Procedures," and outlines the investigatory and disciplinary procedures UW-Madison follows before imposing any sanction on a student. UWS 17 provides for the Title IX Coordinator's involvement in allegations concerning sexual harassment or sexual assault. At UW-Madison, Lauren Hasselbacher is the Title IX Coordinator.[8]

In accordance with the Policy, a student can report sexual assault to several authorities, including the Office of Compliance/Title IX Office or the Dean of Students Office (DoSO). If the student's allegation might constitute criminal conduct, the student also has the option of reporting the sexual assault to law enforcement agencies, including the University of Wisconsin-Madison Police Department (UWPD) or the Madison Police Department (MPD). Any next steps in the process depend on the circumstances, including whether the complainant wants to proceed with an investigation and the information available at the time. Generally, though, the process outlined in UWS 17 is followed whenever a formal investigation is initiated.[9]

---

[6] DPFOF ¶ 40.

[7] DPFOF ¶¶ 41-42. All references to UWS 17 are to the Register June 2016, No. 726.

[8] DPFOF ¶¶ 42-43.

[9] DPFOF ¶¶ 44-46.

### C. Plaintiff Jane Doe's sexual assault allegations.

Plaintiff Jane Doe and another woman (Complainant 1) accused Player 1 of raping them and accused Player 2 of sexually harassing them at an off-campus apartment on April 22, 2018. The two men were student athletes who played on the UW-Madison football team.[10]

On April 24, Doe's father reported Doe's accusation to Kate Dougherty, a student support specialist in the Dean of Students Office (DoSO). By reporting this incident to the University, Doe had several campus resources available to her from the DoSO. DoSO is available to support students affected by sexual harassment and sexual violence by referring students to confidential resources on-campus and off-campus; helping them request accommodations or changes to academic schedules, living arrangements, and transportation, and supporting them throughout relevant disciplinary or criminal processes. DoSO also connects students to the Rape Crisis Center (RCC), which is a confidential resource with an office in University Health Services. RCC provides students access to an advocate and other survivor services.[11]

The same day Dougherty spoke with Doe's father, Dougherty also spoke to Doe. Doe reported that she had a forensic nurse examination and had been in contact with the RCC. Doe provided Dougherty the name and contact information for the MPD detective who was investigating the incident. Doe requested assistance with academic accommodations to complete her semester. Dougherty also went over UW-Madison's

---

[10] DPFOF ¶¶ 25-29, 47.

[11] DPFOF ¶¶ 47-50.

rights and resources for victims of sexual assault, domestic violence, dating violence, and/or stalking.[12]

On April 24, Dougherty completed a Campus Incident Reporting Form for Doe's report of the alleged off-campus sexual assault. Dougherty also emailed Doe's professors to facilitate academic support and accommodations. Dougherty introduced herself and identified that their student, Doe, had been a victim of a sensitive crime and asked for their understanding and any assistance they could offer to Doe. This email was to open the door for a conversation with Doe's professors to ask for accommodations. Doe's professors expressed support for Doe and were willing to accommodate her.[13]

The day after Doe reported the incident, the Title IX Coordinator, Lauren Hasselbacher, reached out to Doe by email. In the email, Hasselbacher explained her position as Title IX Coordinator, offered to speak with Doe about academic accommodations, reporting options, and protective measures, and provided her with information on support services. Hasselbacher also told Doe that Hasselbacher had insufficient information to initiate an investigation at that time and offered to discuss how UW-Madison could investigate and proceed on her allegations.[14]

In the meantime, the City of Madison Police Department notified UW-Madison's Athletics Department of the criminal investigation of Player 1. On April

---

[12] DPFOF ¶¶ 51.

[13] DPFOF ¶¶ 52-55.

[14] DPFOF ¶¶ 56-58.

26, Player 1 was suspended from the football team, pending the criminal investigation. Hasselbacher confirmed Player 1 was suspended with Associate Athletics Director Chris McIntosh on April 30. That same day, Hasselbacher emailed Doe to inform her about the suspension. Hasselbacher also told Doe to let her know if she had questions, needed any additional assistance with completing the semester, and reiterated she could talk with Doe about no contact directives and reporting options.[15]

Doe responded and asked for a no contact directive with both men. On May 1, Hasselbacher issued no contact directives between Doe and Player 1 and Doe and Player 2. Hasselbacher sent Doe copies of the no contact directives that same day.[16]

Two days later, Hasselbacher spoke to Rape Crisis Center Director of Client Programming, Jaime Sathasivam, who relayed that Doe's family was overwhelmed with communication and wanted all communication to run through Sathasivam. Hasselbacher again reiterated there was insufficient information to proceed with an investigation and that she could either meet and speak with the complainants or wait for the Madison Police Department Report. Hasselbacher asked Sathasivam to communicate that any decision was up to Doe and that UW-Madison would move forward when requested.[17]

---

[15] DPFOF ¶¶ 60-62.

[16] DPFOF ¶¶ 63-66.

[17] DPFOF ¶¶ 67-69.

On May 9, Sathasivam emailed an update to Hasselbacher on Doe's behalf. Sathasivam and Doe had met with the detective that morning, and the detective had relayed his hope to refer charges to the Dane County District Attorney's Office sometime the next week. Sathasivam explained that Doe was still interested in working with Hasselbacher's office but wanted "to wait until the criminal decision is made– assuming that doesn't take too long."[18] On May 18, Sathasivam emailed Hasselbacher to let her know the MPD had referred two charges against Player 1, one for each complainant, to the Dane County District Attorney's Office on May 17. In response, Hasselbacher reiterated her understanding that Doe and her family were waiting for the MPD report to become available before initiating a response with UW-Madison.[19]

On May 24, Hasselbacher received a written statement from Complainant 1 (the other accuser) about the sexual assault allegations against Player 1. After receiving Complainant 1's permission, Hasselbacher shared Complainant 1's written statement with Doe's support person, Jaime Sathasivam, that same day (May 24). Hasselbacher said she would like to know Doe's preference on how to proceed on her own potential claims. Hasselbacher explained that if Doe wanted to move forward and include her allegations with the first notice of investigation, Hasselbacher likely had enough information from Complainant 1's statement to outline the charges and send the notice. Hasselbacher further explained, though, that at some point she

---

[18] DPFOF ¶¶ 70-71.

[19] DPFOF ¶¶ 73-75.

would either need the Madison Police Department report or additional information from Doe.[20]

On May 29, Hasselbacher emailed Sathasivam a summary and list of charges for Doe's review. Hasselbacher asked Sathasivam to confirm with Doe that the summary and list of charges were accurate and if Doe had any edits or additions.[21] Sathasivam responded that she had spoken to Doe and relayed the following: Doe had reviewed Complainant 1's written statement and was unsure what more she could add, given her limited memory. Doe said what she read was accurate and offered to speak with Hasselbacher and answer questions. Hasselbacher responded to Sathasivam and Doe and explained that she had enough information to initiate an investigation and would be sending out the Notices of Charge that day (May 29). Hasselbacher thanked Doe for agreeing to speak with her and suggested they wait to speak until Hasselbacher could review the MPD report and/or speak with witnesses. Hasselbacher suggested this to limit the number of times she would have to ask Doe about the allegations.[22]

Later that day (May 29), Hasselbacher issued Notices of Charge to Player 1 and Player 2, and Hasselbacher emailed a copy of the notices to Sathasivam and Doe.[23]

---

[20] DPFOF ¶¶ 77-78.

[21] DPFOF ¶ 80.

[22] DPFOF ¶¶ 81-82.

[23] DPFOF ¶ 83.

**D. The nonacademic misconduct investigation, the findings, and the criminal charges.**

All four parties had attorneys representing them during UW-Madison's investigation into the sexual assault and harassment allegations against Player 1 and the sexual harassment allegations against Player 2. Complainant 1 was represented by Lester Pines of Pines Bach LLP. Player 1 was represented by several attorneys, including Stephen Meyer, Kathleen Stilling, Andrew Miltenberg, and Stuart Bernstein. Player 2 was represented by Attorney Richard Coad. And Doe was represented by Attorney Amy Bogost.[24]

Between May 30 and October 9, 2018, Hasselbacher investigated Doe's allegations. Broadly speaking, during this time, Hasselbacher collected the relevant, available documentation, interviewed witnesses, and attempted to interview Player 1 and Player 2. More specifically, during this timeframe, Hasselbacher interviewed several witnesses, identified as Witness 1, Witness 2, Witness 3, and Witness 4. Hasselbacher documented her interviews with these witnesses. Witness 4 also provided a written statement.[25]

Between May 30 and October 9, 2018, Hasselbacher collected the following relevant, available documentation: surveillance footage from Player 1's apartment of Doe leaving and Player 1, Player 2, Complainant 1, and P1 leaving,[26] surveillance

---

[24] DPFOF ¶¶ 86.

[25] DPFOF ¶¶ 87-89.

[26] P1 was another female student who was present at Player 1's apartment on April 21-22, 2018.

footage from the complainants' residence halls, text messages between the complainants, text messages between Doe and Player 1, text messages between Complainant 1 and Witness 6, text messages between Complainant 2 and Witness 3, Instagram photograph and message from Player 1 to Doe, photographs of Doe and Player 1, snapchat messages from Complainant 1, Complainant 2's Uber receipt, notes from a review of the UW-Madison Police Department report, the Dane County Circuit Court criminal complaint, and records from Complainant 1's forensic nurse examination.[27]

Hasselbacher knew about but was unable to collect the following documentation: the Madison Police Department report(s), surveillance footage of the parties arriving at Player 1's apartment, surveillance footage from the Double U (UU) bar, surveillance footage from city cameras, and records from Doe's forensic nurse examination.[28] Hasselbacher tried to collect records from Doe's forensic nurse examination on June 19 and July 26, 2018. Hasselbacher included the link Doe could use to request the examination report in Hasselbacher's email on June 19. Doe never provided Hasselbacher with any records from her forensic nurse examination.[29] Hasselbacher was also unable to obtain interviews with Player 1, Player 2, and P1.[30]

---

[27] DPFOF ¶ 99.

[28] DPFOF ¶ 100.

[29] DPFOF ¶¶ 102-103.

[30] DPFOF ¶ 100.

On August 9, Hasselbacher met with Doe and Sathasivam to conduct an interview of Doe about her allegations against Player 1. Doe had no memory of the sexual encounter with Player 1 and learned she had been allegedly sexually assaulted from her friend, Complainant 1. Doe told Hasselbacher that she had a forensic nurse exam done, but the District Attorney did not want that information released.[31]

On August 20, Hasselbacher emailed Sathasivam to let her know the Dane County District Attorney's Office had issued criminal charges against Player 1 and UW-Madison may issue a public statement in response to the charges. Hasselbacher further offered that if Doe had "any concerns/requests about returning to school (safety, academic accommodations)," they should let Hasselbacher know. In her response, Sathasivam did not identify any safety concerns or request any academic accommodations.[32]

On August 22, following Hasselbacher's email request, Doe gave Hasselbacher permission to speak with Attorney Bogost and said she would let Hasselbacher know if there was anything she needed before the semester started.[33]

On August 22, 2018, Hasselbacher emailed Player 1's legal team due to the changed circumstances since they last connected (the criminal charges). In the email,

---

[31] DPFOF ¶¶ 119-120. At her deposition, Doe couldn't specifically recall whether the district attorney's office told her that. When Assistant District Attorney Bill Brown was asked whether he told Doe not to release her forensic nurse exam report to the University, he responded, "I don't believe I would have provided legal advice to [Doe] because she had an attorney." (DPFOF ¶¶ 121-122).

[32] DPFOF ¶ 126.

[33] DPFOF ¶ 129.

Hasselbacher asked the lawyers to let her know if Player 1 no longer planned to participate in an interview, but reiterated Player 1 was still welcome to do an interview if he chose to. Hasselbacher also provided information about some confidential services available for support on campus for Player 1. On August 23, 2018, Attorney Miltenberg emailed Hasselbacher a letter demanding that Hasselbacher delay issuing the investigative report now that Player 1 had been charged criminally. Attorney Miltenberg asserted that "significant, critical evidence will now become available in the next two (2) months." Attorney Miltenberg canceled the August 27 interview with Player 1.[34]

Also on August 23, Player 1 executed a signature bond with specific conditions of release in his criminal case. As part of his conditions of release, the Dane County Circuit Court ordered that Player 1 "shall not have any contact, direct or indirect, with Victim #1 or Victim #2 as identified in the criminal complaint," "shall not share any photo or name of the victims except only with his legal counsel," and "shall not encourage the sharing of any photo or name of the victims by others." Had Player 1 intentionally violated these conditions of release, he could have been subject to a new criminal charge of felony bail jumping, which carries up to six years in prison.[35]

In the meantime, Doe returned to Madison for the 2019-2020 academic year and lived in her sorority house with over 30 other women.[36] On August 28, Attorney

---

[34] DPFOF ¶¶ 131-32.

[35] DPFOF ¶¶ 134-138.

[36] DPFOF ¶ 141.

Bogost emailed asking for information about someone who could assist them with Title IX accommodations. Hasselbacher responded that Doe had previously been working with Kate Dougherty in the Dean of Students Office. On August 31, Dougherty received an email from Attorney Bogost, asking to schedule a meeting to discuss accommodations for the fall semester. Attorney Bogost indicated Doe was busy with Rush (sorority recruitment) and was hoping to meet with Dougherty before the semester began or shortly thereafter. Dougherty exchanged emails with Bogost and scheduled a meeting with Doe. Also on August 31, Hasselbacher sent Attorney Bogost and Sathasivam the Initial Investigative Report.[37]

On September 5, Doe's father sent Hasselbacher an email about Doe having music class with Player 2. In response to learning the same information, Assistant Dean and Director of Student Conduct and Community Standards, Tonya Schmidt, immediately went to the class's lecture hall to be there when the class let out and to ensure no contact between Doe and Player 2. That same day, Hasselbacher spoke to Attorney Bogost about the class overlap. That same day, Hasselbacher also called (and left a voicemail) and emailed Player 2's attorney, Rick Coad, to discuss the music class overlap.[38]

On September 6, Hasselbacher emailed Attorney Bogost to let her know Hasselbacher was working on the issue with the class overlap. Hasselbacher asked Bogost to please let Doe know that she apologized for the class overlap, which was an

---

[37] DPFOF ¶¶ 139-142.

[38] DPFOF ¶¶ 143-146.

oversight, and she took responsibility for it. Hasselbacher also asked whether Doe believed that Player 2 made intentional contact in any way. Also on September 6, Hasselbacher sent an email to Associate Athletics Director Chris McIntosh about the class overlap. A football academic advisor met with Player 2 to adjust his class schedule. Player 2 felt it would be best for him to drop the music class and he did. At the time of the class overlap on September 5, there were no specific findings of responsibility for misconduct against Player 2. Nor was Player 2 ever found responsible for misconduct related to Doe.[39]

On September 10, Attorney Bogost emailed Hasselbacher saying she had no changes to the Initial Investigative Report. She also challenged Player 1's and Player 2's right to respond to the report, given their lack of participation in the investigation to that point.[40]

On September 21, Hasselbacher emailed Attorney Bogost a copy of the Amended Initial Investigative Report. On October 2, Hasselbacher emailed Attorney Bogost a copy of the Second Amended Initial Investigative Report because she had received additional information from Complainant 1 and Player 2. On October 9, Hasselbacher notified Attorney Bogost by email that she had provided the Final Investigative Report to the Office of Student Conduct and Community Standards (OSCCS).[41]

---

[39] DPFOF ¶¶ 28, 147-152, 179.

[40] DPFOF ¶ 153.

[41] DPFOF ¶¶ 164-170.

Also on October 9, Hasselbacher received notice that Player 1 had sued her in federal court, along with the Board of Regents, Cathy Trueba, and Chancellor Blank. In the lawsuit, Player 1 sought a stay of all University disciplinary proceedings against him pending the resolution of the related criminal matter.[42]

Assistant Dean/Director, Division of Student Life Ervin (Kipp) Cox was assigned as the investigating officer for decision making purposes. Dean Cox issued Finding Letters on October 30. Dean Cox found Player 1 responsible for second degree sexual assault, third degree sexual assault, and sexual harassment of Doe. Dean Cox recommended a sanction of expulsion. Dean Cox found Player 2 not responsible for violation of criminal law regarding Doe and not responsible for sexual harassment of Doe.[43]

### E. The nonacademic misconduct hearing.

The nonacademic misconduct hearing was held on January 15, 2019. Doe and Complainant 1 appeared via Skype from a room at Union South with their attorneys, Lester Pines and Amy Bogost. Player 1 appeared with Attorney Kathleen Stilling from a separate room at Union South.[44] Bogost offered argument at the hearing in support of Doe's position that Player 1 raped her and should be expelled. Doe testified at the hearing that she underwent a forensic nurse exam, and Bogost informed the Hearing Committee that they (Doe and Bogost) never requested a copy of the forensic

---

[42] DPFOF ¶ 173.

[43] DPFOF ¶¶ 174-179.

[44] DPFOF ¶¶ 180, 182-183.

nurse exam. Doe testified at the hearing that she did not recall, but was told there was no blood alcohol test taken during the forensic nurse exam because she was unable to consent to a blood draw due to her intoxication. Bogost also told the Hearing Committee that Doe could not consent to the blood draw.[45] Doe testified at the hearing that she did not recall giving a urine sample during the forensic nurse exam.[46]

The others who testified and/or presented information at the hearing included Dean Cox, Title IX Coordinator Hasselbacher, UWPD Detective Schirmacher (who played the campus video footage from Sellery and Ogg Hall), and Complainant 1. Complainant 1's attorney offered argument. Player 1, Player 2, and P1 did not testify or participate in the hearing. Player 1's attorney offered argument and was able to ask questions of Doe and Complainant 1 that were filtered through the Hearing Committee.[47]

The Nonacademic Misconduct Hearing Committee issued its written decision on January 29, 2019, but the parties were informed of the decision on January 15. The Hearing Committee unanimously found Player 1 not responsible for second degree sexual assault of Doe. The Hearing Committee unanimously found Player 1 responsible for third degree sexual assault and sexual harassment of Doe. By a

---

[45] DPFOF ¶¶ 190-197.

[46] DPFOF ¶ 199. At her deposition, Doe testified that she recalled giving a urine sample during her forensic nurse exam and she was aware it was tested for alcohol. (DPFOF ¶¶ 199-202).

[47] DPFOF ¶¶ 183-189.

margin of two(yea)-to-one(nay), the Hearing Committee recommended to uphold the sanction of expulsion of Player 1.[48]

### F.  Player 1's appeal to the Chancellor.

On January 30, Player 1's lawyer, Attorney Stuart Bernstein emailed and sent via first class mail a letter to Chancellor Blank. In the letter, Attorney Bernstein stated that Player 1's criminal trial was scheduled to commence on February 11, the day before the deadline for his appeal of the Hearing Committee's decision. Bernstein demanded that Chancellor Blank suspend, adjourn, or delay the appeal so the decision would not be issued in the middle of his criminal trial and therefore have a critical negative impact on the criminal trial and jury. Attorney Bernstein further stated, "In our view, every decision made to date regarding Mr. Player 1' Title IX investigation has been decided adversely against him based solely on the concerns and wishes of the Complainants."[49]

Associate Vice Chancellor for Legal Affairs Nancy Lynch responded to Bernstein's letter on February 1. Lynch informed Bernstein that Chancellor appeals are processed according to Wisconsin Administrative Code § UWS 17.13. Specifically, Lynch noted subsection (3) requires the Chancellor to issue a decision within 30 days of receiving an appeal. Bernstein responded to Lynch's letter on February 4. In the February 4 letter, Bernstein asked Lynch to confirm that Chancellor Blank was denying Player 1's request that an appellate decision be held in abeyance until the

---

[48] DPFOF ¶¶ 204-207.

[49] DPFOF ¶¶ 210-213.

conclusion of Player 1's criminal trial. Bernstein asked whether Chancellor Blank would at least agree not to release any decision until the 30th day following the filing of Player 1's appeal.[50]

On February 12, Player 1 submitted his appeal of the findings to the Office of the Chancellor Rebecca Blank. On February 13, Chancellor Blank's chief of staff emailed Doe and copied Attorney Bogost to inform them that Player 1 had timely appealed the decision of the Hearing Committee.[51]

In his appeal, Player 1 argued the process was unfair, arbitrary and subject to bias such that he was unable to adequately present a defense to the allegations of nonacademic misconduct without prejudicing his concurrent criminal case.[52] Chancellor Blank issued her decision on March 13, affirmed the Committee's decision, and recommended sanction of expulsion. Chancellor Blank's review of Player 1's appeal was governed by Wisconsin Administrative Code § UWS 17.13, which requires the Chancellor to sustain the Committee's decision unless she found: (a) the information in the record does not support the findings or decision, (b) appropriate procedures were not followed which resulted in material prejudice to respondent or complainant, or (c) the decision was based on factors proscribed by state or federal law. Wis. Admin. Code § UWS 17.13(3)(a)-(c). Player 1's submission specifically raised an appeal under both (b) and (c), and Chancellor Blank's decision

---

[50] DPFOF ¶¶ 214-217.

[51] DPFOF ¶¶ 218-221.

[52] DPFOF ¶ 223.

appropriately addressed those bases.[53] As the Chancellor's decision was the final institutional decision in the matter, Player 1's expulsion from the university was effective as of the date of the decision, but the exclusion from campus provisions would not be enforced until March 16. The Chancellor's decision also included information for both the complainants and respondent about seeking further review of the March 13 decision by the Board of Regents.[54]

## G. Player 1's request for review to the Board of Regents.

On March 13, Attorney Bernstein, on behalf of Player 1, emailed a formal request for review of the Chancellor's decision under UWS 17.14.[55]

In his position statement requesting review to the Board of Regents, Player 1 argued his constitutional rights were violated because the nonacademic disciplinary process violated his due process rights by depriving him of a meaningful opportunity to be heard and forcing him to choose between abdicating his Fifth Amendment rights or prejudicing his nonacademic misconduct case. The Board of Regents issued its decision on June 7, denying Player 1's request for review.[56]

---

[53] DPFOF ¶¶ 224-228.

[54] DPFOF ¶¶ 229-230.

[55] DPFOF ¶ 233.

[56] DPFOF ¶¶ 234-237, 242.

### H. The criminal trial.

The criminal trial occurred July 29 through August 2, 2019. Doe testified at the criminal trial. The jury deliberated for approximately 35 minutes and found Player 1 not guilty on all counts.[57]

### I. Player 1's Petition for Restoration of Rights.

The Chancellor's review of a petition for restoration of rights is governed by UWS 17.18 of the Wisconsin Administrative Code. UWS 17.18 allows an expelled or suspended student to submit a written petition for readmission to the chief administrator officer, which at UW-Madison is the Chancellor, who "shall make the readmission decision." UWS 17.18 does not specify how the Chancellor is to decide the petition for restoration of rights, and unlike an appeal, the Chancellor's decision is not limited to the record of the disciplinary proceeding.[58]

In reviewing a petition pursuant to UWS 17.18, Chancellor Blank can consider new information that had been unavailable to the University at the time of the initial decision. Chancellor Blank generally sees two types of new information in petitions for restoration of rights: (1) information about the individual regarding some change or treatment they have undergone, or (2) information about evidence that has come forward that was not there when the original discipline was imposed.[59]

---

[57] DPFOF ¶¶ 243-245.

[58] DPFOF ¶¶ 248-250.

[59] DPFOF ¶¶ 251.

In matters dealing with "sexual harassment, sexual assault, dating violence, domestic violence, and stalking cases," UWS 17.18 states that "the readmission decision should be made in consultation with the Title IX Coordinator, and the complainant should be notified of any change to the disciplinary outcome." UWS 17.18 does not require that the complainants be consulted or informed that a petition for restoration of rights is filed. UWS 17.18 requires only that the complainant "shall be notified of any change to the disciplinary outcome."[60]

On August 6, Player 1 submitted a written petition that was 242 pages, including exhibits. The petition also included a jump drive, which contained approximately 70 video clips. Player 1's counsel stated that the "jump drive contains all of the video which was played at trial. These video excerpts (found on the jump drive under Player 1 Exhibits-Prepared Clips) were admitted at trial as Exhibit 1."[61]

Starting August 6 through August 16, 2019, Chancellor Blank was on vacation with her family in Hawaii. While on the plane to Hawaii, Chancellor Blank checked her email and saw that Player 1's attorneys had emailed a petition for restoration of rights.[62]

Following receipt of the petition, Chancellor Blank reached out to Vice Chancellor of Legal Affairs Raymond Taffora and asked him to work on Player 1's petition. The Office of Legal Affairs then tried to obtain additional information,

---

[60] DPFOF ¶¶ 252-254.

[61] DPFOF ¶¶ 255-256.

[62] DPFOF ¶¶ 246-247.

including: transcripts from the court trial, the district attorneys' impressions of the case, witness lists from trial, and Madison Police Department (MPD) reports from the Player 1 investigation. They were only successful in obtaining and reviewing the MPD police reports and witness lists.[63] Taffora knew the Chancellor would want to make a decision quickly because she is a prompt decision-maker and because the schoolyear was about to begin. The Chancellor intended to make the decision quickly because Player 1 was asking for readmission to the university, and school was going to start soon.[64]

Two days after the petition was filed, on August 8, Lynch called Doe's lawyer Amy Bogost. Following that phone call, Lynch sent Bogost an email listing campus resources available to Doe, including support contact for Dean of Students, Kate Dougherty, and support contact for issues involving threat, Chris Cole, Director of Threat Intervention Services.[65]

On August 12, Lynch and Bogost corresponded via email about the petition for restoration of rights, and Lynch indicated that "the university has not completed its review of the petition. We are collecting all relevant information in order to perform a thorough and accurate review."[66]

---

[63] DPFOF ¶¶ 257-260.

[64] DPFOF ¶¶ 261-262.

[65] DPFOF ¶¶ 263-264.

[66] DPFOF ¶ 268.

Also on August 12, Taffora called Assistant District Attorney Brown to discuss the evidence presented in Player 1's criminal case and inquire about getting access to the trial transcript. Brown did not want to discuss the Player 1 trial with Taffora and directed Taffora to contact the court reporter to get access to the trial transcript. Taffora also called the court reporter for Player 1's criminal trial who informed Taffora that it would take more than two months to even get an expedited copy of the transcripts.[67]

Chancellor Blank spent a substantial amount of time on her vacation considering the petition, including devoting a full day of her vacation in order to review the petition and evidence and to discuss the information provided and gathered. She also had many phone calls to discuss the petition.[68]

On August 14, 2019, Chancellor Blank had a call with Hasselbacher to consult with her in her capacity as Title IX Coordinator, pursuant to UWS 17.18. Chancellor Blank had an idea of what she was going to decide on the petition, and she wanted to consult with Hasselbacher about her decision to get Hasselbacher's input.[69] Chancellor Blank informed Hasselbacher that she appreciated the work she had done on the case, and told her that "both sides might sue."[70] Chancellor Blank discussed

---

[67] DPFOF ¶¶ 269-273.

[68] DPFOF ¶¶ 274.

[69] DPFOF ¶¶ 276-277.

[70] DPFOF ¶ 278. In Chancellor Blank's deposition, she was asked, "And you said 'Both sides might sue.'" Chancellor Blank's response in the transcript is an error, the Chancellor testified, "Turns out to be prescient." (Blank Dep. Tr. 252:6-7).

that they had been collecting information, the videos were important to her review, and she could not ignore the quick jury verdict. Chancellor Blank also informed Hasselbacher that she was thinking of lifting Player 1's expulsion but retaining the sexual harassment charge for Player 1's role in picture-taking of the complainants without their consent. Hasselbacher felt this discussion with Chancellor Blank was a "real conversation" and she recommended that Chancellor Blank give the complainants an opportunity to respond to the petition.[71]

Hasselbacher was not familiar with UWS 17.18 before Player 1 filed his petition for restoration of rights. Hasselbacher would have preferred if the Complainants had an opportunity to respond, but she also understood the perspective of UWS 17.18 was on the due process rights of a respondent.[72]

Chancellor Blank did not request the complainants to respond to Player 1's petition for restoration of rights because it was not part of the administrative rule the Chancellor was required to follow under UWS 17.18.[73] Doe does not know what additional information she would have submitted had she been given an opportunity to submit additional evidence in response to Player 1's petition for restoration of

---

[71] DPFOF ¶¶ 278-280.

[72] DPFOF ¶¶ 281-282, *see, also,* Q&A on Campus Sexual Misconduct, U.S. Dept. of Education, Office of Civil Rights, Q&A #11 & n.30 (September 2017) (available at https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf) (last visited April 3, 2022).

[73] DPFOF ¶¶ 283-284.

rights, except an Instagram message she received from a woman that lived in Atlanta after the criminal trial.[74]

On August 19, the Chancellor issued her decision, which granted Player 1's petition and readmitted him to the University. As Chancellor Blank's written decision explains, the following materials were available to for review: (1) the University's investigatory and hearing record, (2) the materials Player 1 submitted with his petition and the materials his attorneys submitted thereafter, and (3) available Madison Police Department reports. Chancellor Blank noted that the additional information Player 1 submitted in connection with his petition, as well as the MPD reports, had been unavailable to the University at the time of the initial investigation, findings, and appeals. Chancellor Blank noted that the newly supplied information, in particular the MPD reports and certain video clips presented at the criminal trial, impacted her assessment of the prior third-degree sexual assault finding.[75]

Chancellor Blank was persuaded by the totality of the police reports, statements, and videos that she reviewed. Chancellor Blank now had the statements of all major witnesses to the April 21-22, 2018 incident. Chancellor Blank was also persuaded by the fact that Complainant 1 and Complainant 2 (Doe) had provided different and less information to the University during the Title IX investigation than they had provided to the police after reporting the alleged assault.[76]

---

[74] DPFOF ¶ 308.

[75] DPFOF ¶¶ 287-290.

[76] DPFOF ¶¶ 291-292.

In addition to the videos, several pieces of new evidence that guided Chancellor Blank's decision on the petition included the following:

1. Complainant 1's interview with Detective Johnson was transcribed and included with the petition. In the interview, Complainant 1 relayed a conversation she and Doe had after Player 2 and Player 1 had taken the picture of them. Complainant 1 told Detective Johnson that she was speaking with Player 1 and Doe and stated: "I was like [Doe] we're leaving, we're going home, or something, and he was like no, like come back in 20 minutes. And I was like what do you need 20 minutes for? And she was like sex."

2. Complainant 1's statement to the police was consistent with Player 1's statement to the police on April 25, 2018, that Doe said to Complainant 1, "Give us 20 minutes. We are about to have sex."

3. Police interview of Player 1.

4. Police interview of Player 2.

5. Interview of M.R. (referred to as P1 during the investigation).

6. Police interview of Doe.

7. Text messages between Player 1 and Complainant 1, planning for the meet up.[77]

Based upon her review of the totality of the evidence, Chancellor Blank determined there was no longer a preponderance of the evidence that Player 1 had committed third-degree sexual assault. Chancellor Blank concluded that a preponderance of the available evidence did, however, show that Player 1 had sexually harassed Doe by enlisting Player 2 to photograph the complainants without their consent.[78]

---

[77] DPFOF ¶ 294.

[78] DPFOF ¶¶ 295-296.

Chancellor Blank found that the suspension from March 13-August 19, 2019 was an appropriate punishment for the sexual harassment violation, and the impact of that suspension was that Player 1 lost an entire semester worth of credits. Chancellor Blank's decision also admonished Player 1 for misrepresenting his disciplinary history with the University as well as cautioned Player 1 that any additional misconduct while a student would likely result in additional serious disciplinary action. Chancellor Blank's decision granting Player 1's petition readmitted Player 1 to UW-Madison effective that day (August 19, 2019).[79]

Chancellor Blank's decision specifically kept in place the no-contact directive between Player 1 and Doe. Chancellor's Blank decision noted that she did not make the decision lightly to reverse the sexual assault charges, and that she was aware of the challenges that complainants face in reporting sexual violence and the additional difficulty of participating in court and administrative proceedings and establishing evidence sufficient to meet the various burdens of proof to hold respondents accountable.[80]

Chancellor Blank also noted that her decision to readmit was without regard to Player 1's status as a student athlete because his readmission to UW-Madison was separate and independent from his future status as a student athlete, which depended on actions by the NCAA and other applicable governing bodies. Chancellor

---

[79] DPFOF ¶¶ 297-299.

[80] DPFOF ¶¶ 300, 303.

Blank would not have been surprised if Player 1 decided he was not going to stay and play football at UW-Madison.[81]

The same day the petition was granted, UW-Madison notified Doe of the change in the disciplinary decision, as required by UWS 17.18, by sending the Chancellor's decision to Doe via email. Doe received the August 19, email and decision on Player 1's petition at some point between 9:31 a.m. (when UW-Madison emailed it to Doe) and 9:36 a.m. (when Doe forwarded the decision to her father). Three days later, on August 22, Attorney John Clune sent Vice Chancellor Ray Taffora a notice of retainer and demand for preservation of information to UW-Madison on behalf of his clients Doe and Complainant 1.[82]

### J. Communications and media reports about the acquittal and petition.

Player 1's acquittal and his petition for restoration of rights to UW-Madison was covered by local and national media outlets, as well as on social media. The Chancellor's email accounts received many emails from the public, as well as from UW-Madison alumni, donors, employees, and students about Player 1's petition, asking the Chancellor to grant it or deny it for many different reasons. The Chancellor's decision on Player 1's petition was not based on the number of people for or against Player 1's readmission, social media posts, or letters from folks she did not know. The Chancellor understood that no matter what she decided on Player 1's

---

[81] DPFOF ¶¶ 301-302.

[82] DPFOF ¶¶ 305-307.

petition for restoration of rights, she was going to get criticized. So the Chancellor did what she thought was the right thing. Ultimately, both sides sued the Chancellor and the Board of Regents, and both cases are pending before this Court.[83]

### K. Player 1's return to the football team.

Player 1's eligibility and participation in the 2019-2020 football season at UW-Madison depended on Coach Paul Chryst's approval, as well as eligibility determinations governed by the NCAA bylaws and Big Ten Conference rules. At the time of Player 1's readmission, there was one regulation that made him ineligible to compete in the 2019-2020 UW-Madison football season: NCAA Bylaw 14.4.3.1, which required him to have completed six credit hours in the previous spring semester and eighteen credit hours over the 2018-2019 school-year.[84] Since Player 1 was expelled from the institution on March 13, 2019, he had completed zero credits of academic coursework during the spring 2019 semester and did not reach a minimum of 18 credits for the 2018-2019 academic year. Thus, he was ineligible to play pursuant to NCAA Bylaw 14.4.3.1.[85]

In order to be found eligible for the 2019-2020 football season, Player 1 had to request a waiver of this regulation, pursuant to NCAA 14.4.3.10, which provides "the authority to waive all other progress-toward-degree requirements based on objective evidence that demonstrates circumstances that warrant the waiver of the normal

---

[83] DPFOF ¶¶ 309-313.

[84] DPFOF ¶¶ 314-315.

[85] DPFOF ¶ 316.

application of those regulations."[86] Player 1 completed the forms necessary to return to the team on August 19. On August 20, Senior Associate Athletic Director and Senior Woman Administrator for UW-Madison-Athletics, Katie Smith, submitted a progress-toward-degree waiver for Player 1, requesting waiver of the NCAA bylaw. On August 23, the NCAA approved the progress-toward-degree waiver submitted on Player 1's behalf, making Player 1 eligible to compete in the 2019-2020 football season.[87]

### L. Doe's September 10, 2019 meeting with UWPD Director of Threat Intervention Services.

On September 10, 2019, UWPD Director of Threat Intervention Services, Chris Cole, attended an in-person meeting with Jane Doe, her attorneys Amy Bogost and Rachel Sattler, Dean Ervin Cox, and UWPD Detective Carol Ann Kashishian. This meeting was arranged by UW-Madison's Office of Legal Affairs.[88]

During the September 2019 meeting, Doe, along with Bogost and Sattler, reported that Doe was worried about seeing football players on campus, and she wanted to know what she should do when this happened. Apart from expressing this general worry and fear about seeing football players, Doe and her attorneys provided no specific concerns or any information about previously running into football players

---

[86] DPFOF ¶ 317.

[87] DPFOF ¶¶ 318-320.

[88] DPFOF ¶ 321.

and how they reacted, or statements made by football players that could be construed as threats.[89]

While sympathetic to Doe's uneasiness about seeing football players around campus, Cole determined that this general worry about seeing football players on campus was non-specific and did not rise to an actionable threat to her safety because she provided no information (no specific facts and circumstances) that supported the Threat Assessment team's ultimate premise of assessing a threat—that people send out warning signs before they act out. Even though Cole did not feel the information or concerns Doe provided rose to the level of an actionable threat, Cole informed her that if she encountered football players, or anyone, and felt unsafe she should call campus police or 911. He also told her that she could contact him if additional information came to light or if new concerns arose as the school year progressed.[90] Cole also discussed the importance of safety planning, such as being aware of one's surroundings, not walking alone, and knowing the locations of the blue light boxes situated around campus that can be pressed in case of an emergency. He also discussed the UWPD's website, which contained information about the Safe Walk program and the campus bus system, both options to help ensure safe transport around campus.[91]

---

[89] DPFOF ¶¶ 324-325.

[90] DPFOF ¶¶ 325-327.

[91] DPFOF ¶ 328.

The Threat Assessment Team had various strategies it could implement to ensure student safety in situations dealing with student-on-student actionable threats, including the following: coordinating solutions with campus partners such as a no-contact directives, changing of class schedules (so that the two students would not have classes in an area that they were likely to interact); a sit-down with the alleged student-aggressor to discuss their actions; and if necessary, the matter could be referred for criminal charges or university misconduct proceedings.[92] Cole determined that the information provided by Doe did not warrant any of these potential strategies because Doe had not informed him of any specific actions taken or statements made by any football players that rose to the level of an actionable threat. Doe already had a no-contact directive in place with Player 1, and she did not provide any information to suggest that this no-contact directive was not being followed.[93]

## M. Doe never saw Player 1 on campus again and she continued to receive support services and accommodations during the fall 2019 semester.

Following Player 1's readmission to UW-Madison, Doe never saw Player 1 on-campus again. Following the January 1, 2020, Rose Bowl, Player 1 did not return to UW-Madison for the spring semester. Player 1 and Player 2 never tried to call Doe,

---

[92] DPFOF ¶ 329.

[93] DPFOF ¶ 330.

write her a letter, or in any way try to contact Doe directly. And no one on campus ever said anything to Doe about what happened with Player 1.[94]

Doe continued to receive support services and accommodations during the fall 2019 semester. On August 5, 2019, three days after Player 1's acquittal, Kate Dougherty emailed Doe to check in and see how she was doing. Dougherty's email stated:

> I am aware that the verdict came out late on Friday afternoon and wanted to check in to see how you are doing even though I likely know that answer. I can only imagine how upsetting and frustrating it is for you right now. You are not alone! Please know that we are here and thinking about you. I can see that you are enrolled in credits for the fall semester. If there is any support that you need please let me know.

Doe never responded to Dougherty's email. Doe has no criticisms of Dougherty's contacts with her. During the fall 2019 semester, Doe was still seeing a therapist and still had contact with her advocate from the Rape Crisis Center, Sathasivam.[95]

Doe does not recall requesting any specific safety measures from the University.[96] Outside of the September 5, 2018 incident involving the overlapping music class, Doe, Sathasivam, or Attorney Bogost did not make any specific complaints to Hasselbacher about Doe's safety.[97] Outside of the no contact directive

---

[94] DPFOF ¶¶ 335-340.

[95] DPFOF ¶¶ 333-334, 341-343.

[96] DPFOF ¶ 344.

[97] DPFOF ¶ 345. UW-Madison found Player 2 not responsible for violation of criminal law and not responsible for sexual harassment of Doe. Doe did not appeal those findings. (DPFOF ¶ 346).

Doe requested on April 30, 2018, Doe, Sathasivam, or Attorney Bogost did not make any requests to Hasselbacher for specific protective measures.[98]

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is no genuine dispute of material fact where the evidence would not allow a reasonable jury to find for the nonmoving party. *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). At the summary-judgment stage, the nonmovant is entitled to the benefit of reasonable inferences supported by admissible evidence, but "not those supported by only speculation or conjecture." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (quotation marks omitted). Indeed, "summary judgment requires a non-moving party to respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Id.* A court should therefore enter summary judgment against a nonmovant "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## ARGUMENT

Title IX of the Education Amendments of 1972 provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be

---

[98] DPFOF ¶ 347.

denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). There is an implied right of action under Title IX that allows private parties to challenge sex discrimination in educational settings. *Doe v. Columbia Coll. Chi.*, 933 F.3d 849, 854 (7th Cir. 2019) (citing *Cannon v. Univ. of Chi.*, 441 U.S. 677, 689 (1979)).

The Seventh Circuit has recognized two classes of theory by which a party may bring a Title IX claim. *Jauquet v. Green Bay Area Cath. Educ., Inc.*, 996 F.3d 802, 807 (7th Cir. 2021). The first is one of "'indirect' discrimination by way of student-on-student harassment that is so severe that the harassment functionally excludes a student from school activities on the basis of sex." *Id.* (citing *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. Of Educ.*, 526 U.S. 629, 648 (1999)). An indirect-discrimination charge claims that the educational institution was deliberately indifferent to known instances of student-on-student harassment. *Id.* The second class of Title IX theory is considered "direct" because it involves an allegation that "the school itself discriminated against a person on the basis of their sex." *Id.* A direct-discrimination claim alleges that the institution's response to sexual misconduct was motivated by sex bias. *Id.* Federal courts in some parts of the country—though not those in the Seventh Circuit—divide direct discrimination claims into subcategories, such as "erroneous outcome" and "selective enforcement." *Doe v. Purdue Univ.*, 928 F.3d 652, 667–68 (7th Cir. 2019).

In this case, Doe brings both an indirect- and a direct-discrimination claim. Her indirect-discrimination claim is that UW-Madison was deliberately indifferent to

sexual harassment Doe experienced from fellow students. Doe's direct discrimination claim avers that Chancellor Blank's decision on Player 1's Petition for Restoration (Petition) was erroneous and motivated by sex bias. As discussed below, there isn't evidence enough to sustain either claim. The Board is, therefore, entitled to summary judgment on both.

## I.    Doe's deliberate-indifference claim fails because the record evidence does not reach the high bar required to show that UW-Madison's response to known harassment was clearly unreasonable.

In order to prevail on a claim that UW-Madison was deliberately indifferent to the sexual harassment of Doe by other students, she must demonstrate that "(1) the harassment was based on sex, (2) it was at an educational institution that was receiving federal funds, (3) the harassment was so severe, pervasive, and objectively offensive that it deprived the victim of access to educational opportunities, and (4) the school officials had actual knowledge of the harassment and were deliberately indifferent to it." *Columbia Coll. Chi.*, 933 F.3d at 856.

Doe's claim falters on both the third and fourth of these prongs: The only sexual harassment UW-Madison knew about that involved Doe and Player 1 stemmed from the night of April 21 and early morning of April 22, 2018. And for that harassment UW-Madison found Player 1 responsible, both at the conclusion of its Title IX investigation and then again in Chancellor Blank's decision on Player 1's Petition. There is no indication in the record that this harassment, for which Player 1 was punished by a lengthy suspension, deprived Doe of access to educational opportunities. What the record does show is that UW-Madison's response to Doe's

41

report of sexual harassment was anything but deliberately indifferent. No reasonable jury could find that this is "a situation where the school learned of a problem and did nothing." *Johnson*, 972 F.3d at 912 (quotation marks omitted). Summary judgment should enter on Doe's deliberate-indifference claim.

### A. The sexual harassment Doe experienced during the night and early morning hours of April 21 and 22 did not deprive her of access to educational opportunities.

An educational institution "can only be liable for harassment about which it has actual knowledge," and only then when it has "substantial control over both the harasser and the context in which the known harassment occurs." *Gabrielle M. v. Park Forest-Chi. Heights, Ill. Sch. Dist. 163*, 315 F.3d 817, 823 (7th Cir. 2003); *Doe-2 v. McLean Cty. Unit Dist. No. 5 Bd. of Directors*, 593 F.3d 507, 512 (7th Cir. 2010) (quoting *Davis*, 526 U.S. at 645). Actionable harassment, moreover, "must have a concrete, negative effect on the victim's education." *Id.* (quotation marks omitted). (This is, in part, because Article III standing "requires allegations—and, eventually, proof—that the plaintiff personally suffered a concrete and particularized injury in connection with the conduct about which [s]he complains." *Trump v. Hawaii*, 138 S. Ct. 2392, 2416 (2018).) "Examples of a negative impact on access to education may include dropping grades, becoming homebound or hospitalized due to harassment, or physical violence." *Gabrielle M.*, 315 F.3d at 823 (citations omitted).

The only alleged harassment UW-Madison was aware of in this case took place on April 21 and 22, 2018. And from the moment UW-Madison received word of that harassment, it did everything in its power to ensure that educational opportunities

remained open to Doe. This included Kate Doughtery from the Dean of Students Office and Title IX Coordinator Lauren Hasselbacher explaining to Doe the academic supports and accommodations available to her. Doughtery and Hasselbacher both reiterated on several occasions that all of these supports and accommodations were available to Doe at her request. So when Doe asked about accommodations in her classes, Dougherty facilitated communication between Doe and each of her professors to make those accommodations happen. And when Doe requested that a no-contact directive enter between her and Player 1, Hasselbacher entered one. *Accord Johnson v. Ne. Sch. Corp.*, 972 F.3d 905, 912–13 (7th Cir. 2020) ("[S]chool administrators are not required to expel every student accused of sexually harassing another student to avoid Title IX liability."). Aside from at the nonacademic-misconduct hearing, Doe never saw nor heard from Player 1 on campus after she left his apartment on April 22, 2018.[99]

The undisputed evidence indicates that these efforts worked to help keep Doe near the top of her class and an active participant in UW-Madison social activities. She earned stellar marks throughout her time at UW-Madison, graduating with a 3.826 grade-point average, and doing so in fewer than the typical four years, with a bachelor's degree in political science. There is no evidence that Doe's grades or her attendance dropped appreciably after April, 2018. Doe also continued to avail herself of social opportunities at UW-Madison. She joined a legal fraternity her first year at

---

[99] DPFOF ¶¶ 47-64, 139, 181, 333, 335, 339, 341-42.

UW-Madison and lived in her sorority house during her second year. Doe remained an active participant in these social groups until she graduated.[100]

There is thus no evidence in the record of a "concrete, negative effect" on Doe's education. *Gabrielle M.*, 315 F.3d at 823 (affirming summary judgment against Title IX plaintiff, who had suffered from a peer's sexual harassment, because "her grades remained steady and her absenteeism from school did not increase"). "Nothing in the record shows that [Doe] was denied any educational opportunities by [UW-Madison's response to Player 1]'s actions." *Id.*

Because Doe is unable to satisfy this element of her deliberate-indifference allegation, the Court need go no further and  should grant the Board summary judgment on this claim.

**B.      Far from deliberately indifferent, UW-Madison conducted a prompt Title IX investigation that ended in Player 1's expulsion, but which was missing—through no fault of the University's— critical information that would later become available to UW-Madison.**

The Seventh Circuit has characterized deliberate indifference as both a "high bar" and a "demanding standard," one that is met only when the school's "response to harassment is clearly unreasonable in light of the known circumstances." *Jauquet*, 996 F.3d at 808 (quotation marks omitted). A "negligent response is not unreasonable." *Id.* at 809 (brackets and quotation marks omitted). Nor is a response where the victim objects to the remedy provided by the school: "[V]ictims of harassment do not have a Title IX right to make particular remedial demands." *Id.*

---

[100] DPFOF ¶¶ 141, 333, 353-57.

at 808 (quotation marks omitted). And "[i]n fact . . . courts should refrain from second-guessing the disciplinary decisions made by school administrators." *Id.* (quoting *Davis*, 526 U.S. at 808); *see also Johnson*, 972 F.3d at 912 (noting that "judges make poor vice principals" (quotation marks omitted)).

Mentioned in the previous section were aspects of UW-Madison's response to Doe's claims of sexual-misconduct allegations. But those are just the tip of the iceberg. The following recapitulation of events demonstrates just how swift and extensive the University's response was, and demonstrates that no reasonable jury could find that this was "a situation where the school learned of a problem and did nothing." *Johnson*, 972 F.3d at 912 (quotation marks omitted).

The harassment at issue occurred the night of April 21, 2018, and early morning of April 22. Doe's father reported the incident to UW-Madison's Dean of Student's Office two days later, on April 24. Kate Dougherty at the Dean of Student's Office received the report and contacted Doe that same day to tell her about the various supports and accommodations available to her. Later in the day, after speaking with Doe, Dougherty contacted Doe's professors, telling them that Doe had been the victim of a sensitive crime and asking them for their understanding and any assistance they could offer Doe.[101]

This was meant to, and did, facilitate a dialogue between Doe and her professors that resulted in various academic accommodations made for Doe in all of her classes. And, in fact, at the start of each of Doe's remaining semesters at UW-

---

[101] DPFOF ¶¶ 47-54.

Madison, Dougherty was in contact with Doe and her attorney Amy Bogost to help facilitate continued academic accommodations. Dougherty also contacted Doe several times—including the day Player 1 was found not guilty in his criminal trial—just to check in to see how Doe was doing, to let her know that Doe was not alone, and to remind Doe that Dougherty and the Dean of Students Office was there for her if she needed anything. [102]

Dougherty was not the only UW-Madison official to reach out to Doe soon after learning of her allegations. UW-Madison's Title IX Coordinator, Lauren Hasselbacher, emailed Doe on April 25, 2018, to introduce herself and to discuss academic accommodations, reporting options, protective measures, and support services. On April 30, Hasselbacher emailed Doe to reiterate that Hasselbacher was available to answer any of Doe's questions and to provide Doe any assistance Doe needed. Hasselbacher also reminded Doe of her reporting options and about the potential issuance of no-contact directives.[103]

Doe responded to Hasselbacher's email asking that a no-contact directive between her, Player 1, and Player 2 issue. Hasselbacher promptly issued this no-contact directive on May 1, 2018. *This directive remained in place for the duration of Doe's time at UW-Madison.* Hasselbacher kept in regular communication with Doe and her representative at the Rape Crisis Center throughout the month of May. Like Dougherty, Hasselbacher repeatedly made clear to Doe that she was available to field

---

[102] DPFOF ¶¶ 54-55, 126, 140, 333, 341

[103] DPFOF ¶¶ 61-63

further accommodation or support requests from Doe. But aside from asking for a no-contact directive, Doe never made any such request.[104]

Hasselbacher issued Notices of Charge to Player 1 at the end of May, 2018. This kicked off Hasselbacher's monthslong investigation into Doe's allegations. Hasselbacher's investigation turned up surveillance footage, text messages, and witness statements. But because a criminal investigation into Player 1's conduct was then underway, Hasselbacher was unable to access Madison Police Department reports and surveillance footage. (As explained below, this missing evidence turned out to contain highly relevant information and formed the basis for Chancellor Blank's decision on Player 1's Petition after his acquittal.) On October 9, Hasselbacher presented the evidence she was able to collect in a Final Investigative Report to the Office of Student Conduct and Community Standards (OSCCS).[105]

Despite a federal lawsuit initiated by Player 1 to halt UW-Madison's disciplinary proceedings, OSCCS assigned Dean Cox to review Hasselbacher's report and issue findings. On October 30, 2018, relying on the "information available to [him]" at the time, Dean Cox found Player 1 responsible for the third-degree sexual assault of Doe and for the sexual harassment Doe. On January 28, 2019, these findings were upheld by the Nonacademic Misconduct Hearing Committee based on the same information available to Dean Cox, in addition to live testimony before the

---

[104] DPFOF ¶¶ 62-64, 67, 69-83, 162, 347.

[105] DPFOF ¶¶ 82-132, 153-172.

Committee from Doe and Complainant 1. The Committee also adopted Dean Cox's recommended sanction of expulsion.[106]

### C. Chancellor Blank did not act clearly unreasonably when she upheld Player 1's expulsion before responding to new, material information by reducing the sanction to a suspension.

On February 12, 2019, Player 1 appealed as of right the Hearing Committee's decision to Chancellor Blank. No new evidence was presented at the appeal stage, but Player 1 argued, among other things, that the pendency of his criminal case had impeded him from defending himself during UW-Madison's disciplinary process, rendering that process unfair and biased. Dated March 13, 2019, the Chancellor's decision on appeal found there was sufficient evidence, based on the available record, to find Player 1 had, as to Doe, committed third-degree sexual assault and sexual harassment. The Chancellor also found the disciplinary process was fair and lawful. The Chancellor thus upheld the Hearing Committee's decision, including its expulsion sanction, which took effect the date of the Chancellor's decision. An appeal of this decision to the Board of Regents was later denied, ending UW-Madison's disciplinary process.[107]

But then on August 2, 2019, a Dane county jury—in thirty-five minutes of deliberation—acquitted Player 1 of sexual assault charges. The jury's verdict prompted Player 1 to file with the Chancellor a Petition for Restoration of Rights on August 6. The Petition was filed pursuant to provision UWS 17.18 of the Wisconsin

---

[106] DPFOF ¶¶ 173-207.

[107] DPFOF ¶¶ 218, 222-230, 233-242.

Administrative Code and sought Player 1's readmission to UW-Madison. Attached to Player 1's Petition was evidence from his criminal trial that had thus far been unavailable to the Chancellor or any other UW-Madison official. As the Chancellor wrote in her decision on the Petition, "Substantial amounts of information were not made available to the University during the University's Title IX investigation . . . ." Though introduced regrettably late, the Chancellor could not in good faith turn a blind eye to the new evidence.[108]

Of particular note to the Chancellor, this new evidence included all the surveillance footage introduced at Player 1's trial as well as Madison Police Department (MPD) reports. The newly supplied footage showed, among other things, Player 1, Player 2, Complainant 1, and Doe at the UU bar and arriving at Player 1's apartment, where the incident took place. The MPD reports contain a narrative of this video that is consistent with the clips the Chancellor reviewed.[109]

Also included in the MPD reports—and particularly pertinent to the Chancellor's decision on the Petition—was a transcription of Complainant 1's interview with MPD Detective Johnson. In that interview, Complainant 1 said she stated at some point during the night in question something "like [Doe] we're leaving, we're going home, or something, and [Player 1] was like no, like come back in 20 minutes. And I was like what do you need 20 minutes for. And [Doe] was like[,] sex."

---

[108] DPFOF ¶¶ 243-45, 247-48.

[109] DPFOF ¶¶ 288-291, 294.

This was consistent with a MPD report that included a statement from Player 1 that Doe said to Complainant 1, "Give us 20 minutes. We are about to have sex."[110]

The Chancellor had no choice but to put this newly submitted evidence on the scale alongside all the previously submitted evidence already there, and weigh it. The result, as the Chancellor wrote in her decision, was that "the evidence falls short of preponderance of the evidence standard required to find the Petitioner responsible for sexual assault." The newly submitted evidence did, however, allow the Chancellor to maintain the sexual harassment charge.[111] For it included an admission by Player 1 in the MPD reports that he enlisted Player 2 to take picture of Doe and Complainant 2 in a vulnerable state and without their consent.[112]

Based on these findings, the Chancellor reduced Player 1's discipline from expulsion to a suspension and readmitted him to UW-Madison. Importantly, though, Chancellor Blank kept the no-contact order between Player 1 and Doe in effect. As stated above, this order remained in effect throughout Doe's time at UW-Madison. And, outside of disciplinary proceedings, Doe never saw or heard from Player 1 again.[113]

---

[110] DPFOF ¶ 294.

[111] DPFOF ¶¶ 295-96.

[112] The photograph was never recovered, despite a forensic examination of Player 2's phone. All parties agree that Doe was covered by a blanket in the photograph.

[113] DPFOF ¶¶ 181, 297-300, 335, 339.

**D.    There was nothing indifferent about UW-Madison's response to Doe's sexual-harassment allegations.**

UW-Madison's continued supports for Doe and the Chancellor's measured decision-making demonstrate that the University's response was reasonable at each step of the process. Throughout 2018 and 2019, UW-Madison, and particularly the Title IX Coordinator, was surrounded by lawyers representing all parties, armed with competing demands, threats of litigation, and varying levels of cooperation and obstruction. But UW-Madison persisted with and fulfilled its duty to conduct a prompt and equitable investigation under intense pressure, including from Player 1's advocates.

Evidence that the University diligently discharged its duties include the following: The very day UW-Madison received Doe's complaint, Dougherty in the Dean of Student's Office initiated contact with Doe to offer her institutional supports and to facilitate academic accommodations. And indeed Dougherty helped facilitate academic accommodations for Doe whenever she needed them. That is, even after the Chancellor's decision on Player 1's Petition, Dougherty made sure Doe received the academic support she needed.

Hasselbacher, UW-Madison's Title IX Coordinator, was also in regular contact with Doe and her representatives. Hasselbacher was the person who instituted the no-contact directive between Doe and Player 1, and this directive remained in effect after the readmission of Player 1, right up until Player 1 left UW-Madison permanently. When UW-Madison learned that Doe had a class with Player 2—who was also subject to the no-contact directive—an official from the Dean of Students

Office went immediately to the lecture hall to ensure no contact was made between Doe and Player 2. Hasselbacher then reached out to Player 2's attorney to discuss alternative classes for Player 2, after which Hasselbacher was informed that Player 2 had dropped the music class.

Notably, Hasselbacher and others repeatedly informed Doe and her representatives of other available supports and protective measures. Hasselbacher also made clear that Doe or her representative were free to let her know if Doe wanted UW-Madison to institute any of these measures, as UW-Madison empowers adult complainants, like Doe, to select and request the measures of their choice when they need them.

Upon Player 1's readmission, Associate Vice Chancellor Nancy Lynch organized a sit-down meeting between Doe, Doe's attorneys, the Director of Threat Intervention Services Chris Cole, and a UWPD detective. During this meeting, Doe expressed concern about seeing football players around campus. Doe did not report seeing Player 1, or receiving any threats from Player 1 or other football players, but was worried about running into football players on campus. Cole determined that these were not actionable threats, but educated Doe on safety measures, encouraged her to call 911 if she felt threatened, and left the door open for further communication.

Following the September 2019 meeting, and aside from Doe's requests for academic supports, no one at UW-Madison received a request for additional support services from Doe. In other words, there was nothing Doe sought by way of institutional ballast that she did not receive. Doe, of course, would have preferred

that Player 1's sanction remain an expulsion rather than a suspension, but the law is adamant that "Title IX does not require a school to satisfy a victim's . . . remedial requests." *Jauquet*, 972 F.3d at 809. (affirming dismissal of deliberate-indifference claim despite fact that complainant was "particularly upset that [accused] was not outright expelled"). And in fact, "schools are not required to engage in any specific forms of discipline." *Johnson*, 972 F.3d at 912–13.

Also clear is that UW-Madison's response in this case compares favorably to that of other schools in cases that ended at summary judgment. In *Johnson v. Northeast School Corporation*, for example, the Seventh Circuit affirmed a district court's grant of summary judgment against a student's Title IX deliberate-indifference claim. 972 F.3d 911–15. The allegations there were that a male student had raped two of his classmates. *Id.* at 908. Once reported, the school's response was to issue no-contact orders between the accusers and the accused and to conduct a Title IX investigation that included unsuccessful attempts to procure information from law enforcement. *Id.* at 912–13. It also—as here—included unsuccessful attempts to have the accused participate in the Title IX process. *Id.* at 913.

But unlike in this case, the accused in *Johnson* was never suspended or expelled. *See id.* at 912–13. The court did not "take lightly the fact that it may have been difficult, even traumatic, for Johnson to have to face her alleged rapist every day at school." *Id.* at 914. Here, outside of disciplinary proceedings, Doe never had any contact with Player 1 after the events of April 21 and 22 of 2018. And the one time UW-Madison was notified that Doe and Player 2 were in the same music class,

a UW-Madison official responded immediately to rectify the situation. As in *Johnson*, and likely every Title IX case, perhaps school officials could have done more to investigate the harassment claims. Doe may argue that UW-Madison official should have attended Player 1's criminal trial or that the Chancellor should have waited months to get the trial transcript before deciding Player 1's Petition. "But blaming [UW-Madison] for failing to take the specific actions that [Doe] would have preferred it to take sounds in negligence, not deliberate misconduct." *Id.* at 912 (quotation marks omitted); *see Doe v. Trs. Of Bos. Coll.*, 892 F.3d 67, 78, 90–93 (1st Cir. 2018) (affirming grant of summary judgment against Title IX plaintiff even though the decision-maker "refus[ed] to wait for the results of [relevant] forensic tests" before making a decision). And "[a] negligent response is not unreasonable, and therefore will not subject a school to liability [under Title IX]." *Johnson*, 972 F.3d at 912.

In short, if it was not clearly unreasonable, according to the *Johnson* court, for the school to "issue[] a no-contact order, stay[] in contact with law enforcement concerning a pending investigation, attempt[] to conduct [its] own investigation, and ma[k]e difficult decisions about how to approach a complicated situation that involved the rights of both [accused] and [accuser]," *id.* at 913, it was not clearly unreasonable for UW-Madison to do that and then some in this case. *See Gabrielle M.*, 315 F.3d at 824 (affirming summary judgment of deliberate-indifference claim where perpetrator was intermittently suspended and steps were taken to reduce, but not eliminate, contact between perpetrator and victim).

Another recent Seventh Circuit case to which UW-Madison's response here compares favorably is *Jauquet v. Green Bay Area Catholic Education, Inc.*, 996 F.3d 802, 805–06 (7th Cir. 2021). There, the school responded to a "cruel and vicious campaign" of sexual harassment by suspending the perpetrator for three days and offering to move the victim's seat further from his in the classroom. *Id.* School officials also met with the victim several times, but offered her no victim services "because [she] did not appear to need them." *Id.* at 806. And in one of the meetings, the complaint alleged, the school's president "criticize[d] the [victim]'s family and [mother] in particular for "coach[ing] her daughter to be more emotional." *Id.* The Seventh Circuit affirmed dismissal of the complaint because it did not describe "a situation where the school learned of a problem and did nothing . . . even if the school's response to the harassment was not as fulsome as a parent would want for her child." *Id.* at 809 (quotation marks omitted).

As detailed above, UW-Madison's response to Doe's harassment was much more encompassing than that in either *Johnson* or *Jauquet*. This was plainly "not a situation where the school 'learned of a problem and did nothing." *Johnson*, 972 F.3d at 912 (quotation marks omitted). The undisputed evidence is that UW-Madison did "not act *clearly unreasonably* in response to known instances of harassment," which is all the law requires.[114] *Gabrielle M.*, 315 F.3d at 825. Summary judgment should enter for the Board on Doe's deliberate-indifference claim.

---

[114] An off-campus sexual assault, without evidence of any on-campus harassment, cannot give rise to a Title IX claim. *See Doe-2 v. McLean Cty. Unit Dist. No. 5 Bd. of Directors*, 593 F.3d 507, 512 (7th Cir. 2010) (quoting *Davis*, 526 U.S. at 645) (holding Title IX liability requires the funding recipient have "substantial control over both the harasser and the

## II.   Doe's erroneous outcome claim fails because the Chancellor decided Player 1's Petition according to proper procedure and because the record evidence is barren of particularized facts showing that Chancellor Blank was motivated by sex bias.

Doe brings a direct Title IX discrimination claim against UW-Madison. This claim requires proof that "(1) the educational institution received federal funding, (2) plaintiff was excluded from participation in or denied the benefits of an educational program, and (3) the educational institution in question discriminated against plaintiff based on gender." *Columbia Coll. Chi.*, 933 F.3d at 854; *see also Jauquet*, 996 F.3d. at 810.

Doe purports to press this claim pursuant to an "erroneous outcome" theory.[115] Introduced first by the Second Circuit in *Yusuf v. Vassar College*, this theory requires a plaintiff to "cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding." 35 F.3d 709, 715 (2d Cir. 1994). If the plaintiff can do that, then he must "allege particular circumstances suggesting that gender bias was a

---

context in which the known harassment occurs.") "This substantial control element is essential for Title IX liability because a school district cannot be liable for its indifference to harassment that it lacks the authority to prevent." *Doe-2*, 593 F.3d at 512.

[115] Current Title IX regulations would not support a direct discrimination claim against UW-Madison on the facts of this case. Title IX currently addresses sexual harassment that occurs within an "education program or activity," which is limited to "locations, events, or circumstances over which the recipient exercised substantial control over both the respondent and the context in which the sexual harassment occurs, and also includes any building owned or controlled by a student organization that is officially recognized by a postsecondary institution." 34 CFR § 106.44(a). An off-campus sexual assault allegation could not form the basis of an erroneous outcome claim because the University would have been prohibited from treating such allegations as Title IX misconduct. Here, the University did not exercise "substantial control" over both the respondent and the off-campus context in which the alleged harassment occurred. Indeed, today, the University would be prohibited from treating Doe's allegations as Title IX misconduct and would have to dismiss such a complaint, but could address the allegations under other provisions of the student code of conduct. 34 CFR § 106.45(b)(3).

motivating factor behind the erroneous finding." *Id.* Recently, however, the Seventh Circuit decided that "tests or categories labeled 'erroneous outcome' or 'selective enforcement' or 'deliberate indifference' or 'archaic assumptions' need not be considered because at bottom they all ask the same question." *Columbia Coll. Chi.*, 933 F.3d at 854 (citing *Doe v. Purdue Univ.*, 928 F.3d 652, 657 (7th Cir. 2019)). And at the summary-judgment stage, that question is whether the undisputed facts would allow a reasonable jury to find that UW-Madison discriminated against Doe "on the basis of sex." *Id.*; *Johnson v. Marian Univ.*, 829 F. App'x 731, 732 (7th Cir. 2020).

The answer to that question here is no. There is not a shred of evidence to show that Chancellor Blank, when she decided Player 1's Petition, discriminated against Doe on the basis of sex. As explained below, the procedure she followed to reach her decision was in accordance with the applicable provision of Chapter UWS 17 of the Wisconsin Administrative Code. And while there were some people expressing opinions in support of Player 1 and others in support of Doe, there is no evidence— nothing the Chancellor or anyone assisting her decision-making process said or did— that shows the decision on Player 1's Petition was motivated by sex bias.

## A. Doe was not excluded from or denied the benefits of an educational program.

Before reaching the issue of sex bias *vel non*, though, the Court should grant the Board summary judgment on this claim for lack of evidence that Doe "was excluded from participation in or denied the benefits of an educational program." *Columbia Coll. Chi.*, 933 F.3d at 854. (Article III standing requires such proof. *Trump v. Hawaii*, 138 S. Ct. at 2392.) "Examples of a negative impact on access to education

may include dropping grades, becoming homebound or hospitalized due to harassment, or physical violence." *Gabrielle M.*, 315 F.3d at 823.

Both before and after the events of April, 2018, UW-Madison held open to Doe every activity and benefit the University had to offer. After receiving her sexual-assault complaint, both Doughtery at the Dean of Students Office and Title IX Coordinator Hassebacher immediately and then repeatedly thereafter discussed the supports and accommodations UW-Madison would offer upon Doe's request. And indeed Doe received academic accommodations in every class she was taking in April, 2018, and in every class after that where she requested accommodations.

Doe received her bachelor's degree in political science in less than the four years it takes typical students. She finished with a GPA of 3.826, and is now in law school. Neither her course load nor her academic performance showed any signs of an appreciable drop-off after the incident with Player 1.

Similar facts led the Seventh Circuit in *Jauquet* to dismiss a plaintiff's direct-discrimination claim. 996 F.3d 802 at 810. The court held there that because complainant's academic status had not changed as a result of the alleged discrimination and because she had remained a high-performing student at the school, there could be no "reasonable inference that this particular plaintiff was excluded from the benefits of an educational program." *Id.* That inference was also absent in *Gabrielle M. v. Park–Forest Chi. Heights, Ill. Sch. Dist. 163*, where the Seventh Circuit affirmed summary judgment against a Title IX plaintiff because the record "show[ed] that her grades remained steady and her absenteeism from school

did not increase" and that therefore there was "no evidence that Gabrielle was denied access to an education." 315 F.3d at 825.

The state of the evidence is the same here: Doe's academic status remained the same right up until she graduated early with near-perfect grades. This is no doubt a testament to Doe's talent and resolve, but also to the fact UW-Madison did everything in its power to ensure that Doe's education was not interrupted. The dearth of evidence that Doe was excluded from or denied the benefits of being a UW-Madison student dooms her claim. The Court need go no further to grant summary judgment for the Board.

> **B.    Chancellor Blank reached her decision on the Petition by using proper procedure and weighing the relevant evidence, not by discriminating against Doe on the basis of sex.**

The section of the Wisconsin Administrative Code that allows for a petition for restoration of rights after an expulsion is UWS 17.18. At the time of the Chancellor's decision on Player 1's Petition, this section read, in pertinent part, as follows:

> A respondent who has been expelled may petition for the right to apply for readmission. The petition shall be in writing and directed to the chief administrative officer of the institution from which the respondent was . . . expelled . . . . The chief administrative officer shall make the readmission decision. In cases of sexual harassment, sexual assault, dating violence, domestic violence, and stalking cases, the readmission decision should be made in consultation with the Title IX coordinator, and the complainant should be notified of any change to the disciplinary outcome.

UWS 17.18.

Player 1 was expelled from UW-Madison starting March 13, 2019, after the Chancellor upheld his appeal of the Hearing Committee's decision. On August 2,

2019, a jury empaneled in Dane county returned a not-guilty verdict on the two charges of sexual assault stemming from the same incident underlying Player 1's expulsion. On August 6, Player 1 petitioned UW-Madison to restore his rights and readmit him to the University. As part of his Petition, he submitted evidence that had been admitted at his criminal trial and previously unavailable to UW-Madison. This evidence included surveillance footage of Player 1 and Doe together at the UU bar, together walking on University Avenue, and together just before they enter Player 1's apartment, where the incident took place.

The evidence submitted with Player 1's Petition also included accounts of the incident from Player 1 and Complainant 1 that were not only consistent with one another but also contradicted later witness testimony and undercut the allegation that Player 1 had nonconsensual sex with Doe. In Complainant 1's account, given shortly after the incident, she told police that she said something "like [Doe] we're leaving, we're going home, or something, and [Player 1] was like no, like come back in 20 minutes. And I was like what do you need 20 minutes for. And [Doe] was like[,] sex." This report was consistent with Player 1's, who told police shortly after the incident that Doe had told Complainant 1 to "[g]ive us [Doe and Player 1] 20 minutes. We are about have sex."

Chancellor Blank, as the one charged with making the restoration decision, reviewed this and other evidence submitted with Player 1's Petition and the evidence gathered during UW-Madison's Title IX investigation. Pursuant to Chapter 17.18, because this was a case involving allegations of sexual assault and harassment, the

Chancellor consulted UW-Madison's Title IX Coordinator on August 14, before making her final decision on Player 1's Petition. On August 19, 2019, the Chancellor issued her decision, reducing Player 1's sanction from expulsion to suspension, readmitting him to UW-Madison, and maintaining the no-contact order between him and Doe. (This, incidentally, modified the Chancellor's earlier decision on appeal to uphold Player 1's expulsion.) Finally, again following UWS 17.18, Doe was "notified of [this] change to the disciplinary outcome."

The procedure Chancellor Blank followed here was by the book. Nevertheless, the Board anticipates that Doe will argue that the Chancellor should have used other procedures that were not required by the applicable rule and then charge Chancellor Blank with violating those procedures. The first of Doe's preferred procedures is that she have a chance to respond to a petition for restoration of rights. This requirement is nowhere in UWS 17.18. The only right enunciated there vis-à-vis complainants like Doe is that they "be notified of any change to the disciplinary outcome." This was in accordance with relevant Title IX federal guidance at the time that specifically permitted schools to allow an appeal process only for the responding party based on due process concerns. *See Q&A on Campus Sexual Misconduct*, U.S. Dept. of Educ., 5 n.21 & 7, n.30 (available at https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf) (last visited April 3, 2022). Indeed, the U.S. Department of Education's Office for Civil Rights had previously informed schools that it is permissible to allow an appeal only for the responding party because "he/she is the one who stands to

suffer from any penalty imposed and should not be made to be tried twice for the same allegation." *Id.* at 7 n.30.

Doe may nevertheless argue that UW-Madison was required to provide simultaneous notification of any appellate procedure, if one is available, to both parties under the Clery Act. *See* 20 U.S.C. § 1092(f)(8)(B)(iv)(III)(bb). But the Clery Act cannot serve as the basis for a private right of action. And in fact the Clery Act explicitly states it does *not* create a private right of action *or* a standard of care:

> (A) Nothing in this subsection may be construed to—
>
>> (i) create a cause of action against any institution of higher education or any employee of such an institution for any civil liability; or
>>
>> (ii) establish any standard of care.
>
> (B) Notwithstanding any other provision of law, *evidence regarding compliance or noncompliance with this subsection shall not be admissible as evidence in any proceeding of any court, agency, board, or other entity*, except with respect to an action to enforce this subsection.

*See* 20 U.S.C. § 1092(f)(14) (emphasis added). The U.S. Department of Education, rather than private parties, is the enforcing authority of the Clery Act. *Doe v. Syracuse Univ.*, 440 F. Supp. 3d 158, 176–77 n.10 (N.D.N.Y 2020); *Z.J. v. Vanderbilt Univ.*, 335 F. Supp. 3d 646, 703–04 (M.D. Tenn. 2018); *Doe v. United States Dep't of Health and Human Servs.*, 85 F. Supp. 3d 1, 4 (D.D.C. 2015).

Doe therefore cannot use an assertion of technical noncompliance with the Clery Act's simultaneous notice provision as evidence for her sex-discrimination claim

under Title IX.[116] And in any event, Doe admitted at her deposition that she could not think of a single shred of relevant information or evidence that she would have submitted to the Chancellor at the Petition stage. A fictional right that would have gone unexercised is, needless to say, not a basis for Title IX liability.

Besides notice concerns, Doe is also expected to argue that the Chancellor's decision on Player 1's Petition came too quickly and that she should have waited some months to receive the trial transcript from Player 1's criminal case before making it. But UWS 17.18 does not say how long the Chancellor should take to decide a petition for restoration; nor does it require her to look at any particular information outside of the respondent's petition—this is so even though Chapter 17 is replete with various timing provisions and requirements that certain information be admitted and considered. *See, e.g.*, UWS 17.12 ("No less than 5 days in advance of the [disciplinary] hearing, the hearing examiner or committee shall obtain from the investigation officer, in writing, a full explanation of the facts upon which the determination of misconduct was based . . . ."). Chancellor Blank testified that she thought it fair to make a decision before the start of the 2019-2020 academic year.  She prioritized Player 1's Petition accordingly. *See Trs. Of Bos. Coll.*, 892 F.3d at 91–93 ("refus[ing] to wait for the results of the [relevant] forensic tests," where no evidence doing so was motivated by sex, is not enough to stave off summary judgment on Title IX claim).

---

[116] It is undisputed that Nancy Lynch had a telephone conversation with Doe's attorney, Amy Bogost, on August 8, 2019, and it is undisputed that Attorney Bogost and Lynch emailed about the petition for restoration of rights on August 12, 2019, a week before the Chancellor's decision. (Doe Dep. Ex. 2:4-5, Requests to Admit 5 & 6).

There is nothing sex-biased about following the letter of state law. Which is exactly what Chancellor Blank did in deciding Player 1's Petition, when she reviewed the Petition, consulted with the Title IX coordinator, came to a conclusion, and notified Doe of the change in disciplinary outcome. Nor is there anything sex-biased about a decision-maker responding to new information that materially effects the bases of her prior decision. After reviewing Player 1's Petition—especially the newly supplied surveillance footage and police reports—the Chancellor found that the record fell "short of the preponderance of the evidence standard required to the find [Player 1] responsible for sexual assault."

One could, and Doe will, try to second-guess the Chancellor's final decision-making in other ways. Doe might be argue, for example, that the decision was against the weight of the evidence or that Doe should have been permitted to respond to Player 1's Petition. But as the Seventh Circuit noted in *Doe v. Columbia College of Chicago*, complaints like these are "divorced from gender," and therefore cannot sustain a Title IX claim. 933 F.3d at 856. The plaintiff in *Columbia College* alleged that he had been denied access to relevant documents, but made no indication that this denial was based on his sex. *Id.* Analogous reasoning holds here: Doe claims that she was left out of the Petition process, but there is no evidence in the record indicating this happened because of Doe's sex. No evidence, for example, that males in her position were or would have been treated any differently. The same goes for Doe's argument, if any, that the Chancellor's decision was against the weight of the

evidence. Even were it true, "this allegation does not imply that the [Chancellor]'s decision was based on Doe's gender." *Id.*

By modifying her own decision on Player 1's initial Title IX appeal, Chancellor Blank opened herself up to criticism (and lawsuits) from both sides. But she was simply following relevant law and where the evidence in front of her. The undisputed facts do not show that there were "particular procedural flaws affecting the proof" or "particular evidentiary weaknesses behind [her] finding." *Yusuf*, 35 F.3d at 715. There is no evidence that what the Chancellor did or did not do during the Petition process was "based on [Doe]'s sex." *Jauquet*, 996 F.3d at 811. This should end Doe's direct sex-discrimination claim.

### C.   There is no evidence that the Chancellor allowed her decision on Player 1's Petition to become infected with sex bias at the behest of third parties.

Chancellor Blank has specifically disclaimed that her decision on the Petition was influenced by Doe's sex, Player 1's athletic status, or anything other than relevant facts and applicable law.[117] As discussed above, there is no contrary indication from the process she engaged in or the evidence before her. Doe may, however, argue that others—such as Raymond Taffora, then UW-Madison's Vice Chancellor of Legal Affairs, and UW-Madison donors like Ted Kellner—were an undue influence on the Chancellor, somehow sneaking sex discrimination into her decision-making process.

---

[117] DPFOF ¶¶ 295, 289-96, 304.

The argument fails for several reasons. First, the Chancellor was receiving pleas from students and alumni on both sides of the issue of whether to readmit Player 1, and there is no sign that Chancellor Blank was influenced by any of the various lobbying.[118] *See Doe v. Loyola Univ.-Chi.*, No. 20 CV 7293, 2021 WL 2550063, at *7 (holding that Title IX plaintiff had not alleged an actionable sex-discrimination claim where nothing suggested that outside pressure or campus climate "created a bias against men within the decisionmaking apparatus"); *see also Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018) ("[E]xternal pressure alone is not enough to state a claim that the university acted with bias in this particular case.").

Second, the fact that some of the lobbyists on Player 1's side were donors and fans of UW-Madison athletics is irrelevant to Doe's Title IX Claim. The same goes for evidence that Taffora was aware that the timing of the Chancellor's decision could impact Player's prospects as an athlete or football player. Courts have insisted that when Title IX says no discrimination "on the basis of sex," it means on the basis of *sex*—not some proxy (even a good one) for sex. The law is clear, for instance, that even if "virtually all cases of sexual assault at [a university] involve a female victim and male accused" and that university is "biased against those accused of sexual misconduct," this does not suggest sex discrimination because "survivors and perpetrators alike may be male or female." *Doe v. Columbia Coll. Chi.*, 299 F. Supp. 3d 939, 958–59 (N.D. Ill. 2017) (quotation marks omitted), *aff'd*, 933 F.3d 849 (7th Cir.); *see also Marian*, 829 F. App'x at 733 (affirming summary judgment against Title

---

[118] DPFOF ¶¶ 310-11.

IX plaintiff where the evidence "[a]t most . . . demonstrate[d] a pro-victim bias, but both women and men can be victims of sexual assault."); *Loyola Univ.-Chi.*, 2021 WL 2550063, at *7 ("[A] pro-victim bias is not sex bias—both women and men can commit or be victims of sexual assault.").

Thanks to Title IX itself, student-athlete is a poor proxy for sex: both men and women play collegiate sports. On the other hand, college football player—much like "those accused of sexual misconduct," *Columbia Coll. Chi.*, 299 F. Supp. 3d at 959— is a better proxy for sex: the overwhelming majority of college football players—like the overwhelming majority of those accused of sexual misconduct—are men. But an imperfect proxy is not the benchmark under Title IX. And just as "both women and men can [and do] commit . . . sexual assault," both women and men can and do play college football. While it is true that UW-Madison has never had a woman try out for its football team, there is no rule precluding a woman from breaking that glass ceiling, as several have done for college football teams across the country who have fielded women, including for at least one Division I program (Vanderbilt).[119] The point being that discrimination that favors college football players is not the same thing as discrimination "on the basis of sex," and therefore, even if such discrimination exists, cannot be the predicate of a Title IX discrimination claim.

To be clear, there is absolutely no evidence that the Chancellor herself was swayed in her decision by the fact that Player 1 had played football for UW-Madison. (She was aware of this fact when she upheld his expulsion too.) There is also no

---

[119] DPFOF ¶¶ 31-35.

evidence that Taffora, donors, or alumni wanted the Chancellor to readmit Player 1 because he was a football player. (Certain donor letters suggest they wanted Player 1 readmitted because they thought he was a good guy; because they thought the not-guilty verdict indicated that he had been falsely accused; and because of a fear that UW-Madison would appear racist for going the other way.) But even if an inference could be made that these people were motivated by football, and that their motivation rubbed off on the Chancellor, this would not be relevant to Doe's Title IX claim. Favoring football players, like favoring sexual-assault complainants, is "divorced from gender." *Columbia Coll. Chi.*, 933 F.3d at 856.

The third reason Doe's direct sex-discrimination claims fails is that, even in the light most favorable to Doe, the record evidence here does not approach the evidence and allegations backing similar claims in cases allowed to proceed. In *Doe v. Purdue University*, for example, the Seventh Circuit allowed plaintiff's sex-discrimination claim to proceed where there were allegations—necessarily credited at the motion-to-dismiss stage—that the only evidence considered by the decision-maker before suspending a male student accused of sexual assault was a secondhand account of the complainant's accusation. 928 F.3d 652 at 669. And the secondhand account came from the director of a center supporting sexual-assault victims at the university that had posted on its Facebook page, the same month the accused was disciplined, an article titled "Alcohol isn't the cause of campus sexual assault. Men are." *Id*. The court held that the broadcasting of this message to the campus community by someone integral to plaintiff's disciplinary process "could be

understood to blame men as a class for the problem of campus sexual assault rather than the individuals who commit sexual assault." *Id.*

A plausible inference of discrimination on the basis of sex could also be made in *Doe v. Baum.* 903 F.3d at 586–88. There, the Sixth Circuit held that the disciplinary body's decision to discredit the accused witnesses "in part because they were fraternity brothers, while not holding Roe's witnesses [her sorority sisters] to the same standard" was enough for plaintiff to make it past a motion to dismiss. *Id.* at 587. In *Baum*, as in every other recent case allowed to proceed on a theory of direct sex discrimination, there is evidence or credited allegations that include "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Yusuf*, 35 F.3d at 715; *e.g.*, *Doe v. Miami Univ.*, 882 F.3d 579, 593 (6th Cir. 2018) (holding that Title IX sex-discrimination claim could move forward where evidence included "an affidavit from an attorney who represents many students in Miami University's disciplinary proceedings, which describes a pattern of the University pursuing investigations concerning male students, but not female students"); *Doe v. Brown Univ.*, 166 F. Supp. 3d 177, 189 (D.R.I. 2016) (same where university employee commented "that Brown treats male students as 'guilty, until proven innocent,' that Brown has 'loaded the dice against the boys' and that the fact-finding process in cases of sexual misconduct at Brown operates under the assumption that it's always the 'boy's fault.'").

There is no evidence in this case that the Chancellor or anyone involved in her decision-making made distinctions, much less discriminated, based on sex. Pressure from within and without UW-Madison from students and alumni—which here was exerted both for and against Player 1 and Doe—is not enough to get a jury on a Title IX claim. Neither are biases in favor or against imperfect proxies for sex, such as sexual-assault victim or college football player. Indeed, the Chancellor has reviewed two petitions for restoration of rights that were from male students expelled for sexual misconduct and harassment. She granted one (Player 1's) and denied the other.

In short, no reasonable jury could find that the Chancellor "relied on the parties' gender to make h[er] decision" on Player 1's Petition. *Loyola Univ.-Chicago*, 2021 WL 2550063, at *8. None of her actions—even if susceptible to nit-picking and second-guessing—could lead a reasonable factfinder to conclude the Chancellor's decision on the Petition was motivated by sex. Chancellor Blank made her decision by following all required procedures and on the basis of the facts as presented to her. Doe is essentially "left with general allegations about the school administration's perceived [pro-football] culture" which is "not enough to create a triable issue on sex discrimination." *Marian Univ.*, 829 F. App'x at 733.

Because no reasonable jury could find that Chancellor Blank discriminated on the basis of sex in the discharge of her duty to decide Player 1's Petition, the Court should grant the Board summary judgment.

## CONCLUSION

For the foregoing reasons, the Court should grant the Board's summary judgment motion and dismiss this case in its entirety, with prejudice.

Dated: April 8, 2022.

Respectfully submitted,

JOSHUA L. KAUL
Attorney General of Wisconsin


s/Rachel L. Bachhuber
RACHEL L. BACHHUBER
Assistant Attorney General
State Bar #1052533

s/Catherine R. Malchow
CATHERINE R. MALCHOW
Assistant Attorney General
State Bar #1092705

s/Jonathan J. Whitney
JONATHAN J. WHITNEY
Assistant Attorney General
State Bar #1128444

Attorneys for Defendant Board of Regents

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-0188 (Bachhuber)
(608) 267-1311 (Malchow)
(608) 266-1001 (Whitney)
(608) 294-2907 (Fax)
bachhuberrl@doj.state.wi.us
malchowcr@doj.state.wi.us
whitneyjj@doj.state.wi.us