IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JANE DOE,

        Plaintiff,

    v.                               Case No. 20C0856

BOARD OF REGENTS OF THE
UNIVERSITY OF WISCONSIN SYSTEM,

        Defendant.

**DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANT'S
PROPOSED FINDINGS OF FACT**

# Table of Contents

Parties and Witnesses ................................................................. 3

Football and athletics ................................................................. 12

UW-Madison Nonacademic Misconduct Process 2018-2019 ........................... 15

Doe's sexual assault allegations ..................................................... 18

The nonacademic misconduct investigation, the findings, and the criminal charges ....................................................................................... 32

The Nonacademic Misconduct Hearing ................................................ 79

The appeal to the Chancellor ........................................................ 87

Player 1's request for review to the Board of Regents. ............................. 95

The criminal trial July 29 through August 2, 2019 ................................. 98

Petition for Restoration of Rights .................................................. 99

Communications and media reports about the petition ............................. 192

Player 1's return to the football team .............................................. 198

September 10, 2019: Threat Assessment Director and other UW-Madison affiliated staff meet with Doe and her attorneys ................................... 200

University Accommodations to Doe in Fall 2019 semester .......................... 213

Player 1 leaves UW-Madison ......................................................... 222

COVID-19 pandemic ................................................................... 223

Doe's academic performance .......................................................... 224

Player 1's other misconduct ......................................................... 229

Other petitions for restoration of rights ........................................... 232

The Defendant Board of Regents of the University of Wisconsin System submits the following reply to Plaintiff's Response[1] to Defendant's Proposed Findings of Fact as follows:

## Parties and Witnesses

1. The Board of Regents of the University of Wisconsin System (the "Board") is the defendant. The Board consists of 18 members, 16 of whom are appointed by the Governor, subject to confirmation by the Senate. The Board is responsible for establishing policies and rules for governing the System, planning to meet future state needs for collegiate education, setting admission standards and policies, reviewing and approving university budgets, and establishing the regulatory framework within which the individual units are allowed to operate with as great a degree of autonomy as possible. Wis. Stat. §§ 15.91 & 36.09(1)(a).

> **RESPONSE:**   Defendant's Proposed Finding of Fact 1 purported statement of law, not fact, and therefore does not warrant a factual response.

> **REPLY:  Undisputed.**

2. The University of Wisconsin—Madison (UW-Madison) is part of the UW System, which is governed by the UW System Board of Regents. The University of

---

[1] Doe references an "Exhibit A" in her Response to Defendant's Proposed Findings of Fact, which Doe states "contains a spreadsheet of hearsay emails and third-party documents that UW relies on its Proposed Findings of Fact for which it has not established admissibility." (Dkt. 147:3.) However, Doe failed to cite to Exhibit A in any of her responses to Defendant's Proposed Findings of Fact and failed to attach it to the operative pleading, dkt. 147. For these reasons, the Court should disregard Exhibit A. The Defendant has only responded to Doe's hearsay objections that were properly raised in her responses to the Defendant's Proposed Findings of Fact.

Wisconsin System is comprised of 13 four-year schools, including UW-Madison. (Blank Dep. Tr. 24:2-15 (Dkt. 93:7).)

> **RESPONSE:** Admit.

> > **REPLY: Undisputed**.

3.      UW-Madison serves 46,000 students, from all 50 states and 134 countries, with 22,000 faculty and staff, and has a mission of education, research and outreach. (Blank Decl. ¶ 3.)

> **RESPONSE:** Admit.

> > **REPLY: Undisputed.**

4.      The primary purpose of the University of Wisconsin–Madison is to provide a learning environment in which faculty, staff and students can discover, examine critically, preserve and transmit the knowledge, wisdom and values that will help ensure the survival of this and future generations and improve the quality of life for all. The university seeks to help students to develop an understanding and appreciation for the complex cultural and physical worlds in which they live and to realize their highest potential of intellectual, physical and human development. It also seeks to attract and serve students from diverse social, economic and ethnic backgrounds and to be sensitive and responsive to those groups which have been underserved by higher education. (Blank Decl. ¶ 6.)

> **RESPONSE:** Admit.

> > **REPLY: Undisputed.**

5.     UW-Madison is organized into schools and colleges, each headed by a dean. The university has several governance groups and works closely with a number of affiliate organizations. (Blank Decl. ¶ 4.)

> **RESPONSE:** Admit.

> **REPLY: Undisputed.**

6.     As Chancellor, Rebecca "Becky" Blank is the chief executive of the University. The leadership team at UW-Madison is composed of six vice chancellors who report to Chancellor Blank, in addition to the chief diversity officer and deputy vice chancellor for diversity and inclusion, the chief strategy officer and chief of staff. The director of athletics also reports to Blank. (Blank Decl. ¶ 5, Ex. 133.)

> **RESPONSE:** Admit.

> **REPLY: Undisputed.**

7.     As Chancellor, Blank collaborates with the leadership team to develop strategic priorities for the university and oversees the operations of the university. (Blank Decl. ¶ 7.)

> **RESPONSE:** Admit.

> **REPLY: Undisputed.**

8.     Matt Mayrl is employed in the Office of the Chancellor at UW-Madison and has served as the Chief of Staff and Chief Strategy Officer since November 16, 2015. (Mayrl Decl. ¶ 3.)

> **RESPONSE:** Admit.

> **REPLY: Undisputed.**

9.     Mayrl serves as an advisor to the Chancellor and provides operational support to the Chancellor and oversees the daily functions of the office. Mayrl manages the flow of issues, projects and problems requiring either short-term responses or anticipatory preparations and maintains close liaison and coordination with internal and external offices and entities. (Mayrl Decl. ¶ 3.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

10.     Lauren Hasselbacher is the Title IX Coordinator in the Office of Compliance/Title IX at UW-Madison and has served in this position since May 2017. (Hasselbacher Decl. ¶ 4.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

11.     As Title IX Coordinator, Hasselbacher helped finalize a new campus-wide policy related to sexual harassment and sexual assault, investigated and oversaw UW-Madison's responses to allegations of sexual harassment and sexual assault, maintained data or information related to sexual harassment and sexual assault at UW-Madison, and tracked training and trained UW-Madison staff and students on topics related to Title IX, sexual harassment, and sexual assault. (Hasselbacher Decl. ¶ 4.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

12.     Hasselbacher is currently employed as the Assistant Director of Civil Rights Compliance and Title IX Coordinator at UW-Madison. In this role, Hasselbacher continues to oversee the university response to sexual harassment and sexual violence, as well as all civil rights investigations (including allegations of sexual harassment and sexual violence). Hasselbacher also supervises the university ADA Coordinator. (Hasselbacher Decl. ¶ 5.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

13.     Raymond Taffora was the Vice Chancellor for Legal Affairs at all times relevant. (Taffora Dep. Tr. 8:2-5.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

14.     Taffora provided legal services to all elements of UW-Madison. (Taffora Dep. Tr. 13:14-14:2.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

15.     Nancy Lynch was the Associate Vice Chancellor for Legal Affairs at all relevant times. (Taffora Dep. Tr. 14:1-7.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

16.     Catherine "Kate" Dougherty was a student assistant specialist in the Dean of Students Office (DoSO) at UW-Madison. (Dougherty Decl. ¶¶ 4-5.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

17.     Dougherty was on-call in the office two days per week from 8:30 a.m. –
4:30 p.m. When Dougherty was on-call, she managed everything that came into the
office, including walk-ins who came for assistance. Dougherty also oversaw emails
that came into the dean of student life account, dean@studentlife.wisc.edu, and
handled phone calls that were forwarded to her. On days when Dougherty was not
on-call, she conducted follow-up on her casework. In addition, Dougherty held various
roles on campus committees as a representative from DoSO.

**RESPONSE:** Dispute. Defendant does not provide any citation to any
evidence for this proposed finding of fact in paragraph 17.

**REPLY:  The Board acknowledges the fact's citation was
inadvertently omitted. The citation for this proposed fact is the
Declaration of Catherine Dougherty at paragraph 6. (Dkt. 104:2.)
Plaintiff cites no evidence to dispute the proposed fact, so this
fact is undisputed.**

18.     Katie Smith is a Senior Associate Athletic Director and the Senior
Woman Administrator for UW-Madison Athletics. (Smith Decl. ¶ 2.)

**RESPONSE:** Admit.

**REPLY:  Undisputed.**

8

19.     Smith oversees UW-Madison's athletics compliance office and is a Deputy Title IX Coordinator. Smith also serves as sport administrator for women's volleyball and co-sport administrator for football. (Smith Decl. ¶ 3.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

20.     Smith worked in UW-Madison's athletics Compliance Office for 21 years, beginning in 1998 and was promoted to Director of Compliance in 2010. (Smith Decl. ¶ 4.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

21.     As Senior Associate Athletic Director at UW-Madison, Smith oversees all areas of the Compliance Office, including monitoring systems which assist the UW-Madison in complying with all University, Big Ten Conference, and National Collegiate Athletic Association (NCAA) rules and regulations that govern UW-Madison's athletic operations and student-athletes. (Smith Decl. ¶ 5.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

22.     Smith's sport administration responsibilities with volleyball and football include frequent interactions with staff members on areas including but not limited to budget, staffing, student-athlete matters, and overall sport and department initiatives. (Smith Decl. ¶ 5.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

23.    Jess Lathrop is employed by the University of Wisconsin – System as the Executive Director and Corporate Secretary for the Board. Lathrop has held this position since August 1, 2017.  (Lathrop Decl. ¶ 2.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

24.    In this position, Lathrop is a records custodian for the Board and has access to the records maintained and kept in the course of regularly conducted activities of the Board. (Lathrop Decl. ¶ 3.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

25.    Jane Doe is the Plaintiff in this case. Jane Doe was referred to as Complainant 2 in the UW-Madison disciplinary process of Player 1. (Hasselbacher Decl. ¶ 7.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

26.    ████  ████ is Player 1 in the Amended Complaint. ████ was referred to as Respondent 1 in the UW-Madison disciplinary process. (Hasselbacher Decl. ¶ 9.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

27.   ▮▮▮▮▮▮ is Player 2. ▮▮▮▮ was referred to as Respondent 2 in the UW-Madison disciplinary process. (Hasselbacher ¶ 10.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

28.   Player 2 was found not responsible for the allegations related to Doe by the Office of Student Conduct and Community Standards Investigating Officer, Assistant Dean Ervin "Kipp" Cox. (Hasselbacher Decl. ¶ 10; Doe Dep. Ex. 5 at 25-27 (Dkt. 97-12:25-27).)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

29.   Doe's UW-Madison nonacademic misconduct complaint against Player 1 was consolidated with another woman's complaint against Player 1 arising out of the same events. This woman was referred to as Complainant 1 in UW-Madison's investigation and the UWS 17 proceeding related to the allegations. (Hasselbacher Decl. ¶ 10.)

**RESPONSE:** Admit. Plaintiff notes that Hasselbacher Decl. ¶ 10 does not support the proposed finding of fact in paragraph 29.

**REPLY: Undisputed. The Board acknowledges the wrong paragraph of Hasselbacher's declaration was cited. The correct citation is the Declaration of Lauren Hasselbacher at paragraph 8. (Dkt. 102:2-3.)**

30.     A third woman was also at the apartment with Player 1, Player 2, Complainant 1, and Doe. This woman was referred to in UW-Madison's investigation and UWS 17 proceeding as P1. (Hasselbacher Decl. ¶ 59, Ex. 125.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

### Football and athletics

31.     UW-Madison's athletics operations, including the football program, are regulated by the National Collegiate Athletic Association (NCAA) Bylaws and the Big Ten Conference Rules. (Smith Decl. ¶ 5.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

32.     Chancellor Blank testified that football is important because it brings people to campus, it creates a sense of cohesion and excitement on campus among the students, it provides a national platform for the university when the team is doing well, and it's one way the university is visible on the national stage. (Blank Dep. Tr. 20:25-21:8 (Dkt. 93:6).)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

33.     The Big Ten conference rules, the NCAA bylaws, and the UW-Madison regulations do not prohibit a woman student-athlete from being part of the UW-Madison football team. (Smith Decl. ¶ 7.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

34. Since 1998, no women have tried out for the football team at UW-Madison. (Smith Decl. ¶ 7.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

35. Other NCAA college football programs have had women players, including Vanderbilt, another Division I school, which recently had a female kicker: Sarah Fuller. (Smith Decl. ¶ 8.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

36. Chancellor Blank attends the home games of the football team. (Blank Dep. Tr. 39:20-23 (Dkt. 93:11).)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

37. When Chancellor Blank attends home football games, she sits in the Chancellor's box, which is a climate-controlled suite. The others invited to the Chancellor's box vary from week to week. If there are alumni in town who are major donors, they would get invited. The Board of Regents has a standing invitation to the Chancellor's box. Occasionally there are faculty or staff who are invited to the box, and occasionally groups of students. (Blank Dep. Tr. 40:7-23 (Dkt. 93:11).)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

38.     Chancellor Blank attends several women's athletics events. She attended a lot of volleyball games this past year, given the UW-Madison women's volleyball team was national champions. Chancellor Blank usually attends at least one women's hockey game a year, sometimes more. She attends at least one women's basketball game a year, sometimes more. She has also gone to women's soccer matches, watched the women's crew team, and watched the women's softball team. (Blank Dep. Tr. 44:13-22 (Dkt. 93:12).)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

39.     Vice Chancellor Raymond Taffora is not a sports enthusiast, but would attend football games at times in the Chancellor's box with the other vice chancellors because members of the Board of Regents would be there. (Taffora Dep. Tr. 41:22-43:18.)

**RESPONSE:**   Dispute. Mr. Taffora's deposition testimony was as follows:

Q. All right. How about just personally, your attendance at football games, would you go to games?

A No. You know, I'm really not much of a sports enthusiast. You're more likely to find me in libraries than you are at football games. So I would – when I went to football games it would have been as a professional responsibility, so it would have been in the chancellor's box with all the other vice chancellors, in part because, you know, members of the Board of Regents would be there on an occasional basis, other persons would be there the were of some consequence to the University, so I would go then, but not if I could help it.

Dep. Tr. of Raymond Taffora, [Doc. 122 at 41:22-42:9] (emphasis added) (hereinafter, "Taffora Dep.").

> **REPLY:   Objection.  Doe's  response  does  not  genuinely dispute  the  proposed  fact.  The  cited  testimony  in  no  way undermines  the  proposed  fact  and  the  Court  should  deem  it undisputed in accordance with the Preliminary Pretrial Packet, *Summary  Judgment  Procedures*  II(C),  (D)(5),  &  (E).  Fed.  R.  Civ. Pro. 56(c) & (e).**

## UW-Madison Nonacademic Misconduct Process 2018-2019

40.     One way UW-Madison implements Title IX on campus is through the enforcement of the UW-Madison Policy on Sexual Harassment and Sexual Violence. **Exhibit 111** is a true and accurate copy of the UW-Madison Policy on Sexual Harassment and Sexual Violence in effect at the time of Doe's alleged sexual assault. (Hasselbacher Decl. ¶ 12, Ex. 111.)

> **RESPONSE:**  Admit.

> **REPLY:  Undisputed.**

41.     Among other things, the UW-Madison Policy on Sexual Harassment and Sexual Violence establishes the disciplinary procedures used to investigate claims of sexual harassment and sexual assault. Relevant here, the Policy explains that when the respondent is a student, UW-Madison uses the investigatory and disciplinary procedures outlined in the Wisconsin Administrative Code chapter UWS 17 (Register June 2016, No. 726). (Hasselbacher Decl. ¶ 13, Ex. 111, at 4–5.)

> **RESPONSE:**  Admit.

> **REPLY:  Undisputed.**

42.     Wisconsin Administrative Code ch. UWS 17 ("UWS 17") is titled "Student Nonacademic Disciplinary Procedures." UWS 17 outlines the investigatory and disciplinary procedures UW-Madison follows before imposing any sanction on a student. (Hasselbacher Decl. ¶14, Ex. 112.)

> **RESPONSE:** Defendant's Proposed Finding of Fact 42 is a purported statement of law, not fact, and therefore does not warrant a factual response.

> **REPLY: Undisputed. Doe's response is unfounded because Hasselbacher is merely explaining that UW-Madison follows the required rules in Chapter UWS 17 of the Wisconsin Administrative Code.**

43.     UWS 17 provided for the Title IX Coordinator's involvement in allegations concerning sexual harassment or sexual assault. Wis. Admin. Code. UWS § 17.05. (Hasselbacher Decl. ¶ 15, Ex. 112, at 2.)

> **RESPONSE:** Defendant's Proposed Finding of Fact 136 is a purported statement of law, not fact, and therefore does not warrant a factual response.

> **REPLY: Undisputed. Doe's response is unfounded because Hasselbacher is explaining the Title IX Coordinator's involvement in the procedures described in Chapter UWS 17 of the Wisconsin Administrative Code.**

44. A student could report sexual assault to several authorities, including Hasselbacher's office (Office of Compliance/Title IX) or the Dean of Students Office (DoSO). If the student's allegation might constitute criminal conduct that violates the Wisconsin statutes, the student also has the option of reporting the sexual assault to law enforcement agencies, including the University of Wisconsin-Madison Police Department (UWPD) or the Madison Police Department (MPD). (Hasselbacher Decl. ¶ 16, Ex. 111, at 3–4.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

45. Hasselbacher became involved in sexual harassment or sexual assault allegations when they were reported to her or reported to another office and then communicated to her. Whether reported directly to Hasselbacher or from another source, Hasselbacher would typically reach out to the complainant to introduce herself, offer referrals to confidential resources, academic accommodations, protective measures, and response options. (Hasselbacher Decl. ¶ 17.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

46. Any next steps in the nonacademic misconduct process depended on the circumstances, including whether the complainant wanted to proceed with an investigation and the information available at the time. Generally, though, the process outlined in UWS 17 is followed whenever a formal investigation is initiated. (Hasselbacher Decl. ¶ 18.)

**RESPONSE:** Admit.

**REPLY:  Undisputed.**

### Doe's sexual assault allegations

47.    On April 24, 2018, Jane Doe's father contacted DoSO and reported that Doe was sexually assaulted by Player 1 on April 21 and 22, 2018. (Dougherty Decl. ¶ 12; Hasselbacher Decl. Ex. 112.)

> **RESPONSE:**  Admit. Plaintiff notes that UW Ex. 112, cited in this paragraph, is to a document entitled "Chapter UWS 17" and not relevant to this paragraph.

> **REPLY:  Undisputed.**

48.    By reporting this incident to the University, Doe had several campus resources available to her from DoSO. DoSO is available to support students affected by sexual harassment and sexual violence by referring students to confidential resources on-campus and off-campus; helping them request accommodations or changes to academic schedules, living arrangements, and transportation; and supporting them throughout relevant disciplinary or criminal processes. (Dougherty Decl. ¶ 13.)

> **RESPONSE:** Admit.

> **REPLY:  Undisputed.**

49.    DoSO also connects students to the Rape Crisis Center (RCC), which is a confidential resource with an office in University Health Services. RCC provides students access to an advocate and other survivor services. (Dougherty Decl. ¶ 14.)

**RESPONSE:** Admit and dispute. Plaintiff admits that RCC, which is a separate non-profit, does have an on-campus office. To the extent UW suggests that the RCC's on-campus office was involved with Plaintiff, Plaintiff denies that suggestion. Exhibit 1, Decl. of Amy Bogost, April 27, 20222, at ¶ 35 (hereinafter "Bogost Decl.").

**REPLY: The proposed fact is undisputed. The Rape Crisis Center is a resource UW-Madison contracts with to provide free services to students. (Dougherty Decl. ¶ 14, dkt. 104:4). The fact that Doe may have connected with the Rape Crisis Center by other means, does not genuinely dispute the proposed fact. The Court should deem the proposed fact undisputed. Fed. R. Civ. Pro. 56(c) & (e).**

50. DoSO provides the student with information about all resources available and empowers the student to select and access the resources when the student needs them. If DoSO does not provide the specific support requested, DoSO will connect the student to a resource who can assist the student with the requested support. (Dougherty Decl. ¶ 15.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

51. The same day Doe's father contacted DoSO to report the alleged sexual assault, Dougherty spoke to Doe about supports and accommodations. Doe said that she had a forensic nurse examination and had been in contact with the Rape Crisis

Center. Doe provided Dougherty the name and contact information for the detective from the Madison Police Department who was investigating the incident. Doe requested assistance with academic accommodations to complete her semester. Dougherty also went over UW-Madison's rights and resources for victims of sexual assault, domestic violence, dating violence, and/or stalking. (Dougherty Decl. ¶¶ 16-17, Ex. 127, Ex. 154.)

> **RESPONSE:** Admit.

> > **REPLY: Undisputed.**

52.     Dougherty completed a Campus Incident Reporting Form for Doe's report of the alleged off-campus sexual assault on April 24, 2018. (Dougherty Decl. ¶ 18, Ex. 149.)

> **RESPONSE:** Admit.

> > **REPLY: Undisputed.**

53.     That same day, April 24, 2018, Dougherty emailed Doe's professors to facilitate academic support. Dougherty introduced herself and identified that their student, Doe, had been a victim of a sensitive crime and asked for their understanding and any assistance they could offer to Doe. This email was to open the door to have a conversation with Doe's Professors to ask for accommodations. (Dougherty Decl. ¶¶ 19-21, Ex. 126 at 1-10, Ex. 153 at 1-84; Doe Dep. Tr. Vol. I at 83:6-24 (Dkt. 97:22).)

> **RESPONSE:** Admit.

> > **REPLY: Undisputed.**

54.     Dougherty assisted Doe with academic accommodations to allow her to finish the spring 2018 semester. (Dougherty Decl. ¶¶ 19-21, Ex. 126 at 1-10, Ex. 153 at 1-84.)

  **RESPONSE:** Admit.

   **REPLY: Undisputed.**

55.     Doe's professors expressed support for Doe and were willing to accommodate her. (Doe Dep. Tr. Vol. I at 87:6-89:6 (Dkt. 97:23), Doe Dep. Ex. 3 at 458-467 (Dkt. 97-5:113-115, Dkt. 97-6:1-7), *see, generally*, Dougherty Decl. Ex. 153.)

  **RESPONSE:** Admit.

   **REPLY: Undisputed.**

56.     Title IX Coordinator Lauren Hasselbacher emailed Doe on April 25, 2018. (Hasselbacher Decl. ¶ 22, Ex. 113 at 1, Doe Dep. Ex. 5 at 591-96 (Dkt. 97-17:15-20).)

  **RESPONSE:** Admit.

   **REPLY: Undisputed.**

57.     In the April 25 email, Hasselbacher introduced herself, explained her position as Title IX Coordinator, offered to speak with Doe about academic accommodations, reporting options, and protective measures, and provided her with information on support services. Hasselbacher also told Doe that Hasselbacher had insufficient information to initiate an investigation at that time and offered to discuss how UW-Madison could investigate and proceed on her allegations. (Hasselbacher Decl. ¶ 23, Ex. 113, at 1.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

58.     Hasselbacher had insufficient information to initiate an investigation at that time (April 25) because the university had only received very short, general reports. Before Hasselbacher begins an investigation, she would usually require more details, including dates and circumstances and the nature of the alleged assault. (Hasselbacher Decl. ¶ 24.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

59.     Also on April 25, 2018, Complainant 1's father met with Hasselbacher in her office about Complainant 1's allegations against Player 1 and Player 2. Complainant 1's father and Hasselbacher, generally discussed the process and options for initiating a formal investigation. (Hasselbacher Decl. ¶ 25, Ex. 158 at 1.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

60.     Meanwhile, on April 27, Hasselbacher learned Player 1 had been suspended from the UW-Madison football team effective April 26, 2018. On April 30, Hasselbacher confirmed with Associate Athletics Director Chris McIntosh that Player 1 had been suspended based on the fact the Athletics Department had been notified by the Madison Police Department that Player 1 was the subject of a criminal investigation. (Hasselbacher Decl. ¶ 26, Ex. 113 at 3-4, Ex. 137.)

**RESPONSE:** Admit.

**REPLY:  Undisputed.**

61.    Hasselbacher sent an email to Doe to inform her of Player 1's suspension from the football team on April 30, 2018. (Hasselbacher Decl. ¶ 27, Ex. 113, at 5-6.)

**RESPONSE:**  Admit.

**REPLY:  Undisputed.**

62.    In the April 30 email, Hasselbacher explained that the Athletics Department had made the decision to suspend Player 1 based on information independently provided to it by the Madison Police Department that Player 1 was the subject of a criminal investigation. Hasselbacher also told Doe to let her (Hasselbacher) know if she had any questions or needed any additional assistance with completing the semester. Hasselbacher reiterated that she could talk with Doe about no contact directives and reporting options. (Hasselbacher Decl. ¶ 28, Ex. 113, at 5-6.)

**RESPONSE:**  Admit.

**REPLY:  Undisputed.**

63.    In response, Doe asked for a no contact directive between herself and Player 1 and Player 2. (Hasselbacher Decl. ¶ 29, Ex. 113, at 5.)

**RESPONSE:**  Admit.

**REPLY:  Undisputed.**

64.    At Doe's request, Hasselbacher issued a no contact directive between Doe and Player 1 and between Doe and Player 2 on May 1, 2018. Hasselbacher

attached copies of the no contact directives to Doe in an email that same day. (Hasselbacher Decl. ¶ 30, Ex. 113, at 5-11.)

 **RESPONSE:** Admit.

  **REPLY: Undisputed.**

65. Hasselbacher did not issue a no contact directive before May 1 because Hasselbacher does not issue no contact directives unless it is requested by the complainant. (Hasselbacher ¶ 31.)

 **RESPONSE:** Admit.

  **REPLY: Undisputed.**

66. Hasselbacher waits for a complainant to request a no contact directive because sometimes people do not want a no contact directive. For example, if a complainant believes a respondent does not know the complainant's name, the complainant may not want an official communication from UW-Madison with identifying information to be sent. In addition, UW-Madison would not want to create a situation that might further endanger a victim who is unaware that a no contact directive was sent. This is particularly true for domestic violence victims because the victim's partner might retaliate against the victim for the no contact directive when the victim did not even know it was sent. (Hasselbacher Decl. ¶ 31.)

 **RESPONSE:** Admit.

  **REPLY: Undisputed.**

67. On May 3, Hasselbacher spoke with Jaime Sathasivam, Director of Client Programming at the Rape Crisis Center (RCC), by phone. Hasselbacher

recorded a note about the phone call in Doe's Maxient file. (Hasselbacher Decl. ¶ 32, Ex. 114, at 3.)

> **RESPONSE:** Dispute. The cited exhibit does not support the proposed finding of fact in paragraph 67.

> **REPLY:  The Board acknowledges the page number of Exhibit 114 was incorrect in the citation. The correct citation is Exhibit 114 at 24. (Dkt. 102-4:24). Page 24 of Exhibit 114 contains a note recorded by Hasselbacher about her call with Jaime from RCC that states, "Jaime said the [Doe] family is overwhelmed with communication and would like communication to go through her." (Dkt. 102-4:24). Doe cites no evidence to dispute the proposed fact, so the Court should deem it undisputed in accordance with the Preliminary Pretrial Packet, *Summary Judgment Procedures* II(C) & (E). Fed. R. Civ. Pro. 56(c) & (e).**

68.    Maxient is a database where student records were kept regarding sexual harassment, sexual violence, and other student complaints and misconduct. (Hasselbacher Dep. Tr. 73:8-74:12.)

> **RESPONSE:** Admit.

> **REPLY:  Undisputed.**

69.    During the May 3 call, RCC Director Sathasivam relayed that Doe's family was overwhelmed with communication and wanted all communication to run through her. Hasselbacher again reiterated there was insufficient information to

proceed with an investigation and that she could either meet and speak with the Complainants or wait for the Madison Police Department Report. Hasselbacher asked Sathasivam to communicate that any decision was up to Doe and that UW-Madison would move forward when requested. (Hasselbacher Decl. ¶ 33, Ex. 114, at 33; Doe Dep. Tr. Vol. I at 16:12-18:3 (Dkt. 97:5-6.)

**RESPONSE:** Dispute. UW's Ex 114 at 33 relates to a Notice of Appeal and has nothing to do with the facts asserted in this paragraph. Plaintiff admits that she testified as follows:

Q.    To your recollection, was your family overwhelmed with communication and wanted communication to go through Jaime from the Rape Crisis Center?

MR. CLUDE: Object to the foundation.

THE WITNESS: In regards to – in regards to what?

BY MS. BACHHUBER:

Q.    To your complaint against [Player 1].

A.    I think yes.

Q.    Okay, Do you recall feeling overwhelmed on May 3, 2018, or around that time?

A.    Yes. I was overwhelmed.

Dep. Tr. of Jane Doe, [Doc. 97 at 17:1-12] (hereinafter "Doe Dep.").

**REPLY:   Objection.  Doe's  response  does  not  genuinely dispute  the  proposed  fact.  The  Board  acknowledges  that  the cited page number of Exhibit 114 was incorrect and the correct**

26

citation is Declaration of Lauren Hasselbacher, Exhibit 114 at page 24. (Dkt. 102-4:24). That note states as follows:

> Jaime said the [Doe] family is overwhelmed with communication and would like communication to go through her. Jaime asked about the investigation – I confirmed that we do not have sufficient information to proceed with investigation at this time, and that we can either meet and speak with Complainants or wait for the MPD report to become available. I asked Jaime to communicate that the decision is up to the Complainant (Doe), and that we will move forward when requested.

(Dkt. 102-4:24.)

The quoted testimony in Doe's response does not genuinely dispute the proposed fact and Doe cites no further evidence, so the Court should deem it undisputed in accordance with the Preliminary Pretrial Packet, *Summary Judgment Procedures* II(C), (D) & (E). Fed. R. Civ. Pro. 56(c) & (e).

70.    On May 9, 2018, Sathasivam emailed an update on Doe's behalf. (Hasselbacher Decl. ¶ 34, Ex. 113, at 12.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

71.    In the May 9 email, Sathasivam said she and Doe had met with the detective that morning, and the detective had relayed his hope to refer charges to the Dane County District Attorney's Office sometime the next week. Sathasivam explained that Doe was still interested in working with Hasselbacher's office but

27

wanted "to wait until the criminal decision is made– assuming that doesn't take too long." (Hasselbacher Decl. ¶ 35, Ex. 113 at 12.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

72.    Hasselbacher understood Sathasivam's email to mean Doe preferred to avoid an interview required to initiate proceedings with UW-Madison and instead preferred to wait until the Madison Police Department made a charging decision and the police report became available. (Hasselbacher Decl. ¶ 36.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

73.    On May 18, 2018, Hasselbacher received another update from Sathasivam. (Hasselbacher Decl. ¶ 37, Ex. 113 at 13-15.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

74.    Sathasivam said the Madison Police Department referred two charges, one for each complainant, to the District Attorney's Office yesterday, which would have been May 17. (Hasselbacher Decl. ¶ 38, Ex. 113 at 15.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

75.    In response, Hasselbacher reiterated her understanding that Doe and her family were waiting for the Madison Police Department report to become available before initiating an investigation with UW-Madison. Hasselbacher also

tried to confirm whether Doe was comfortable with Hasselbacher acknowledging Doe's involvement in any communications Hasselbacher had with Complainant 1. (Hasselbacher Decl. ¶ 39, Ex. 113 at 14.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

76.     Complainant 1 was represented by Attorneys Lester Pines and Jordan Loeb of Pines Bach LLP as of May 18, 2018. (Hasselbacher Decl. ¶ 40.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

77.     On May 24, 2018, Hasselbacher received a written statement from Complainant 1 about the sexual assault allegations from April 21 and 22. (Hasselbacher Decl. ¶ 41, Ex. 115.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

78.     After receiving Complainant 1's permission, Hasselbacher shared Complainant 1's written statement with Doe's support person, Jaime Sathasivam, that same day (May 24). Hasselbacher said she would like to know Doe's preference on how to proceed on her own potential claims. Hasselbacher explained that if Doe wanted to move forward and include her allegations with the first notice of investigation, Hasselbacher likely had enough information from Complainant 1's statement to outline the charges and send the notice. Hasselbacher further explained,

though, that at some point she would either need the Madison Police Department report or additional information from Doe. (Hasselbacher Decl. ¶ 42, Ex. 113 at 13.)

**RESPONSE:**  Admit.

**REPLY:  Undisputed.**

79.     Based on Hasselbacher's review of her emails, Hasselbacher also had a verbal conversation with Sathasivam on May 25, 2018, at 2:00 p.m. (Hasselbacher Decl. ¶ 43, Ex. 113 at 13.)

**RESPONSE:**  Admit.

**REPLY:  Undisputed.**

80.     On May 29, 2018, Hasselbacher emailed Sathasivam a summary and list of charges for Doe's review. Hasselbacher asked Sathasivam to confirm with Doe that the summary and list of charges were accurate and if Doe had any edits or additions. (Hasselbacher Decl. ¶ 44, Ex. 113 at 17.)

**RESPONSE:**  Admit.

**REPLY:  Undisputed.**

81.     Sathasivam responded that she had spoken to Doe and relayed the following: Doe had reviewed Complainant 1's written statement and was unsure what more she could add, given her limited memory. Doe said what she read was accurate and offered to speak with Hasselbacher and answer questions. (Hasselbacher Decl. ¶ 45, Ex. 113, at 17.)

**RESPONSE:**  Admit.

**REPLY:  Undisputed.**

82.     Hasselbacher responded to Sathasivam and Doe. Hasselbacher explained that she had enough information to initiate an investigation and would be sending out the Notices of Charge that day (May 29). Hasselbacher thanked Doe for agreeing to speak with her and suggested they wait to speak until Hasselbacher could review the Madison Police Department report and/or speak with witnesses. Hasselbacher suggested this to limit the number of times she would have to ask Doe about the allegations. Hasselbacher made clear, though, that if Doe preferred to speak sooner, they could work something out. (Hasselbacher Decl. ¶ 46, Ex. 113, at 16.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

83.     Later that day (May 29), Hasselbacher issued Notices of Charge to Player 1 and Player 2, and Hasselbacher emailed a copy of the notices to Sathasivam and Doe. Hasselbacher also noted it was UW-Madison protocol to notify the Athletics Department when a student-athlete was subject to a formal investigation of student misconduct and asked Sathasivam and Doe to let her know if they had any concerns about Hasselbacher sharing that information with the Athletics Department. They did not share any concerns with Hasselbacher. (Hasselbacher Decl. ¶ 47, Ex. 113, at 16-26.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

84.     Hasselbacher issued Amended Notices of Charge to Player 1 and Player 2 on May 31, 2018, after learning the initial notice inadvertently provided the wrong date for the alleged assault. Hasselbacher emailed copies of the Amended Notices of Charge to Sathasivam and Doe on May 30. (Hasselbacher Decl. ¶ 48, Ex. 113, at 27-37.)

>    **RESPONSE:** Admit.

>    **REPLY:  Undisputed.**

85.     On May 31, 2018, Attorney Stephen Meyer sent Hasselbacher an email introducing himself as the attorney for Player 1. (Hasselbacher Decl. ¶ 49, Ex. 113, at 38.)

>    **RESPONSE:** Admit.

>    **REPLY:  Undisputed.**

## The nonacademic misconduct investigation, the findings, and the criminal charges

86.     All four parties had attorneys representing them during UW-Madison's investigation into the sexual assault and harassment allegations against Player 1 and the sexual harassment allegations against Player 2. Complainant 1 was represented by Lester Pines of Pines Bach LLP. Player 1 was represented by several attorneys, including Stephen Meyer, Kathleen Stilling, Andrew Miltenberg, and Stuart Bernstein. Player 2 was represented by Attorney Richard Coad. And Doe was represented by Attorney Amy Bogost. (Hasselbacher Decl. ¶¶ 40, 49, 53, 80, 88; Mayrl Decl. ¶ 6, Ex. 130 at 1-4.)

>    **RESPONSE:** Admit.

**REPLY:  Undisputed.**

87.    Between May 30 and October 9, 2018, Hasselbacher investigated Doe's allegations. Broadly speaking, during this time, Hasselbacher collected the relevant, available documentation, interviewed witnesses, and attempted to interview Player 1 and Player 2. (Hasselbacher Decl. ¶ 50.)

**RESPONSE:**  Admit.

**REPLY:  Undisputed.**

88.    More specifically, during this timeframe, Hasselbacher interviewed several witnesses, identified as Witness 1, Witness 2, Witness 3, and Witness 4. Hasselbacher documented her interviews with these witnesses. (Hasselbacher Decl. ¶ 51, Ex. 116.)

**RESPONSE:**  Admit.

**REPLY:  Undisputed.**

89.    Witness 4 also provided a written statement. (Hasselbacher Decl. ¶ 52, Ex. 117.)

**RESPONSE:**  Admit.

**REPLY:  Undisputed.**

90.    On June 6, 2018, Hasselbacher received an email from Attorney Richard Coad to notify her that he represented Player 2 in the investigation being conducted by the Title IX office. (Hasselbacher Decl. ¶ 53, Ex. 113, at 39.)

**RESPONSE:**  Admit.

**REPLY:  Undisputed.**

91.    On June 6, 2018, Player 1's attorney, Stephen Meyer, emailed Hasselbacher a letter urging her to obtain and review some specific information in the hands of law enforcement. (Hasselbacher Decl. ¶ 54, Ex. 113, at 41-42.)

RESPONSE: Admit.

REPLY: Undisputed.

92.    Hasselbacher responded to Meyer's letter via email on June 19, 2018, and clarified that Player 1 could provide information relevant to the investigation at any time, which included participating in an interview. Hasselbacher also said Player 1 could provide names of witnesses or other documentation (text messages, photos, etc.) that he believed might be relevant. Hasselbacher stated that her intention was to alert Player 1 and his attorney when she was nearing the conclusion of the investigation and provide an opportunity to meet with Hasselbacher at that time. (Hasselbacher Decl. ¶ 55.)

RESPONSE: Dispute. This paragraph is inadmissible hearsay. F.R.E. 801, 802. Without waiving her objection, Plaintiff admits the Hasselbacher Decl. ¶ 55 contains this statement.

REPLY: The proposed fact is undisputed and Doe's objection is unfounded. Doe cites no evidence to dispute the proposed fact, and the email was provided in the record at Exhibit 113 page 43. (Dkt. 102-3:43.) The email states, "Also, I want to clarify that [Player 1] can provide information relevant to the investigation at any time, which could include

34

participating in an interview. You can also provide names of witnesses or other documentation (text messages, photos, etc.) that you believe may be relevant. Otherwise, it is my intention to alert you when I am nearing the conclusion of the investigation and provide an opportunity to meet with me at that time." (Dkt. 102-3:43).

Hasselbacher's email was a business record that meets the exception to the hearsay rule under Rule 803(6). (Dkt. 102-3:43.) Hasselbacher sent the email to Attorney Meyer in the course and scope of her duties as Title IX Coordinator. (Dkt. 102-3:43.) The email is a record of Hasselbacher's communication to Meyer made in the course and scope of Hasselbacher's duties and sent at the time shown in the email record (6/19/2018 4:10 PM). (*Id.*) The email record was maintained in the regularly conducted operations of UW-Madison and also preserved in response to Doe's counsel's demand for preservation of all electronically stored information related to the case in anticipation of litigation. (Hasselbacher Decl. ¶¶ 17, 19 (dkt. 102:4-5); Hasselbacher Decl. Ex. 113 at 43 (dkt. 102-3:43); Taffora Dep. 33:18-34:5 (dkt. 122:9-10); Taffora Dep. Ex. 1 at 1-4 (dkt. 122-1:1-4)); Fed. R. Evid. 803(6); *Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 955–56 (7th Cir. 2021).

93.     Player 1's attorney responded to Hasselbacher's email on June 21, 2018, and attached two letters. (Hasselbacher Decl. ¶ 56, Ex. 113, at 43-53.)

**RESPONSE:**  Admit.

**REPLY:  Undisputed.**

94.     On June 28, 2018, Player 1's attorney sent Hasselbacher another letter and included a screenshot of a text message exchange between Player 1 and Doe from April 22, 2018. (Hasselbacher Decl. ¶ 57, Ex. 113, at 60-62.)

**RESPONSE:**  Admit.

**REPLY:  Undisputed.**

95.     A private investigator working with Player 1's legal team interviewed two additional witnesses, Witness 5 and Witness 6, and provided Hasselbacher with written summaries of the interviews. Witnesses 5 and 6 declined to be interviewed by Hasselbacher. (Hasselbacher Decl. ¶ 58, Ex. 118.)

**RESPONSE:**  Admit.

**REPLY: Undisputed.**

96.     In addition, Hasselbacher tried to contact another individual, identified as P1, but she refused to participate in the process. (Hasselbacher Decl. ¶ 59, Ex. 125.)

**RESPONSE:**  Admit.

**REPLY:  Undisputed.**

97.     Hasselbacher also offered to interview Player 1 and Player 2, but both declined to participate in an interview. **Exhibit 159** is a chronology Hasselbacher

created of offers and/or requests to interview Player 1 during the course of the Office of Compliance Title IX investigation initiated on May 29, 2018. (Hasselbacher Decl. ¶ 60, Ex. 159.)

RESPONSE:  Admit.

REPLY: Undisputed.

98.    Hasselbacher created the chronology of offers and/or requests to interview Player 1 in response to a letter from another of Player 1's attorneys, Andrew Miltenberg. Miltenberg sent Hasselbacher a letter on August 23, 2019, in which he accused Hasselbacher of waiting four months to request an interview with Player 1. Miltenberg also emailed Hasselbacher in follow up on August 26, 2018. (Hasselbacher Decl. ¶ 61, Ex. 160.)

RESPONSE:  Admit.

REPLY: Undisputed.

99.    Between May 30 and October 9, 2018, Hasselbacher collected the following relevant, available documentation: surveillance footage from Player 1's apartment of Doe leaving and Player 1, Player 2, Complainant 1, and P1 leaving, surveillance footage from the Complainants' residence halls, text messages between the Complainants, text messages between Doe and Player 1, text messages between Complainant 1 and Witness 6, text messages between Complainant 1 and Witness 3, Instagram photograph and message from Player 1 to Doe, photographs of Doe and Player 1, snapchat messages from Complainant 1,  Complainant 2's uber receipt, notes from a review of the UW-Madison Police Department report, the Dane County

Circuit Court criminal complaint, and records from Complainant 1's SANE examination (forensic nurse examination report). (Hasselbacher Decl. ¶ 62.)

> **RESPONSE:** Dispute. Hasselbacher Decl. ¶ 62 is mostly similar, but not the same as the proposed finding of fact in paragraph 99.

> **REPLY:  Objection. Doe's response does not genuinely dispute the fact because Doe cites no evidence to dispute it, nor does she even point out the portion that is purportedly unsupported by the cited evidence. The cited paragraph in Hasselbacher's declaration states:**

>> **Between May 30 and October 9, 2018, I collected the following relevant, available documentation: surveillance footage from [Player 1's] apartment of Doe leaving and [Player 1], Player 2, Complainant 1, and P1 leaving, surveillance footage from the complainants' residence halls, text messages between the complainants, text messages between Doe and [Player 1], text messages between Complainant 1 and Witness 6, text messages between Complainant 2 and Witness 3, Instagram photograph and message from [Player 1] to Doe, photographs of Doe and [Player 1], snapchat messages from Complainant 1,  Complainant 2's uber receipt, the UW-Madison Police Department report, the Dane County Circuit Court criminal complaint, and records from Complainant 1's SANE examination (forensic nurse examination report).**

> **(Dkt. 102:12-13.) The Court should deem the proposed fact undisputed in accordance with the Preliminary Pretrial Packet,** *Summary Judgment Procedures* **II(C) & (E).**

100.    Hasselbacher knew about but was unable to collect the following documentation: the Madison Police Department report(s), surveillance footage of the parties arriving at Player 1's apartment, surveillance footage from the UU bar, surveillance footage from city cameras, and records from Doe's SANE forensic nurse examination. Hasselbacher was also unable to obtain interviews with Player 1, Player 2, and P1. (Hasselbacher Decl. ¶ 63.)

> **RESPONSE:**  Admit. *See* PPFF ¶¶ 91-93, 184-188 (explaining that Player 1 had in his possession the police reports and the referenced videos but chose not to provide those to UW during the Title IX investigation) and RPFF ¶¶ 1, 14 (explaining that Plaintiff never had in her possession the SANE forensic nurse examination).
>
> **REPLY:    Undisputed. The Board objects to Doe's additional argument because she failed to cite evidence in support of it in accordance with the Preliminary Pretrial Packet, *Summary Judgment Procedures* II(C) & (E). Procedure II(E)(1) allows a party to use evidence in the form described in Procedure I(C)(1)(a)-(f). Procedure I(C)(1)(a)-(f) does not include citations to other proposed facts as a form of evidence. The Court should disregard Doe's additional arguments.**

101.    Hasselbacher tried to collect records from Doe's forensic nurse examination on June 19 and July 26, 2018. Hasselbacher included the link Doe could

use to request the examination report in Hasselbacher's email on June 19. (Hasselbacher Decl. ¶ 64, Ex. 113, at 54-59, 63-69.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

102. Doe never provided Hasselbacher with any records from her SANE forensic nurse examination. (Hasselbacher Decl. ¶ 65.)

**RESPONSE:** Deny to the extent this paragraph 102 assumes that Plaintiff ever had in her possession her SANE forensic nurse examination report. She did not. *See* RPPFF ¶¶ 1, 14 (explaining that Plaintiff never had in her possession the SANE forensic nurse examination).

**REPLY: The Board objects to Doe's response because she failed to cite evidence in support of it in accordance with the Preliminary Pretrial Packet,** *Summary Judgment Procedures* **II(E). Procedure II(E)(1) allows a party to use evidence in the form described in Procedure I(C)(1)(a)-(f). Procedure I(C)(1)(a)-(f) does not include citations to other proposed facts as a form of evidence. The Court should disregard Doe's response and deem the proposed fact undisputed in accordance with Procedure II(C) & (E).**

**Subject to the objection, the Board replies: The proposed fact is undisputed. The proposed fact also does not "assume" any**

**fact that is disputed. Doe had *control* over whether she obtained a copy of the forensic nurse examination because Hasselbacher sent Doe's advocate and representative, Jaime Sathasivam, a link via email that Doe could use to request the forensic nurse examination report on June 19, 2018. (Hasselbacher Decl. Ex. 113 at 55 (Dkt. 102-3:55).). Doe does not dispute this fact. (*See* Doe's Resp. to DPFOF ¶ 101 (Dkt. 147:28, ¶ 101).)**

103.   Hasselbacher could not collect any reports from the Madison Police Department because they refused to disclose them due to the ongoing nature of their criminal investigation. By July 26, 2018, Hasselbacher knew she would not receive a copy of any Madison Police Department reports, and Hasselbacher communicated that understanding to the Complainants. (Hasselbacher Decl. ¶ 66, Ex. 113, at 63-69.)

> **RESPONSE:**   Admit that the MPD did not provide its report to Hasselbacher. *See* PPFF ¶¶91-93, 184-188 (explaining that Player 1 had in his possession the police reports and the referenced videos but chose not to provide those to UW during the Title IX investigation).

> **REPLY:   Undisputed. The Board objects to Doe's additional argument because she failed to cite evidence in support of it in accordance with the Preliminary Pretrial Packet, *Summary Judgment Procedures* II(E). Procedure II(E)(1) allows a party to use evidence in the form described in**

**Procedure I(C)(1)(a)-(f). Procedure I(C)(1)(a)-(f) does not include citations to other proposed facts as a form of evidence. The Court should disregard Doe's additional argument in accordance with Procedure II(C) & (E).**

104. In Hasselbacher's July 26 email to Doe (through Sathasivam), Hasselbacher asked if Doe would be willing to provide additional information, including an in-person interview and any other documentation like text messages or communications with Player 1, Player 2, or the witnesses. Sathasivam said she would check with Doe. (Hasselbacher Decl. ¶ 67, Ex. 113, at 63.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

105. On August 1, 2018, Hasselbacher met with Player 1's lawyer, Stephen Meyer. Meyer brought a PowerPoint presentation of surveillance footage of the parties leaving Player 1's apartment on April 22, 2018. (Hasselbacher Decl. ¶ 68, Ex. 156.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

106. Player 1's suspension from the UW-Madison football team was lifted on August 1, 2018. Hasselbacher was not involved in the decision to lift the suspension from the UW-Madison football team. (Hasselbacher Decl. ¶ 69.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

107.   The Athletics Department has a separate Student-Athlete Discipline Policy that applies to student athletes. The Athletics Department is the responsible office for enforcing the Student-Athlete Discipline Policy. (Blank Decl. ¶ 56, Ex. 137.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

108.   Around 2:30 p.m. on August 2, Hasselbacher sent Director of Compliance and ADA Coordinator Cathleen Trueba a draft email Hasselbacher planned to send to Sathasivam to update her and Doe on Player 1's reinstatement. (Hasselbacher Decl. ¶ 70, Ex. 113, at 70.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

109.   Hasselbacher was unable to send the update before Doe's father contacted other UW-Madison officials around 7:23 p.m. on August 2 about the reinstatement. Hasselbacher was out of the office and traveling on August 2. (Hasselbacher Decl. ¶ 71, Ex. 113, at 71-74.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

110.   Hasselbacher emailed Sathasivam on August 2, around 8:10 p.m., to have her pass along the update to Doe on Player 1's reinstatement to the UW-Madison football team. Hasselbacher relayed:

> [Player 1] was suspended on April 26 from team activities as per the Student Athlete Discipline Policy. As of July 31, no arrest or charge has occurred and the student athlete has been reinstated. The student

athlete's status will be rereviewed again if or when more information becomes available.

Questions about the Student Athlete Discipline Policy can be directed to Chris McIntosh, Associate Athletics Director (copied). Chris is away from campus this week and will return to campus on Monday, August 6.

(Hasselbacher Decl. ¶ 72, Ex. 113, at 73-74.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

111.   Hasselbacher also apologized that Doe's family became aware of Player 1's reinstatement before she could pass along the information directly. (Hasselbacher Decl. ¶ 73, Ex. 113, at 74.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

112.   Around 4:30 p.m. the next day (August 3), Hasselbacher received an email from Doe asking for an "explanation as to why Player 1 ha[d] been reinstated to the team?" Doe also asked if Hasselbacher needed anything from her. (Hasselbacher Decl. ¶ 74, Ex. 113 at 75.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

113.   Around 5:00 p.m., Hasselbacher received an email from Sathasivam saying Doe could speak over the phone or in person next week and suggesting they set something up for August 9 or 10. (Hasselbacher Decl. ¶ 75, Ex. 113 at 85-86.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

114.    Because Hasselbacher was out of the office at this time, Hasselbacher responded to both emails on Monday, August 6. (Hasselbacher Decl. ¶ 76, Ex. 113 at 75, 85-86.)

**RESPONSE:**  Admit.

**REPLY:  Undisputed.**

115.    In response to Sathasivam, Hasselbacher confirmed her availability and sought clarification on what Doe wanted to discuss. Sathasivam explained that Doe was willing to participate in an interview but expressed that Doe was feeling overwhelmed at trying to understand the separate processes (which Hasselbacher assumed meant the criminal and Title IX processes) and the Athletics Department processes. Hasselbacher reiterated to Sathasivam that "any decision thus far regarding a suspension from Athletics is independent from the university investigation of sexual misconduct being conducted by [her] office." (Hasselbacher Decl. ¶ 77, Ex. 113 at 85-86.)

**RESPONSE:**  Admit.

**REPLY:  Undisputed.**

116.    In response to Doe, Hasselbacher explained that the "decision about [Player 1's] suspension is one made by the Athletics Department and it is independent of the investigation being conducted by [her] office." Hasselbacher provided information, similar to that in Exhibit 113 at 73-74, and copied Sathasivam so she could assist Doe in arranging a conversation with McIntosh, if Doe wanted. (Hasselbacher Decl. ¶ 78, Ex. 113 at 75.)

**RESPONSE:** Admit.

**REPLY:  Undisputed.**

117.   On August 8, 2018, Hasselbacher met with Attorney Meyer and Player 1 to discuss the investigative process. During this meeting, they tentatively scheduled an interview with Player 1 for August 23, 2018. (Hasselbacher Decl. ¶ 79.)

**RESPONSE:** Admit.

**REPLY:  Undisputed.**

118.   On August 10, 2018, Attorney Meyer emailed Hasselbacher that he would have some follow up inquiry which would be sent via a second email. In this email, Attorney Meyer notified Hasselbacher that Attorney Stilling and Attorney Miltenberg also represented Player 1 and that Hasselbacher might be receiving communications from them during Attorney Meyer's absence next week. (Hasselbacher Decl. ¶ 80, Ex. 113, at 76-77.)

**RESPONSE:** Admit.

**REPLY:  Undisputed.**

119.   Title IX/EO Complaint Investigator Jennifer Horace and Hasselbacher met with Doe on August 9, 2018. (Hasselbacher Decl. ¶ 81, Ex. 119.)

**RESPONSE:** Admit.

**REPLY:  Undisputed.**

120.   Doe had no memory of the sexual encounter with Player 1 and learned she had been allegedly sexually assaulted from her friend, Complainant 1. Doe told Hasselbacher that she had a forensic nurse exam done but the District Attorney did

not want that information released. (Hasselbacher Decl. Ex. 119 at 3-4 Doe Dep. Tr. Vol. I at 45:4-8 (Dkt. 97:12).)

> **RESPONSE:** Admit except Plaintiff disputes the insertion of "allegedly," as the cited evidence demonstrates that Complainant 1 herself witnessed the assault and did not say that Plaintiff had "allegedly" been assaulted.

> **REPLY: Undisputed and the Court should disregard Doe's additional argument because Doe cannot offer the hearsay statements of Complainant 1 for the truth of the matter asserted. Fed. R. Evid. 801-802.**

121.   Doe doesn't specifically recall being told not to release her forensic nurse exam by the district attorney's office. (Doe Dep. Tr. Vol. 1 at 57:10-59:19, 68:2-22 (Dkt. 97:15-16, 18.)

> **RESPONSE:** Admit.

> **REPLY: Undisputed.**

122.   When Assistant District Attorney Bill Brown was asked whether he told Doe not to release her forensic nurse exam report to the University, he responded, "I don't believe I would have provided legal advice to [Doe] because she had an attorney." (Brown Dep. Tr. 129:16-21 (Dkt. 95:33).)

> **RESPONSE:** Dispute. Defendant cites to incomplete testimony, which was as follows:

Q. Okay. Did you tell [Plaintiff] not to release her forensic nurse exam report to the University of Wisconsin as part of the Title IX investigation?

A. I don't believe I would have provided legal advice to [Plaintiff] because she had an attorney. But I don't recall that conversation if it did happen.

Dep. of William Brown [Doc. 95 at 129:16-21] (hereinafter "Brown Dep.")

**REPLY: The proposed fact is undisputed. Doe's additional testimony does not genuinely dispute the proposed fact and the Court should disregard it in accordance with the Preliminary Pretrial Packet,** *Summary Judgment Procedures* **II(C), (D) & (E). Fed. R. Civ. Pro. 56(c) & (e).**

123. Hasselbacher created Exhibit 119 based on her handwritten notes from the interview with Doe. Hasselbacher's routine practice is to take informal notes during an interview. After the interview, she types her notes into a more formal memo for the case file. Hasselbacher's handwritten notes from the interview with Doe, and others, are **Exhibit 157.** (Hasselbacher Decl. ¶ 82, Ex. 157.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

124. On August 16, 2018, Hasselbacher received an email from Attorney Andrew Miltenberg, one of Player 1's lawyers. Due to a scheduling conflict, Attorney Miltenberg asked to reschedule Player 1's interview to Monday, August 27 or Tuesday, August 28. Hasselbacher had a phone call with Attorney Miltenberg that same day and granted his request to move Player 1's interview to Monday, August 27, 2018. (Hasselbacher Decl. ¶ 83, Ex. 113 at 78-80.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

125.   Hasselbacher also emailed Attorney Miltenberg, Attorney Stilling, and Attorney Meyer on August 16 to confirm their meeting for Monday, August 27, 2018 at 1:00 p.m. Hasselbacher explained that if there was any other information Player 1 would like her to consider as part of the investigation, to please provide it by Monday August 20. (Hasselbacher Decl. ¶ 84, Ex. 113 at 81-84.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

126.   On August 20, 2018, Hasselbacher emailed Sathasivam to let her know the Dane County District Attorney's Office had issued criminal charges against Player 1 and UW-Madison may issue a public statement in response to the charges. Hasselbacher further offered that if Doe had "any concerns/requests about returning to school (safety, academic accommodations)," they should let Hasselbacher know. In her response, Sathasivam did not identify any safety concerns or request any academic accommodations. (Hasselbacher Decl. ¶ 85, Ex. 113 at 87.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

127.   Also on August 20, 2018, Assistant Vice Chancellor for University Communications John Lucas and Director of News and Media Relations Meredith McGlone sent emails with news coverage of Player 1's decision to take a leave of absence from the football team due to imminent criminal charges. Lucas and McGlone

49

also sent emails with news coverage of the Athletics Department's decision to suspend Player 1, again, from the football team pursuant to the Student Athlete Discipline Policy. (Hasselbacher Decl. ¶ 86, Ex. 113 at 157-161.)

> **RESPONSE:** Dispute. Defendant cites to 157-161 of Exhibit 113 but did not include those pages in its attachments to its Proposed Findings of Fact. Exhibit 113 ends at page 149.

> **REPLY: The proposed fact is undisputed. Doe cites no evidence to dispute the proposed fact, and only points out the omission of the email, which was a clerical error. The information in the proposed fact is also contained in its entirety in Hasselbacher's declaration at paragraph 86, which states the proposed fact verbatim. (Dkt. 102:19, ¶ 86.)**

> **Due to a clerical error, the pages 157-161 were not filed with the rest of Exhibit 113. (Edwards Decl. ¶¶ 5-6 (dkt. 160:1-2). The Board moved for leave to file a corrected Exhibit 113 on May 3, 2022. (Dkt. 158). The corrected Exhibit 113 was attached to the motion as docket 158-1. The additional pages are at docket 158-1, pages 157-161.**

> **Because Doe cites no evidence to dispute the proposed fact, the Court should deem it undisputed in accordance with the Preliminary Pretrial Packet, *Summary Judgment Procedures* II(C), (D) & (E).**

128.   On August 20, Hasselbacher also emailed the Dean of Students Office, requesting someone check whether any classes overlapped for Complainant 1, Doe, Player 1, or Player 2. Hasselbacher indicated it wasn't an issue for the women to have the same classes as each other, or for the men to have the same classes as each other, but the men should not have any class overlap with the women. That same day, Hasselbacher learned Doe and Player 2 had both registered for the same section of Music 113. Doe was also registered for another class at the same time (PoliSci170). (Hasselbacher Decl. ¶ 87, Ex. 113, at 88-91.)

RESPONSE: Admit.

REPLY: Undisputed.

129.   On August 22, Hasselbacher emailed Doe because she received a call from her attorney, Amy Bogost, but Hasselbacher did not yet have permission from Doe to speak with Attorney Bogost about the investigation. Hasselbacher also told Doe she had been communicating with Sathasivam but Doe should "let me know if there is anything [she was] needing assistance with as the semester approaches." In response, Doe gave Hasselbacher permission to speak with Attorney Bogost and said she would let Hasselbacher know if there was anything she needed before the semester started. (Hasselbacher Decl. ¶ 88, Ex. 113, at 92.)

RESPONSE: Admit.

REPLY: Undisputed.

130.   On August 22, Hasselbacher also sent Sathasivam two emails. One let her know Player 2 had been suspended from the first two UW-Madison football

games. Hasselbacher again reiterated that "[l]ike other team participation decisions, this is a decision made by the Athletic Department." The second email reminded Sathasivam that the Dean of Students Office could help if Doe had any questions about class accommodations. Hasselbacher reaffirmed that if Doe wanted outreach about support, they should let Hasselbacher know. (Hasselbacher Decl. ¶ 89, Ex. 113 at 93.)

> **RESPONSE:** Admit.

> **REPLY: Undisputed.**

131.    On August 22, 2018, Hasselbacher emailed Player 1's legal team due to the changed circumstances since they last connected (the criminal charges). In the email Hasselbacher asked the lawyers to let her know if Player 1 no longer planned to participate in an interview, but reiterated Player 1 was still welcome to do an interview if he chose to. Hasselbacher also provided some information about some confidential services available for support on campus for Player 1. (Hasselbacher Decl. ¶ 90, Ex. 113 at 81-84.)

> **RESPONSE:** Admit.

> **REPLY: Undisputed.**

132.    On August 23, 2018, Attorney Miltenberg emailed Hasselbacher a letter demanding that Hasselbacher delay issuing the investigative report now that Player 1 had been charged criminally. Attorney Miltenberg asserted that "significant, critical evidence will now become available in the next two (2) months." Attorney

Miltenberg canceled the August 27 interview with Player 1. (Hasselbacher Decl. ¶ 91, Ex. 123.)

      **RESPONSE:** Admit.

      **REPLY: Undisputed.**

133.    On August 23, 2018, Player 1 executed a signature bond with specific conditions of release in his criminal case. (Bachhuber Decl. Ex. 162.)

      **RESPONSE:** Dispute. Exhibit 162 is hearsay on its face and not admissible. F.R.E. 801, 802. The Bachhuber Declaration does not satisfy any foundation for an exception to hearsay for this document. Instead, the Bachhuber Declaration merely states that Ms. Bachhuber requested and received this document through an open records request. To the extent the Court accepts Exhibit 162, Plaintiff admits that it is a document with a check mark for "SIGNATURE BOND."

      **REPLY: Doe's objection is without merit and the proposed fact is undisputed. The cited evidence is a certified public record of a court proceeding that is stamped by the Dane County Circuit Court as filed on August 23, 2018. Fed. R. Evid. 803(8). The record is certified, but the Court's filing system rejected the document with the certificate, which is depicted below as Figure 1:**



*Figure 1*

Because the certified public record of the Dane County Circuit Court in Case 2018CF1694 can be presented in a form that would be admissible in evidence under the public records exception to the hearsay rule, the Court should overrule Doe's objection and deem the proposed fact undisputed. *United States v. Lechuga*, 975 F.2d 397, 399 (7th Cir. 1992) (Certified public records, "such as the fact that defendant was released on bond … are admissible under the public records exception to the hearsay rules." (citations omitted)); Fed. R. Civ. Pro. 56(e).

134.    As part of his conditions of release, the Dane County Circuit Court ordered:

    a.  Player 1 shall not have any contact, direct or indirect, with Victim #1 or Victim #2 as identified in the criminal complaint;

    b.  Player 1 shall not share any photo or name of the victims except only with his legal counsel; and

    c.  Player 1 shall not encourage the sharing of any photo or name of the victims by others.

(Bachhuber Decl. Ex. 162.)

    **RESPONSE:**  Dispute. Exhibit 162 is hearsay on its face and not admissible. F.R.E. 801, 802. The Bachhuber Declaration does not satisfy any foundation for an exception to hearsay to this document. Instead, the Bachhuber Declaration merely states that Ms. Bachhuber requested and received this document through an open records request. To the extent the Court accepts 162, Plaintiff admits that it is a document with a check mark for "SIGNATURE BOND" and essentially contains the hearsay statements in a., b., and c. above, among other things.

    **REPLY: The proposed fact is undisputed, and the Court should overrule Doe's hearsay objection. As explained and shown by *Figure 1* in reply to paragraph 133 above, the certified public record of the Dane County Circuit Court in Case 2018CF1694 can be presented in a form that would be admissible**

**in evidence under the public records exception to the hearsay rule. The Court should overrule Doe's objection and deem the proposed fact undisputed.** *United States v. Lechuga*, **975 F.2d 397, 399 (7th Cir. 1992) (Certified public records, "such as the fact that defendant was released on bond … are admissible under the public records exception to the hearsay rules." (citations omitted)); Fed. R. Civ. Pro. 56(e).**

135. Assistant District Attorney Bill Brown prosecuted Player 1 for the criminal sexual assault charges. (Brown Dep. Tr. 9:11-10:5 (Dkt. 95:3-4).)

> **RESPONSE:** Admit.

> **REPLY: Undisputed.**

136. Bail jumping is a crime of someone not following the conditions of their bond. If a defendant is released on bail/bond for a felony criminal charge, and if the defendant violates the conditions of release, the defendant can be charged with felony bail jumping. Felony bail jumping carries up to six years in prison. (Brown Dep. Tr. 119:8-23 (Dkt. 95:31); *see, also,* Wis. Stat. § 946.49.)

> **RESPONSE:** Defendant's Proposed Finding of Fact 136 is a purported statement of law, not fact, and therefore does not warrant a factual response.

> **REPLY: Undisputed.**

137. Player 1 was criminally charged with two felonies. (Brown Dep. Tr. 119:24-120:1 (Dkt. 95:31).)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

138.   If Player 1 violated the conditions of his release and had intentional contact with Doe, he could have been charged with felony bail jumping. (Brown Dep. Tr. 120:2-9 (Dkt. 95:31).)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

139.   On August 28, Attorney Bogost emailed asking for information about someone who could assist them with Title IX accommodations. Hasselbacher responded that Doe had previously been working with Catherine (Kate) Dougherty, a Student Assistance Specialist in the Dean of Students Office. (Hasselbacher Decl. ¶ 92, Ex. 113 at 94-95, Ex. 114 at 25.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

140.   On August 31, 2018, Dougherty received an email from Doe's attorney, Amy Bogost, asking to schedule a meeting to discuss accommodations for the fall semester. Attorney Bogost indicated Doe was busy with Rush (sorority recruitment) and was hoping to meet with Dougherty before the semester began or shortly thereafter. Dougherty exchanged emails with Bogost and scheduled a meeting with Doe. (Dougherty Decl. ¶ 22, Ex. 126 at 11-15.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

141.   Doe joined a legal fraternity during her first year. Doe lived at her sorority house during the 2018-2019 academic year with probably over 30 other women. Doe remained an active participant in these social groups until she graduated (Doe Dep. Tr. Vol. I at 79:3-18, 130:51-133:16 (Dkt. 97:21, 34).)

> **RESPONSE:**   Dispute.   Plaintiff testified that she joined the legal fraternity either her freshman or sophomore year. Doe Dep. [Doc. 97 at 130:5-11]. Plaintiff testified that she attended fewer meetings in the 2019 school year. (*Id*. At 130:20-22). As for her sorority activities, Plaintiff also testified that her participation diminished. She testified as follows:
>
> Q. And did you continue to participate in those activities in the fall of 2019?
>
> A. I was definitely less participating in those activities.
>
> Q. What about the retreats and hiking and stuff?
>
> A. It was hard for me to do a lot at that point, so I was keeping to myself and trying to stay home or go home to Chicago as much as possible.
>
> *Id*. At 133:24-134:6.
>
> **REPLY: The Board objects to Doe's response because the cited evidence does not genuinely dispute the proposed fact. The Court should deem the proposed fact undisputed in accordance with the Preliminary Pretrial Packet, *Summary Judgment Procedures* II(C), (D) & (E). Fed. R. Civ. Pro. 56(c) & (e). Doe testified that she attended meetings or social gatherings for the legal fraternity once a month in the spring of 2019, once every**

**two months in the fall of 2019, and once a month in the spring of 2020. (Doe Dep. Vol. I at 130:23-131:6 (dkt. 97:34).) Doe did not cite anything to dispute that she lived at her sorority house with at least 30 other women during the 2018-2019 school year. Doe participated in Rush with her sorority in the fall of 2019. (Doe Dep. Vol. I at 140:24-25 (dkt. 97:36).). And it is undisputed that Player 1 did not return to UW-Madison's campus after the January 1, 2020 Rose Bowl game when he dropped out of the University and entered the NFL draft. (Plaintiff's Resp. to DPFOF ¶¶ 348-349 (dkt. 147:106, ¶¶ 348-349) (Undisputed).)**

**The Court should deem the proposed fact undisputed.**

142.    Hasselbacher sent Attorney Bogost and Sathasivam the Initial Investigative Report on August 31, 2018. Hasselbacher made clear she did not send a copy directly to Doe because of prior requests that communication flow through them. Hasselbacher asked them to let her know Doe had received a copy, which Attorney Bogost did on September 4. (Hasselbacher Decl. ¶ 93, Ex. 113 at 103-104.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

143.    On September 5, Doe's father sent Hasselbacher an email about Doe having music class with Player 2. In response to learning the same information, Assistant Dean and Director of Student Conduct and Community Standards Tonya Schmidt immediately went to the class's lecture hall to be there when the class let

out and to ensure no contact between Doe and Player 2. (Hasselbacher Decl. ¶ 94, Ex. 113 at 105-107.)

        **RESPONSE:**  Admit. that Ex. 113 at 106 states "We received your message and an employee from the Student Conduct office went to the classroom to be there when it let out to ensure this is no contact today." Exhibit 113 at 106 does not state who that employee was.

        **REPLY:  Undisputed and the Declaration of Lauren Hasselbacher paragraph 94 includes the identity of the employee who went to the lecture hall: "In response to learning the same information, Assistant Dean and Director of Student Conduct and Community Standards Tonya Schmidt immediately went to the class's lecture hall to be there when the class let out to ensure no contact between Doe and Player 2." (Hasselbacher Decl. ¶ 94 (dkt. 102:21).)**

    144.   That same day, Hasselbacher spoke to Attorney Bogost about the class overlap. (Hasselbacher Decl. ¶ 95, Ex. 113 at 105.)

        **RESPONSE:**  Admit.

        **REPLY:  Undisputed.**

    145.   That same day, Hasselbacher also called (and left a voicemail) and emailed Player 2's attorney, Rick Coad, to discuss the music class overlap. (Hasselbacher Decl. ¶ 96, Ex. 113 at 108-110.)

        **RESPONSE:**  Admit.

**REPLY:  Undisputed.**

146.   Hasselbacher followed up with Player 2's attorney on September 6 to offer class alternatives so Player 2 and Doe would not be enrolled in the same music class. (Hasselbacher Decl. ¶ 97, Ex. 113 at 111-114.)

**RESPONSE:**  Admit.

**REPLY:  Undisputed.**

147.   Hasselbacher emailed Attorney Bogost on September 6 to let her know Hasselbacher was working on the issue with the class overlap. Hasselbacher asked Bogost to please let Doe know that she apologized for the class overlap, which was an oversight, and she took responsibility for it. Hasselbacher also asked whether Doe believed that Player 2 made intentional contact in any way. (Hasselbacher Decl. ¶ 99, Ex. 113 at 105.)

**RESPONSE:**  Admit.

**REPLY:  Undisputed.**

148.   It was Hasselbacher's understanding that Player 2 did not necessarily see Doe or interact with her in the music class. Hasselbacher asked Bogost this question so that she could properly address the situation with Player 2. (Hasselbacher Decl. ¶ 98, Ex. 113 at 105.)

**RESPONSE:**  Dispute. Ms. Bogost's Declaration states as follows:

> At the beginning of the semester in 2018, Plaintiff was enrolled in a music course. On the first day of that class, Plaintiff went to that class and saw that Player 2 was in the class. Plaintiff believed that Player 2 also saw her, which was quite distressing. I reported that Plaintiff and Player 2 had seen each other in the

same class to someone at UW (either Tonya Schmidt or Lauren Hasselbacher).

Declaration of Amy Bogost, **Response Exhibit 1** at ¶ 3 (hereinafter "Bogost Dec.")

> **REPLY:  The proposed fact is undisputed and the Board objects to Doe's response because the cited declaration testimony is nonresponsive and does not genuinely dispute the fact. Hasselbacher's email to Bogost specifically states, "My current understanding is that [Doe] saw [Player 2] in class and it was very upsetting for her, but that [Player 2] did not necessarily see her and did not interact with her. I only ask so that I can properly address the situation with [Player 2]." (Ex. 113 at 105 (dkt. 102-3:105)). Bogost's declaration does not dispute this information in any way. To the extent Doe offers Bogost's declaration testimony to prove Doe's perception of the event, the Board objects to the response as hearsay offered for the truth of the matter asserted. Fed. R. Evid. 801-802. The Court should disregard Doe's response in accordance with the Preliminary Pretrial Packet, *Summary Judgment Procedures* II(C), (D), & (E).**

149.  Hasselbacher also sent an email to Associate Athletics Director Chris McIntosh on September 6 and asked what instructions football players are given regarding scheduling classes on Fridays. Hasselbacher asked McIntosh whether

there was a time of day they should be able to attend classes on Fridays without it conflicting with their travel schedule. (Hasselbacher Decl. ¶ 99, Ex. 113, at 113.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

150. McIntosh responded to Hasselbacher's email that same day and attached another email to his response entitled "Fwd: [Player 2] – Dropped Course." The attached email was an email from Football Academic Advisor Aaron Stang on September 6, 2018. Stang stated he met with Player 2 to make adjustments to his schedule. Stang said Player 2 was contacted by a Title IX coordinator via phone to make him aware of a complaint by a student regarding his enrollment in Music 113. Player 2 sounded unsure about which specific person complained and said he did not even see anyone in the class, as the enrollment numbers were very high. Player 2 felt it would be best for him to drop the class altogether as it was only a 1 credit elective and he would still be fulltime after he dropped it. Player 2 dropped the class about 20 minutes before Stang sent the email. (Hasselbacher Decl. ¶ 100, Ex. 113 at 114.)

**RESPONSE:** Dispute. UW's Proposed Statement of Fact 150 contains inadmissible double-hearsay. F.R.E. 801, 802. Both Ms. Hasselbacher's declaration at ¶ 100 and Ex. 113 at 114 contain hearsay statements from UW representative Aaron Stang to Ms. Hasselbacher and Mr. Stang's hearsay statement contains hearsay statements from Player 2. If the statement is admissible, then Plaintiff states that Exhibit 113 at 114 speaks for itself.

REPLY: Doe's objection is unfounded because Hasselbacher emailed McIntosh in the course and scope of her duties as Title IX Coordinator and McIntosh responded to the email in the course and scope of his employment as Deputy Athletics Director. (Hasselbacher Decl. Ex. 113 at 113-114 (dkt. 102-3:113-114)). The emails, including the attached email (Ex. 113 at 114), are records of employees' communications made in the course and scope of the employees' duties at the time of the timestamp on the email record. (Dkt. 102-3:113-114). The emails were maintained in the course of the regularly conducted operations of UW-Madison and also preserved in response to Doe's counsel's demand for preservation of all electronically stored information related to the case in anticipation of litigation. (Hasselbacher Decl. ¶¶ 17, 19, 100 (dkt. 102:4-5, 22); Ex. 113 at 113-114 (dkt. 102-3:113-114); Taffora Dep. 33:18-34:5 (dkt. 122:9-10), Taffora Dep. Ex. 1 at 1-4 (dkt. 122-1:1-4)); Fed. R. Evid. 803(6); *Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 955–56 (7th Cir. 2021). The Court should also overrule Doe's objection because the Board can offer the evidence in an admissible form by having the relevant employees testify. Fed. R. Civ. Pro. 56(e); *Igasaki*, 988 F.3d at 955-56. Finally, it is undisputed that Player 2 was not in Doe's class after that first

day because Doe testified to that fact at her deposition. (Doe
Dep. Vol. I at 81:4-17 (dkt. 97:21)).

**The Court should deem the proposed fact undisputed.**

151.    In McIntosh's September 6 email to Hasselbacher, McIntosh asked if the
fact that Player 2 dropped the particular class resolved the scheduling conflict.
McIntosh stated, "If not, let me know and I'll inquire with our academic services
folks." (Hasselbacher Decl. ¶ 101, Ex. 113 at 113.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

152.    Hasselbacher emailed Attorney Bogost on September 7 to let her know
Player 2 would no longer be enrolled in the same music class as Doe. (Hasselbacher
Decl. ¶ 102, Ex. 113 at 115.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

153.    On September 10, Attorney Bogost emailed Hasselbacher saying she
had no changes to the Initial Investigative Report. She also challenged Player 1's and
Player 2's right to respond to the report, given their lack of participation in the
investigation to that point. (Hasselbacher Decl. ¶ 103, Ex. 113 at 117-18.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

154.     On September 11, Player 2's attorney provided additional information and a letter in response to the Initial Investigative Report. (Hasselbacher Decl. ¶ 104, Ex. 113, at 122-127.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

155.     On September 12, Attorney Bogost asked to speak with Hasselbacher about her concerns related to Player 1's and Player 2's right to respond to the Initial Investigative Report. She further responded she was glad Player 2 was no longer enrolled in the music class. Attorney Bogost suggested Player 1 and Player 2 being on UW-Madison's campus created a hostile environment for Doe, referenced the high-profile nature of the case, and opined that UW-Madison was obligated to protect Doe from "ongoing harassment." Outside of referencing the media attention surrounding the case, Attorney Bogost did not identify any specific threats or "ongoing harassment" of Doe. (Hasselbacher Decl. ¶ 105, Ex. 113, at 116-119.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

156.     At the time of the class overlap on September 5, there were no specific findings of responsibility for misconduct against Player 2. (Hasselbacher Decl. ¶ 106.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

157.   On September 12, Hasselbacher also sent Attorney Bogost a copy of the written statement Player 2 provided in response to the Initial Investigative Report. (Hasselbacher Decl. ¶ 107, Ex. 113 at 116-119, Ex. 120.)

RESPONSE:  Admit.

REPLY:  Undisputed.

158.   In addition to the statement from Player 2, Player 1's attorney provided Hasselbacher with a copy of the PowerPoint presentation with video from Player 1's apartment building of the parties leaving the apartment. (Hasselbacher Decl. ¶ 108, Ex. 113 at 150-156.)

RESPONSE:  Admit. Plaintiff notes that Defendant cites to 150-156 of Exhibit 113 but did not include those pages in its attachments to its Proposed Findings of Fact. Exhibit 113 ends at page 149.

REPLY:  Undisputed. The Board filed a motion for leave to file and amended/corrected Exhibit 113 containing the missing pages on May 3, 2022. (Dkt. 158; Dkt. 158-1:150-156).

159.   On September 21, Hasselbacher emailed Attorney Bogost a copy of the Amended Initial Investigative Report. (Hasselbacher Decl. ¶ 109, Ex. 113 at 120-121.)

RESPONSE:  Admit.

REPLY:  Undisputed.

160.   On September 26, Attorney Bogost emailed an objection to "the amended reports that are based on material submitted by Respondents." Broadly speaking, Attorney Bogost claimed it was unfair for Player 1 and Player 2 to be able to review

and comment on the report, complained about the length of the investigation, and urged Hasselbacher to finish the investigation as "promptly and reasonably possible." (Hasselbacher Decl. ¶ 110, Ex. 113 at 128-133.)

> **RESPONSE:** Dispute. Plaintiff disputes the characterization of Ms. Bogost's September 26, 2018, correspondence (UW's Ex. 113 at 129-130), and that correspondence speaks for itself. As set forth in UW's Exhibit 113 at 129-130, Ms. Bogost at the outset of her correspondence objected to new evidence submitted by Respondents, which consisted of a PowerPoint of six videos provided by Player 1. Ms. Bogost also explained that Ms. Hasselbacher's office:
>
>> has not had any cooperation from [Player 1] and very limited cooperation from [Player 2]. It is obvious that [Player 1 and Player 2] do not wish to cooperate due to the criminal charges filed against [Player 1] and potential criminal charges against [Player2]. However, [Player 1 and Player 2] do not get to pick and choose when they are willing to cooperate. This clearly puts the Complainants at a disadvantage.
>
> Ms. Bogost explained that not allowing Plaintiff to see the newly-produced video violated statutory mandates that a complainant shall have all of the rights provided to the respondent. Ms. Bogost noted that the sexual assault had taken place over five months before her email and the requirement that an investigation must have a prompt resolution. Ms. Bogost noted the prejudice to Plaintiff by having to be on campus with Respondents and expressed her concern that Plaintiff had had to sit in a class with Player 2. Ms. Bogost also requested an

opportunity to be allowed to view in its entirety the evidence Player 1 submitted and referenced in amended report. *Id.*

**REPLY: Doe's attempt to dispute the proposed fact is not a *genuine* dispute because it doesn't dispute the fact. Fed. R. Civ. Pro. 56(c)(1)(B). The Court should disregard Doe's response and deem the proposed fact undisputed in accordance with the Preliminary Pretrial Packet, *Summary Judgment Procedures* II(C), (D), & (E).**

**As for Doe's additional argument, there are several inaccuracies in it:**

**First, Bogost's letter did not mention any "statutory mandates," it references Title IX guidance that rights made available to one party "during the investigation" should be made available to the other party on equal terms. (Dkt. 102-3:130).**

**Second, Bogost's assumption that Hasselbacher was "not allowing Doe to see the newly-produced video" was a mistaken presumption. The very next day, Hasselbacher responded to Bogost and asked whether she was able to access the attachments to the Amended Initial Investigative Report, and Bogost demanded a hard copy she could keep in her possession. Hasselbacher clarified that she would not actually distribute the attachments to the Amended Initial Investigative Report,**

but Bogost was welcome to come review them. **(Ex. 113 at 131-132 (dkt. 102-3:131-132)).**

**Third, Bogost's argument that, "the sexual assault had taken place over five months before her email and the requirement that an investigation must have a prompt resolution," ignores the fact that Doe, herself, did not attend an interview with Hasselbacher until August 9, 2018. (Dkt. 102-9:1.)**

**Finally, Bogost's assertion that "Doe had to sit in class with Player 2" contradicts Doe's deposition testimony that she left the class when she saw Player 2. (Doe Dep. Tr. Vol. I at 80:21-25 (dkt. 97:21)). Player 2 was never found responsible for any misconduct related to Doe and Doe did not appeal that finding. (Pl's Resp. to DPFOF ¶ 346 (dkt. 147:106, ¶ 346)).**

**The Court should disregard Doe's additional argument in accordance with the Preliminary Pretrial Packet, *Summary Judgment Procedures* II(D)(5).**

161. Later on September 26, Attorney Bogost requested an extension to review and comment on the Amended Initial Investigative Report. (Hasselbacher Decl. ¶ 113, Ex. 113 at 134.)

**RESPONSE:** Plaintiff admits that on September 26, 2018, Ms. Bogost requested an extension to respond to the amended reports until midnight that same day. UW's Ex. 113 at 134.

**REPLY:  Undisputed.**

162.    Attorney Bogost also again complained about Player 1's and Player 2's presence on campus. She opined that since the alleged assault there had been "an ongoing hostile environment" for Doe and claimed Doe "suffered every day that she is on campus with the knowledge Respondents are on campus." Other than the class overlap on September 5, Attorney Bogost did not identify any other instances of Doe seeing Player 1 or Player 2 on campus. Although Attorney Bogost suggested interim measures were required to ensure Doe's safety, she did not identify any additional measures sought (and the no contact directives remained in place). (Hasselbacher Decl. ¶ 111, Ex. 113 at 129.)

> **RESPONSE:**  Dispute. Plaintiff disputes the characterization of Ms. Bogost's September 26, 2018, correspondence (UW's Ex. 113 at 129-130), and that correspondence speaks for itself. Regarding the impact on Plaintiff, Ms. Bogost wrote:
>
>> The delay is extremely prejudicial to the Complainants. It is very beneficial to the Respondents as they continue to walk around this campus even through Respondent 1 is under court order to stay away from the Complainants. Since this incident, there has been an ongoing hostile environment for the Complainant 2. Complainant 2 has suffered every day that she is on this campus with the knowledge that the Respondents are on campus. The fact that the Complainant 2 had to sit in class with Respondents exemplifies the disregard for the safety and well being of Complainant 2. Interim measures are required under Title IX to ensure the safety of the Complainants.
>
> UW Ex. 113 at 130.
>
> **REPLY:  This is not a genuine dispute because Doe's cited evidence does not identify any additional interim protective**

measures sought. Bogost's version of what happened in the class and the "impact on Plaintiff" is not based on personal knowledge. Fed. R. Evid. 602. It is based on hearsay offered for the truth of the matter asserted. Fed. R. Evid. 801-802, 805. And the cited hearsay actually contradicts Doe's own deposition testimony, where she testified:

> Q: Did [Player 2] have any contact with you in any way during the class?
>
> A: No. Because I left.
>
> Q: When did you leave?
>
> A: Upon seeing him.
>
> …
>
> Q: Okay. And so when you walked in, saw him, you left, is that right?
>
> A: I believe so.

(Doe Dep. Vol. I at 80:21-25, 81:21-25 (dkt. 97:21)).

There is no admissible evidence that Doe had to "sit in class with Respondents" as Bogost claimed. Doe left the class upon seeing Player 2 (and it is undisputed that Player 2 was never found responsible for nonacademic misconduct related to Doe). (Doe Dep. Vol. I at 80:21-25, 81:21-25 (dkt. 97:21); Pl's Resp. to DPFOF ¶ 346 (dkt. 147:106, ¶ 346)). Nor does Bogost's email identify any specific protective measures she sought. This is not

**a genuine dispute, and the Court should deem the proposed fact**

**undisputed in accordance with the Preliminary Pretrial Packet,**

*Summary Judgment Procedures* **II(C), (D), & (E). Fed. R. Civ. Pro.**

**56(c) & (e).**

163.   For example, had Bogost or Doe informed Hasselbacher that she crossed

paths with Player 1 or Player 2 on routes she took to class on certain days,

Hasselbacher could have talked to Player 1's or Player 2's lawyers and requested they

take a different route to avoid contact with Doe. Without specific information from

Doe, Hasselbacher would not know whether such a situation was occurring or had

occurred. (Hasselbacher Decl. ¶ 112.)

> **RESPONSE:** Dispute. Ms. Bogost's Declaration states as follows:
>
> In the fall of 2018, I was in communication with various UW officials, including Lauren Hasselbacher, Tonya Schmidt, and Kate Dougherty. During this period, I expressed my and Plaintiff's ongoing concern about her safety given that Player 1 and Player 2 were on campus. From my perspective, it seemed relatively straight-forward for UW to help figure out areas where there might be overlap between Plaintiff, on the one hand, and Player 1 and Player 2 on the other hand (such as being in similar areas of campus before and after class) and to be proactive in working with the parties' representatives to figure out how to keep Player 1 and Player 2 away from Plaintiff, and I raised that with UW. The consistent response I received from UW was that the campus was too big and there wasn't anything UW could do other than check course schedules.
>
> **Response Exhibit 1**, Bogost Decl. at ¶ 5.
>
> **REPLY: The Board objects to Doe's response because**
>
> **Bogost's opinion that "it seemed relatively straight-forward" for**
>
> **UW-Madison to figure out where there might be overlap**
>
> **between Doe's schedule and all football players' schedules is**

irrelevant and not based on personal knowledge. Fed. R. Evid. 401-403, 602. UW-Madison is a large campus of 46,000 students and it is not "relatively straight-forward" to predict where three people might be and go before and after classes without further details. (Hasselbacher Decl. ¶¶ 111-112 (dkt. 102:24-25)).

Subject to the objection, the Board replies: Doe's response does not genuinely dispute the proposed fact. If Bogost was making a specific request in the above quoted language, her request was so vague that it did not provide actual notice to UW-Madison of the additional measures she sought. And UW-Madison did, *in fact*, compare schedules of Doe and the football players by checking the schedules of Player 1 and Player 2 and Doe for overlap. (Hasselbacher Decl. ¶ 87 (dkt. 102:19); Ex. 113 at 88-91 (dkt. 102-3:88-91) The one incident of overlap was an oversight that was corrected immediately, which Doe acknowledged at her deposition. (Doe Dep. Vol. I at 81:4-9 (dkt. 97:21)).

Because Doe's response does not genuinely dispute the proposed fact, the Court should deem it undisputed. Fed. R. Civ. Pro. 56(c) & (e).

164. Also on September 26, Player 2's attorney provided an additional factual statement from Player 2. (Hasselbacher Decl. ¶ 114, Ex. 113, at 135-136.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

165.   In addition, Complainant 1 submitted a redacted copy of her forensic nurse examination. (Hasselbacher Decl. ¶ 115.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

166.   On October 2, Hasselbacher emailed Attorney Bogost a copy of the Second Amended Initial Investigative Report. (Hasselbacher Decl. ¶ 116, Ex. 113, at 137-138.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

167.   Attorney Bogost responded on October 8, again objecting to Player 1's and Player 2's participation in the investigative reports. Attorney Bogost reiterated many of the same complaints in her September 26 letter. (Hasselbacher Decl. ¶ 117, Ex. 113 at 140.)

**RESPONSE:** Dispute. Plaintiff does not know what "many of the same complaints" means and therefore Ms. Bogost's email to Ms. Hasselbacher speaks for itself. See Ex. 113 at 140.

**REPLY:  This is not a genuine dispute, and the Court should deem the proposed fact undisputed in accordance with the Preliminary Pretrial Packet, *Summary Judgment Procedures* II(C), (D), & (E). Fed. R. Civ. Pro. 56(e).**

168.    Attorney Bogost alleged it was "not a mistake" that Doe and Player 2 had an overlapping music class. As Hasselbacher explained by email on September 5, the overlapping class was an oversight—an oversight Hasselbacher immediately corrected, took responsibility for, and apologized for. Ultimately Player 2 agreed to drop the class. (Hasselbacher Decl. ¶ 120, Ex. 113 at 105-107, 114.)

>    **RESPONSE:** Ex. 113 at 114 is inadmissible double hearsay in that it is an email from a UW employee about a conversation with Player 2 regarding Player 2 dropping the course. F.R.E. 801, 802. Without waiving the hearsay objection, Plaintiff admits this paragraph 168. See Bogost Decl., Response Exhibit 1 at ¶ 4 (explaining that while Ms. Bogost did not think that the overlap in the music class was "intentional conduct by UW," she believed it was "not a mistake insofar as had someone done the required due diligence, this stressful event never would have happened.").

>    **REPLY: The proposed fact is undisputed. Doe's objection is without merit. Doe's additional argument and citation to Bogost's declaration should be disregarded because Bogost's speculation about the reason for the overlap is irrelevant and inadmissible. Fed. R. Evid. 401-403, 602. And it is undisputed that Player 2 was not in Doe's class after that first day because Doe testified to that fact at her deposition. (Doe Dep. Vol. I at 81:4-17 (dkt. 97:21))**

76

169.    In Hasselbacher's response, she reiterated to Attorney Bogost that if there were additional support or protective measures Hasselbacher could offer Doe while the investigation was pending, they should let her know. (Hasselbacher Decl. ¶ 119, Ex. 113 at 139.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

170.    The next day (October 9), Hasselbacher notified Attorney Bogost by email that she had provided the Final Investigative Report to the Office of Student Conduct and Community Standards (OSCCS). (Hasselbacher Decl. ¶ 121, Ex. 113 at 143, Ex. 121.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

171.    Throughout this process, Hasselbacher served as a neutral investigator. Based on her training, Hasselbacher did not make assessments based on any person's overall credibility when drafting the final investigative report. Hasselbacher presented the information she collected to the OSCCS without opinion. OSCCS made the findings and recommended the sanctions. (Hasselbacher Decl. ¶ 122.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

172.    In addition to serving as a neutral investigator, Hasselbacher also served in her role as Title IX Coordinator, so she was also ensuring the proper process was followed. (Hasselbacher Decl. ¶ 123.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

173.    Also on October 9, 2018, Hasselbacher received notice that Player 1 had sued her in federal court, along with the Board of Regents, Director of the Office of Compliance Cathy Trueba, and Chancellor Blank. In the lawsuit, Player 1 sought a stay of all University disciplinary proceedings against him pending the resolution of the related criminal matter. (Hasselbacher Decl. ¶ 124, Ex. 124.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

174.    Assistant Dean/Director, Division of Student Life Ervin (Kipp) Cox was assigned as the investigating officer for decision making purposes. (Hasselbacher Decl. ¶ 125, Ex. 113 at 143.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

175.    On October 17, 2018, Dougherty emailed Doe because it was midway through the semester, and Dougherty wanted to check in. Dougherty let Doe know that she was there for her if she needed anything. (Dougherty Decl. ¶ 26, Ex. 126 at 45.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

176.    Doe did not respond to Dougherty's October 17 email. (Dougherty Decl. ¶ 27.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

177.   Dean Cox issued Finding Letters on October 30, 2018. (Hasselbacher Decl. ¶ 126; Lathrop Decl. ¶ 6, Ex. 128 at 28-34.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

178.   Dean Cox found Player 1 responsible for second degree sexual assault, third degree sexual assault, and sexual harassment of Doe. Dean Cox recommended a sanction of expulsion. (Lathrop Decl. ¶ 6, Ex. 128 at 28-34.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

179.   Dean Cox found Player 2 not responsible for violation of criminal law regarding Doe and not responsible for sexual harassment of Doe. (Doe Dep. Ex. 5 at 25-27 (Dkt. 97-12:25-27).)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

## The Nonacademic Misconduct Hearing

180.   The Nonacademic Misconduct Hearing was held on January 15, 2019. (Lathrop Decl. ¶ 6, Ex. 128 at 403, Ex. 151 (██████1 at 00:27-00:39.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

181. Bogost told Assistant District Attorney Bill Brown that, at the hearing on January 15, Player 1 allegedly saw Doe and began deliberately walking toward her in an effort to intimidate her and Bogost had to step in front of Player 1 to stop him from physically coming into contact with Doe. Based on the facts presented to Assistant District Attorney Bill Brown, he was not overly concerned. (Brown Dep. Tr. 120:13-122:3 (Dkt. 95:31-32).)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

182. Doe and Complainant 1 appeared with their attorneys via Skype in a separate room from ███████ in Union South. (Lathrop Decl. Ex. 151 (██████1 at 00:27-00:45, Cehpus-2 at 02:34-:02:56).)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

183. Player 1 appeared with Attorney Kathleen Stilling. Stilling offered argument and was able to ask questions of Doe and Complainant 1 that were filtered through the Hearing Committee. (Lathrop Decl. Ex. 151 (██████2 at 01:20-02:34, 3:19:15-3:57:20.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

184. Complainant 1 testified at the hearing. (Lathrop Decl. Ex. 151 (██████2 at 2:32:59-3:09:57, 3:10:40-3:11:40).)

**RESPONSE:** Admit.

**REPLY:  Undisputed.**

185.   Complainant 1's attorney made argument at the hearing. (Lathrop Decl. Ex. 151 (████ 2 at 2:18:04-2:32:56; ████ 3 at 07:15-21:20).)

**RESPONSE:**  Admit.

**REPLY:  Undisputed.**

186.   Player 1 did not testify at the hearing. (Lathrop Decl. Ex. 151 (████ 3 at 00:45-01:40).)

**RESPONSE:**  Admit.

**REPLY:  Undisputed.**

187.   Player 2 did not testify at the hearing. (Lathrop Decl. Ex. 128 at 4, Ex. 151 (████ 3 at 00:45-01:40).)

**RESPONSE:**  Admit.

**REPLY:  Undisputed.**

188.   P1 did not testify at the hearing. (Lathrop Decl. Ex. 128 at 4.)

**RESPONSE:**  Admit.

**REPLY:  Undisputed.**

189.   Hasselbacher testified as a witness at the hearing held on January 15, 2019. (Hasselbacher Decl. ¶ 127; Lathrop Decl. ¶ 6, Ex. 128 at 403.)

**RESPONSE:**  Admit.

**REPLY:  Undisputed.**

190.   Doe testified at the nonacademic misconduct hearing. (Lathrop Decl. Ex. 151 (████ 2 at 3:19:15-3:57:20).)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

191.    Doe's attorney, Amy Bogost, offered argument at the hearing. (Lathrop Decl. Ex. 151 (███████2 at 3:11:42-3:15:50, ███████3 at 21:20-25:55).)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

192.    Doe's attorney, Amy Bogost, read Doe's statement into the record at the hearing. (Lathrop Decl. Ex. 151 (███████2 at 3:17:10-3:19:06).)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

193.    Doe testified at the hearing that she underwent a forensic nurse exam. (Lathrop Decl. Ex. 151 (███████2 at 3:34:20-3:35:59).)

**RESPONSE:**  Admit that the cited portion of the record shows that Plaintiff was asked by a hearing panel member whether she had SANE nurse exam and that she testified that she had.

**REPLY: Undisputed.**

194.    Doe's attorney, Amy Bogost, on Doe's behalf informed the Hearing Committee that they never requested a copy of the forensic nurse exam. (Lathrop Decl. Ex. 151 (███████2 at 3:35:15-3:35:59).)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

195.   Doe testified at the hearing that she did not recall, but was told there was not a blood alcohol test taken during the forensic nurse exam because she was unable to consent due to her intoxication. (Lathrop Decl. Ex. 151 (████2 at 3:35:15-3:36:40).)

> **RESPONSE:** Admit.

> > **REPLY: Undisputed.**

196.   Bogost also told the Hearing Committee that Doe could not consent to a blood draw due to Doe's intoxication. (Lathrop Decl. Ex. 151 (████2 at 3:37:50-3:38:35.)

> **RESPONSE:**  Dispute. The cited portion of the record demonstrates that in response to questions from a hearing panel member, Ms. Bogost explained the difference between a lower level of consent for a SANE nursing exam compared to the higher level of consent for a blood alcohol draw.

> > **REPLY:  This is not a genuine dispute. Fed. R. Civ. Pro. 56(c) & (e). Doe failed to provide adequate foundation for Bogost's "explanation" of the difference between the levels of consent needed for a sexual assault nurse examination compared to a blood alcohol draw and the Board cannot locate any basis to support it. Fed. R. Evid. 602, 701-703. Bogost failed to explain her conclusory statement that a blood draw requires a "higher level of consent" than a sexual assault nurse**

**examination, where a female patient would be subject to an internal examination and photographs of their vaginal area. (Brown Dep. 46:1-47:9 (dkt. 95:13); Lathrop Decl. Ex. 128 at 608-609 (dkt. 106-9:6-7); Lathrop Decl. Ex. 151 (███████2 at 3:37:50-3:38:35) (dkt. 106-10).). And the SANE forensic nurse examination in the record of this case (Complainant 1's examination) shows the nurse examiner did a "foley catheter exam," took a urine sample ("urinalysis sent"), took "forensic photographs," took a blood draw, and obtained cervical swabs. (Lathrop Decl. Ex. 128 at 608-09 (dkt. 106-9:6-7).).**

**The Court should disregard Bogost's unsupported conclusory statements and deem the proposed fact undisputed in accordance with the Preliminary Pretrial Packet, *Summary Judgment Procedures* II(C), (D), & (E).**

197. Doe testified at her deposition that she did not recall giving testimony at the hearing that she did not have a blood draw because she could not consent due to her intoxication. (Doe Dep. Tr. Vol. I at 101:8-11 (Dkt. 97:26).)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

198. Doe testified at the nonacademic misconduct hearing that she did not recall giving urine sample at the hospital during the forensic nurse exam. (Lathrop Decl. Ex. 151 (███████2 at 3:51:00-3:51:22).)

**RESPONSE:** Admit.

> **REPLY: Undisputed.**

199.    Doe testified at her deposition that she recalled giving a urine sample during her forensic nurse exam. (Doe Dep. Tr. Vol. I at 101:12-13 (Dkt. 97:26).)

**RESPONSE:** Admit.

> **REPLY: Undisputed.**

200.    Doe testified at her deposition that she was aware her urine sample was analyzed for alcohol and was used as an exhibit at Player 1's criminal trial. (Doe Dep. Tr. Vol. I at 101:12-102:18 (Dkt. 97:26-27).)

**RESPONSE:** Admit.

> **REPLY: Undisputed.**

201.    Doe was aware of the results of the toxicology report from her urine sample at sometime before the criminal trial. (Doe Dep. Tr. Vol. I at 102:9-18 (Dkt. 97:27).)

> **RESPONSE:**  Admit. Plaintiff admits that she became aware of the toxicology report from her urine sample at some point before the late July 2019 criminal trial. Plaintiff has never seen the toxicology report. Doe Dep. [Doc. 97 at 102:9-10]; Declaration of Jane Doe, Response Exhibit 3 at ¶ 15 (hereinafter, "Doe Decl.").
>
> **REPLY:  Undisputed. The Court should disregard Doe's attempt to assert additional information in accordance with the**

Preliminary Pretrial Packet, *Summary Judgment Procedures* **II(D)(5).**

202.   Doe saw a copy of her forensic nurse exam record at Player 1's criminal trial. (Doe Dep. Tr. Vol. I at 55:3-18 (Dkt. 97:15).)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

203.   Doe testified at the nonacademic misconduct hearing that her memory of the incident had been filled in by Complainant 1 and had not been filled in by anyone else, such as P1. (Lathrop Decl. Ex. 151 (████ 2 at 3:23:55-3:24:30)).)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

204.   The Nonacademic Misconduct Hearing Committee issued its written decision on January 29, 2019. (Lathrop Decl. ¶ 6, Ex. 128 at 325-332; Doe Dep. Tr. Vol. I at 99:17-21, 104:16-105:7 (Dkt. 97:25, 27), Doe Dep. Ex. 3 at 718-726 (Dkt. 97-8:28-36).)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

205.   The Hearing Committee unanimously found Player 1 not responsible for second degree sexual assault of Doe. (Lathrop Decl. ¶ 6, Ex. 128 at 331-32.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

206.    The Hearing Committee unanimously found Player 1 responsible for third degree sexual assault and sexual harassment of Doe. (Lathrop Decl. ¶ 6, Ex. 128 at 330-331.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

207.    In a two(yea)-to-one(nay) vote, the Hearing Committee recommended to uphold the sanction of expulsion of Player 1. (Lathrop Decl. ¶ 6, Ex. 128 at 332.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

## The appeal to the Chancellor

208.    Chancellor Blank has several email accounts at UW-Madison: rblank@chancellor.wisc.edu, rebecca.blank@wisc.edu, and chancellor@wisc.edu. The chancellor@wisc.edu account is the Chancellor's public facing email address, which is posted on the university's website. In 2018-2019, Chancellor Blank did not regularly monitor emails sent to the chancellor@wisc.edu account and instead relied on staff to regularly check that account and forward emails as necessary to others for response or to her rblank@chancellor.wisc.edu account. This continues to be Chancellor Blank's practice. The rblank@chancellor.wisc.edu email account is currently, and was in 2018-2019, Chancellor Blank's primary email account for communicating with university officials and other work-related communications. (Blank Decl. ¶ 9; Mayrl Decl. ¶ 4.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

209. Mayrl has access to the Chancellor's public facing email account (chancellor@wisc.edu). (Mayrl Decl. ¶ 4.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

210. On January 30, 2019, Player 1's lawyer, Attorney Stuart Bernstein, emailed the chancellor@wisc.edu account a letter regarding the Title IX investigation of Player 1. The letter was also sent via first class mail. Mayrl received a copy of the letter from the chancellor@wisc.edu account. (Mayrl Decl. ¶ 6, Ex. 130 at 1-4.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

211. In the letter, Attorney Bernstein stated that Player 1's criminal trial was scheduled to commence on February 11, 2019, the day before his scheduled appeal of the Hearing Committee's decision. (Mayrl Decl. Ex. 130 at 3.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

212. Bernstein demanded that Chancellor Blank suspend, adjourn, or delay the appeal of the Hearing Committee's decision so the decision would not be issued in the middle of his criminal trial and therefore have a critical negative impact on the criminal trial and jury. (Mayrl Decl. Ex. 130 at 3.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

213.   Attorney Bernstein further stated, "In our view, every decision made to date regarding [Player 1's] Title IX investigation has been decided adversely against him based solely on the concerns and wishes of the Complainants." (Mayrl Decl. Ex. 130 at 4.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

214.   Associate Vice Chancellor for Legal Affairs Nancy Lynch responded to Bernstein's letter on February 1, 2019. Lynch informed Bernstein that Chancellor appeals are processed according to Wisconsin Administrative Code § UWS 17.13. Specifically, Lynch noted subsection (3) requires the Chancellor to issue a decision within 30 days of receiving an appeal. (Mayrl Decl. Ex. 130 at 6.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

215.   Bernstein responded to Lynch's letter on February 4, 2019. (Mayrl Decl. Ex. 130 at 10.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

216.   In the February 4 letter, Bernstein asked Lynch to confirm that Chancellor Blank was denying Player 1's request that an appellate decision will be held in abeyance until the conclusion of Player 1's criminal trial. Bernstein asked whether Chancellor Blank would at least agree not to release any decision until the 30th day following the filing of Player 1's appeal. (Mayrl Decl. Ex. 130 at 10.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

217.   On February 12, 2019, Attorney Bernstein sent another letter by email asking UW-Madison to postpone Player 1's time to appeal the Nonacademic Misconduct Hearing Committee's decision until after his criminal proceedings. (Mayrl Decl. Ex. 130 at 13-16.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

218.   Also on February 12, 2019, Player 1 submitted his appeal of the findings of responsibility issued by the Nonacademic Misconduct Hearing Committee to the Office of the Chancellor. (Blank Decl. ¶ 19, Ex. 139.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

219.   On February 13, 2019, Mayrl emailed Doe and copied Attorney Bogost to inform them that Player 1 had timely appealed the decision of the Hearing Committee. (Mayrl Decl. ¶ 12, Ex. 130 at 32-46.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

220.   Also on February 13, Mayrl emailed Player 1 and his legal team to confirm the Chancellor's Office had received his February 12, 2019, appeal of the Hearing Committee's decision. (Mayrl Decl. ¶ 13, Ex. 130 at 49.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

221.   In response to Mayrl's email confirming receipt of Player 1's appeal, Attorney Andrew Miltenberg emailed Mayrl and said: "Matthew, the lack of judgment on the part of UW is absolutely stunning. UW has made, so many significant missteps that it is truly mystifying. Keep this email handy, I will remind you of it in the near future." (Mayrl Decl. ¶ 13, Ex. 130 at 47.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

222.   On February 14, 2019, Attorney Bogost emailed Mayrl thanking him for sending Player 1's appeal and asking if the Complainants were allowed to file a brief in response to the Respondent's appeal. Mayrl responded and informed Attorney Bogost that the appeal process does not involve a briefing period and limits the review to the underlying hearing record. (Mayrl Decl. ¶ 15, Ex. 130 at 50-51.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

223.   In his appeal, Player 1 argued the process was unfair, arbitrary and subject to bias such that he was unable to adequately present a defense to the allegations of nonacademic misconduct without prejudicing his concurrent criminal case. (Blank Decl. Ex. 139 at 7-9, 12-13, Ex. 140 at 3.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

224.    Chancellor Blank issued her decision on March 13, 2019, and affirmed the Committee's decision and recommended sanction of University Disciplinary Expulsion. (Blank Decl. ¶ 20, Ex. 140.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

225.    Chancellor Blank's review of Player 1's appeal was governed by Wisconsin Administrative Code § UWS 17.13, which requires the Chancellor to sustain the Committee's decision unless she found one or more of the following:

d.   The information in the record does not support the findings or decision. Wis. Admin. Code § UWS 17.13(3)(a) (Register June 2016, No. 726); (Hasselbacher Decl. Ex. 112 at 4.)

e.   Appropriate procedures were not followed which resulted in material prejudice to the respondent or complainant. Wis. Admin. Code § UWS 17.13(3)(b) (Register June 2016, No. 726); (Hasselbacher Decl. Ex. 112 at 4.)

f.   The decision was based on factors proscribed by state or federal law. Wis. Admin. Code § UWS 17.13(3)(c) (Register June 2016, No. 726); (Hasselbacher Decl. Ex. 112 at 4.)

(Blank Decl. ¶¶ 20-22, Ex. 140 at 3.)

**RESPONSE:** Defendant's Proposed Finding of Fact 225 is a purported statement of law, not fact, and therefore does not warrant a factual response.

**REPLY: Undisputed. Doe cites no evidence to dispute the proposed fact and the Court should deem it undisputed in accordance with the Preliminary Pretrial Packet,** *Summary Judgment Procedures* **II(C). Fed. R. Civ. Pro. 56(e).**

226. Player 1's submission specifically raised an appeal under both (b) and (c) of the previous paragraph, and Chancellor Blank's decision appropriately addressed those bases. (Blank Decl. ¶ 23, Ex. 140 at 4.)

**RESPONSE:** Plaintiff admits that Player 1's submission specifically raised an appeal under both (b) and (c) of the previous paragraph, and Chancellor Blank's decision addressed those bases. Whether she "appropriately" addressed those bases is a purported statement of law.

**REPLY: Undisputed. Doe cites no evidence to dispute the proposed fact and the Court should deem it undisputed in accordance with the Preliminary Pretrial Packet,** *Summary Judgment Procedures* **II(C). Fed. R. Civ. Pro. 56(e).**

227. The Chancellor found there was sufficient evidence using the preponderance of evidence standard under UWS 17.12(4)(f)(3) (Register June 2016, No. 726) to support the conclusion that Player 1 violated two counts of UWS 17.09(2) and two counts of UWS 17.09(12). (Blank Decl. Ex. 140 at 4; Hasselbacher Decl. Ex. 112 at 2-4.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

228.   The Chancellor reached the conclusions set forth in her March 13 written decision on Player 1's appeal based on the factors outlined in Wis. Admin. Code § 17.13(3). (Register June 2016, No. 726). (Blank Decl. ¶ 24; Hasselbacher Decl. Ex. 112 at 4.)

> **RESPONSE:**  Defendant's Proposed Finding of Fact 228 is a purported statement of law, not fact, and therefore does not warrant a factual response.

> **REPLY:  Undisputed. Doe cites no evidence to dispute the proposed fact and the Court should deem it undisputed in accordance with the Preliminary Pretrial Packet, *Summary Judgment Procedures* II(C). Fed. R. Civ. Pro. 56(e).**

229.   As the Chancellor's decision was the final institutional decision in the matter, Player 1's expulsion from the university was effective as of the date of the decision, but the exclusion from campus provisions would not be enforced until March 16. (Blank Decl. Ex. 140 at 16.)

> **RESPONSE:**  Admit.

> **REPLY:  Undisputed.**

230.   The Chancellor's decision also included information for both the Complainants and Respondent about seeking further review of the March 13 decision by the Board of Regents. (Blank Decl. Ex. 140 at 16.)

> **RESPONSE:**  Admit.

> **REPLY:  Undisputed.**

231.   On March 13, 2019, Mayrl emailed Player 1 a copy of the Chancellor's decision regarding his appeal and copied Player 1's attorneys. (Mayrl Decl. ¶ 16, Ex. 130 at 70-87.)

**RESPONSE:**  Admit.

**REPLY:  Undisputed.**

232.   Also on March 13, Mayrl emailed a copy of the Chancellor's decision on Player 1's appeal to Doe and Attorney Bogost. (Mayrl Decl. ¶ 17, Ex. 130 at 52-69.)

**RESPONSE:**  Admit.

**REPLY:  Undisputed.**

233.   Also on March 13, 2019, Attorney Bernstein, on behalf of Player 1, emailed Chancellor Blank, Lauren Hasselbacher, Ervin Cox, Raymond Taffora, Matt Mayrl, Caroline Marks, Nancy Lynch, Rachel Jeris, and Tonya Schmidt to serve as "official notification to you and the entire UW System that [Player 1] has filed with the Wisconsin Board of Regents pursuant to UWS 17.14, a formal request for appeal of your March 13, 2019 decision." (Mayrl Decl. ¶ 18, Ex. 130 at 89; Hasselbacher Decl. ¶ 133, Ex. 113 at 144-146.)

**RESPONSE:**  Admit.

**REPLY:  Undisputed.**

## Player 1's request for review to the Board of Regents.

234.   The Board of Regents review is governed by Chapter III, Section 7, of the Regent Bylaws, which sets forth the factors to be considered in deciding whether review should be granted:

g. The case involves substantial constitutional claims;

h. There is a serious concern the chancellor abused his[, her, their] discretion or exceeded his[, her, their] authority;

i. The decision made at the institutional level could have system-wide implications; or

j. The final institutional decision is based on facts not supported by the record, resulting in material prejudice to the individual seeking review.

(Lathrop Decl. Ex. 152 at 10; Doe Dep. Ex. 3 at 564-565 (Dkt. 97-6:104-105).)

**RESPONSE:** UW's Board of Regents Bylaws speak for themselves. To the extent the Bylaws are governed by applicable law, Defendant's Proposed Finding of Fact 234 is a purported statement of law, not fact, and therefore does not warrant a factual response.

**REPLY: Undisputed. Doe cites no evidence to dispute the proposed fact and the Court should deem it undisputed in accordance with the Preliminary Pretrial Packet, *Summary Judgment Procedures* II(C). Fed. R. Civ. Pro. 56(e).**

235.   On April 18, 2019, Player 1 submitted his position statement to the Board of Regents seeking review of the final institutional decision on the record under UWS 17.14. *See* Wis. Admin. Code § UWS 17.14 (Register 2016, No. 726); (Hasselbacher Decl. Ex. 112 at 4; Lathrop Decl. Ex. 128 at 627-633.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

236.    Player 1 argued that factors (a), (c), and (d), of Chapter III, Section 7, of the Regent Bylaws were implicated and militated in favor of Board review. (Lathrop Decl. Ex. 128 at 628.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

237.    Player 1 argued that his constitutional rights were violated because UW-Madison's disciplinary process violated his due process rights by depriving him of a meaningful opportunity to be heard and forcing him to choose between abdicating his Fifth Amendment rights or prejudicing his nonacademic misconduct case. (Lathrop Decl. Ex. 128 at 634-628.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

238.    UW-Madison submitted its position statement on May 9, 2019 asking the Board to deny Player 1's request for review. (Lathrop Decl. Ex. 128 at 643.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

239.    The Complainants, including Doe, were now both represented by Amy Bogost, who needed an extension to file their position statement to May 10, 2019. (Lathrop Decl. Ex. 128 at 644-653 (dated May 9, but received May 10).)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

240.    Bogost, on behalf of Doe and Complainant 1, joined in UW-Madison's arguments for two of the three challenged provisions of the Regent Bylaws. (Lathrop Decl. Ex. 128 at 651-652.)

**RESPONSE:**  Admit.

**REPLY:  Undisputed.**

241.    Player 1 submitted his reply to the Complainants' position statement and his reply to UW-Madison's position statement on May 16, 2019. (Lathrop Decl. Ex. 128 at 655-664.)

**RESPONSE:**  Admit.

**REPLY:  Undisputed.**

242.    The Board issued its decision on June 7, 2019, denying Player 1's request for review. (Lathrop Decl. Ex. 152.)

**RESPONSE:**  Admit.

**REPLY:  Undisputed.**

### The criminal trial July 29 through August 2, 2019

243.    The criminal trial occurred July 29 through August 2, 2019. (Blank Decl. Ex. 143 at 1; Bachhuber Decl Ex. 165.)

**RESPONSE:**  Admit.

**REPLY:  Undisputed.**

244.    Doe testified at the criminal trial. (Doe Dep. Tr. 105:8-19 (Dkt. 97:27).)

**RESPONSE:**  Admit.

**REPLY:  Undisputed.**

245.   The jury deliberated for approximately 35 minutes and found Player 1 not guilty of sexually assaulting Doe. (Blank Decl. Ex. 143 at 1; Bachhuber Decl Ex. 165.)

> **RESPONSE:**  Dispute in part. Neither exhibit upon which UW relies states that the jury returned a verdict in 35 minutes. UW's cited evidence of Ex. 143 at 1 is merely a cover page entitled "[Player 1] Case Number 201769601 Petition for Readmission" and Ex. 165 is a signed jury verdict of not guilty.

> **REPLY:  The Board acknowledges that it cited the wrong page of Exhibit 143 and should have cited page 2 of Exhibit 143. (Dkt. 112-10:2). The proposed fact is undisputed because Doe cites no evidence to dispute the proposed fact. The Court should deem it undisputed in accordance with the Preliminary Pretrial Packet, _Summary Judgment Procedures_ II(C). Fed. R. Civ. Pro. 56(e).**

### Petition for Restoration of Rights

246.   Starting August 6 through August 16, 2019, Chancellor Blank was on vacation with her family in Hawaii. (Blank Dep. Tr. 134:10-25 (Dkt. 93:35).)

> **RESPONSE:**  Admit.

> **REPLY:  Undisputed.**

247.   While on the plane to Hawaii, Chancellor Blank checked her email and saw that Player 1's attorneys had emailed a petition for restoration of rights. (Blank Decl. ¶27, Ex. 141; Blank Dep. Tr. 135:8-15 (Dkt. 93:35).)

RESPONSE:  Admit.

REPLY:  Undisputed.

248.   The Chancellor's review of a petition for restoration of rights is governed by UWS 17.18 of the Wisconsin Administrative Code (Register June 2016, No. 726). (Hasselbacher Decl. Ex. 112 at 5; Blank Decl. Ex. 146 at 1.)

RESPONSE:  Defendant's Proposed Finding of Fact 248 is a purported statement of law, not fact, and therefore does not warrant a factual response.

REPLY:  Undisputed. Doe cites no evidence to dispute the proposed fact and the Court should deem it undisputed in accordance with the Preliminary Pretrial Packet, *Summary Judgment Procedures* II(C). Fed. R. Civ. Pro. 56(e).

249.   UWS 17.18 allows an expelled or suspended student to submit a written petition for readmission to the chief administrator officer, which at UW is the Chancellor, who "shall make the readmission decision." (Hasselbacher Decl. Ex. 112 at 5; Taffora Dep. Tr. 44:17-25; 46:1-7, Ex. 2 at 5.)

RESPONSE:  Defendant's Proposed Finding of Fact 249 is a purported statement of law, not fact, and therefore does not warrant a factual response.

> **REPLY:  Undisputed. Doe cites no evidence to dispute the proposed fact and the Court should deem it undisputed in accordance with the Preliminary Pretrial Packet, *Summary Judgment Procedures* II(C). Fed. R. Civ. Pro. 56(e).**

250.    UWS 17.18 does not specify how the Chancellor is to decide the petition for restoration of rights, and unlike an appeal, the Chancellor's decision is not limited to the record of the disciplinary proceeding. (Blank Decl. ¶30; Blank Dep. Tr. 78:20-25 (Dkt. 93:21).)

> **RESPONSE:**  Defendant's Proposed Finding of Fact 250 is a purported statement of law, not fact, and therefore does not warrant a factual response.

> **REPLY:  Undisputed. Doe cites no evidence to dispute the proposed fact and the Court should deem it undisputed in accordance with the Preliminary Pretrial Packet, *Summary Judgment Procedures* II(C). Fed. R. Civ. Pro. 56(e).**

251.    In reviewing a petition pursuant to UWS 17.18, Chancellor Blank can consider new information that previously had been unavailable to the University. Chancellor Blank generally sees two types of new information in petitions for restoration of rights: (1) information about the individual regarding some change or treatment they have undergone, or (2) information about evidence that has come forward that was not there when the original discipline was imposed. (Blank Dep. Tr. 79:11-17 (Dkt. 93:21).)

**RESPONSE:** Defendant's Proposed Statement of Fact 251's first sentence is a purported statement of law, not fact, and therefore does not warrant a factual response. Plaintiff notes that 17.18 does not address whether the Chancellor can consider new information. Plaintiff admits the second sentence in the Defendant's Proposed Statement of Fact 251.

**REPLY: Undisputed. Doe cites no evidence to dispute the proposed fact and the Court should deem it undisputed in accordance with the Preliminary Pretrial Packet, *Summary Judgment Procedures* II(C). Fed. R. Civ. Pro. 56(e).**

252.   In matters dealing with "sexual harassment, sexual assault, dating violence, domestic violence, and stalking cases," UWS 17.18 requires "the readmission decision should be made in consultation with the Title IX Coordinator, and the complainant should be notified of any change to the disciplinary outcome." (Hasselbacher Decl. Ex. 112 at 5.)

**RESPONSE:** Defendant's Proposed Finding of Fact 252 is a purported statement of law, not fact, and therefore does not warrant a factual response.

**REPLY: Undisputed. Doe cites no evidence to dispute the proposed fact and the Court should deem it undisputed in accordance with the Preliminary Pretrial Packet, *Summary Judgment Procedures* II(C). Fed. R. Civ. Pro. 56(e).**

253.   UWS 17.18 does not require that the complainants be consulted or informed that a petition for restoration of rights is filed. (Taffora Dep. Tr. 69:3-8.)

**RESPONSE:** Defendant's Proposed Finding of Fact 253 is a purported statement of law, not fact, and therefore does not warrant a factual response. Plaintiff additionally disputes that Mr. Taffora's interpretation of UWS 17.18 is correct. Plaintiff notes that Mr. Taffora acknowledged that there is nothing in UWS 17.18 that excludes the complainant from participating in a Petition for Restoration of Rights. See PPFF 242 (citing Taffora Dep. [Doc. 122 at 55:19-25]).

**REPLY: Doe's response does not genuinely dispute the proposed fact and the Court should deem it undisputed. (Taffora Dep. Tr. 69:3-8 (dkt. 122:18); Hasselbacher Decl. Ex. 112 at 5 (dkt. 102-3:5)); Fed. R. Civ. Pro. 56(e).**

**Doe cites Taffora's deposition testimony in an effort to dispute the fact, but the cited testimony does not support a dispute when viewed in its entirety. Fed. R. Evid. 106. The portion of Taffora's testimony cited by Doe states, "Yes, that doesn't touch that particular provision, that concept." (Taffora Dep. 55:19-25 (dkt. 122:15)). But Taffora also testified, "And I would note that, again, UWS 17.18 simply says the chancellor shall make the readmission decision as she sees fit. I would also note that it does say that it does contemplate or it touches what**

**the complainant's role is, and it says, quote, 'The complainant shall be notified of any change to the disciplinary outcome,' closed quote. So there is some contact made with what the complainants get in this provision, and it's they get notified." (Taffora Dep. 57:16-25 (dkt. 122:15).).**

**Because Doe did not genuinely dispute the proposed fact, the Court should deem it undisputed. Fed. R. Civ. Pro. 56(e).**

254.   UWS 17.18 requires only that the complainant "shall be notified of any change to the disciplinary outcome." (Taffora Dep. Tr. 57:20-22; Ex. 2 at 5.)

**RESPONSE:** Defendant's Proposed Finding of Fact 254 is a purported statement of law, not fact, and therefore does not warrant a factual response. Plaintiff additionally disputes that Mr. Taffora's interpretation of UWS 17.18 is correct.

**REPLY: Undisputed. Doe cites no evidence to dispute the proposed fact and the Court should deem it undisputed in accordance with the Preliminary Pretrial Packet, *Summary Judgment Procedures* II(C). Fed. R. Civ. Pro. 56(e). Indeed, Taffora testified, "I would note that, again, UWS 17.18 simply says the chancellor shall make the readmission decision as she sees fit. I would also note that it does say that it does contemplate or it touches what the complainant's role is, and it says, quote, 'The complainant shall be notified of any change to**

**the disciplinary outcome,' closed quote. So there is some contact made with what the complainants get in this provision, and it's they get notified." (Taffora Dep. 57:16-25 (dkt. 122:15).).**

255.     On August 6, Player 1 submitted a written petition that was 242 pages, including exhibits. The petition also included a jump drive, which contained approximately 70 video clips. (Taffora Dep. Tr. 85:1-10; Mayrl Decl. Ex. 136; Blank Decl. Ex. 143.)

**RESPONSE:** Admit.

**REPLY:  Undisputed.**

256.     Player 1's counsel stated that the "jump drive contains <u>all</u> of the video which was played at trial. These video excerpts (found on the jump drive under [Player 1] Exhibits-Prepared Clips) were admitted at trial as Exhibit 1." (Blank Decl. ¶38; Ex. 143 at 4 (emphasis in original); Bachhuber Decl. Ex. 161 at 1.

**RESPONSE:**  Plaintiff objects and therefore disputes paragraph 256 because it is hearsay and UW offers no exception for its admissibility. F.R.E. 801, 802. Plaintiff admits that the hearsay Ex. 143 letter from Player 1's counsel contains the quoted sentenced.

Bachhuber Decl. Ex. 161 at 1 is also impermissible hearsay and UW offers no exception for its admissibility. F.R.E. 801, 802. Additionally, it is an unsigned Stipulation and Order for Return/Destruction of Exhibits and therefore has no evidentiary weight, and Plaintiff disputes its inclusion.

**REPLY: Doe's objection is without merit and the proposed fact is undisputed. Fed. R. Civ. Pro. 56(c) & (e). The cited evidence is the certified public record of a court proceeding that is electronically stamped by the Dane County Circuit Court as filed on August 2, 2019, as Document 279 in Case 2018CF001694. (Dkt. 119-2:1-6); Fed. R. Evid. 803(8). The record is also certified, but the Court's filing system rejects the document with the certificate, which is depicted below as Figure 2:**



*Figure 2*

**Because the certified public record of the Dane County Circuit Court in Case 2018CF1694 can be presented in a form that would be admissible in evidence under the public records exception to the hearsay rule, the Court should overrule Doe's objection and deem the proposed fact undisputed.** *United States v. Lechuga*, **975 F.2d 397, 399 (7th Cir. 1992) (Certified public records, "such as the fact that defendant was released on bond ... are admissible under the public records exception to the hearsay rules." (citations omitted)); Fed. R. Civ. Pro. 56(e).**

257. Following receipt of the petition, Chancellor Blank reached out to Taffora and asked him to work on Player 1's petition. (Taffora Dep. Tr. 53:3-7, 28:3-22.)

> **RESPONSE:** Admit.

> **REPLY: Undisputed.**

258. Taffora, as well as UW-Madison Office of Legal Affairs Attorneys Lynch and Jeris, were involved in working on the Chancellor's decision on Player 1's petition for restoration of rights. (Taffora Dep. Tr. 84:7-17.)

> **RESPONSE:** Admit.

> **REPLY: Undisputed.**

259. Taffora and Lynch collectively reviewed all materials provided by Player 1' counsel, which included the written petition, jump drive with videos, and then several additional emails that were sent with attachments from Player 1's counsel.

(Taffora Dep. Tr. 86:2-6; 102:3-10; Blank Decl. ¶ 31, Ex. 145; Blank Dep. Tr. 137:8-13, 230:3-16 (Dkt. 93:35, 59.)

> **RESPONSE:** Exhibit 145 is a document that contains impermissible hearsay. F.R.E. 801, 802. According to Blank Declaration at paragraph 31, Exhibit 45 consists of documents Player 1's counsel sent after the Petition for Restoration of Rights. The entire document is hearsay. Without waiving this objection, Plaintiff admits that Mr. Taffora testified that he and Ms. Lynch reviewed the entirety of the submission.

> **REPLY: Doe's objection is without merit because Exhibit 145 is not offered for the truth of the matter asserted, but rather it is offered to show the information Taffora and Lynch collectively reviewed. Fed. R. Evid. 801(c)(2). Doe also cites no evidence to dispute the proposed fact.**

> **The Court should overrule Doe's objection and deem the proposed fact undisputed in accordance with the Preliminary Pretrial Packet, *Summary Judgment Procedures* II(C). Fed. R. Civ. Pro. 56(e).**

260.   The Office of Legal Affairs also tried to obtain additional information after receiving the petition, including: transcripts from the court trial, the District Attorneys' impressions of the case, witness lists from trial, and Madison Police Department reports from the Player 1 investigation. However, they were only successful in obtaining and reviewing the MPD police reports and witness lists.

(Taffora Dep. Tr. 105:10-13; Blank Decl. ¶32; Ex. 142; Blank Dep. Tr. 165:6-17 (Dkt. 93:42).)

> **RESPONSE:** Dispute. UW never ordered the transcripts. See PPFF 212. Prosecutor Brown's testimony cited in PPFF ¶ 212 is supported by UW's Exhibit 143 at 131-39, which is a portion of Plaintiff's trial testimony submitted by Player 1's counsel as part of the Petition for Restoration. Page 139 of Exhibit 143 (which is the last page) shows that the court reporter completed portions of Plaintiff's trial testimony from July 31, 2019, the very next day on August 1, 2019.

> **REPLY: Objection. Doe failed to cite evidence in support of her purported dispute in accordance with the Preliminary Pretrial Packet, *Summary Judgment Procedures* II(C) & (E). Procedure II(E)(1) allows a party to use evidence in the form described in Procedure I(C)(1)(a)-(f). Procedure I(C)(1)(a)-(f) does not include citations to other proposed facts as a form of evidence. Further objection because Brown's testimony about his conversation with a court reporter is hearsay and his speculation about when transcripts could be prepared was not based on personal knowledge. Fed. R. Evid. 602, 801-802. The Court should disregard Doe's attempted dispute.**

> **Subject to the objection, the Board replies: Doe cites no evidence to dispute anything other than the portion of the fact**

about the transcripts. To the extent the Court overrules the Board's objection, this is not a genuine dispute of material fact because UW-Madison was not seeking an 8-page portion of the transcript of the proceeding. To the extent the Court deems the fact disputed, this is an immaterial dispute because UW-Madison had no duty to seek the transcripts of the court proceeding before reviewing the petition and making a decision under UWS 17.18. Nor is there any duty under Title IX, VAWA, or the Clery Act. *See* 20 U.S.C. § 1681(a); 20 U.S.C. § 1092(f)(14) ("Nothing in this subsection may be construed to ... establish a standard of care."); 34 C.F.R. § 668.46(k); *Doe v. Syracuse Univ.*, 440 F. Supp. 3d 158, 176–77 n.10 (N.D.N.Y 2020); *Z.J. v. Vanderbilt Univ.*, 335 F. Supp. 3d 646, 703–04 (M.D. Tenn. 2018); *Doe v. United States Dep't of Health and Human Servs.*, 85 F. Supp. 3d 1, 4 (D.D.C. 2015); *United States v. Morrison*, 529 U.S. 598, 627, 120 S. Ct. 1740, 1759 (2000).

261.    Taffora knew the Chancellor would want to make a decision quickly because she is a prompt decision-maker and because the school-year was about to begin. (Taffora Dep. Tr. 119:16-25, 120:1-9.)

> **RESPONSE:** Dispute. The record does not show that Chancellor Blank makes decisions quickly. Following the Title IX Hearing decision, Player 1 appealed the decision on February 12, 2019, to Chancellor Blank, who

upheld the committee's decision in her Decision of Appeal, which she issued on March 13, 2019. PPFF ¶ 27(4) and Exhibit 9 thereto, Chancellor's Appeal Decision. Thus, Chancellor Blank took 29 of 30 allowed days to issue her Chancellor's Appeal Decision. Additionally, this statement is contradicted by UW's own Proposed Statement of Fact 367 and 368, which shows that the Chancellor received another petition for restoration in a sexual assault case in October 2017 and waited until December 2017 to issue her decision denying the petition.

**REPLY: This is not a genuine dispute for several reasons.**

**First, Doe failed to cite evidence in support of her purported dispute in accordance with the Preliminary Pretrial Packet, *Summary Judgment Procedures* II(C) & (E). Procedure II(E)(1) allows a party to use evidence in the form described in Procedure I(C)(1)(a)-(f). Procedure I(C)(1)(a)-(f) does not include citations to other proposed facts as a form of evidence.**

**Second, the comparison with the petition submitted in October 2017 does not genuinely dispute the fact because, as the Chancellor testified in her April 8, 2022 declaration, "There was not the same urgency in deciding this male's petition since it came in during the middle of the semester, so even if it had been decided quickly he could not have enrolled in fall semester." (April 8, 2022, Blank Decl. ¶ 54 (dkt. 112:13)).**

Third, there is, indeed, evidence in the record of the timing of Chancellor Blank's decisions when a petition for restoration is submitted before the academic semester. Doe also had this information before she responded to this proposed fact, so she was well aware of the timeline of Chancellor Blank's prior decisions. (Hoechst Decl. Ex. 171 (dkt. 140-6).). The Defendant's Response to Plaintiff's Second Interrogatories, Interrogatory No. 13, which Chancellor Blank verified and signed under 28 U.S.C. § 1746, shows Chancellor Blank granted two other petitions for restoration of rights to enable the students to enroll in the next academic semester. (Dkt. 140-6:2-3). Petitioner 1 petitioned for restoration of rights on January 9, 2015, and Chancellor Blank granted the petition by letter dated January 16, 2015, which allowed Petitioner 1 to enroll in the spring 2015 semester at UW-Madison. (Hoechst Decl. Ex. 171 at 2-3, Resp. to Interrogatory No. 13 (Dkt. 140-6:2-3)). Petitioner 2 petitioned for restoration of rights on May 27, 2015, and Chancellor Blank granted the petition on July 7, 2015, which allowed Petitioner 2 to enroll in the fall 2015 semester at UW-Madison. (Hoechst Decl. Ex. 171 at 3, Resp. to Interrogatory No. 13 (Dkt. 140-6:3)).

Because Doe's response does not genuinely dispute the proposed fact, the Court should deem it undisputed in

accordance with the Preliminary Pretrial Packet, *Summary Judgment Procedures* II(C), (D), & (E), and Federal Rule of Civil Procedure 56(e).

262.    The Chancellor intended to make the decision quickly because Player 1 was asking for readmission to the university, and school was going to start soon. (Blank Dep. Tr. 243:19-25, 245:4-20 (Dkt. 93:62.)

> **RESPONSE:**  Dispute. The Chancellor made the decision to readmit Player 1 so that he could rejoin the football team as quickly as possible. See Brown Dep. [Doc. 95 at 69:4-70:18; 84:4-85:7; 86:18-22; 93:6-94:16]; PPFF ¶ 203 and Exhibit 59 thereto [Doc. 128-59]; PPFF ¶¶ 137-166, 203-209. The Chancellor also justified her rush of the Restoration Decision without waiting for trial transcripts, "given the publicity this trial was getting." Blank Dep. [Doc. 93 at 244:11-19].

> **REPLY:   Objection. Doe's response is objectionable on several grounds:**

> **First, Bill Brown's testimony does not create a genuine dispute of material fact. Fed. R. Civ. Pro. 56(c) & (e). Doe cites the deposition testimony of Bill Brown for the proposition that Chancellor Blank made the decision on Player 1's petition so he could rejoin the football team. Bill Brown has no personal knowledge of Blank's motive. Fed. R. Evid. 602. Brown's opinion**

is based on speculation and irrelevant to the claims in this lawsuit. Fed. R. Evid. 401-403, 602.

Second, the football post-it note, referred to by Doe as "PPFF ¶ 203 and Exhibit 59 thereto," contains Gerise LaSpisa's inadmissible hearsay statements and Bill Brown's irrelevant, speculation about why Taffora wanted the transcripts quickly. It does not create a genuine dispute as to Blank's intentions or motive.

Third, the Board objects to Doe's assertion that Chancellor Blank "justified her rush" of the petition decision without waiting for transcripts "given the publicity this trial was getting" because it is unsupported by evidence and does not genuinely dispute the proposed fact. Rather, it is conclusory and argumentative and assumes, without evidence, that the decision was "rushed," rather than decided in accordance with routine and past practice when a petition is received before the beginning of a semester. (Hoechst Decl. Ex. 171 at 2-3, Def's Resp. to Pl's Second Interrogatories, Interrogatory No. 13 (dkt. 140-6:2-3). The response also misstates Chancellor Blank's testimony, and the testimony on this subject just preceding the cited testimony. Fed. R. Evid. 106. Chancellor Blank testified: "I'll give the same answer. We had to do a timely response as we are

required to do, I think, in almost all of these types of cases. And he was appealing for readmission to the university. The university was going to start very soon. If he was going to be readmitted, we were going to make a decision inside a month, which is not an unreasonable period of time to make a decision." (Blank Dep. 243:19-244:1 (dkt. 93:62).). Chancellor Blank was asked, "I'm not sure how we got to a year, but if this decision could have been made later in the semester, wouldn't you have rather had complete information than do it quickly to get it in before the school semester starts?" Chancellor Blank responded, "I don't think that was tenable both on the basis of what he wanted, which was readmission to the university. It wasn't tenable given the publicity this trial was getting. We clearly had to make a decision on this case and make it in a timely manner rather than putting his life on hold for another number of months to a year or however long it was going to take." (Blank Dep. 244:11-23 (dkt. 93:62).).

Chancellor Blank justified her *timely* decision because the school year was about to begin and "you are either going to let him back into school or you are not." (Blank Dep. 245:9-10 (dkt. 93:62).). This was consistent with Chancellor Blank's past practice when she received a petition before the start of a

semester. (Hoechst Decl. Ex. 171 at 2-3, Def's Resp. to Pl's Second Interrogatories, Interrogatory No. 13 (dkt. 140-6:2-3)). Of the two other petitions for restoration that Chancellor Blank granted, Petitioner 1 submitted his petition on January 9, 2015, and Chancellor Blank granted it on January 16, 2015. (*Id.*) Petitioner 2 submitted his petition on May 27, 2015, and Chancellor Blank granted it on July 7, 2015, which allowed Petitioner 2 to enroll in the fall 2015 semester at UW-Madison. (*Id.*) And, importantly, UW-Madison had no duty to seek the transcripts of the court proceeding before reviewing the petition and making a decision under UWS 17.18. Nor is there any duty under Title IX, VAWA, or the Clery Act. *See* 20 U.S.C. § 1681(a); 20 U.S.C. § 1092(f)(14) ("Nothing in this subsection may be construed to … establish a standard of care."); 34 C.F.R. § 668.46(k); *Doe v. Syracuse Univ.*, 440 F. Supp. 3d 158, 176–77 n.10 (N.D.N.Y 2020); *Z.J. v. Vanderbilt Univ.*, 335 F. Supp. 3d 646, 703–04 (M.D. Tenn. 2018); *Doe v. United States Dep't of Health and Human Servs.*, 85 F. Supp. 3d 1, 4 (D.D.C. 2015); *United States v. Morrison*, 529 U.S. 598, 627, 120 S. Ct. 1740, 1759 (2000). The Court should disregard Doe's assertion the decision was "rushed" because she does not cite evidence to create a genuine dispute of fact on this issue. Fed. R. Civ. Pro. 56(c) & (e).

Fourth, and finally, Doe failed to cite evidence in support of her dispute in accordance with the Preliminary Pretrial Packet, *Summary Judgment Procedures* II(C) & (E). Procedure II(E)(1) allows a party to use evidence in the form described in Procedure I(C)(1)(a)-(f). Procedure I(C)(1)(a)-(f) does not include citations to other proposed facts as a form of evidence. Doe cites 37 of her own proposed findings of fact and places the burden on defense counsel and the Court to go and find the cited evidence in the record for those 37 proposed facts to determine whether the evidence supports the dispute. For this reason, alone, the Court should disregard Doe's response and deem the proposed fact undisputed. Preliminary Pretrial Packet, *Summary Judgment Procedures* II(C) & (E); Fed. R. Civ. Pro. 56(c), & (e).

Subject to the objection, the Board replies: To the extent the Court overrules the Board's objections, this is an immaterial dispute because both men and women play college football, and there is no rule precluding a woman from being part of the UW-Madison football team. (Hoechst Decl. Ex. 166-169 (dkt. 140-1, 140-2, 140-3, 140-4); Smith Decl. ¶¶ 7-8 (dkt. 117:2-3).). Since at least 1998, no women have tried out for the football team at UW-Madison. (Smith Decl. ¶¶ 4, 7 (dkt. 117:2-3).). Doe's evidence

**purporting to show bias in favor of football players—like evidence purporting to show bias in favor of sexual-misconduct victims—is irrelevant under the law. 20 U.S.C. § 1681(a);** ***see Johnson v. Marian Univ.,* 829 F. App'x 731, 732-33 (7th Cir. 2020); Fed. R. Evid. 401. There is no evidence that Blank made the decision to readmit Player 1 "on the basis of sex." 20 U.S.C. § 1681(a). What matters under Title IX is bias based on sex. And there is no evidence of that in this case.**

263.    Two days after the petition was filed, on August 8, 2019, Lynch called Doe's lawyer Amy Bogost.  (Doe Dep. Ex. 2 at 4, Request to Admit 5 (Dkt. 97-1:4); Bachhuber Decl. Ex. 144 at 2.)

> **RESPONSE:** Dispute. Ms. Bogost's Declaration states that she believes she was the one who initiated the phone call. Bogost Decl., Response Exhibit 1 at ¶ 36. Further, Plaintiff notes that UW cites Doe Dep. Ex. 2, Plaintiff's admission for Request for Admission No. 5, which was as follows: "Admit your attorney, Amy Bogost, and Nancy Lynch had a telephone discussion on August 8, 2019. (See BOR_011659)." UW has added to this Admission 5 that Lynch initiated the call which is disputed.

> **REPLY:  Immaterial dispute. For purposes of summary judgment only, the Board accepts that Bogost called Lynch.**

264.    Following that phone call, Lynch sent Bogost an email listing campus resources available to Doe, including support contact for the Dean of Students Office, Kate Dougherty, and support contact for issues involving threat, Chris Cole, Director of Threat Intervention Services. (Doe Dep. Ex. 2 at 4, Request to Admit 5 (Dkt. 97-1:4); Bachhuber Decl. Ex. 144 at 3-4.)

> **RESPONSE:** Dispute. Plaintiff is not able to respond to this paragraph because it cites as evidence Request to Admit 5, which has nothing to do with this paragraph.

> **REPLY: Objection. Doe's objection is without merit. In Request to Admit No. 5, Doe admitted her "attorney, Amy Bogost, and Nancy Lynch had a telephone discussion on August 8, 2019. (See BOR_011659)." (Dkt. 97-1:4.) Attached to the Declaration of Rachel Bachhuber as Ex. 144 is BOR_011659, which Doe admitted in the request to admit. (*Id.*; Ex. 144 (dkt. 119-1)). The email from Lynch to Bogost on August 9, 2019, contains the information in the proposed fact. Lynch sent the email listing campus resources available to Doe, including support contact for the Dean of Students Office, Kate Dougherty, and support contact for issues involving threat, Chris Cole, Director of Threat Intervention Services:**

On Fri, Aug 9, 2019 at 8:36 AM Nancy Lynch <nancy.lynch@wisc.edu> wrote:

Amy,

I'm following up our conversation yesterday.

The Dean of Students support contact for both individuals is:

Kate Dougherty
608-263-5700
catherine.dougherty@wisc.edu

As of today the Dean of Students has not yet heard back from either individual in response to a reach out earlier in the week. Kate is out of the office today (Friday, August 8). If there is a need to speak with someone today, please have them reach out to Christina Olstad, Dean of Students, at 263-5702 or colstad2@wisc.edu.

For issues involving threat, please reach out to either staff member above and in addition please include:

Chris Cole
Director of Intervention Services
Christopher.cole@wisc.edu
(608) 263-0542

Chris Cole is out of the office until August 19. If you wish to reach out before then, please include Detective Sergeant Cheryl Radzinski in the communication. Her contact info is: cheryl.radzinski@wisc.edu and 608-265-9558.

Please let me know if you have any other questions.

Nancy

Nancy K. Lynch
Associate Vice Chancellor for Legal Affairs
Office of Legal Affairs
University of Wisconsin-Madison
Room 360 Bascom Hall
500 Lincoln Drive
Madison, WI 53706
nancy.lynch@wisc.edu
p. 608.263.7400  f: 608.263.4725

**Exhibit 144 p. 003**

**(Dkt. 119-1:3.) Doe also submitted this email in response to Defendant's Proposed Findings of Fact as "Response Exhibit 9." (Dkt. 147-3:3-4.)**

**Doe also cites no evidence to support this dispute, so the Court should deem it undisputed in accordance with the Preliminary Pretrial Packet, *Summary Judgment Procedures* II(C). Fed. R. Civ. Pro. 56(e).**

265.    Three days after the petition was filed, on August 9, 2019, a settlement conference occurred with Player 1's attorneys, Player 1's family friend Mr. Cantrell, and Lynch and Taffora. (Taffora Dep. Tr. 98:5-19; Ex. 6.)

**RESPONSE:** Admitted.

**REPLY: Undisputed.**

266.    The purpose of the conference was to explore settlement of Player 1's legal claims against the University in order to avoid any future litigation. (Taffora Dep. Tr. 92:1-8, 100:12-19, 104:13-15.)

**RESPONSE:**  Dispute. The purpose of the meeting was specifically to discuss the Petition for Restoration of Rights and any claims Player 1 may have had. Mr. Taffora's testimony was as follows:

Q. Okay.·So in this settlement discussion that you had -- is that a fair way to characterize this meeting, a settlement discussion?

A. I think we -- I think we may have termed it that. It was a discussion obviously about the pending petition and matters related thereto.

Q. Okay. And including settling any claims that they may have?

A. Yes. Yeah, that was our -- that was what we were concerned about, yes.
Q. And when you say, "That's what we were concerned about," you mean that's what you were hoping to accomplish with them?

A. Correct.

Taffora Dep. [Doc. 122 at 103:1-14] (emphasis added).

**REPLY: Objection. The cited evidence does not genuinely dispute the fact. Fed. R. Civ. Pro. 56(e). The Court should deem the proposed fact undisputed in accordance with the Preliminary Pretrial Packet, *Summary Judgment Procedures* II(C) & (E).**

267.    At some point following that meeting, it became apparent that UW-Madison would not be able to resolve Player 1's claims through settlement. (Taffora Dep. Tr. 153:2-25, 154:1-18.)

RESPONSE: Admit.

REPLY: Undisputed.

268.    On August 12, 2019, Lynch and Bogost corresponded via email about the petition for restoration of rights, and Lynch indicated that "the university has not completed its review of the petition. We are collecting all relevant information in order to perform a thorough and accurate review." (Doe Dep. Ex. 2 at 4-5, Request to Admit 6 (Dkt. 97-1:4-5); Bachhuber Decl. Ex. 144 at 1.)

RESPONSE: Plaintiff admits only that Ms. Lynch sent Ms. Bogost an email which stated only what UW was telling the public, as set forth in the text from the cited email:

Thank you for the email. I will share the following information which is consistent with the university's response to the planned 4:00 p.m. press conference by attorneys for Mr. [Player 1]. Notwithstanding the comments from his lawyers, the university has not completed its review of the petition. We are collecting all relevant information in order to perform a thorough and accurate review, all of which takes time. In addition, the Athletic Department is not part of this teleconference. As I noted in our telephone conversation last week, we cannot control what our students say and they are free to make their own decisions. We are also limited in our ability to control activities of individuals associated with the university if undertaken in a personal capacity.

Email from Nancy Lynch, dated August 12, 2019, **Response Exhibit 9**.

**REPLY: Undisputed, but the Board objects to Doe's mischaracterization of the email as "only what UW was telling the public." In the second to last sentence of the quoted text**

**above, Lynch says, "I noted in our telephone conversation last week…." Neither Lynch, nor UW-Madison was "telling the public" what Lynch "noted in our telephone conversation last week[.]" The Court should deem the proposed fact undisputed. Fed. R. Civ. Pro. 56(e).**

269.   On August 12, 2019, Taffora emailed Attorney Meyer and Attorney Stilling and asked "Could one of you share the name(s) of the court reporter(s) so I can get the Q.C. trial transcript I've been seeking for nearly a week now?" Taffora further said, "If you don't want to supply it, I'll proceed on our end to order the transcript." (Taffora Dep. Tr. 114:4-115:23; Ex. 10 at 3; Ex. 9.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

270.   On August 12, 2019, Attorney Meyer replied via email that the main court reporter's name was Patrick Weishan and that court reporter information was publicly available, but Attorney Meyer did not provide any transcripts. (Taffora Dep. Tr. 115:10-20; Ex. 10 at 2.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

271.   On August 12, 2019, Taffora also called Assistant District Attorney Bill Brown to discuss the evidence presented in Player 1's criminal case and inquire about getting access to the trial transcript. (Taffora Dep. Tr. 111:9-13, 112:12-13.)

**RESPONSE:** Admit.

**REPLY:  Undisputed.**

272.    Brown did not want to discuss the Player 1 trial with Taffora and directed Taffora to contact the court reporter to get access to the trial transcript. (Taffora Dep. Tr. 112:5-18.)

**RESPONSE:** Admit.

**REPLY:  Undisputed.**

273.    Taffora also called the court reporter for Player 1's criminal trial, Patrick Weishan, who informed Taffora that it would take more than two months to even get an expedited copy of the transcripts. (Taffora Dep. Tr. 115:22-25, 116:1-17.)

**RESPONSE:**   Dispute. Proposed Statement of Fact 273 and cited evidence is hearsay and UW offers no exception to its inadmissibility. F.R.E. 801, 802. Additionally, Mr. Taffora's testimony is inconsistent with Exhibit 8 to Player 1's Petition, which is a portion of Plaintiff's trial testimony submitted by Player 1's counsel as part of the Petition for Restoration. Page 139 of UW Exhibit 143 (which is the last page) shows that the court reporter completed portions of Plaintiff's trial testimony from July 31, 2019, the very next day on August 1, 2019.

**REPLY: Doe's objection is without merit because the cited testimony is not offered for the truth of the matter asserted, but rather to show the steps Taffora took to attempt to obtain the transcripts and the information he learned and shared with Chancellor Blank, which UW-Madison relied on when**

determining whether it was tenable to wait for trial transcripts. In addition, Doe's cited evidence does not create a genuine dispute of material fact because UW-Madison was not seeking an 8-page portion of the transcript of the proceeding. Fed. R. Civ. Pro. 56(e).

The Court should overrule Doe's objection and deem the proposed fact undisputed in accordance with the Preliminary Pretrial Packet, *Summary Judgment Procedures* II(C). Fed. R. Civ. Pro. 56(e). To the extent the Court deems the fact disputed, the dispute is immaterial because UW-Madison had no duty to seek the transcripts of the court proceeding before reviewing the petition and making a decision under UWS 17.18. Nor is there any duty under Title IX, VAWA, or the Clery Act. *See* 20 U.S.C. § 1681(a); 20 U.S.C. § 1092(f)(14) ("Nothing in this subsection may be construed to … establish a standard of care."); 34 C.F.R. § 668.46(k); *Doe v. Syracuse Univ.*, 440 F. Supp. 3d 158, 176–77 n.10 (N.D.N.Y 2020); *Z.J. v. Vanderbilt Univ.*, 335 F. Supp. 3d 646, 703–04 (M.D. Tenn. 2018); *Doe v. United States Dep't of Health and Human Servs.*, 85 F. Supp. 3d 1, 4 (D.D.C. 2015); *United States v. Morrison*, 529 U.S. 598, 627, 120 S. Ct. 1740, 1759 (2000).

274.   Chancellor Blank spent a substantial amount of time during her vacation considering the petition, including devoting a full day of her vacation in order to review the petition and evidence and to discuss the information provided and gathered. She also had many daily phone calls to discuss the petition. These calls were primarily with Taffora, but Lynch, Mayrl and Charlie Hoslet (Vice Chancellor for External Relations) also took part in some of the phone calls. (Blank Dep. Tr. 92:18-25, 135:16-25, 136:8-19, 175:3-10 (Dkt. 93:24, 35, 45).)

**RESPONSE:**  Admit.

**REPLY:  Undisputed.**

275.   On August 12, 2019, Player 1's lawyers held a press conference with members of the UW football team. (Taffora Dep. Ex. 11.)

**RESPONSE:**  Admit.

**REPLY:  Undisputed.**

276.   On August 14, 2019, Chancellor Blank had a call with Hasselbacher to consult with the Title IX Coordinator, pursuant to UWS 17.18. (Blank Dep. Tr. 250:23-25 (Dkt. 93:64); Blank Dep. Ex. 15 (Dkt. 93-15).)

**RESPONSE:**   Dispute: Ms. Hasselbacher testified that Chancellor Blank did not call her to consult about Chancellor Blank's decision:

Q. Did you have any understanding prior to the conversation you had with Chancellor Blank that you had any say in the matter as to whether or not the petition for restoration of rights should be granted?

**A. I did not believe that I was being consulted about the underlying decision, no**.

Q. So would you describe it as she's calling to tell you what she's going to do?

A. No, not necessarily.

Q. Okay. So you said that you understood that when she called you, it was not for purposes of consulting with you on the underlying decision. What was the purpose then of the call as far as you understood it?

A. And I guess when I say underlying decision, I mean like sussing through the substance of the evidence, for example, but my understanding when I spoke with her that it was an opportunity to provide her my opinion on the process.

Dep. Tr. of Lauren Hasselbacher, [Doc. 121 at 213:23-214:15] (emphasis added) (hereinafter "Hasselbacher Dep.").

**REPLY: Objection. Doe's response does not create a genuine dispute of material fact. Hasselbacher testified about her conversation with Chancellor Blank on August 14 stating, "It felt like a real conversation." (Hasselbacher Dep. 236:4-6 (dkt. 121:60)). Hasselbacher testified, "For I think the first portion of the conversation, she (Chancellor Blank) was explaining more her thought process and considerations[.]" (Hasselbacher Dep. 223:10-12 (dkt. 121:57).). Hasselbacher also testified that Chancellor Blank was "leaning" towards the decision to readmit Player 1 during their August 14, 2019, phone consult about the decision on the petition. (Hasselbacher Dep. 223:10-224:15, 230:2-4, 237:1-13 (dkt. 121:57, 59, 60).) Hasselbacher testified that that she and Chancellor Blank talked about if the Chancellor granted the petition, how "she'd be communicating that**

127

**message to the complainants" and how it would be understood by the rest of campus. (Hasselbacher Dep. 226:13-17 (dkt. 121:58).). UWS 17.18 does not require Chancellor Blank to "sus" through the substance of the evidence, nor does it require any magic words to be compliant with UWS 17.18. The Court should deem the proposed fact undisputed in accordance with Rule 56(c)(1) & (e).**

277.   Chancellor Blank had an idea of what she was going to decide on the petition, and she wanted to consult with Hasselbacher about her decision and get Hasselbacher's input. (Blank Dep. Tr. 144:12-16, 250:23-25 (Dkt. 93:37, 64); Ex. 15 (Dkt. 93-15).)

> **RESPONSE:** Dispute: Chancellor Blank testified that she had already made her decision on the petition when she called Ms. Hasselbacher. She testified as follows:
>
> > Q. Okay. If I -- and I'm going to show you this in a few minutes -- but if I told you your conversation with -- according to Lauren's notes, your conversation with her was on the 14th –
> >
> > A. Yes. That would make sense because I would have talked to her, I think. Once I knew what I was going to do, I would want to talk to her and tell her what I was doing, get her input into that, and see what her objections, if any, were.
> >
> > Q. Okay. You had not spoken with her prior to –
> >
> > A. I did not.
>
> Blank Dep. [Doc. 93 at 144:8-18] (emphasis added). Plaintiff also disputes the characterization that Chancellor Blank "**wanted** to consult

with Hasselbacher" as stated in this Proposed Finding of Fact 277 (emphasis added). Chancellor Blank testified, "I had a conversation with Lauren Hasselbacher -- **I'm required to consult** with her under statute after I looked through all of these documents." Id. at 139:6-8 (emphasis added).

**REPLY: The Board objects to Doe's response because the testimony quoted by Doe does not definitively state Chancellor Blank had made her *final* decision. Chancellor Blank's testimony, as quoted by Doe above, states, "I would want to talk to her and tell her what I was doing, get her input into that and see what her objections, if any, were." The Court should disregard Doe's response because it does not genuinely dispute the fact. Fed. R. Evid. 56(e).**

**Subject to the objection, the Board replies: Doe's response does not genuinely dispute the fact. The admissible evidence shows the Chancellor's final decision was made on August 19, 2019, when the final decision was issued. (*See* Blank Decl. ¶¶ 33-34 (dkt. 112:7); Ex. 146 (dkt. 112-12).). Blank's declaration states she worked on several drafts of the decision before she approved the final draft. (Blank Decl. ¶ 33, dkt. 112:7.). Hasselbacher testified about her conversation with Chancellor Blank on August 14 stating, "It felt like a real conversation."**

(Hasselbacher Dep. 236:4-6 (dkt. 121:60)). Hasselbacher testified, "For I think the first portion of the conversation, she (Chancellor Blank) was explaining more her thought process and considerations[.]" (Hasselbacher Dep. 223:10-12 (dkt. 121:57).). Hasselbacher also testified that Chancellor Blank was "leaning" towards the decision to readmit Player 1 during their August 14, 2019, phone consult about the decision on the petition. (Hasselbacher Dep. 223:10-224:15, 230:2-4, 237:1-13 (dkt. 121:57, 59, 60).) Hasselbacher testified that that she and Chancellor Blank talked about if the Chancellor granted the petition, how "she'd be communicating that message to the complainants" and how it would be understood by the rest of campus. (Hasselbacher Dep. 226:13-17 (dkt. 121:58).). UWS 17.18 does not require Chancellor Blank to "sus" through the substance of the evidence with the Title IX Coordinator, nor does it require any magic words to be compliant with UWS 17.18.

As for Doe's distinction between whether Chancellor Blank "wanted to" or was "required to," this distinction is immaterial. In the testimony Doe quotes above, Chancellor Blank said, "I would want to talk to her[.]"

**Because Doe's response does not genuinely dispute the fact, the Court should deem the proposed fact undisputed in accordance with Rule 56(c) & (e).**

278.   Chancellor Blank informed Hasselbacher that she appreciated the work Hasselbacher had done on the case, and told her that "both sides might sue."[2] Chancellor Blank discussed that they had been collecting information, the videos were important to her review, and she could not ignore the quick jury verdict. (Blank Dep. Tr. 252:1-23 (Dkt. 93:64), Ex. 15 (Dkt. 93-15); Hasselbacher Dep. Tr. 217:8-24; Ex. 10.)

> **RESPONSE:**  Plaintiff admits that this paragraph 278 contains part of what Chancellor Blank and Ms. Hasselbacher discussed, but disputes that it is the entirety of what was discussed. See, e.g., PPFF 222.

> **REPLY:   Undisputed. The Board objects to Doe's additional argument because she failed to properly cite evidence in support of it in accordance with the Preliminary Pretrial Packet, *Summary Judgment Procedures* II(C) & (E). Procedure II(E)(1) allows a party to use evidence in the form described in Procedure I(C)(1)(a)-(f). Procedure I(C)(1)(a)-(f) does not include citations to other proposed facts as a form of**

---

[2]  Blank's deposition transcript incorrectly records Blank's response to the question, "And you said 'Both sides might sue.'" Blank's answer should read: "Turns out to be prescient." It incorrectly says, "depression." (Blank Dep. Tr. 252:6-7 (Dkt. 93:64).)

evidence. **The Court should disregard Doe's additional argument.**

279.    Chancellor Blank also informed Hasselbacher that she was thinking of lifting Player 1's expulsion but retaining the sexual harassment charge for Player 1's role in picture-taking of the Complainants without their consent. (Blank Dep. Tr. 253:6-25 (Dkt. 93:64), Ex. 15 (Dkt. 93-15).)

> **RESPONSE:** Dispute. Chancellor Blank had already decided what she was going to do before she spoke with Lauren Hasselbacher. See PPFF ¶¶ 219-221. As for the issue of picture-taking, Chancellor Blank did not testify that she discussed the issue of photographing with Ms. Hasselbacher. Instead, her testimony was her own thinking on the subject as follows:
>
> > Q. "Retain form of the sexual harassment charge. Not frivolous." · Do you recall saying something about something being not frivolous?
> >
> > A. I don't recall using that specific language, but I certainly did -- was not going to set aside the charge of taking pictures of women without their consent that he and his friend both admitted to. You know, that was a self-admitted issue.
>
> Blank. Dep. [Doc. 93 at 253:13-18]. This testimony does not support that Chancellor Blank said anything other than "retain form of sexual harassment charge. Not frivolous." to Ms. Hasselbacher. Chancellor Blank's cited deposition testimony reflects only her own thinking on the matter, and UW does not cite any testimony from Ms. Hasselbacher on this point.

132

Additionally, Chancellor Blank's statement that this was a "self-admitted issue" by Player 1 presumably refers to the Madison Police Department report. In that report, the MPD reported the following from an investigator at the MPD:

> I asked him [Player 1] about the pictures and he said, "Shit I did not take no pictures. He then said, "Fuck it. Fuck it. We got one picture and then she [Complainant 1] asked me to delete it. She [Complainant 1] was sitting right here and we and I deleted the picture. We went to our recent deleted pictures and deleted that shit too. It was one picture too."

UW Ex. 142 at 48. Moreover, as set forth in Plaintiff's Motion for Summary Judgment, Assistant Dean Cox dismissed the charge for Player 1's role in in any picture-taking of Plaintiff. See PPFF ¶ 107. Thus, there was not a pending sexual harassment charge for Player 1's role in picture-taking of Plaintiff without her consent, which was instead newly crafted by Chancellor Blank. Blank Dep. [Doc. 93 at 258:22-260:23].

Finally, UW's own DOE Deposition Exhibit 5 at BOR_001419-21 demonstrates that **Player 2** was also **not charged** with any photographing of Plaintiff. Doe Dep. Ex. 5 [Doc. 98-37]. That exhibit shows that Dean Cox concluded in the Title IX Finding regarding Player 2: "Therefore, I do not see enough information to show it is more likely than not likely this law was violated regarding Complainant 2 and therefore am finding you not responsible for violating 17.09(12) in relation to Complainant 2." Dean Cox went on to state, "In light of

finding you not responsible for violating 17.09(12) in relation to Complainant 2, **I do not find you responsible for sexual harassment** for any photos you took of Complainant 2." Doe Dep. Ex. 5 [Doc. 98-37 at BOR_001420] (emphasis added).

**REPLY: The Board objects to Doe's response for six reasons:**

**First, Doe's response is not responsive to the proposed fact and is rather arguing additional facts in violation of the Court's Preliminary Pretrial Packet,** *Summary Judgment Procedures* **II(D)(5).**

**Second, Doe cites several of her own proposed findings of fact, which are not evidence in a form allowed under the Preliminary Pretrial Packet,** *Summary Judgment Procedures* **II(C) & (E). Procedure II(E)(1) allows a party to use evidence in the form described in Procedure I(C)(1)(a)-(f). Procedure I(C)(1)(a)-(f) does not include citations to other proposed facts as a form of evidence. The Court should disregard Doe's response where she cites only her proposed facts. To the extent this Court considers Doe's cites to her own proposed facts regarding the date of the Chancellor's decision on the petition, the cited evidence in her proposed facts (Blank Dep. at 144:8-16 (dkt. 93:37)) is speculation and not based on personal**

knowledge. Fed. R. Evid. 602. The cited testimony also does not definitively state the date Chancellor Blank made her decision. Chancellor Blank reviewed several drafts of the decision before approving the final decision on August 19, 2019. (*See* Blank Decl. ¶¶ 33-34 (dkt. 112:7); Ex. 146 (dkt. 112-12).). Hasselbacher also testified that Chancellor Blank was leaning towards the decision to readmit Player 1 during their August 14, 2019, phone consult about the decision on the petition. (Hasselbacher Dep. 223:10-224:15, 230:2-4, 237:1-13 (dkt. 121:57, 59, 60).) The Court should disregard Doe's response about the date of Chancellor Blank's decision because she cites no admissible evidence to support it. Fed. R. Evid. 56(e).

Third, Doe criticizes the Board for not citing any testimony from Hasselbacher to support the fact. Hasselbacher testified about her conversation with Chancellor Blank with respect to retaining the sexual harassment charge for "[Player 1] asking [Player 2] to take a photo." (Hasselbacher Dep. 226:18-227:5, 224:20-227:10 (dkt. 121:57-58); Hasselbacher Decl. Ex. 122 (dkt. 102-12).).

Fourth, the paragraph in the response regarding Player 1's self-admitted issue is irrelevant to the proposed fact. Fed. R. Evid. 401-402.

**Fifth, Assistant Dean Cox's determination finding Player 1 not responsible for *violation of criminal law* related to the photograph (because Doe was covered at the time the photograph was taken) is irrelevant because it does not negate a finding of sexual harassment related to the photograph and because under UWS 17.13, Chancellor Blank reviewed the *hearing committee's decision* on the nonacademic misconduct, which she affirmed in March 2019. (Blank Decl. Ex. 140 at 3-4 (dkt. 112-7:3-4) UWS 17.13 states that a "respondent may appeal in writing to the chief administrative officer (the chancellor) within 14 days of the date of the written decision to review the decision of the hearing examiner or committee, based upon the record." Wis. Admin. Code. § UWS 17.13 (Register June 2016 No. 726). The hearing committee on the nonacademic misconduct charges found Player 1 responsible for sexual harassment based on "the actions of the Respondent on April 21-22, 2018." (Lathrop Decl. Ex. 128 at 9 (dkt. 106-1:9).). More importantly, Chancellor Blank had additional information beyond the record before Assistant Dean Cox and the hearing committee and was not constrained by those decisions at the petition stage. (Blank Decl. Ex. 142 (dkt. 112-9), Ex. 143 (dkt. 112-10); Hasselbacher Decl. Ex. 112 at 4-5 (dkt. 102-2:4-5) (*compare* UWS 17.13 *with* UWS 17.18)).**

**Sixth, the paragraph regarding Assistant Dean Cox's determination related to Player 2 is irrelevant to the Chancellor's decision regarding Player 1's petition and does not create a genuine dispute of this proposed fact. Fed. R. Evid. 401-402.**

**Because Doe's response is not responsive to the proposed fact and violates the Court's procedures on summary judgment, this fact is not *genuinely* disputed and the Court should deem it undisputed. Fed. R. Civ. Pro. 56(c)(1) & (e).**

280.   Hasselbacher felt this discussion with Chancellor Blank was a "real conversation" and she recommended that Chancellor Blank give the Complainants an opportunity to respond to the petition. (Hasselbacher Tr. 232:6-14, 236:3-6.)

**RESPONSE:** Dispute in part and admit in part: Plaintiff admits that Ms. Hasselbacher used the phrase "real discussion." However, as set forth in Plaintiff's response to UW's Proposed Finding of Fact 276, Ms. Hasselbacher testified that she did not believe she was being consulted by Chancellor Blank. Hasselbacher Dep. [Doc. 121 at 213:23-214:15]. Plaintiff admits that Ms. Hasselbacher testified she told Chancellor Blank that Chancellor Blank should provide the complainants an opportunity to respond to the petition, which Chancellor Blank did not do. PPFF ¶¶ 174, 181.

REPLY:  Doe does not dispute the proposed fact, so it is undisputed. The Board objects to Doe's response for several reasons:

First, Doe's response is again not responsive to the proposed fact, does not genuinely dispute the fact, and is rather arguing something else in violation of the Court's Preliminary Pretrial Packet, *Summary Judgment Procedures* II(D)(5). Fed. R. Civ. Pro. 56(c)(1) & (e).

Second, Doe cites several of her own proposed findings of fact, which are not evidence in a form allowed under the Preliminary Pretrial Packet, *Summary Judgment Procedures* II(C) & (E). Procedure II(E)(1) allows a party to use evidence in the form described in Procedure I(C)(1)(a)-(f). Procedure I(C)(1)(a)-(f) does not include citations to other proposed facts as a form of evidence. The Court should disregard Doe's response where she cites only her proposed facts.

Third, Hasselbacher's deposition testimony does not support the proposed fact. Hasselbacher clarified what she meant by being "consulted about the underlying decision," and testified, "I guess when I say underlying decision, I mean like sussing through the substance of the evidence, for example, but my understanding when I spoke with her that it was an

**opportunity to provide her my opinion on the process. (Hasselbacher Dep. 214:11-14 (dkt. 121:55)).**

**Because Doe's response does not genuinely dispute the proposed fact, the Court should deem the fact undisputed. Fed. R. Civ. Pro. 56(c)(1) & (e); Preliminary Pretrial Packet, *Summary Judgment Procedures* II(C) & (E).**

281.    Hasselbacher was not familiar with UWS 17.18 before Player 1 filed his petition for restoration of rights. (Hasselbacher Tr. 187:13-17.)

**RESPONSE:**   Dispute. Ms. Hasselbacher testified that she was not familiar with the petition for restoration of rights process before she began working at UW, not before Player 1 filed his petition for restoration of rights. Hasselbacher Dep. [Doc. 121 at 187:13-17].

**REPLY:  This dispute is immaterial for purposes of the Board's motion for summary judgment. The Board does not dispute Doe's clarification that Hasselbacher testified that she was not familiar with the petition of restoration of rights process before she began working at UW-Madison.**

282.    Hasselbacher would have preferred if the Complainants had an opportunity to respond, but understood the perspective of UWS 17.18 was on the due process rights of a respondent. (Hasselbacher Dep. Tr. 188:2-7, 188:22-189:5; Hasselbacher Decl. Ex. 112 at 5; Q&A on Campus Sexual Misconduct, U.S. Dept. of Education, Office of Civil Rights, Q&A #11 and n.30 (September 2017) (available at

https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf   (last   visited
April 3, 2022)).)

> **RESPONSE:**   Dispute. Defendant's Proposed Finding of Fact 282
> includes a purported statement of law, not fact, and to the extent it
> involves a statement of law does not warrant a factual response.
>
> Contrary   to   UW's   Proposed   Finding   of   Fact   282,   Ms.
> Hasselbacher testified that she believed it was unfair to allow a
> respondent to file a petition and present so-called new evidence while
> the   complainant   would   have   no   knowledge   of   what   that   was.
> Hasselbacher Dep. at [Doc. 121 at 187:21-188:11]; see also id. at 233:13-
> 18.
>
> Moreover, Ms. Hasselbacher testified that she believed UWS
> 17.18 needed to be changed, which it was by the Wisconsin Legislature,
> subsequent to Player 1's reinstatement. Ms. Hasselbacher testified:

Q. So I'm not asking what you communicated with the lawyers or what the
lawyers communicated to you, but did you hold a personal view that the
petition for restoration of rights statute needed to be changed by allowing
claimants to participate in the process?

MS. BACHHUBER: · Object to form. · Go ahead and answer.

A. In my position as the Title IX coordinator and in my practice at the
university, I had an opinion about a preferred process for the petition for
restoration.

Q. And was the preferred process for the petition for restoration one that
included the opportunity for claimants to participate?

A. Yes.

Q. And why was that? · Why did you have that opinion that that was a preferred
process?

A. I felt that it was consistent with the rest of the way Chapter 17 handled instances of sexual harassment and sexual violence.

Q. That the rest of the way Chapter 17 handled it was that it allowed claimants to participate in the entire Title IX process?

A. Generally speaking, yes.

Q. And particularly when evidence was presented in the Title IX process, both sides had a right to know what that evidence was if it was part of the Title IX investigation or finding or disciplinary process, correct?

A. Generally speaking, both parties have a right to understand the underlying substance that the decision-maker is using to make determinations about responsibility.

Hasselbacher Dep. [Doc. 121 at 178:17-179:23].

**REPLY:   Objection.   The quoted testimony does not support Doe's response and the Court should disregard it. Nowhere in the testimony does Hasselbacher state, "UWS 17.18 needed to be changed." Also, Hasselbacher did not testify, "she believed it was unfair to allow a respondent to file a petition and present so-called new evidence while the complainant would have no knowledge of what that was"—that was Plaintiff's *counsel* testifying at the deposition, which was objected to by defense counsel. (Hasselbacher Dep. 187:21-188:9 (dkt. 121:48).).**

**Hasselbacher testified:**

> **I think it would have been preferable if the complainant had an opportunity to respond, but I think it has to do with the perspective that you're looking at the case, whether it's the due process rights of the respondent regarding the discipline that was imposed or whether you're looking at it from the perspective of overall access to the process from the sides of both parties.**

**(Hasselbacher Dep. 188:1-9 (dkt. 121:48).).**

**Hasselbacher further testified:**

> **I would say that the petition involving [Player 1] made me more familiar with the process as outlined in Chapter 17, which required a further review of VAWA and its requirements and realizing that while Chapter 17 maybe wasn't explicitly out of compliance with any federal regulations or rules, that again to be – make it more consistent I think with the rest of the disciplinary process, that I suggested it be amended.**

**(Hasselbacher Dep. 188:22-189:5 (dkt. 121:48).).**

**The Board further objects because Doe's response is not responsive and is instead an attempt to add additional argument, which violates the Preliminary Pretrial Packet, *Summary Judgment Procedures* II(C) & (D)(5). The Court should deem the proposed fact undisputed. Fed. R. Evid. 56(e).**

283.    Chancellor Blank did not request the Complainants to respond to Player 1's petition for restoration of rights because it was not part of the administrative rule the Chancellor was required to follow under UWS 17.18. (Blank Dep. Tr. 183:2-7 (Dkt. 93:47).)

> **RESPONSE:** Defendant's Proposed Finding of Fact 283 is a purported statement of law, not fact, and therefore does not warrant a factual response. Plaintiff disputes Chancellor Blank's interpretation of UWS 17.18.

**REPLY:  Undisputed. And Doe's objection to the fact as a conclusion of law is without merit. The proposed fact is a fact— it's explaining why Chancellor Blank did not request the complainants to respond to Player 1's petition for restoration of rights. Because Doe cites no evidence for her dispute, the Court should deem the fact undisputed. Fed. R. Civ. Pro. 56(c) & (e); Preliminary Pretrial Packet,** *Summary Judgment Procedures* **II(C) & (E).**

284.   Chancellor Blank did not request the Complainants to respond to Player 1's petition for restoration of rights because she did not think it was necessary to consider further argument from the parties. Chancellor Blank did not consider Player 1's argument in the petition, nor did she consider his attorney's closing argument from the criminal trial that was submitted as part of the petition. (Blank Dep. Tr. 183:2-184:11 (Dkt. 93:47).)

**RESPONSE:** Dispute. Chancellor Blank based her decision on Football Player 1's status as a football player. PPFF ¶¶ 137-166; 203-209. Moreover, Chancellor Blank expressed that she was not interested in Plaintiff's opinion and made a sweeping assumption that Plaintiff would not have any compelling evidence to present to the Chancellor. Nevertheless, the Chancellor conceded she did not know whether Plaintiff or her counsel would have evidence that could have helped her decision. Blank Dep. [Doc. 93 at 183:16-186:12].

**REPLY:  Objection, Doe's response and purported dispute is not responsive and does not dispute the proposed fact at all. Doe failed to cite evidence in support of her dispute in accordance with the Preliminary Pretrial Packet, *Summary Judgment Procedures* II(C) & (E). Procedure II(E)(1) allows a party to use evidence in the form described in Procedure I(C)(1)(a)-(f). Procedure I(C)(1)(a)-(f) does not include citations to other proposed facts as a form of evidence. Here, Doe cites 37 of her own proposed findings of fact and places the burden on defense counsel and the Court to go and find the cited evidence in the record for those 37 proposed facts to determine whether the evidence supports the dispute. For this reason, alone, the Court should disregard Doe's response and deem the proposed fact undisputed. Preliminary Pretrial Packet, *Summary Judgment Procedures* II(C) & (E); Fed. R. Civ. Pro. 56(c) & (e).**

**Subject to the objection, the Board replies: To the extent the Court overrules the Board's objection, this is an immaterial dispute because Doe has failed to point to any admissible evidence of what "compelling evidence" she would have submitted. (Doe Dep. Tr. Vol. I at 125:7-21 (dkt. 97:32), Doe Dep. Ex. 4 at 188 (dkt. 97-11:81, Doe Dep. Tr. Vol. II at 167:3-168:22 (dkt. 99:2)). It is also immaterial because both men and women play**

**college football, and there is no rule precluding a woman from being part of the UW-Madison football team. (Hoechst Decl. Ex. 166-169 (dkt. 140-1, 140-2, 140-3, 140-4); Smith Decl. ¶¶ 7-8 (dkt. 117:2-3).). Since at least 1998, no women have tried out for the football team at UW-Madison. (Smith Decl. ¶¶ 4, 7 (dkt. 117:2-3).). Doe's evidence purporting to show bias in favor of football players—like evidence purporting to show bias in favor of sexual-misconduct victims—is irrelevant under the law. 20 U.S.C. § 1681(a); *see Johnson v. Marian Univ.*, 829 F. App'x 731, 732-33 (7th Cir. 2020). Chancellor Blank knew Player 1 was a football player when she upheld the expulsion on March 13, 2019. (Blank Decl. ¶¶ 17, 20 (dkt. 112:5), Ex. 140 (dkt. 112-7)). There is no evidence that Blank made the decision to readmit Player 1 "on the basis of sex." 20 U.S.C. § 1681(a). What matters under Title IX is bias based on sex. And there is no evidence of that in this case.**

285.   Chancellor Blank looked at the newly available evidence to answer the question presented of whether there was a preponderance of evidence to support the finding that Player 1 committed third degree sexual assault of Doe. (Blank Dep. Tr. 183:22-184:11 (Dkt. 93:47).)

**RESPONSE:** Dispute. Chancellor Blank based her decision on Football Player 1's status as a football player. PPFF ¶¶ 137-166; 203-209. *See also* Response to ¶¶ 293, 294 *infra*.

**REPLY: Objection, Doe's response and purported dispute is not responsive and does not dispute the proposed fact. Doe failed to cite evidence in support of her dispute in accordance with the Preliminary Pretrial Packet,** *Summary Judgment Procedures* **II(C) & (E). Procedure II(E)(1) allows a party to use evidence in the form described in Procedure I(C)(1)(a)-(f). Procedure I(C)(1)(a)-(f) does not include citations to other proposed facts as a form of evidence. Doe again cites 37 of her own proposed findings of fact and places the burden on defense counsel and the Court to go and find the cited evidence in the record for those 37 proposed facts to determine whether the evidence supports the dispute. For this reason, alone, the Court should disregard Doe's response and deem the proposed fact undisputed. Preliminary Pretrial Packet,** *Summary Judgment Procedures* **II(C) & (E); Fed. R. Civ. Pro. 56(c) & (e). And, as demonstrated in the Board's replies to ¶¶ 293-294 below, the Board objects to Doe's attempt to discredit Chancellor Blank's declaration statements where she clarified ambiguous and confusing testimony, which is specifically permitted under**

recent Seventh Circuit precedent. *James v. Hale*, 959 F.3d 307, 317 (7th Cir. 2020).

Subject to the objection, the Board replies: To the extent the Court overrules the Board's objection, this is an immaterial dispute because both men and women play college football, and there is no rule precluding a woman from being part of the UW-Madison football team. (Hoechst Decl. Ex. 166-169 (dkt. 140-1, 140-2, 140-3, 140-4); Smith Decl. ¶¶ 7-8 (dkt. 117:2-3).). Since at least 1998, no women have tried out for the football team at UW-Madison. (Smith Decl. ¶¶ 4, 7 (dkt. 117:2-3).). Doe's evidence purporting to show bias in favor of football players—like evidence purporting to show bias in favor of sexual-misconduct victims—is irrelevant under the law. 20 U.S.C. § 1681(a); *see Johnson v. Marian Univ.*, 829 F. App'x 731, 732-33 (7th Cir. 2020). Chancellor Blank knew Player 1 was a football player when she upheld the expulsion on March 13, 2019. (Blank Decl. ¶¶ 17, 20 (dkt. 112:5), Ex. 140 (dkt. 112-7)). There is no evidence that Blank made the decision to readmit Player 1 "on the basis of sex." 20 U.S.C. § 1681(a). What matters under Title IX is bias based on sex. And there is no evidence of that in this case.

286. On August 15, 2019, Taffora and Lynch provided Chancellor Blank with a first draft of the decision on Player 1's petition. (Blank Decl. ¶33.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

287. On August 19, 2019, the Chancellor issued her decision on Player 1's petition for restoration of rights, which granted his petition and readmitted him to the University. (Blank Decl. ¶¶34-35; Ex. 146.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

288. As Chancellor Blank's written decision explains, the following materials were available to her for review: (1) the University's investigatory and hearing record, (2) the materials Player 1 submitted with his petition and the materials his attorneys submitted thereafter, and (3) available Madison Police Department reports independently obtained by UW-Madison's Office of Legal Affairs. (Blank Decl. ¶35; Ex. 146 at 4.)

**RESPONSE:** Dispute. UW misstates the Restoration Decision by stating that the materials identified in (1), (2), and (3) were "available for review." In fact, the Restoration Decision (UW Ex. 146) states that Chancellor Blank actually reviewed all of those materials, which statement was false according to Chancellor Blank's sworn deposition testimony: The Restoration Decision states:

> In evaluating the petition, **I reviewed the following materials** to which the University obtained access: (1) the University's investigatory and hearing record; (2) the materials submitted with the Petition for Restoration and by Petitioner's counsel thereafter; and (3) available police reports. After conducting a thorough review of the available information, I have concluded that the newly supplied information affects the

University's prior findings in this matter related to third-degree sexual assault, but not sexual harassment.

UW Ex. 146 at 4. Plaintiff disputes that Chancellor Blank actually reviewed the University's investigatory and hearing record and all of the materials submitted with the Petition for Restoration of Rights and by Petitioner's counsel thereafter. Instead, during her deposition, Chancellor Blank testified as follows:

Q. What things did you look at?

A. I looked at a selective group of videos, and I believe that I read the transcript of a couple of the police reports.

Q. Okay. So you said "a select group of videos." That means that you were shown some of the videos that were submitted?

A. There were large numbers of videos as I understand it, and I looked at some that them that seemed more relevant.

Q. Okay. And then you recall looking at a couple of police reports?

A. Yes.

Q. Anything else that you recall looking at?

A. Other than going back to the original appeal as well as the petition, no.

Q. Okay. So you looked at the petition that was submitted --

A. Mm-hmm.

Q. -- and then your prior appeal?

A. Yes.

Q. Okay.

A. His appeal to me when the original discipline came down. Sorry. Yeah. And what I was interested in is what new information is there. And that particularly seemed to be the videos and the police reports.

Q. Okay. So your written outcome of the original appeal from the hearing?

A. Yes.

Q. Right? And then the petition, right?

A. Yes.

Q. And then a couple of the police reports and some of the videos that were selected?

A. Yes.

Q. Who selected those videos for you?

A. The General Counsel's Office.

Q. Do you recall how many those were?

A. I would guess I looked at five or six.

Q. Okay. And these are five or six new videos that your understanding were not used in the actual Title IX hearing itself?

A. Yes.

Blank Dep. [Doc. 93 at 68:20-70:12].

**REPLY: This is not a genuine dispute because the Board did not purport to quote Chancellor Blank's decision. The Board cited paragraph 35 of Chancellor Blank's declaration, "the following materials were available to me at the time of my review[.]" (Blank Decl. ¶ 35 (dkt. 112:8).). Doe failed to address the testimony in Blank's declaration and, therefore, has not genuinely disputed this fact. Fed. R. Civ. Pro. 56(c) & (e).**

**In addition, Chancellor Blank also testified at her deposition that she would look through the investigative report at the chancellor-level appeal and again at the petition-level review. (Blank Dep. 103:14-25 (dkt. 93:27).).**

**Because Doe failed to genuinely dispute the proposed fact, the Court should deem it undisputed. Fed. R. Civ. Pro. 56(c) & (e); Preliminary Pretrial Packet, *Summary Judgment Procedures* II(C) & (E).**

289.  Chancellor Blank noted that the additional information Player 1 submitted in connection with his petition, as well as the Madison Police Department (MPD) reports, was unavailable to the University at the time of the initial investigation, findings, and appeals. (Blank Decl. ¶36; Ex. 146, at 4.)

**RESPONSE:**  Plaintiff disputes that the Restoration Decision at page 4 supports this paragraph. The Restoration Decision speaks for itself. Additionally, and as set forth in Plaintiff's Proposed Findings of Fact, Player 1 could have, but chose not, submit video and police department reports during the Title IX investigation, findings and appeals. PPFF ¶¶ 187, 188. See also Plaintiff's response to UW's ¶¶ 293, 294 infra regarding Chancellor Blank's deposition testimony and also the so-called "new evidence," much of which was not new at all.

**REPLY: This is not a genuine dispute of fact because Chancellor Blank's declaration testimony includes this**

proposed fact, which Doe ignores entirely. The Court should deem the proposed fact undisputed because Doe cites no evidence to dispute it in accordance with the Preliminary Pretrial Packet, *Summary Judgment Procedures* II(C) & (E). Doe again cites other proposed facts, instead of evidence in the record. Procedure II(E)(1) allows a party to use evidence in the form described in Procedure I(C)(1)(a)-(f). Procedure I(C)(1)(a)-(f) does not include citations to other proposed facts as a form of evidence. And Doe's additional information, about whether Player 1 and his attorneys *could have* submitted the police reports and videos at the time of the nonacademic misconduct investigation and hearing is irrelevant and immaterial to whether UW-Madison had access to such evidence. Chancellor Blank testified she was not going to punish Player 1 at a later stage for following the advice of his lawyers during his criminal proceeding. Fed R. Evid. 401-402. (Blank Dep. 179:17-181:3 (dkt. 93:46).) Finally, as demonstrated in the Board's replies to ¶¶ 293-294 below, the Board objects to Doe's attempt to discredit Chancellor Blank's declaration statements where she clarified ambiguous and confusing testimony, which is specifically permitted under recent Seventh Circuit precedent. *James v.*

***Hale*, 959 F.3d 307, 317 (7th Cir. 2020). The Court should deem the proposed fact undisputed. Fed. R. Civ. Pro. 56(c) & (e).**

290.    Chancellor Blank noted that the newly supplied information, in particular the Madison Police Department reports and certain video clips presented at the criminal trial, impacted the prior third-degree sexual assault finding. (Blank Decl. ¶37; Ex. 146, at 4.)

> **RESPONSE:** Plaintiff disputes that the Restoration Decision at page 4 supports this paragraph. The Restoration Decision speaks for itself. See also Plaintiff's response to ¶¶ 293, 294 infra regarding Chancellor Blank's deposition testimony and also the so-called "new evidence," much of which was not new at all.

> **REPLY:  Doe's response does not genuinely dispute the proposed fact because she failed to address the fact that Chancellor Blank's declaration provides the information in the proposed fact. (Blank Decl. ¶ 37 (dkt. 112:8).). Doe also failed to cite any evidence to support the purported dispute, so the Court should deem the proposed fact undisputed. Fed. R. Civ. Pro. 56(c) & (e); Preliminary Pretrial Packet, *Summary Judgment Procedures* II(C), (D), & (E). As demonstrated in the Board's replies to ¶¶ 293-294 below, the Board objects to Doe's attempt to discredit Chancellor Blank's declaration statements where she clarified ambiguous and confusing testimony, which is**

specifically permitted under recent Seventh Circuit precedent.
*James v. Hale*, 959 F.3d 307, 317 (7th Cir. 2020).

291.   Chancellor Blank was persuaded by the totality of the police reports,
statements, and videos that she reviewed, including the fact that the University now
had in its possession the statements of all major witnesses to the April 21-22, 2018
incident, such as P1, Player 2, and Player 1 himself.  (Blank Decl. ¶44; Ex. 142 at 17-
26, 27-31, 37-42, 45-47, 66-69, 70-71; Ex. 143 at 149-185.)

> **RESPONSE:**   Dispute. This paragraph is contrary to Chancellor
> Blanks' sworn deposition testimony. *See infra* ¶¶ 293-94. *See also*
> Plaintiff's response to ¶¶ 293, 294 infra regarding Chancellor Blank's
> deposition testimony and also the so-called "new evidence," much of
> which was not new at all.
>
> **REPLY:  The Board objects to Doe's attempt to discredit
> Chancellor Blank's declaration statements where she clarified
> ambiguous and confusing testimony, which is specifically
> permitted under recent Seventh Circuit precedent. *James v.
> Hale*, 959 F.3d 307, 317 (7th Cir. 2020). The Board incorporates
> its replies to ¶¶ 293-294, below. Doe failed to cite any evidence
> to support a dispute, so the Court should deem the fact
> undisputed. Fed. R. Civ. Pro. 56(e).**

292.   Chancellor Blank was also persuaded by the fact that Complainant 1
and  Complainant 2 (Doe)  had  provided  different  and  less  information  to  the

University during the Title IX investigation than they had provided to the police after reporting the alleged assault. (Blank Decl. ¶44; Ex. 142 at 17-26, 27-31, 37-42, 45-47, 66-69, 70-71; Ex. 143 at 149-185.)

> **RESPONSE:** Dispute. This paragraph is contrary to Chancellor Blanks' deposition testimony. See infra ¶¶ 293-94. Additionally, Plaintiff's Responses to paragraphs 293 and 294 show that the assertion that Complainant 1 and Plaintiff provided less information to the University is disputed.

> **REPLY: The Board objects to Doe's attempt to discredit Chancellor Blank's declaration statements where she clarified ambiguous and confusing testimony, which is specifically permitted under recent Seventh Circuit precedent.** *James v. Hale***, 959 F.3d 307, 317 (7th Cir. 2020). The Board incorporates its replies to ¶¶ 293-294, below. Doe failed to cite any evidence to support a dispute, so the Court should deem the fact undisputed. Fed. R. Civ. Pro. 56(e).**

293.    At her deposition on March 25, 2022, Chancellor Blank was asked what new evidence she found persuasive that was reviewed in connection with the petition for restoration. Despite Chancellor Blank asking, she was not given an opportunity at her deposition to review the evidence submitted with the petition or the police reports obtained. As it had been over two-and-a-half years since Chancellor Blank's review of the petition for restoration and other documents and videos, she could not

recall what specific information she found persuasive, and she informed Doe's counsel that she would have to go back and review the documents and videos to testify to specific details about the additional information that Chancellor Blank found relevant and persuasive. (*See*, *e.g.*, Blank Dep. 201:1-20; 228:2-24; 229:13-230:2 (Dkt. 93:51, 58-59).)

> **RESPONSE:** Dispute.
>
> Initially, Plaintiff notes that this paragraph represents that "Despite Chancellor Blank asking, she was not given an opportunity at her deposition to review the evidence submitted with the petition or the police reports obtained." The cited paragraphs for this proposition ("Blank Dep. 201:1-20; 228:2-24; 229:13-230:2") show that not to be the case. Furthermore, UW counsel could have, but did not, ask questions of Chancellor Blank about any evidence they wanted. Counsel simply decided not to do that. Blank Dep. [Doc. 93 at 319:25].
>
> In her deposition, Chancellor Blank gave an oath to tell the truth. Id. at 6:5-7. Chancellor Blank then executed a declaration in support of UW's Motion for Summary Judgment, which state that she "declare[s] pursuant to 28 U.S.C. § 1746 and under the penalty of perjury, that the following is true and correct." Chancellor Blank has been deposed before and she has testified in front of Congress a number of times. Id. at 6:19-7:8. Five attorneys attended Chancellor Blank's deposition on UW's behalf: Rachel Bachhuber defended the deposition and two additional

156

counsel of record from the Attorney General's Office were present; the UW's highest ranking attorney, Nancy Lynch, attended the deposition, as did UW counsel Rachel Jeris. Declaration of Christopher Ford, Response Exhibit 2 at ¶ 4. Chancellor Blank testified that her deposition preparation was thorough and that she reviewed the Petition for Restoration of Rights in her preparation:

Q. And so did you do anything to prepare for today's deposition?

A. I looked over the documents that had been sent to me, the emails and things that I think went to you under Discovery. <u>Looked over the petition</u> and the appeal and **my responses and talked with legal counsel about what to expect**.

Q. Okay. · So you looked over their emails. Do you have a -- well, first of all, just generally speaking, do you have a sense of how much time you spent reviewing the various documents that you just disclosed?

A. **I probably <u>spent several hours reading through everything</u>. We spent several hours talking together.**· And then when this got delayed, **I <u>spent an hour or so last weekend looking through it all again</u>**.

Blank Dep. [Doc. 93 at 14:6-22] (emphasis added).

In her sworn Declaration, Chancellor Blank stated, "**<u>Since it had been over two-and-a-half years since my review of the petition for restoration</u>** and other documents and videos, I could not recall what specific information I found persuasive...." Blank Decl. [Doc. 112 at ¶ 43] (emphasis added). Thus, her sworn declaration in support of the Motion for Summary Judgment directly contradicts her deposition testimony. In the former, she swore that she had not looked at the petition for over two and a half years. In the latter, she swore that she looked over the petition in preparation for her deposition—not just once,

but twice. Only one version can be true: either her sworn deposition testimony or her sworn declaration.

In her deposition, Chancellor Blank also testified to the following regarding what she reviewed in granting Player 1's Petition for Restoration and what persuaded her to grant the Petition:

Q. What things did you look at?

A. I looked at a selective group of videos, and I believe that I read the transcript of a couple of the police reports.

Q. Okay. So you said "a select group of videos." That means that you were shown some of the videos that were submitted?

A There were large numbers of videos as I understand it, and I looked at some that them that seemed more relevant.

Q Okay. And then you recall looking at a couple of police reports?

A. Yes.

Q. Anything else that you recall looking at?

A. Other than going back to the original appeal as well as the petition, no.

Q. Okay. So you looked at the petition that was submitted --

A. Mm-hmm.

Q. -- and then your prior appeal?

A. Yes.

Q. Okay.

A. His appeal to me when the original discipline came down. Sorry. Yeah. And what I was interested in is what new information is there. And that particularly seemed to be the videos and the police reports.

Q. Okay. So your written outcome of the original appeal from the hearing?

A. Yes.

Q. Right? And then the petition, right?

A. Yes.

Q. And then a couple of the police reports and some of the videos that were selected?

A. Yes.

Q. Who selected those videos for you?

A. The General Counsel's Office.

Q. Do you recall how many those were?

A. I would guess I looked at five or six.

Q. Okay. And these are five or six new videos that your understanding were not used in the actual Title IX hearing itself?

A. Yes.

. . .

Q. . . Maybe the easier thing before we get into this is tell me what are the things that you based your outcome on?

A. So the petition basically said to me that I needed to review the case and see what the evidence looked like and if there was any new evidence or mitigating circumstance that hadn't been there before, right? The jury trial clearly suggested, from what we knew of it, that there had been evidence presented that we had not seen or had access to, so we were particularly interested in getting that. The two pieces of evidence that were most important in my mind after I looked at this, were **some of the police reports that had not been available to us, as well as some of these videos**.

Blank Dep. [Doc. 93 at 68:20-70:12; 146:17-147:7] (emphasis added).

Chancellor Blank now seeks to add significantly to, and in contradiction to, her deposition testimony through this paragraph 293. Accordingly, Plaintiff disputes Chancellor Blank's Declaration on these issues.

**REPLY: Doe does not dispute the proposed fact and her attempt to exclude Chancellor Blank's declaration fails to meet the clear**

contradiction standard under Seventh Circuit precedent. Chancellor Blank did not contradict her prior testimony. Chancellor Blank's declaration *clarified ambiguous and confusing testimony* after reviewing the documents Doe's counsel failed to provide her at the deposition, which is specifically permitted under Seventh Circuit precedent. *James v. Hale*, 959 F.3d 307, 317 (7th Cir. 2020) Doe's argument fails to address the fact that Chancellor Blank's deposition is full of instances where she testified that she would need to go back and look at documents or information to answer questions about specific details. (*See*, *e.g.*, Blank Dep. 201:1-20; 228:2-24; 229:13-230:2 (Dkt. 93:51, 58-59).) In each of those instances, Doe's counsel failed to provide Chancellor Blank with the documents or information she needed.

Now Doe cherry-picks a sentence from the middle of a paragraph in Chancellor Blank's declaration—that it had been two-and-a-half years since her review of the petition—and attempts to argue Chancellor Blank is somehow denying she looked over the petition before her deposition. (Dkt. 112:9, ¶ 43). Chancellor Blank's declaration statement was not intended to mean that she had not reviewed *any* of Player 1's Petition or *any* of the supporting documents in over two years. (Blank Second Decl. ¶ 4). Rather, what Chancellor Blank meant by this statement—and this meaning is

conveyed when reviewing the paragraph as a whole with the sentence in context—was that because it had been over two years since her August 19, 2019 decision on Player 1's Petition, her recollection was limited and her deposition testimony did not include an exhaustive list of the specific information within the police reports and videos that she found most relevant in arriving at her decision. (*Compare* Dkt. 112:9, ¶ 43, *with* Blank Second Decl.¶ 4). Doe's counsel never showed Chancellor Blank the police reports or videos at her deposition, and she could not testify to that level of detail without referencing the information. (Blank Second Decl. ¶ 4).

Doe's bald assertion that Chancellor Blank's declaration "directly contradicts" her deposition testimony does not come close to the clear contradiction needed to exclude her declaration as a sham. In the Seventh Circuit, "an affidavit can be excluded as a sham only where the witness has given 'clear answers to unambiguous questions which negate the existence of any genuine issue of material fact.'" *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 572 (7th Cir. 2015) (quoting *Bank of Illinois v. Allied Signal Safety Restraint Systems*, 75 F.3d 1162, 1170 (7th Cir. 1996). The contradiction must be "so clear that the only reasonable inference was that the affidavit was a sham designed to thwart the purposes of summary judgment." *Id.* at 571 (citing *Bank of Ill.*, 75 F.3d at 1168-69). The fact that Chancellor Blank testified she

"looked over the petition" before her deposition does not mean Chancellor Blank had all the moving parts memorized such that she could explain specific details without referencing the documents. Doe's counsel showed Chancellor Blank only 15 pages of the 242-paged petition and demanded she specify exactly what new evidence she found persuasive even though none of the new evidence was attached to Doe's counsel's 15-page excerpt (and which defense counsel noted on the record):

> Mr. Clune: Okay. I'm going to show you the petition.
>
> (Exhibit No. 9 was marked for identification)
>
> Ms. Bachhuber: *That's not the full petition.*
>
> Mr. Clune: Sorry. I'll identify it more clearly on the record.
>
> This is the written petition summary from defendant's counsel. Is that a fair description?
>
> Ms. Bachhuber: *No. The document that we provided to you was 242 pages. We did not separate out the argument portion. We provided to you exactly how [Player 1's] counsel provided it[.]*

(Blank Dep. 157:8-158:1 (emphasis added)).

Doe's counsel repeatedly demanded Chancellor Blank to specify the exact information she found persuasive in the City of Madison police reports, yet Doe's counsel never showed her even one page of the 132-page reports. Chancellor Blank repeatedly testified that she would have to go back and look at the documents and could not testify to that level of detail from memory alone.

Specifically, Chancellor Blank testified with respect to the Petition and police reports:

> Q: So what do you recall about the reports – the descriptions in the police reports – that was new information for you.
>
> A: So there were police reports that we did not get at the time, and some of those reports suggested that they did not see a lot of physical evidence of intoxication. Again, that's my recollection of that. I remember there was a case where the testimony at the hearing had been that someone had gone back to the room and vomited, and the police reports said there was no – they did not see or smell any evidence of that it.
>
> So there were a number of police reports that suggested, at least by their observation, the individuals that they interviewed were not completely unable to – to take action, to act normally.
>
> Q: And whose police reports were these? Was this UWPD?
>
> A: This was, I think, Madison Police.
>
> Q: Okay. But you don't recall with more specificity than you just described?
>
> A: *I would have to go back and review the documents.*

(Blank Dep. 200:23-201:20).

> Q: What else have we talked about yet that was in those police reports or videos that helped you make a determination on consent?
>
> Ms. Bachhuber: Objection to foundation. Go ahead.
>
> A: I will go back to my same answer. And as I pointed out here in my report, they also indicated how incomplete the complainant's reports were that we had at the hearing, that there was other information in the police reports that came out presumably at the trial that was certainly available. And that – you asked me why I was willing to overturn the findings of that investigation or that disciplinary hearing. It was very clear that there was additional information. And the police reports added to that sense.

163

Q: Okay. So the question is what is the additional information?

> *Ms. Bachhuber: Object to foundation. You are not showing her the information. Go ahead and answer.*

A: Yeah. I mean, the very fact that they did not give us the full story that they gave the police very soon thereafter is symbolic of the fact that the hearing itself was not complete and therefore makes it easier to say let me – that that is an important piece of why I made the decision to overturn the results of the hearing as well as the other things that you mentioned.

Q: But you didn't just say there's additional information, so that works in [Player 1's] favor. There must have been specific things that –

A: Well, this is additional information that works in the disfavor of the complainants in that they were not telling a full story even though they told their story to the police. The police had information that they were not telling us about.

Q: Right. So going back to the question of what is the information?

> *Ms. Bachhuber: Object to foundation.*

Q: Maybe I will ask a better question. What is the additional information that they provided to the police that they didn't provide to the Title IX?

A: *I would have to go back and look at those police reports and compare them to our – I mean, I just can't testify at that level of detail right now.*

(Blank Dep. 228:2-230:2 (emphasis added)).

Q: Okay. When you say there was additional information that was in the police reports, did you have the impression, from the complainants – did you have the impression that the complainants had withheld information from the university, or did you just have the impression that there was additional information in the police reports?

A: The impression I got was that they did not give as full information in our investigation and that the police had additional information that they could have told us about and

they did not. Not the police. The complainants could have told us about and didn't.

Q: But you don't recall today what that is?

A: *I would have to go back and look at that.*

(Blank Dep. 230:21-231:10 (emphasis added)).

Chancellor Blank's declaration *clarified this ambiguous and confusing testimony* after reviewing the documents Doe's counsel failed to provide her at the deposition, which is specifically permitted under Seventh Circuit precedent. *James v. Hale*, 959 F.3d 307, 317 (7th Cir. 2020) "[B]ecause a deponent may be confused by a question and [her] memory may fail, a judge may also consider an affidavit that contradicts a statement in a deposition if the statement is demonstrably mistaken. We also allow the submission of a supplemental affidavit that clarifies ambiguous or confusing deposition testimony." *Id.* (citations omitted).

It was Doe's counsel's responsibility to provide Chancellor Blank with the information she needed to answer his questions with the level of specificity he was seeking at her deposition, not defense counsel's. Doe's counsel tries to place the blame on defense counsel, claiming defense counsel "could have, but did not, ask questions of Chancellor Blank about any evidence they wanted. Counsel simply decided not to do that." Chancellor Blank's deposition began at 1:25 p.m. and ended at 9:35 p.m. Blank's deposition transcript, at page 315, shows the deposition had been going for 6 hours and 37 minutes,

165

**excluding all of Doe's counsel's breaks. And Doe's counsel continued the deposition using the last of the remaining time allowed under Rule 30(d)(1).**

**Doe failed to meet her burden to establish a clear contradiction where the witness has given "clear answers to unambiguous questions which negate the existence of any genuine dispute of fact." *Castro*, 786 F.3d at 572 (citation omitted).**

**Because Doe cites no evidence to support a *genuine* dispute of fact, the Court should deem the proposed fact undisputed in accordance with the Preliminary Pretrial Packet, *Summary Judgment Procedures* II(C) & (E). Fed. R. Civ. Pro. 56(c) & (e).**

294.   In addition to the videos, Chancellor Blank was also persuaded by some of the exhibits to the petition and the MPD police reports. Based on Chancellor Blank's re-review of the petition, exhibits, and the MPD reports, several pieces of new evidence that guided her decision on the petition for restoration of rights included the following:

    a. Complainant 1's interview with Detective Johnson was transcribed and included with the petition. In the interview, Complainant 1 relayed a conversation she and Doe had after Player 2 and Player 1 had taken the picture of them. Complainant 1 told Detective Johnson that she was speaking with Player 1 and Doe and stated: "I was like [Doe] we're leaving, we're going home, or something, and he was like no, like come

back in 20 minutes. And I was like what do you need 20 minutes for? And she was like sex." (Ex. 143 at 85.)

b. Complainant 1's statement was consistent with Player 1's statement to the police that Doe said to Complainant 1, "Give us 20 minutes. We are about to have sex." (Ex. 142 at 39.)

c. Police interview of Player 1. (Ex. 142 at 37-43.)

d. Police interview of Player 2. (Ex. 142 at 27-30.)

e. Interview of P1.  (Ex. 143 at 149-185; Ex. 142 at 95.)

f. Police interview of Doe. (Ex. 142 at 45-47.)

g. An excerpt of Doe's testimony at the criminal trial. (Blank Dep. Tr. 153:9-14 (Dkt. 93:39).)

h. The text messages between Player 1 and Complainant 1, planning for the meet up. (Blank Dep. Tr. 153:24-155:5 (Dkt. 93:40).)

i. The MPD reports contain a narrative of the videos that is consistent with the clips the Chancellor reviewed. (Blank Decl. ¶ 39.)

(Blank Decl. ¶45; Ex. 142 at 27-30, 37-43, 45-47, 95; Ex. 143 at 85, 141-147, 149-185; Blank Dep. Tr. 153:9-155:5 (Dkt. 93:39-40).)

**RESPONSE:**  Dispute. Chancellor Blank's sworn deposition testimony contradicts paragraph 294 and her sworn Declaration as set forth supra in Plaintiff's Response to UW's Proposed Finding of Fact 293.

Plaintiff additionally disputes that paragraph 294 (a) was "new evidence." During the underlying Title IX investigation, UW had in its

possession the criminal complaint against Player 1. See Criminal Complaint, Exhibit A to Final Investigative Report, Response Exhibit 4 (hereinafter "Criminal Complaint"). In fact, Ms. Hasselbacher included it as Exhibit A to the final Title IX Investigative Report. *Id.*[3]

Additionally UW counsel Rachel Jeris wrote to Player 1's counsel, expressly telling Player 1's counsel that the criminal complaint would be included in the Title IX Investigative Report, as "it is consistent with information that Complainants provided to the University."

Letter from Rachel Jeris dated September 21, 2018, Response Exhibit 5. The criminal complaint had essentially the same information in it that UW now claims is "new."

Specifically, the criminal complaint states:

Comp 1 said she walked up to the side of the bed and pulled Comp 2's arm. Comp 1 said Comp 2's arm "just flopped back down." Det. Olsen asked if Comp 2 pulled her arm away and she said, "no, it just dropped down." Comp 1 said she nudged Comp 2 while telling her to "get up, get up." Det. Olsen asked Comp 1 if Comp 2's eyes were open and she said Comp 2 "looked possessed." Comp 1 clarified that she could see that Comp 2's "eyes rolled back." Comp 1 said **"I could see the whites of her eyes."** Det. Olsen asked if Comp 2 said anything and Comp 1 said "it was hard to understand her. **I think she said "sex." Comp 1 said Comp 2 eyes closed again.** Comp 1 said the defendant yelled at her to "get out." Comp 1 said the defendant yelled to [Player 2] "come get her out of here." Comp 1 said the defendant told her, "come back in 20 minutes."

Criminal Complaint, **Response Exhibit 4** at BOR_002211-12 (emphasis added). The above referenced portion of the complaint is

---

[3] UW Included The Final Investigative Report, dated October 9, 2018, as Exhibit 121, but did not include any of the attachments with it, including Exhibit A. See UW Ex. 121, attached to Declaration of Lauren Hasselbacher.

substantially similar to the transcribed interview upon which UW now relies, post-deposition of Chancellor Blank.

Moreover, UW has omitted the full statement contained in Exhibit 143 at 85-86. The full portion of this statement was as follows: "Okay. So I tried to get [Plaintiff] out and [Plaintiff] was like, and he was like, I was like [Plaintiff] we're leaving, we're going home, or something, and he was like no, like come back in 20 minutes. And I was like what do you need 20 minutes for? And she was like sex. **She was like, her eyes were rolling to the back of her head**. And he's like come back in 20 minutes. He's like get out of my room right now. And then I got mad at [Plaintiff] and I was like are you really going to have sex with someone who just talked to me like that. **And she was like not even responding.**" UW's Ex. 143 at 85 (emphasis added).

Plaintiff additionally disputes paragraph 294 (b) was "new evidence" for the same reasons she disputes paragraph 294 (a) was "new evidence."

Plaintiff additionally disputes paragraph 294 (c) was "new evidence," as UW provides no explanation for what the "new evidence" was in paragraph 294 (c).

Plaintiff additionally disputes paragraph 294 (f) was "new evidence," as Plaintiff's police interview was so similar to her interview with Ms. Hasselbacher that it is unclear what UW could consider "new evidence," from her interview with the police department. Compare Doe Police Interview, BOR_021359-BOR_021361, and Doe Hasselbacher Interview, BOR_019743-

019746, Response Exhibit 6. Defendant UW's paragraph 294 (f) provides no description of the information within the police interview of Player 1 that it considered "new."

Plaintiff additionally disputes paragraph 294 (g) was "new evidence." The excerpt of Doe's testimony at the criminal trial concerned the text message which was attached as Exhibit G to the Final Title IX Investigative Report. See Text Messages, Exhibit G to Investigative Report, Response Exhibit 7.

Plaintiff additionally disputes paragraph 294 (h) was "new evidence." The text messages included as Exhibit 9 to the Petition for Restoration (see Ex. 143 at 140-147) were substantially similar to the information contained in the Criminal Complaint, Exhibit A to the Final Investigative Report, wherein Complainant 1 described the communications with Player 1 prior to the assaults. See Criminal Complaint, **Response Exhibit 4** at page 2, second full paragraph.

**REPLY: Doe's objection to Chancellor Blank's declaration is without merit as set forth in the Board's reply to its proposed fact number 293. Doe cites no evidence to support a *genuine* dispute of fact for the remainder of the proposed fact subparts, so the Court should deem the proposed fact undisputed in accordance with the preliminary pretrial packet, *Summary Judgment Procedures* II(C), (D), & (E). Fed. R. Civ. Pro. 56(c) & (e). The Board will reply to each subpart as Doe has outlined:**

**294(a): The Board objects to Doe's response because Doe failed to genuinely dispute the fact and there is no "Response Exhibit 4" attached Plaintiff's Response to the Defendant's Proposed Findings of Fact. (Dkt. 147). Although snippets of Complainant 1's interview with the police detective were included in the criminal complaint, the fully transcribed interview was brand new information to UW-Madison. (*Compare* Lathrop Decl. Ex. 128 at 454-458 (dkt. 106-7:54-58), *with* Blank Decl. Ex. 143 at 74-129 (dkt. 112-10:74-129)). The criminal complaint just indicated Doe said the word "sex" with no context. Complainant 1's transcribed police statement was the first time UW-Madison learned that the word "sex" was Doe's answer to Complainant 1's question "[W]hat do you need 20 minutes for?" (Blank Decl. Ex. 143 at 85 (dkt. 112-10:85)). And this was *consistent with Player 1's statement to the police on April 22, 2018*. Both Player 1 and Complainant 1 told the police that Doe said she needed 20 minutes for sex. (Ex. 143 at 85 (dkt. 112-10:85); Ex. 142 at 39 (dkt. 112-9:39)). The Court should deem this subpart undisputed.**

**294(b): The Board objects to Doe's response because Doe failed to genuinely dispute the fact. The point of the quoted portion of Player 1's statement to the police is that it was**

*consistent with Complainant 1's statement to the police on April 22, 2018.* Both Player 1 and Complainant 1 told the police that Doe said she needed 20 minutes for sex. (Ex. 143 at 85 (dkt. 112-10:85); Ex. 142 at 39 (dkt. 112-9:39)). The Board also incorporates its response to subpart 294(a). The Court should deem this subpart undisputed.

294(c): The Board objects to Doe's cursory dispute because she failed to cite any evidence to support it. Player 1's statement to the police was brand new information to UW-Madison. Player 1 did not participate in an interview with the Title IX coordinator, nor did he testify at the hearing. Doe does not dispute the fact that Player 1 did not participate in an interview, nor does she dispute that Player 1 did not testify at the hearing. (Pl's Resp. to DPFOF ¶¶ 97 & 186 (dkt. 147:26-27, 50 (undisputed)); (Hasselbacher Decl. ¶ 60 (dkt. 102:13), Ex. 159 (dkt. 102-19); Lathrop Decl. Ex. 151 (███████ 3 at 00:45-01:40) (dkt. 106-10).). This was the first time UW-Madison saw Player 1's statements about what happened in his off-campus apartment on April 21-22, 2018. The Court should deem this subpart undisputed.

294(d): Doe failed to respond to this subpart, so the Court should deem this subpart undisputed.

294(e): Doe failed to respond to this subpart, so the Court should deem this subpart undisputed.

294(f): Doe failed to genuinely dispute that Doe's statement to the police was new evidence that UW-Madison had previously been unable to access. It is undisputed that UW-Madison was unable to collect the City of Madison Police Reports during the nonacademic misconduct investigation. (Pl's Resp. to DPFOF ¶ 100 (dkt. 147:27-28); Hasselbacher Decl. ¶ 63 (dkt. 102:14).) The Court should deem this subpart undisputed.

294(g): Doe failed to genuinely dispute that the trial transcript excerpt of her testimony was brand new evidence for UW-Madison. (Blank Decl. Ex. 143 at 131-139 (Dkt. 112-10:131-139).) The Court should deem this subpart undisputed.

294(h): Doe failed to genuinely dispute that the text messages attached to Player 1's petition were never provided to UW-Madison in the underlying nonacademic misconduct investigation. The text messages are very different than the information in the criminal complaint. (*Compare* Blank Decl. Ex. 143 at 140-147 (dkt. 112-10:140-147), *with* Lathrop Decl. Ex. 128 at 454-458 (dkt. 106-7:54-58).)

294(i): Doe failed to respond to this subpart, so the Court should deem this subpart undisputed.

**Because Doe failed cite evidence to genuinely dispute the proposed fact, the Court should deem the proposed fact undisputed. Fed. R. Civ. Pro. 56(c) & (e).**

295.    Chancellor Blank determined that based upon her review of the totality of the evidence, there was no longer a preponderance of the evidence that Player 1 had committed third-degree sexual assault. (Blank Decl. ¶46; Ex. 146 at 4-5; Blank Dep. Tr. 235:14-21, 237:1-7 (Dkt. 93:60).)

> **RESPONSE:**   Dispute. Plaintiff admits that Chancellor Blank's Restoration Decision states, "The level of ambiguity created by these conflicting accounts is, practically speaking, incapable of resolution. As a result the evidence falls short of the preponderance of the evidence standard required to find the Petitioner responsible for sexual assault." UW Ex. 146 at 4. Plaintiff denies that the decision was based on a review of the totality of the evidence, as UW never allowed Plaintiff or her counsel to review the petition or to participate in the petition process. See PPFF ¶¶ 225-231. Plaintiff additionally disputes that the decision was based on so-called "new evidence." See supra Response to ¶ 294. Plaintiff additionally asserts that the decision was based on Player 1's football player status. See PPFF ¶¶ 137-166, 203-209.

> **REPLY:  The Board objects to Doe's response because it does not genuinely dispute the proposed fact and because she failed to properly cite evidence in support of her purported**

dispute in accordance with the Preliminary Pretrial Packet, *Summary Judgment Procedures* II(C) & (E). Procedure II(E)(1) allows a party to use evidence in the form described in Procedure I(C)(1)(a)-(f). Procedure I(C)(1)(a)-(f) does not include citations to other proposed facts as a form of evidence. Here, Doe cites 44 of her own proposed facts, and again places the burden on defense counsel and the Court to find the cited evidence for 44 proposed facts to determine whether the evidence supports the dispute. For this reason, alone, the Court should disregard Doe's response and deem the proposed fact undisputed. Fed. R. Civ. Pro. 56(c) & (e); Preliminary Pretrial Packet, *Summary Judgment Procedures* II(C) & (E).

To the extent the Court overrules the Board's objection, this is an immaterial dispute because Doe failed to point to any admissible evidence of what Doe would have submitted to Chancellor Blank had she been given an opportunity to "review the petition or to participate in the petition process." *Drake v. Minnesota Min. & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted." (citation

omitted)). Neither UWS 17.18, Title IX, VAWA, or the Clery Act. *See* Wis. Admin. Code. § UWS 17.18 (Register June 2016 No. 726); 20 U.S.C. § 1681(a); 20 U.S.C. § 1092(f)(14) ("Nothing in this subsection may be construed to … establish a standard of care."); 34 C.F.R. § 668.46(k); *Doe v. Syracuse Univ.*, 440 F. Supp. 3d 158, 176–77 n.10 (N.D.N.Y 2020); *Z.J. v. Vanderbilt Univ.*, 335 F. Supp. 3d 646, 703–04 (M.D. Tenn. 2018); *Doe v. United States Dep't of Health and Human Servs.*, 85 F. Supp. 3d 1, 4 (D.D.C. 2015); *United States v. Morrison*, 529 U.S. 598, 627, 120 S. Ct. 1740, 1759 (2000). As for Doe's reference to the "new evidence" and proposed fact number 294, Doe failed to genuinely dispute that fact for the reasons set forth in the Board's above reply to ¶ 294.

Finally, Doe "asserts" that the decision was based on Player 1's status as a football player. But Chancellor Blank knew Player 1 was a football player when she upheld his expulsion. (Blank Decl. Ex. 140 at 16.) In any event, this is an immaterial dispute because both men and women play college football, and there is no rule precluding a woman from being part of the UW-Madison football team. (Hoechst Decl. Ex. 166-169 (dkt. 140-1, 140-2, 140-3, 140-4); Smith Decl. ¶¶ 7-8 (dkt. 117:2-3).). Since at least 1998, no women have tried out for the football team at UW-Madison. (Smith Decl. ¶¶ 4, 7 (dkt. 117:2-3).). Doe's evidence

**purporting to show bias in favor of football players—like evidence purporting to show bias in favor of sexual-misconduct victims—is irrelevant under the law. 20 U.S.C. § 1681(a); *see Johnson v. Marian Univ.*, 829 F. App'x 731, 732-33 (7th Cir. 2020); Fed. R. Evid. 401-402. There is no evidence that Blank made the decision to readmit Player 1 "on the basis of sex." 20 U.S.C. § 1681(a). What matters under Title IX is bias based on sex. And there is no evidence of that in this case.**

296.    Chancellor Blank concluded that a preponderance of the available evidence did, however, show that Player 1 had sexually harassed Doe (Complainant 2) by enlisting Player 2 to photograph the Complainants without their consent. Player 1's instigation of photographing the Complainants in his bedroom represented behavior that violated the nonacademic misconduct code prohibiting sexual harassment because it was an invasion of privacy and was hostile, intimidating, and offensive. (Blank Decl. ¶47; Ex. 146, at 5.)

> **RESPONSE:** Dispute. . Additionally, as set forth in Plaintiff's Proposed Findings of Fact in support of Plaintiff's Motion for Summary Judgment, the Title IX Finding did not find Player 1 responsible for taking photographs of Plaintiff under the criminal code as there was insufficient evidence. See PPFF ¶ 106. Also, as set forth in paragraph 251 of the PPFF, Chancellor Blank testified as follows:
>
> Q: But, nonetheless, you found him responsible for a sexual harassment charge that he hadn't actually been charged with?

…

A: He had clearly been under discussion about the picture. And there was clearly subsequent evidence that he was involved in the picture. And therefore we found him guilty of being involved with the picture, which was sexual harassment.

Q: Even though he had been cleared of that at the hearing?
…

A: There's further evidence of that that [sic] he subsequently admitted to being involved.

Q: When was that evidence admitted?

A: I believe it was part of the police report. I would have to go back and doublecheck that.

Q: When was that? During the Petition for Restoration?

…

A: No. I believe this was something that happened outside of that, and I honestly would have to go back and look up, but I do know that there was evidence that he actually admitted to this—

Q: Okay.

A: It says here, "Following the petitioner's original denial to police, petitioner eventually admitted in a police interview and at trial that he took steps to document his sexual interaction with the complainants, including eliciting the assistance of a friend to photograph the women in a vulnerable state and without their consent.

Q: Okay. So in the Petition for Restoration, you not only can overturn previous findings of responsibility, you can add new findings of responsibility?

…

A: I clearly did so, and it was acceptable.

Blank Dep. [Doc. 93 at 258:22-260:23].

**REPLY: The Board objects to Doe's response because the quoted testimony omits the valid objections of counsel (each ellipsis is an omitted objection) and is inappropriately quoted**

as if no objections were made. The Court should disregard the proposed fact for this reason alone and instead sustain the objections.

Further objection because Assistant Dean Cox's determination finding Player 1 not responsible for violation of criminal law related to the photograph (because Doe was covered at the time the photograph was taken) is irrelevant. Fed. R. Evid. 401-402. Under UWS 17.13, Chancellor Blank reviewed the *hearing committee's decision* on the nonacademic misconduct, which she affirmed in March 2019. (Blank Decl. Ex. 140 at 3-4 (dkt. 112-7:3-4) UWS 17.13 states that a "respondent may appeal in writing to the chief administrative officer (the chancellor) within 14 days of the date of the written decision to review the decision of the hearing examiner or committee, based upon the record." Wis. Admin. Code. § UWS 17.13 (Register June 2016 No. 726). The hearing committee on the nonacademic misconduct charges found Player 1 responsible for sexual harassment based on "*the actions of the Respondent on April 21-22, 2018.*" (Lathrop Decl. Ex. 128 at 9 (dkt. 106-1:9) (emphasis added).). It is undisputed that Chancellor Blank found there was sufficient evidence (using the preponderance of the evidence standard) to support the hearing committee's conclusion that

**Player 1 sexually harassed Doe. (Pl's Resp. to DPFOF ¶ 227 (dkt. 147:59) (undisputed)).**

**Doe's cited evidence does not *genuinely* dispute the proposed fact, and the Court should deem this fact undisputed. Fed. R. Civ. Pro. 56(c) & (e); Preliminary Pretrial Packet, *Summary Judgment Procedures* II(C) & (E).**

297.    Chancellor Blank concluded the suspension from March 13-August 19, 2019 was an appropriate punishment for the sexual harassment violation, and the impact of that suspension was that Player 1 lost an entire semester worth of credits. (Blank Dep. Tr. 262:11-25 (Dkt. 93:67).)

> **RESPONSE:**    Dispute. The sexual harassment violation was purportedly based on Player 1's role in photographing the Complainants, which had been dismissed in the Title IX Findings. *See supra* Response to ¶ 296.

> **REPLY: The Board objects to the use of "Title IX Finding." Wis. Admin. Code § UWS 17.11 governs Cox's role in the disciplinary procedure that UW-Madison followed.  Cox made a "determination" under § UWS 17.11(4)(c)(2), which automatically proceeds to a hearing on the recommendation.**

> **The Board further objects to Doe's response because Assistant Dean Cox's determination finding Player 1 not responsible for violation of criminal law related to the**

180

photograph (because Doe was covered at the time the photograph was taken) is irrelevant. Fed. R. Evid. 401-402. Under UWS 17.13, Chancellor Blank reviewed the *hearing committee's decision* on the nonacademic misconduct, which she affirmed in March 2019. (Blank Decl. Ex. 140 at 3-4 (dkt. 112-7:3-4) UWS 17.13 states that a "respondent may appeal in writing to the chief administrative officer (the chancellor) within 14 days of the date of the written decision to review the decision of the hearing examiner or committee, based upon the record." Wis. Admin. Code. § UWS 17.13 (Register June 2016 No. 726). The hearing committee on the nonacademic misconduct charges found Player 1 responsible for sexual harassment based on "*the actions of the Respondent on April 21-22, 2018.*" (Lathrop Decl. Ex. 128 at 9 (dkt. 106-1:9) (emphasis added).). It is undisputed that Chancellor Blank found there was sufficient evidence (using the preponderance of the evidence standard) to support the hearing committee's conclusion that Player 1 sexually harassed Doe. (Pl's Resp. to DPFOF ¶ 227 (dkt. 147:59) (undisputed)).

Further objection because Doe cites no evidence to support her dispute and she failed to address the portion of the

181

fact related to Player 1's suspension and the impact of that suspension.

Because Doe's response to DPFOF ¶ 296 does not *genuinely* dispute this proposed fact (DPFOF ¶ 297), the Court should deem this fact undisputed. Fed. R. Civ. Pro. 56(c) & (e); Preliminary Pretrial Packet, *Summary Judgment Procedures* II(C) & (E).

298. Chancellor Blank's decision also admonished Player 1 for misrepresenting his disciplinary history with the University as well as cautioned Player 1 that any additional misconduct while a student would likely result in additional serious disciplinary action. (Blank Dep. Tr. 291:1-13 (Dkt. 93:74).)

RESPONSE: Dispute. This paragraph omits that the Chancellor also noted in her Restoration Decision, "I am also troubled by the fact that the Petitioner **lied to police as part of the investigation of the incidents associated with this petition** . . .." (Emphasis added). UW's Ex. 146 at 6-7.

REPLY: Immaterial dispute—the Board does not dispute that Chancellor Blank's decision also contains the quoted language.

299. Chancellor Blank's decision granting Player 1's petition readmitted Player 1 to UW-Madison effective that day (August 19, 2019). (Blank Decl. ¶48; Ex. 146, at 7.)

**RESPONSE:** Plaintiff admits that UW Ex. 146 states Player 1 was readmitted to UW-Madison on August 19, 2019.

**REPLY: Undisputed.**

300. Chancellor Blank's decision specifically kept in place the no-contact directive between Player 1 and Doe: "The no-contact directives issued to the Petitioner prohibiting contact with the Complainants remain in effect." (Blank Decl. ¶49; Ex. 146, at 7.)

**RESPONSE:** Plaintiff admits that UW Ex. 146 states the above.

**REPLY: Undisputed.**

301. Chancellor Blank noted that her decision to readmit was without regard to Player 1's status as a student athlete because his readmission to UW-Madison was separate and independent from his future status as a student athlete, which depended on actions by the NCAA and other applicable governing bodies. (Blank Decl. ¶50; Ex. 146, at 7; Blank Dep. Tr. 254:4-11 (Dkt. 93:65).)

**RESPONSE:** Plaintiff admits that UW Ex. 146 states the above. Plaintiff disputes the accuracy of this statement, however, as Chancellor Blank's Restoration Decision was based on Player 1's status as a football player. See PPFF ¶¶ 137-166, 196-216.

**REPLY: The proposed fact is undisputed. Doe's reference to *58* of her proposed facts should be disregarded by the Court in accordance with the Preliminary Pretrial Packet, *Summary Judgment Procedures* II(C) & (E). Procedure II(E)(1) allows a**

party to use evidence in the form described in Procedure I(C)(1)(a)-(f). Procedure I(C)(1)(a)-(f) does not include citations to other proposed facts as a form of evidence.

The Board further objects because Doe cites no evidence to assert that Player 1 was a football player *at the time of Chancellor Blank's petition decision*. Player 1 was not even a student at UW-Madison at the time of the petition decision because he was expelled, much less a football player for UW-Madison. (April 8, 2022, Blank Decl. ¶¶ 25, 48, 50 (dkt. 112:6, 12)). Indeed, Doe does not dispute the Board's proposed facts relating to Player 1's return to the football team, including the fact that he was deemed eligible for the team on August 23, 2019. (Dkt. 147:96-98, ¶¶ 314-320).

To the extent the Court overrules the Board's objection and considers Doe's attempted dispute, this is an immaterial dispute because both men and women play college football, and there is no rule precluding a woman from being part of the UW-Madison football team. (Hoechst Decl. Ex. 166-169 (dkt. 140-1, 140-2, 140-3, 140-4); Smith Decl. ¶¶ 7-8 (dkt. 117:2-3).). Since at least 1998, no women have tried out for the football team at UW-Madison. (Smith Decl. ¶¶ 4, 7 (dkt. 117:2-3).). Doe's evidence purporting to show bias in favor of football players—like

**evidence purporting to show bias in favor of sexual-misconduct victims—is irrelevant under the law. 20 U.S.C. § 1681(a); *see Johnson v. Marian Univ.*, 829 F. App'x 731, 732-33 (7th Cir. 2020); Fed. R. Evid. 401-402. Chancellor Blank knew Player 1 was a football player when she upheld the expulsion on March 13, 2019. (Blank Decl. ¶¶ 17, 20 (dkt. 112:5), Ex. 140 (dkt. 112-7)). There is no evidence that Blank made the decision to readmit Player 1 "on the basis of sex." 20 U.S.C. § 1681(a). What matters under Title IX is bias based on sex. And there is no evidence of that in this case.**

302.    Chancellor Blank would not have been surprised if Player 1 decided he was not going to stay and play football at UW-Madison. (Blank Dep. Tr. 254:4-11 (Dkt. 93:65).)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

303.    Chancellor Blank's decision noted that she did not make the decision lightly to reverse the sexual assault charges, and that she was aware of the challenges that complainants face in reporting sexual violence and the additional difficulty of participating in court and administrative proceedings and establishing evidence sufficient to meet the various burdens of proof to hold respondents accountable. (Blank Dec. ¶51; Ex. 146, at 7.)

**RESPONSE:** Dispute. Exhibit 146 at 7 does not contain the above-referenced statement.

**REPLY: The Board acknowledges that it cited the wrong page of the decision, which should be page 5 of Exhibit 146. (Dkt. 112-12:5.) Doe failed to address the fact that Chancellor Blank's declaration paragraph 51 also contains this information (Dkt. 112:12, ¶ 51), so her response does not genuinely dispute the proposed fact and the Court should deem it undisputed. Fed. R. Civ. Pro. 56(c) & (e); Preliminary Pretrial Packet, *Summary Judgment Procedures* II(C) & (E).**

304.   Chancellor Blank based her decision on the information gathered during the nonacademic misconduct proceeding and disciplinary hearing and the additional information that was presented in connection with the petition and gathered by the Office of Legal Affairs, and determined there was not a preponderance of the evidence that Player 1 had committed third-degree sexual assault. (Blank Dec. ¶51; Ex. 146, at 5.)

**RESPONSE:** Dispute. Exhibit 146 at 5 does not contain the above-referenced statement. Additionally, Plaintiff disputes that Chancellor Blank's decision was based on the factors cited in this paragraph, but was instead based on Football Player 1's status as a football player. See PPFF ¶¶ 137-166, 196-216. See also Plaintiff's response to ¶¶ 293, 294

infra regarding Chancellor Blank's deposition testimony and also the so-called "new evidence," much of which was not new at all.

**REPLY:  The Board acknowledges that page 4 of Exhibit 146 contains the information in the fact and should have been the page cited. (Dkt. 112-12:4.) Doe did not address the fact that most of this information is also contained in paragraph 51 of Chancellor Blank's declaration. (Dkt. 112:12, ¶ 51.)**

**The Board objects to Doe's purported dispute because she failed to properly cite evidence in support of it in accordance with the Preliminary Pretrial Packet, *Summary Judgment Procedures* II(C) & (E). Procedure II(E)(1) allows a party to use evidence in the form described in Procedure I(C)(1)(a)-(f). Procedure I(C)(1)(a)-(f) does not include citations to other proposed facts as a form of evidence.**

**The Board further objects because Doe cites no evidence to assert that Player 1 was a football player *at the time of Chancellor Blank's petition decision.* Player 1 was not even a student at UW-Madison at the time of the petition decision because he was expelled, much less a football player for UW-Madison. (April 8, 2022, Blank Decl. ¶¶ 25, 48, 50 (dkt. 112:6, 12)). Indeed, Doe does not dispute the Board's proposed facts relating to Player 1's return to the football team, including the fact that**

he was deemed eligible for the team on August 23, 2019. (Dkt. 147:96-98, ¶¶ 314-320).

To the extent the Court overrules the Board's objection, this is an immaterial dispute because both men and women play college football, and there is no rule precluding a woman from being part of the UW-Madison football team. (Hoechst Decl. Ex. 166-169 (dkt. 140-1, 140-2, 140-3, 140-4); Smith Decl. ¶¶ 7-8 (dkt. 117:2-3).). Since at least 1998, no women have tried out for the football team at UW-Madison. (Smith Decl. ¶¶ 4, 7 (dkt. 117:2-3).). Doe's evidence purporting to show bias in favor of football players—like evidence purporting to show bias in favor of sexual-misconduct victims—is irrelevant under the law. 20 U.S.C. § 1681(a); *see Johnson v. Marian Univ.*, 829 F. App'x 731, 732-33 (7th Cir. 2020); Fed. R. Evid. 401-402. Chancellor Blank knew Player 1 was a football player when she upheld the expulsion on March 13, 2019. (Blank Decl. ¶¶ 17, 20 (dkt. 112:5), Ex. 140 (dkt. 112-7)); *see, also,* Def's Reply to DPFOF ¶¶ 293-294. There is no evidence that Blank made the decision to readmit Player 1 "on the basis of sex." 20 U.S.C. § 1681(a). What matters under Title IX is bias based on sex. And there is no evidence of that in this case.

305.    The same day the petition was granted, UW-Madison notified Doe of the change in the disciplinary outcome, as required by UWS 17.18, by sending the Chancellor's decision to Doe via email. (Doe Dep. Tr. 110:15-11:14 (Dkt. 97:29); Doe Dep. Ex. 3 at 682-689 (Dkt. 97-7:107-114).)

> **RESPONSE:**  Defendant's Proposed Finding of Fact 305 includes a purported statement of law, not fact, and therefore does not warrant a factual response. Plaintiff admits that UW-Madison sent her an email on August 19, 2019, regarding the Chancellor's decision granting the petition.

> **REPLY: Undisputed.**

306.    Doe received the August 19, 2019, email and decision on Player 1's petition at some point between 9:31 a.m. (when UW-Madison emailed it to Doe) and 9:36 a.m. (when Doe forwarded the decision to her father). (Doe Dep. Tr. Vol. I at 110:15-111:20 (Dkt. 97:29); Doe Dep. Ex. 3 at 682-689, 821 (Dkt. 97-7:107-114, Dkt. 97-9:16).)

> **RESPONSE:** Admit.

> **REPLY: Undisputed.**

307.    Three days later, on August 22, 2019, Attorney John Clune sent Vice Chancellor Ray Taffora a notice of retainer and demand for preservation of information to UW-Madison on behalf of his clients Doe and Complainant 1. (Taffora Dep. Tr. 33:16-34:5, Ex. 1.)

> **RESPONSE:** Admit.

189

**REPLY:  Undisputed.**

308.   At her deposition, Doe testified she does not know what additional information she would have submitted had she been given an opportunity to submit additional evidence in response to Player 1's petition for restoration of rights, except an Instagram message she received after the criminal trial from a woman that lived in Atlanta. (Doe Dep. Tr. Vol. I at 125:7-21 (Dkt. 97:32), Doe Dep. Ex. 4 at 188 (Dkt. 97-11:81), Doe Dep. Tr. Vol II, at 167:3-168:22 (Dkt. 99:2).)

> **RESPONSE:**  Plaintiff admits that she testified, "I'm not exactly sure what I would have submitted, but relevant stuff to the case that I got was in my favor." Doe Dep. [Doc. 199 at 167: 3-9]. Additionally, Plaintiff refers to paragraphs 1 and 3-5 of her Responsive Proposed Statement of Fact regarding Attorney Bogost's declaration on this issue.

> **REPLY:   The proposed fact is undisputed. The Board objects to Doe's reference to her responsive proposed statement of facts, instead of citing Bogost's declaration on this issue because it violates the Court's procedures on summary judgment. Preliminary Pretrial Packet, *Summary Judgment Procedures* II(C) & (E). Procedure II(E)(1) allows a party to use evidence in the form described in Procedure I(C)(1)(a)-(f). Procedure I(C)(1)(a)-(f) does not include citations to other proposed facts as a form of evidence.**

The Board further objects to Bogost's declaration testimony as inadmissible hearsay, speculation, and lacking foundation to offer an expert opinion on toxicology. Fed. R. Evid. 602, 701-703, 801-802; *Drake v. Minnesota Min. & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted." (citation omitted)). Bogost further failed to explain why she did not submit the "additional evidence" at the time of the investigation and nonacademic misconduct hearing.

Indeed, Bogost and Doe *could have* submitted the toxicology report or SANE forensic nurse examination record (which would also contain the toxicology lab results) at any time by requesting the examination record using the link Hasselbacher provided to Sathasivam in an email on June 19, 2018. (Hasselbacher Decl. Ex. 113 at 55 (dkt. 102-3:55)). Hasselbacher followed up with Sathasivam about her request for Doe's SANE forensic nurse report again on July 26, 2018. (Hasselbacher Decl. Ex. 113 at 63 (dkt. 102-3:63)). Complainant 1 produced her SANE nurse examination before the final investigative report was issued (but redacted the information

about the results of the urinalysis). (Hasselbacher Decl. ¶ 115
(dkt. 102:25); Lathrop Decl. Ex. 128 at 580-81 (dkt. 106-8:50-51);
Lathrop Decl. Ex. 128 at 577-626 (dkt. 106-8:47-72; dkt. 106-9:1-
24)). Doe testified at her deposition she was "Not entirely sure
what extra evidence I had" to submit at the petition stage. (Doe
Dep. Tr. Vol. II at 168:3-19 (dkt. 99:2)). As for the forensic nurse
examination report, when Doe was asked whether she would
have submitted her forensic nurse examination report at the
petition stage, if given an opportunity, Doe responded,
"Possibly." When asked under what circumstances would she
*not* have submitted it, Doe responded "I'm not sure. It would
depend on the situation." (Doe Dep. Tr. Vol. II at 168:3-14 (dkt.
99:2)).

Because Doe does not genuinely dispute the proposed fact,
it should be deemed undisputed. Fed. R. Civ. Pro. 56(c) & (e).

### Communications and media reports about the petition

309.   Player 1's acquittal and his petition for restoration of rights to UW-
Madison was covered by local and national media outlets, as well as on social media.
(Blank Dep. Ex. 31, Ex. 32, Ex. 33 (Dkt. 93-31, Dkt. 93-32, Dkt. 93-33).)

RESPONSE: Admit.

REPLY: Undisputed.

310.    The Chancellor's email accounts received many emails from the public, as well as from UW-Madison alumni, donors, employees, and students about Player 1's petition, asking the Chancellor to grant it or deny it for many different reasons. (Blank Dep. Tr. 249:24-250:11, 272:16-275:12, 301:20-303:25, 304:1-305:2 (Dkt. 93:63-64, 69-70, 76-77), Ex. 14, Ex. 17, Ex. 27, Ex. 28 (Dkt. 93-14, Dkt. 93-17, Dkt. 93-27, Dkt. 93-28).)

RESPONSE: Admit.

REPLY: Undisputed.

311.    The Chancellor's decision on Player 1's petition was not based on the number of people for or against Player 1's readmission, social media posts, or letters from folks she did not know. (Blank Dep. Tr. 308:5-7 (Dkt. 93:78).)

RESPONSE: Dispute. The Chancellor's decision based on Football Player 1's status as a football player. See PPFF ¶¶ 137-166, 196-216.

REPLY: The Board objects to Doe's response because it is not responsive to the proposed fact. The Board further objects because Doe failed to cite evidence in support of her dispute in accordance with the Preliminary Pretrial Packet, *Summary Judgment Procedures* II(C) & (E). Procedure II(E)(1) allows a party to use evidence in the form described in Procedure I(C)(1)(a)-(f). Procedure I(C)(1)(a)-(f) does not include citations to other proposed facts as a form of evidence. Rather than following the Court's procedures and citing evidence in the

record in the form required under Procedure I(C)(1)(a)-(f), Doe cites 58 of her own proposed findings of fact and places the burden on defense counsel and the Court to go and find the cited evidence in the record for those 58 proposed facts to determine whether the evidence supports the dispute. For this reason, alone, the Court should disregard Doe's response and deem the proposed fact undisputed. Preliminary Pretrial Packet, *Summary Judgment Procedures* II(C) & (E); Fed. R. Civ. Pro. 56(c) & (e).

The Board further objects because Doe cites no evidence to assert that Player 1 was a football player *at the time of Chancellor Blank's petition decision.* Player 1 was not even a student at UW-Madison at the time of the petition decision because he was expelled, much less a football player for UW-Madison. (April 8, 2022, Blank Decl. ¶¶ 25, 48, 50 (dkt. 112:6, 12)). Indeed, Doe does not dispute the Board's proposed facts relating to Player 1's return to the football team, including the fact that he was deemed eligible for the team on August 23, 2019. (Dkt. 147:96-98, ¶¶ 314-320).

To the extent the Court overrules the Board's objection, this is an immaterial dispute because both men and women play college football, and there is no rule precluding a woman from

194

**being part of the UW-Madison football team. (Hoechst Decl. Ex.**
**166-169 (dkt. 140-1, 140-2, 140-3, 140-4); Smith Decl. ¶¶ 7-8 (dkt.**
**117:2-3).). Since at least 1998, no women have tried out for the**
**football team at UW-Madison. (Smith Decl. ¶¶ 4, 7 (dkt. 117:2-3).).**
**Doe's evidence purporting to show bias in favor of football**
**players—like evidence purporting to show bias in favor of**
**sexual-misconduct victims—is irrelevant under the law. 20**
**U.S.C. § 1681(a); *see Johnson v. Marian Univ.*, 829 F. App'x 731,**
**732-33 (7th Cir. 2020); Fed. R. Evid. 401-402. Chancellor Blank**
**knew Player 1 was a football player when she upheld the**
**expulsion on March 13, 2019. (Blank Decl. ¶¶ 17, 20 (dkt. 112:5),**
**Ex. 140 (dkt. 112-7)). There is no evidence that Blank made the**
**decision to readmit Player 1 "on the basis of sex." 20 U.S.C. §**
**1681(a).  What matters under Title IX is bias based on sex. And**
**there is no evidence of that in this case.**

312.    The Chancellor understood that no matter what she decided on Player
1's petition for restoration of rights, she was going to get criticized. So the Chancellor
did what she thought was the right thing. (Blank Dep. Tr. 308:8-14 (Dkt. 93:78).)

   **RESPONSE:**  Dispute. The Chancellor's decision was based on Football
   Player 1's status as a football player. See PPFF ¶¶ 137-166, 196-216.

   **REPLY:  The Board objects to the response because Doe**
   **failed to cite evidence in support of her dispute in accordance**

with the Preliminary Pretrial Packet, *Summary Judgment Procedures* II(C) & (E). Procedure II(E)(1) allows a party to use evidence in the form described in Procedure I(C)(1)(a)-(f). Procedure I(C)(1)(a)-(f) does not include citations to other proposed facts as a form of evidence. Rather than following the Court's procedures and citing evidence in the record in the form required under Procedure I(C)(1)(a)-(f), Doe cites 58 of her own proposed findings of fact and places the burden on defense counsel and the Court to go and find the cited evidence in the record for those 58 proposed facts to determine whether the evidence supports the dispute. For this reason, alone, the Court should disregard Doe's response and deem the proposed fact undisputed. Preliminary Pretrial Packet, *Summary Judgment Procedures* II(C) & (E); Fed. R. Civ. Pro. 56(c) & (e).

The Board further objects because Doe cites no evidence to assert that Player 1 was a football player *at the time of Chancellor Blank's petition decision.* Player 1 was not even a student at UW-Madison at the time of the petition decision because he was expelled, much less a football player for UW-Madison. (April 8, 2022, Blank Decl. ¶¶ 25, 48, 50 (dkt. 112:6, 12)). Indeed, Doe does not dispute the Board's proposed facts relating to Player 1's return to the football team, including the fact that

he was deemed eligible for the team on August 23, 2019. (Dkt. 147:96-98, ¶¶ 314-320).

To the extent the Court overrules the Board's objection, this is an immaterial dispute because both men and women play college football, and there is no rule precluding a woman from being part of the UW-Madison football team. (Hoechst Decl. Ex. 166-169 (dkt. 140-1, 140-2, 140-3, 140-4); Smith Decl. ¶¶ 7-8 (dkt. 117:2-3).). Since at least 1998, no women have tried out for the football team at UW-Madison. (Smith Decl. ¶¶ 4, 7 (dkt. 117:2-3).). Doe's evidence purporting to show bias in favor of football players—like evidence purporting to show bias in favor of sexual-misconduct victims—is irrelevant under the law. 20 U.S.C. § 1681(a); *see Johnson v. Marian Univ.*, 829 F. App'x 731, 732-33 (7th Cir. 2020); Fed. R. Evid. 401-402. Chancellor Blank knew Player 1 was a football player when she upheld the expulsion on March 13, 2019. (Blank Decl. ¶¶ 17, 20 (dkt. 112:5), Ex. 140 (dkt. 112-7)). There is no evidence that Blank made the decision to readmit Player 1 "on the basis of sex." 20 U.S.C. § 1681(a). What matters under Title IX is bias based on sex. And there is no evidence of that in this case.

313.    Ultimately, both sides (Doe and Player 1) sued the Chancellor and the Board of Regents, and both cases are pending before this Court. (*See* Dkt. 26; *see, also,* ███ *v. Board of Regents, et al.*, Case No. 21-CV-126 (W.D. Wis.).

RESPONSE:  Admit.

REPLY:  Undisputed.

## Player 1's return to the football team

314.    Player 1's readmission to UW-Madison did not make him automatically eligible to participate in the 2019-2020 football season at UW-Madison; rather, his participation in the football season at UW-Madison depended on Coach Paul Chryst's approval, as well as eligibility determinations governed by the NCAA Bylaws and Big Ten Conference Rules. (Smith Decl. ¶10; Ex. 146, at 7.)

RESPONSE:  Admit.

REPLY:  Undisputed.

315.    At the time of Player 1's readmission, there was one regulation that made him ineligible to compete in the 2019-2020 UW-Madison football season, NCAA Bylaw 14.4.3.1, which required him to have completed six credit hours in the previous spring semester and eighteen credit hours over the 2018-2019 school-year. (Smith Decl. ¶¶-17; Ex. 150, at 174-75.)

RESPONSE:  Admit.

REPLY:  Undisputed.

316.    Since Player 1 was expelled from the institution on March 13, 2019, he had completed zero credits of academic coursework during the spring 2019 semester

and did not reach a minimum of 18 credits for the 2018-2019 academic year. Thus, he was ineligible to play pursuant to NCAA Bylaw 14.4.3.1. (Smith Decl. ¶19.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

317.   In order to be found eligible for the 2019-2020 football season, Player 1 had to request a waiver of this regulation, pursuant to NCAA 14.4.3.10, which provides "the authority to waive all other progress-toward-degree requirements based on objective evidence that demonstrates circumstances that warrant the waiver of the normal application of those regulations." (Smith Decl. ¶20, Ex. 150, at 182.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

318.   Player 1 completed the forms necessary to return to the team on August 19, 2019. (Smith Decl. ¶21: Ex. 131, at 1-3.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

319.   On August 20, 2019, Senior Associate Athletic Director and Senior Woman Administrator for UW-Madison-Athletics, Katie Smith, submitted a progress-toward-degree waiver for Player 1, requesting waiver of the NCAA bylaw requiring completion of a minimum of six credits per term and 18 credits over the fall and spring combined, pursuant to NCAA Bylaw 14.4.3.1 and 14.4.3.10. (Smith Decl. ¶¶2, 22; Ex. 131, at 2.)

**RESPONSE:** Admit.

**REPLY:  Undisputed.**

320.   On August 23, 2019, the NCAA approved the progress-toward-degree waiver submitted on Player 1's behalf, making Player 1 eligible to compete in the 2019-2020 football season.  (Smith Decl. ¶23; Ex. 131, at 1-2.)

**RESPONSE:**  Admit.

**REPLY:  Undisputed.**

## September 10, 2019: Threat Assessment Director and other UW-Madison affiliated staff meet with Doe and her attorneys

321.   On September 10, 2019, UWPD Director of Threat Intervention Services, Chris Cole, attended an in-person meeting with Jane Doe, her attorneys Amy Bogost and Rachel Sattler, Kipp Cox (Assistant Dean/Director, Division of Student Life), and UWPD Detective Carol Ann Kashishian. This meeting was arranged by Nancy Lynch. (Cole Decl. ¶¶2, 10, 13.)

**RESPONSE:**  Admit that there was a meeting on September 10, 2019. If Carol Ann Kashishian was there, she did not say anything at the meeting. Bogost Decl. at ¶ 24.

**REPLY:  Undisputed and the additional information is irrelevant to the proposed fact, so the Court should disregard it in accordance with the Preliminary Pretrial Packet, *Summary Judgment Procedures* II(D)(5).**

322.   In Cole's role as Director of Threat Intervention Services, he was also Chair of the Threat Assessment Team, which was a team of individuals across the

University Community whose job it was to evaluate threats to the university and develop strategies to mitigate them. (Cole Decl. ¶3.)

> **RESPONSE:**  Admit that Mr. Cole makes this statement in his Declaration.

> **REPLY: Undisputed.**

323.    The threat assessment concept was developed in response to school and workplace violence and is based on the premise that people often display warning signs and behaviors before they act out violently. The idea that people "just snap" and act out with no warning signs is, in most cases, inaccurate.  The Threat Assessment team was tasked with the identification, assessment, and management of those displaying such warning signs and behaviors. (Cole Decl. ¶5.)

> **RESPONSE:**  Admit and dispute. Plaintiff admits that Mr. Cole makes this statement in his Declaration. Plaintiff disputes insofar as Player 1 previously violated the no contact order without any warning. See PPFF ¶¶ 112-115.

> **REPLY:  Undisputed. Doe's additional information is irrelevant to the proposed fact, so the Court should disregard it in accordance with the Preliminary Pretrial Packet, *Summary Judgment Procedures* II(D)(5).**

324.    During the September 2019 meeting, Doe, along with Bogost and Sattler, reported that Doe was worried about seeing football players on campus, and

Doe wanted to know what she should do when this happened. (Cole Decl. ¶14; Doe

Dep. Tr. Vol. I at 120:15-25 (Dkt. 97:31).)

> **RESPONSE:** Dispute In her declaration, Ms. Bogost explains:
>
> A Georgia woman, who appeared to know Player 1, sent Plaintiff a threatening social media message following the criminal trial. I brought this threat up, and Plaintiff's fears based on other hostile social media, at the meeting we had with Chris Cole and Assistant Dean Cox on September 10, 2019, as discussed below.
>
> . . .
>
> At the time of the September 10, 2019, meeting, Player 1 was back on the UW football team and on campus. Plaintiff was terrified about Player 1 being back on campus, and, based on what Plaintiff had already been through, we expected UW to develop a safety plan. Instead of presenting any kind of safety plan, Mr. Cole essentially said that Plaintiff should just call 911 if she felt threatened.
>
> At the meeting, I explained to the UW officials that Plaintiff was not doing well, that she was not eating, and that she was terrified. I also explained that her fears were not just made up, but that she had already encountered Player 2 at her residence on the first day of classes. I brought up the social media message referenced above in paragraph 14 and generally explained the hostility that Plaintiff was experiencing after the criminal trial. I also expressed concern about Plaintiff running

into Player 1 and that just seeing gatherings of football players around campus, unsure whether Player 1 was with them, was traumatizing to Plaintiff.

Mr. Cole offered no reassurance. Instead, he adamantly told Plaintiff that if, for example, she went into a cafeteria and saw Player 1 there, she had to leave.

Plaintiff started crying during the meeting when she realized UW was not going to do anything to help her

Bogost Decl., Exhibit 1 at ¶¶ 14, 25, 26, 27, 28.

**REPLY: The Board objects to Doe's response as inadmissible hearsay based on hearsay (Bogost's statements about Doe's statements and experience). Fed. R. Evid. 801-802, 805. In addition, Doe's response does not genuinely dispute the proposed fact because the proposed fact states that Doe was worried about running into football players on campus. Doe also offers no factual foundation for how she knew these individuals she would see were UW-Madison football players. Fed. R. Evid. 602; _Drake v. Minnesota Min & Mfg. Co._, 134 F.3d 878, 887 (7th Cir. 1998) ("Although 'personal knowledge' may include inference and opinions, those inferences must be substantiated by specific facts. ... 'Rule 56 demands something more specific than the bald assertion of the general truth of a particular**

matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.'" (citations omitted)). And Bogost and Doe lack personal knowledge about whether Player 1 actually knew the Georgia woman because Bogost's declaration states, "A Georgia woman, *who appeared to know Player 1*[.]" Fed. R. Evid. 602.

Subject to the objections, the Board replies: To the extent the Court overrules the Board's objections, this is an immaterial dispute based on Doe's own deposition testimony. Doe testified that other than the unspecified groups of people Doe believed were football players, she never saw Player 1 on campus in the fall of 2019. (Doe Dep. Tr. Vol. I at 116:18-21 (dkt. 97:30)). Doe testified that Player 1 never contacted her in the fall of 2019. (Doe Dep. Tr. Vol. I at 116:15-17 (dkt. 97:30)). Doe testified that she did not see Player 1 in 2020 at all. (Doe Dep. Tr. Vol. I at 117:1-2 (dkt. 97:30)). Doe testified she never saw Player 2 on campus again after her September 10 meeting with Chris Cole. (Doe Dep. Tr. Vol. I at 123:5-8 (dkt. 97:32). Doe testified that neither Player 1 nor Player 2 tried to write her a letter or in any way try to contact her directly. (Doe Dep. Tr. Vol. I at 123:11-13 (dkt. 97:32)).

As for the Georgia woman and the Instagram message, this portion of the response is immaterial because an individual

**unaffiliated with UW-Madison, living in the State of Georgia, is outside UW-Madison's control.** *Davis*, **526 U.S. at 646 (University's liability is limited "to circumstances wherein [it] exercises substantial control over both the harasser and the context in which the known harassment occurs.") The portion of the response that "Doe had already encountered Player 2 at her residence on the first day of classes" is irrelevant and immaterial because Doe's "residence" was an off-campus, privately owned apartment building,** *i.e.* **outside of the University's control.** *Davis*, **526 U.S. at 646. And Player 2 was never found responsible for misconduct related to Doe. (Doe Dep. Tr. Vol. I at 122:12-25, 123:1-2 (dkt. 97:32); Doe Dep. Ex. 5 at 25-27 (dkt. 97-12:25-27); Hasselbacher Decl. ¶ 10 (dkt. 102:3);** *see, also,* **https://www.hubmadison.com/ (last visited April 3, 2022).)**

325.    Apart from expressing this general worry and fear about seeing football players, Doe and her attorneys provided no specific concerns or any information about previously running into football players and how the players reacted, or statements made by football players that could be construed as threats during the September 2019 meeting. (Cole Decl. ¶15.)

        **RESPONSE:**  Dispute. *See supra* response to ¶ 324.

            **REPLY:  Objection. Doe's response is not responsive to the proposed fact and she failed to explain how Bogost's statements**

actually expressed specific concerns or information about previously running into football players and how the players reacted, or statements made by football players that could be construed as threats. The Court should deem the fact undisputed in accordance with the Preliminary Pretrial Packet, *Summary Judgment Procedures* II(C) & (E). Fed. R. Civ. Pro. 56(c) & (e).

Subject to the objection, the Board replies: To the extent the Court overrules the Board's objection, the Board disputes that Bogost told Cole at this meeting that Doe saw Player 2 at an off-campus apartment. This dispute is immaterial because the fact that Doe saw Player 2 at her off-campus apartment is not evidence of a specific threat to Doe's safety on-campus, and Doe never saw Player 1 or Player 2 on campus after this meeting. (Doe Dep. Tr. Vol. I at 116:15-117:2, 122:5-15, 123:5-13 (Dkt. 97:30, 32).). Doe's residence was an off-campus, privately owned apartment building, *i.e.* outside of the University's control. And Player 2 was never found responsible for misconduct related to Doe. (Doe Dep. Tr. Vol. I at 122:12-25, 123:1-2 (dkt. 97:32); Doe Dep. Ex. 5 at 25-27 (dkt. 97-12:25-27); Hasselbacher Decl. ¶ 10 (dkt. 102:3); *see, also,* https://www.hubmadison.com/ (last visited April 3, 2022)); *Davis*, 526 U.S. at 646 (University's liability is

**limited "to circumstances wherein [it] exercises substantial control over both the harasser and the context in which the known harassment occurs.")**

326.   While sympathetic to Doe's uneasiness about seeing football players around campus, Cole determined that this general worry about seeing football players on campus was non-specific and did not rise to an actionable threat to her safety because she provided no information (no specific facts and circumstances) that supported the Threat Assessment team's ultimate premise of assessing a threat—that people send out warning signs before they act out. (Cole Decl. ¶¶15-17.)

> **RESPONSE:** Dispute. *See supra* response to ¶ 324. Additionally, Ms. Bogost's declaration disputes that Mr. Cole was sympathetic, as she explains, "Neither Mr. Cole nor Mr. Cox expressed any sympathy or demonstrated any real concern her for safety." Bogost Decl., **Response Exhibit 1** at ¶ 30. Similarly, Plaintiff's Declaration states, "the school seemed unmotivated to enforce the no contact provision of the Chancellor's Decision on Restoration of Rights. They advised me that I should just avoid Player 1 when I could and call the police if anything else occurred." Doe Decl., **Response Exhibit 3** at ¶ 6.

> **REPLY:   The Board objects to Doe's response as not responsive to the fact. The fact doesn't say Cole "expressed sympathy," as Bogost would like to dispute. Nor does Bogost's declaration ¶ 30 (or anywhere) provide any specific facts and**

circumstances about a threat to Doe's safety, aside from her general worry about seeing football players on campus. The Board further objects to Doe's declaration about the enforcement of the no contact provision because she lacks competence and personal knowledge to offer such testimony. Based on her deposition and declaration, Doe has not identified any facts to substantiate her conclusory statement. (Doe Dep. Vol. I at 118:16-125:6 (dkt. 97:31-32.)) At her deposition, Doe could not provide any level of detail other than her general conclusion that the "school seemed unmotivated." (Doe Dep. Vol. I at 118:16-125:6 (dkt. 97:31-32.)); *see Drake*, 134 F.3d at 887 ("Although 'personal knowledge' may include inference and opinions, those inferences must be substantiated by specific facts. ... 'Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.'" (citations omitted)) Also see the Board's reply to DPFOF ¶ 324.

Because Doe's response does not genuinely dispute the proposed fact, the Court should deem it undisputed. Fed. R. Civ. Pro. 56(c) & (e); Preliminary Pretrial Packet, *Summary Judgment Procedures* II(C) & (E).

327.    Even though Cole did not believe the information or concerns Doe provided rose to the level of an actionable threat, Cole informed her that if she encountered football players, or anyone, and felt unsafe she should call campus police or 911. He also told her that she could contact him if additional information came to light or if new concerns arose as the school year progressed. (Cole Decl. ¶¶18, 23; Doe Dep. Tr. Vol I at 120:15-25 (Dkt. 97:31).)

> **RESPONSE:** Admit that Mr. Cole told Plaintiff she should call 911 if threatened. Plaintiff disputes Mr. Cole's other statements regarding the meeting. *See supra* response to ¶ 324.

> **REPLY: The fact is undisputed and Doe's reference to her response to DPFOF ¶ 324 is irrelevant. Fed. R. Evid. 401-402. Bogost's declaration does not address whether Cole told Doe that she could contact him if additional information came to light or if new concerns arose as the school year progressed. Because Doe did not genuinely dispute the proposed fact, the Court should deem it undisputed. Fed. R. Civ. Pro. 56(c) & (e); Preliminary Pretrial Packet, *Summary Judgment Procedures* II(C) & (E).**

328.    At the September 2019 meeting, Cole also discussed the importance of safety planning, such as being aware of one's surroundings, not walking alone, and knowing the locations of the blue light boxes situated around campus that can be pressed in case of an emergency. He also would have discussed the UWPD's website,

which contained information about the Safe Walk program and the campus bus system, both options to help ensure safe transport around campus. (Cole Decl. ¶19.)

>**RESPONSE:**  Dispute. Mr. Cole did not discuss these issues at the September 2019 meeting, as set forth in the Declaration of Amy Bogost. Bogost Decl., **Response Exhibit 1** at ¶ 29.

>**REPLY:  Immaterial dispute—Doe never saw Player 1 or Player 2 on campus after this meeting. (Doe Dep. Tr. Vol. I at 116:15-117:2, 122:5-15, 123:5-13 (Dkt. 97:30, 32).). And no one on campus ever said a word to her about what happened with Player 1. (Doe Dep. Tr. Vol. II at 173:11-13 (dkt. 99:4).).**

329.   The Threat Assessment Team had various strategies it could implement to ensure student safety in situations dealing with student-on-student actionable threats, including the following: coordinating solutions with campus partners such as a no-contact directive, changing of class schedules (so that the two students would not have classes in an area that they were likely to interact); a sit-down with the alleged student-aggressor to discuss their actions; and if necessary, the matter could be referred for criminal charges or university misconduct proceedings.  (Cole Decl. ¶20.)

>**RESPONSE:**  Admit and dispute. Plaintiff admits that Mr. Cole makes this statement in his Declaration. Plaintiff disputes that UW could do nothing more than simply to tell Plaintiff to call 911. *See supra* response to ¶ 324.

**REPLY: The proposed fact is undisputed, and Doe's purported dispute is not responsive to the proposed fact. Because Doe does not genuinely dispute the proposed fact, the Court should deem it undisputed. Fed. R. Civ. Pro. 56(c) & (e); Preliminary Pretrial Packet, *Summary Judgment Procedures* II(C) & (E).**

330.     Cole determined that the information provided by Doe did not warrant any of these potential strategies because Doe had not informed him of any specific actions taken or statements made by any football players that rose to the level of an actionable threat. Doe already had a no-contact directive in place with Player 1, and she did not provide any information to suggest that this no-contact directive was not being followed. (Cole Decl. ¶21.)

**RESPONSE:** Dispute. *See supra* response to ¶ 324.

**REPLY: Doe's purported dispute is not responsive to the proposed fact. Because Doe does not genuinely dispute the proposed fact, the Court should deem it undisputed. Fed. R. Civ. Pro. 56(c) & (e); Preliminary Pretrial Packet, *Summary Judgment Procedures* II(C) & (E).**

331.     During the September 2019 meeting, Cole was not informed of any actionable threats Doe had received, either from social media posts or from statements or actions by other students. (Cole ¶22; Doe Tr. 125:22-126:16.)

**RESPONSE:** Dispute. *See supra* response to ¶ 324.

**REPLY:  Doe's purported dispute is not responsive to the proposed fact. To the extent Doe relies on the Georgia woman's Instagram message as a "social media post," this portion of the response is immaterial because an individual unaffiliated with UW-Madison, living in the State of Georgia, is outside UW-Madison's control.** *Davis***, 526 U.S. at 646 (University's liability is limited "to circumstances wherein [it] exercises substantial control over both the harasser and the context in which the known harassment occurs.") Because Doe does not genuinely dispute the proposed fact, the Court should deem it undisputed. Fed. R. Civ. Pro. 56(c) & (e); Preliminary Pretrial Packet,** *Summary Judgment Procedures* **II(C) & (E).**

332.  Following that September 2019 meeting, Cole did not receive any other information from Doe, her family, or her attorneys regarding any threats or safety concerns. (Cole Decl. ¶24.)

**RESPONSE:**  Dispute. Mr. Cole's Declaration at Paragraph 24 states he does not recall receiving any other information from Doe, her family, or her attorneys regarding any threats of safety concerns.

**REPLY:  Doe cites no evidence to support her alleged dispute. Doe did not offer evidence that she, her family, or her attorneys** *did* **in fact reach out to him. The Court should deem**

the fact undisputed. Fed. R. Civ. Pro. 56(c) & (e); Preliminary

Pretrial Packet, *Summary Judgment Procedures* II(C) & (E).

## University Accommodations to Doe in Fall 2019 semester

333.   On August 5, 2019, three days after Player 1's acquittal, Kate Dougherty

emailed Doe to check in and see how she was doing. Dougherty's email stated:

> I am aware that the verdict came out late on Friday afternoon and
> wanted to check in to see how you are doing even though I likely know
> that answer. I can only imagine how upsetting and frustrating it is for
> you right now. You are not alone! Please know that we are here and
> thinking about you. I can see that you are enrolled in credits for the fall
> semester. If there is any support that you need please let me know.

(Dougherty Decl. ¶ 37, Ex. 126 at 79.)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

334.   Doe did not respond to Dougherty's August 5 email. (Dougherty Decl. ¶

38.)

**RESPONSE:** Dispute. Ms. Bogost's declaration explains that she

responded on Plaintiff's behalf:

> In response to Kate Dougherty's August 4, 2019, email to Plaintiff, I followed-
> up with UW attorney Nancy Lynch a week later, expressing my appreciation
> for the email and explaining that Plaintiff was not in a great emotional place
> and was continuing to get social media threats and that I would follow-up with
> Ms. Dougherty, which I did.

Bogost Decl. at ¶ 34.

**REPLY: Doe's purported dispute is not responsive to the**

**proposed fact. Because Doe does not genuinely dispute the**

**proposed fact, the Court should deem it undisputed. Fed. R. Civ.**

213

Pro. 56(c) & (e); Preliminary Pretrial Packet, *Summary*

*Judgment Procedures* II(C) & (E).

335.   Following Player 1's readmission to UW-Madison, Doe never saw Player

1 on-campus again. (Doe Dep. Tr. Vol. I at 122:12-15 (Dkt. 97:32).)

**RESPONSE:**  DISPUTE: The full context of Plaintiff's testimony was

as follows:

Q. Okay. And so what did you think that the school needed to do to
meaningfully enforce the no-contact provision in the chancellor's
decision?

A. Something more than just call 911. I think there should have been
more safeguards put in place to ensure that I would not come into
contact with the perpetrator or the roommate.

Q. And you didn't come into contact with Mr. [Player 1] at any point
after September of 2019 until he left campus, correct?

MR. CLUNE: · Objection to form.

THE WITNESS: · Well, I would go the other direction if I saw the football
players.

BY MS. BACHHUBER: But you have no knowledge that he was actually
in that group with the football players when you would see them,
correct?

A. Yes.

Doe Dep. Tr. 121:23:122:15. Thus, Plaintiff would not be able to

confirm whether Player 1 was in a group of football players she saw

because she would move away from that group.

**REPLY:  The Board objects to Doe's response because it**

**does not genuinely dispute the proposed fact. Doe did not see**

**Player 1 on campus, Doe Dep. Tr. Vol. I at 116:15-117:2 (dkt. 97:30), she failed to lay the factual foundation for how she knew these groups of people were football players, and she admitted she lacked personal knowledge of whether Player 1 was actually in the groups she believed were football players. Fed. R. Evid. 602; (Doe Dep. Tr. Vol. I at 116:15-117:2, 122:5-15 (dkt. 97:30, 32)). The Court should deem the fact undisputed. Fed. R. Civ. Pro. 56(c) & (e); Preliminary Pretrial Packet, *Summary Judgment Procedures* II(C) & (E); *Drake v. Minnesota Min. & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("Although 'personal knowledge' may include inferences and opinions, those inferences must be substantiated by specific facts. ... Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.")**

336.    Doe saw groups of football players around campus, but had no personal knowledge of whether Player 1 was in the groups of football players. (Doe Dep. Tr. Vol. I at 122:12-15 (Dkt. 97:32).)

      **RESPONSE:** Dispute. *See supra* ¶ 335.

      **REPLY:  The Board objects to Doe's purported dispute because it does not genuinely dispute the fact. Doe testified:**

**Q: But you have no knowledge that he was actually in that group with the football players when you would see them, correct?**

**A: Yes.**

**(Doe Dep. Tr. Vol. I at 122:12-15 (dkt. 97:32).). The Court should deem the fact undisputed. Fed. R. Civ. Pro. 56(c) & (e); Preliminary Pretrial Packet,** *Summary Judgment Procedures* **II(C) & (E);** *Drake***, 134 F.3d at 887 ("Although 'personal knowledge' may include inferences and opinions, those inferences must be substantiated by specific facts. … Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.")**

337.   Doe lived at the Hub on State Street in the fall of 2019. (Doe Dep. Tr. Vol. I at 115:9-12 (Dkt. 97:30).)

**RESPONSE:** Admit.

**REPLY: Undisputed.**

338.   The Hub is not located on campus or owned or controlled by UW-Madison. (*See* https://www.hubmadison.com/ (last visited April 3, 2022).)

**RESPONSE:** Dispute. UW provides no admissible evidence for this Proposed Statement of Fact 338, but simply cites a webpage, which is impermissible hearsay. F.R.E. 801, 802.

**REPLY:  Doe knows the Hub is a privately owned building and not affiliated with UW-Madison because she lived there. To the extent this is an attempt to misrepresent to this Court that the Hub is a UW-Madison residence hall, Doe cites no evidence to support a dispute. The Hub is neither a UW-Madison residence hall, nor is it one of UW-Madison's University Apartments for graduate student, faculty, and staff. (*See* *https://www.housing.wisc.edu/apartments/* (last visited May 10, 2022);   https://www.housing.wisc.edu/residence-halls/   (last visited May 10, 2022)). The Court should deem it undisputed because UW-Madison can call a witness (Doe) to testify to this fact in a form admissible in evidence. Fed. R. Civ. Pro. 56(e).**

339.   Player 1 and Player 2 never tried to call Doe, write her a letter, or in any way try to contact Doe directly. (Doe Dep. Tr. Vol. I at 123:5-13 (Dkt. 97:32).)

**RESPONSE:** Admit.

**REPLY:  Undisputed.**

340.   No one on campus ever said anything to Doe about what happened with Player 1. (Doe Dep. Tr. Vol. II at 173:11-13 (Dkt. 99:4).)

**RESPONSE:** Admit.

**REPLY:  Undisputed.**

341.   During the fall 2019 semester, Doe continued to receive support services, in the form of academic accommodations, from UW-Madison. (Doe Dep. Tr.

Vol I at 128:12-15 (Dkt. 97:33); Bachhuber Decl. ¶ 2, Doe Dep. Ex. 3 at 569-599 (Dkt. 97-6:109-115, Dkt. 97-7:1-24); Dougherty Decl. Ex. 153 at 117-121.)

**RESPONSE:**  Admit.

**REPLY:  Undisputed.**

342.    Doe has no criticisms of Dougherty's contacts with her. (Doe Dep. Tr. Vol. I at 75:5-7 (Dkt. 97:20).)

**RESPONSE:**  Admit.

**REPLY:  Undisputed.**

343.    During the fall 2019 semester, Doe was still seeing a therapist and still had contact with her advocate from the Rape Crisis Center, Jaime Sathasivam. (Doe Dep. Tr. Vol. I at 128:16-21 (Dkt. 97:33).)

**RESPONSE:**  Admit.

**REPLY:  Undisputed.**

344.    Doe does not recall requesting any specific safety measures from the University. (Doe Dep. Tr. Vol. I at 123:14-125:6 (Dkt. 97:32).)

**RESPONSE:**  Admit in part and dispute in part. Plaintiff admits that in her deposition, she testified she was unsure what additional safety measure she believes the university should have taken and that it was not her area of expertise. Doe Dep. [Doc. 97 at 123:14-20]. Further, her representative, Ms. Bogost, expected UW to develop a safety plan, which UW did not do. Bogost Decl., Response Exhibit 1 at ¶ 25.

**REPLY:  Doe's response is not responsive and does not create a genuine dispute. Neither Doe's testimony, nor Bogost's declaration state that they *requested* specific safety measures. Their assumptions are irrelevant. Fed. R. Evid. 401-402. The Court should deem the fact undisputed. Fed. R. Civ. Pro. 56(c) & (e);  Preliminary  Pretrial  Packet,  *Summary  Judgment Procedures* II(C) & (E).**

345.   Outside of the September 5, 2018 incident involving the overlapping music class among Doe and Player 2, neither Doe, Sathasivam, nor Attorney Bogost made any specific complaints to Hasselbacher about Doe's safety. (Hasselbacher Decl. ¶ 140.)

> **RESPONSE:**  Dispute. Ms. Bogost's Declaration states:
>
> In the fall of 2018, I was in communication with various UW officials, including Lauren Hasselbacher, Tonya Schmidt, and Kate Dougherty. During this period, I expressed my and Plaintiff's ongoing concern about her safety given that Player 1 and Player 2 were on campus. From my perspective, it seemed relatively straight-forward for UW to help figure out areas where there might be overlap between Plaintiff, on the one hand, and Player 1 and Player 2 on the other hand (such as being in similar areas of campus before and after class) and to be proactive in working with the parties' representatives to figure out how to keep Player 1 and Player 2 away from Plaintiff, and I raised that with UW. The consistent response I received from UW was that the campus was too big and there wasn't anything UW could do other than check course schedules.
>
> Bogost Decl., **Response Exhibit 1** at ¶ 5.

**REPLY:  Doe's response is not responsive to the fact and the Court should deem it undisputed. Bogost's declaration testimony, that "it  seemed  relatively  straight-forward,"  is**

speculation not based on personal knowledge. Fed. R. Evid. 602; *Drake*, 134 F.3d at 887 ("Although 'personal knowledge' may include inference and opinions, those inferences must be substantiated by specific facts. ... 'Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.'" (citations omitted)). Bogost's declaration testimony, "I raised that with UW" is impermissible hearsay because she failed to identify to whom she raised that with, making it impossible for the Board to verify its accuracy or whether the person who she informed was someone who had authority to take action or speak on behalf of the Board. Fed. R. Evid. 801-802; *Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 533 (7th Cir. 2003) (holding that, while statements by supervisor might constitute non-hearsay admissions on behalf of defendant, plaintiff's own version of the statements which were based on an employee's version of the statements, is not admissible), *overruled on other grounds by Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016); *see, also*, *Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068, 1080 (7th Cir. 2016).

And even if the Court overrules the Board's objections, Bogost's declaration does not identify any specific complaints

**she told any specific University official, so it does not genuinely dispute the fact. The Court should deem the fact undisputed. Fed. R. Civ. Pro. 56(c) & (e); Preliminary Pretrial Packet, *Summary Judgment Procedures* II(C) & (E).**

346.     UW-Madison found Player 2 not responsible for violation of criminal law and not responsible for sexual harassment of Doe. Doe did not appeal those findings. (Doe Dep. Ex. 5 at 25-27 (Dkt. 97-12:25-27); Hasselbacher Decl. ¶ 10.)

   **RESPONSE:**  Admit.

        **REPLY:  Undisputed.**

347.     Outside of the no contact directive Doe requested on April 30, 2018, Doe, Sathasivam, and Attorney Bogost did not make any requests to Hasselbacher for specific accommodations. (Hasselbacher Decl. ¶ 141.)

   **RESPONSE:**  Dispute. *See supra* ¶ 345.

        **REPLY:  Doe's response is not responsive to the fact and the Court should deem it undisputed. Bogost's declaration testimony, that "it seemed relatively straight-forward," is speculation not based on personal knowledge. Fed. R. Evid. 602; *see Drake*, 134 F.3d at 887 ("Although 'personal knowledge' may include inference and opinions, those inferences must be substantiated by specific facts.") Bogost's declaration testimony, "I raised that with UW" is impermissible hearsay because she failed to identify to whom she raised that with, making it**

impossible for the Board to verify its accuracy or whether the person who she informed was someone who had authority to take action or speak on behalf of the Board. Fed. R. Evid. 801-802; *Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 533 (7th Cir. 2003) (holding that, while statements by supervisor might constitute non-hearsay admissions on behalf of defendant, plaintiff's own version of the statements which were based on an employee's version of the statements, is not admissible), *overruled on other grounds by Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016); *see, also, Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068, 1080 (7th Cir. 2016).

And even if the Court overrules the Board's objections, Bogost's declaration does not identify any specific accommodations she requested of any specific University official, so it does not genuinely dispute the fact. The Court should deem the fact undisputed. Fed. R. Civ. Pro. 56(c) & (e); Preliminary Pretrial Packet, *Summary Judgment Procedures* II(C) & (E).

## Player 1 leaves UW-Madison

348.   Following the January 1, 2020, Rose Bowl, Player 1 did not return to UW-Madison for the spring semester. (Smith Decl. ¶26.)

**RESPONSE:** Admit.

**REPLY:  Undisputed.**

349.    A few days following the bowl game, Player 1 dropped out of the University and entered the NFL draft. (Am. Compl. ¶ 112 n.4, dkt. 26:19.)

**RESPONSE:**  Admit.

**REPLY:  Undisputed.**

350.    Player 1 was officially removed from the football roster on February 10, 2020, because he withdrew from the institution.  (Smith Decl. ¶27; Ex. 155.)

**RESPONSE:**  Admit.

**REPLY:  Undisputed.**

351.    Player 1 entered the 2020 NFL draft, and generally, college football student-athletes who are expected to be high-level draft picks, such as Player 1, train at specialized training facilities prior to the draft. (Smith Decl. ¶28; Doe Dep. Tr. Vol I at 134:22-25 (Dkt. 97:35).)

**RESPONSE:**  Admit.

**REPLY:  Undisputed.**

## COVID-19 pandemic

352.    UW-Madison moved to remote learning because of the COVID-19 pandemic in February or March of 2020. (Doe Dep. Tr. Vol. I at 131:7-9 (Dkt. 97:34).)

**RESPONSE:**  Admit.

**REPLY:  Undisputed.**

## Doe's academic performance

353.   Doe received her bachelor's degree in political science in less than the four years it takes typical students. (Doe Dep. Tr. Vol. I at 6:9-14 (Dkt. 97:3), Ex. 3 at 125-127 (Dkt. 97-3:10-12).)

> **RESPONSE:** Plaintiff admits that she graduated in 7 semesters. The cited evidence does not confirm that amount of time it takes for "typical students" to finish.

> **REPLY: Undisputed.**

354.   Doe finished her undergraduate program with a GPA of 3.826. (Doe Dep. Tr. Vol. 1 at 7:10-14 (Dkt. 97:3), Ex. 3 at 125-127 (Dkt. 97-3:10-12).)

> **RESPONSE:** Admit.

> **REPLY: Undisputed.**

355.   Doe is now in law school. (Doe Dep. Tr. Vol. I at 10:13-19 (Dkt. 97:4).)

> **RESPONSE:** Admit.

> **REPLY: Undisputed.**

356.   Neither her course load nor her academic performance showed any signs of an appreciable drop-off after her incident with Player 1. (Doe Dep. Tr. Vol. I at 9:6-10:6 (Dkt. 97:3-4), Ex. 3 at 125-127 (Dkt. 97-3:10-12).)

> **RESPONSE:** Dispute. Plaintiff dropped her philosophy course because she was not in a place where she was capable of exerting the time and energy to do her best in the class. Doe Dep. [Doc. 97 at 156:14-25]. Additionally, After Player 1 returned to campus in August 2019, Plaintiff was living in a constant state of stress as a result, which

224

required her to work harder and longer hours to attain the same grades. She also took a lower course load than she otherwise would have taken. She also sought out easier courses than she would have otherwise due to the effort it was taking me to do schoolwork. It took Plaintiff an additional semester to complete her degree from what she had planned. Additionally, Plaintiff's plan had been to graduate in three years (six semesters). As a result of Player 1 being readmitted to UW, she abandoned her plan to take enough credit hours to graduate in three years and instead took an extra semester to graduate. This delayed her entry into law school by a full year. Doe Decl., **Response Exhibit 3** at ¶¶ 12, 13.

**REPLY: Objection. Plaintiff's response does not genuinely dispute the proposed fact and the Court should deem it undisputed. Doe dropped her philosophy class the fall 2019 semester because she had previously been waitlisted for Political Science 511: Campaign Finance. (Doe Dep. Tr. Vol. I at 157:17-158:10 (dkt. 97-40-41); Doe Dep. Ex. 3 at 126 (dkt. 97-3:11).). Doe's transcript shows she took Political Science 511 during fall 2019 semester. (Doe Dep. Ex. 3 at 126 (dkt. 97-3:11).). Philosophy 211 and Political Science 511 were both 4 credit classes and Doe's major was Political Science. (Doe Dep. Tr. Vol. I at 157:17-158:10 (dkt. 97-40-41); Doe Dep. Ex. 3 at 126 (dkt. 97-3:11).).**

As for her attempt to dispute that neither her course load nor her academic performance showed any signs of an appreciable drop-off after her incident with Player 1, Doe's transcript shows she got her worst grade (a BC) in Econ 101 the fall 2017 semester. (Doe Dep. Ex. 3 at 10 (dkt. 97-3:10).). And aside from fall 2017 when she took 15 credits, Doe took 13 or 14 credits worth of classes during the remaining semesters before spring 2020 when Player 1 left campus:

- Fall 2017 – 15 credits

- Spring 2018 – 14 credits

- Fall 2018 – 14 credits

- Spring 2019 – 13 credits

- Fall 2019 – 14 credits

- Spring 2020 (after Player 1 left campus) – 13 credits

- Fall 2020 – 9 credits

(Doe Dep. Ex. 3 at 125-126 (dkt. 97-3:10-11); Doe Dep. Tr. Vol. I at 9:6-10:11 (dkt. 97:3-4).). Because Doe failed to genuinely dispute the proposed fact, the Court should deem it undisputed. Fed. R. Civ. Pro. 56(c) & (e); Preliminary Pretrial Packet, *Summary Judgment Procedures* II(C) & (E).

357.   Doe continued to avail herself of social opportunities at UW-Madison, including participation in her sorority activities, as well as participating in activities as a member of a legal fraternity. (Doe Dep. Tr. Vol. I at 130:5-133:23.)

> **RESPONSE:**  Dispute. Plaintiff testified that her participation in the sorority activities and legal fraternity meetings diminished. She testified as follows:
>
> Q. And did you continue to participate in those activities in the fall of 2019?
>
> A. I was definitely less participating in those activities.
>
> Q. What about the retreats and hiking and stuff?
>
> A. It was hard for me to do a lot at that point, so I was keeping to myself and trying to stay home or go home to Chicago as much as possible.
>
> Doe Dep. [Doc. 97 at 133:24-134:6].
>
> In, addition, Plaintiff's father's declaration states:
>
> Following Player 1's readmission to UW in August 2019, my daughter reduced her social activities substantially.
>
> . . .
>
> My daughter often came home on the weekend after Player 1 was readmitted. She would stay either with me or her mother. I observed that she seemed depressed and withdrawn and not her normal self. She was much less talkative than she was normally. While she was at home, she mostly just did her schoolwork and kept to herself much more than normal
>
> Declaration of Plaintiff's Father, **Response Exhibit 8** at ¶¶ 6, 10. See also Doe Decl., **Response Exhibit 3** at ¶ 3 (explaining after Player 1 returned to campus in the fall semester of 2019, Plaintiff stopped going

out much and largely just tried to focus on school and sorority commitments. On weekends, Plaintiff mostly went home to Chicago especially during the football season.)

**REPLY:  The Board objects to Doe's response because it does not genuinely dispute the proposed fact. At her deposition, Doe testified that she attended meetings or social gatherings for the legal fraternity once a month in the spring of 2019, once every two months in the fall of 2019, and once a month in the spring of 2020. (Doe Dep. Vol. I at 130:23-131:6 (dkt. 97:34).) Doe testified she participated in Rush with her sorority in the fall of 2019. (Doe Dep. Vol. I at 140:24-25 (dkt. 97:36).). Rush is an event with over 500 participants, at which Doe and her sorority sisters performed songs and dances and had conversations with other women about potentially joining their sorority. (Doe Dep. Tr. Vol. I at 75:17-79:2 (dkt. 97:20-21)). Doe cannot dispute her own testimony that during the one semester she shared a campus with Player 1 after he was readmitted, Doe participated in both the legal fraternity and her sorority. She also went to a UW-Madison hockey game. (Doe Dep. Tr. Vol. I at 141:20-25 (dkt. 97:36)) The Court should deem the fact undisputed. Fed. R. Civ. Pro. 56(c) & (e); Preliminary Pretrial Packet, *Summary Judgment Procedures* II(C) & (E).**

## Player 1's other misconduct

358.    Player 1 was investigated for another incident of nonacademic misconduct for a report from a university staff member concerning his behavior on May 3, 2017. The staff member alleged that Player 1 became angry and pushed the staff member who was attempting to tow Player 1's moped for unpaid tickets. (Blank Dep. Tr. 292:7-295:4 (Dkt. 93:74-75), Ex. 23 (Dkt. 93-23).)

> **RESPONSE:** Admit and dispute. Plaintiff affirmatively states that the instances of misconduct contained in paragraphs 358-362 are not the only instances of misconduct involving Player 1 and refers expressly to the total of **FIVE** instances of misconduct cited on page 6 of UW's Ex 146.

> **REPLY:  Undisputed.**

359.    The University of Wisconsin Police Department investigated the May 3, 2017, incident and reviewed video. The report states: "I located the incident from 5/3/17 at approximately 1:25-1:30pm. I did not see any indication the suspect Player 1 pushed or intentionally shoved Gorman. I did observe Gorman walk closely between Player 1 and his moped. Player 1 had a large piece of cardboard, or similar in his hand, and a bag in the other. It appears Player 1 moves hi[s] arm up to place the items on the moped, and his arm brushes past Gorman. I did not see any motion that appeared to be an intentional contact with Gorman." (Sasso Decl. Ex. 129 at 1, 3.)

> **RESPONSE:** Admit Plaintiff notes that Ex 129 had not been produced to Plaintiff prior to UW's Motion for Summary Judgment as the document does not contain any bates numbers. Plaintiff affirmatively

states that the instances of misconduct contained in paragraphs 358-362 are not the only instances of misconduct involving Player 1 and refers expressly to page 6 of UW's Ex 146.

**REPLY: Undisputed.**

360.    A new student leader reported being sexually harassed by Player 1 for an incident on June 23, 2016 during the orientation program for incoming freshman, called "SOAR." The woman reported Player 1 walked past her slowly and got close to her and touched her hand (as she was looking in the other direction). The woman said he looked comfortable and probably thought he was being smooth. Player 1 looked her up and down and made direct eye contact. The same day he and two other friends were walking by her and said, "oh hey, this cutie again, your hair is a different color." (Blank Dep. Tr. 280:22-281:21 (Dkt. 93:71), Ex. 20 at 2 (Dkt. 93-20).)

> **RESPONSE:** Admit. Plaintiff affirmatively states that the instances of misconduct contained in paragraphs 358-362 are not the only instances of misconduct involving Player 1 and refers expressly to page 6 of UW's Ex 146.

**REPLY: Undisputed.**

361.    The next day, Player 1 came out of the SOAR session to talk to the same woman and got very close to her when he asked her a question. The woman described one of his actions as "sexy eye contact." (Blank Dep. Ex. 20 at 2 (Dkt. 93-20:2).)

> **RESPONSE:** Dispute. The report stated, "One of the times he came out and approached her, he put his hand close to her face and her supervisor

230

Chris Verhage called him and told him that was inappropriate." Blank
Dep Ex. 20 at 2. Plaintiff affirmatively states that the instances of
misconduct contained in paragraphs 358-362 are not the only instances
of misconduct involving Player 1 and refers expressly to page 6 of UW's
Ex 146.

**REPLY:  Doe cites no evidence to dispute the fact, she only
adds information in violation of the Court's procedures. The
Board does not dispute Doe's additional information, so the
proposed fact is undisputed.**

362.    Player 1 met with the Title IX Coordinator (at the time Dave Blom) on
September 13, 2016 to discuss the concerns reported about his behavior at SOAR.
They discussed the concerns in the context of the University's prohibition against
sexual harassment. They discussed the concepts of "unwelcome" conduct and conduct
of a "sexual nature" and how the behavior attributed to him at SOAR could raise a
question about potential sexual harassment. Although Player 1 did not believe his
behavior was being accurately characterized, he listened respectfully and attentively
and stated that he understood why the Title IX Coordinator wanted to meet with him.
(Blank Dep. Ex. 20 at 2 (Dkt. 93-20:2).)

**RESPONSE:**    Admit and dispute. UW omitted the additional
description in the report that Mr. Blom wrote, "I told him I did not want
to see his name connected to a similar report in the future and he said
he understood.  I provided him with my card and a copy of the

University's sexual harassment brochure. Blank Dep. Ex. 20 at 2. Plaintiff affirmatively states that the instances of misconduct contained in paragraphs 358-362 are not the only instances of misconduct involving Player 1 and refers expressly to page 6 of UW's Ex 146.

**REPLY: The Board does not dispute Doe's additional information, so the fact is undisputed. As for Doe's "affirmative statement," the Court should disregard it in accordance with the Preliminary Pretrial Packet,** *Summary Judgment Procedures* **II(D)(5).**

### Other petitions for restoration of rights

363. During Chancellor Blank's deposition, she was asked about how many other petitions for restoration of rights she had reviewed. Chancellor Blank testified that she could not remember the exact number, but she believed it was eight total. (Blank Dep. Tr. 75:18-23 (Dkt. 93:20).)

**RESPONSE:** Dispute. Chancellor Blank did not testify that she could not remember. Instead, she testified as follows in her deposition:

Q. And for the Petition for Restoration, is – first of all, how many of those have you done since you've –

A. **I actually asked that question. I could not have told you off the top of my head.· I am told I have done eight.**

Blank Dep [Doc. 93 at 75:18-23] (emphasis added).

**REPLY:  This is not a genuine dispute of fact because Chancellor Blank's deposition testimony (quoted by Doe) was mistaken, and she corrected this in her April 8, 2022 declaration, which is specifically permitted under Seventh Circuit precedent. (Blank Decl. ¶ 52 (dkt. 112:12-13)); *James v. Hale*, 959 F.3d 307, 317 (7th Cir. 2020). This is also an immaterial dispute because it has no relevance to Doe's claims (whether Chancellor Blank decided eight or ten petitions). The Court should deem the proposed fact undisputed.**

364.   Upon a review of the records, Chancellor Blank has reviewed ten petitions for restoration of rights while Chancellor. Two concerned expulsions for academic misconduct, two concerned expulsions for non-academic misconduct, and six concerned suspensions for non-academic misconduct. (Blank Decl. ¶ 52.)

**RESPONSE:** Dispute. This statement contradicts her sworn deposition testimony that she reviewed eight petitions *Cf*. Blank Dep. [Doc. 93 at 75:18-23] with Blank Decl. ¶ 52.

**REPLY:  This is not a genuine dispute of fact because Chancellor Blank's deposition testimony (cited by Doe) was mistaken, and she corrected this in her April 8, 2022 declaration, which is specifically permitted under Seventh Circuit precedent. (Blank Decl. ¶ 52 (dkt. 112:12-13)); *James*, 959 F.3d at 317. This is also an immaterial dispute because it has no**

**relevance to Doe's claims (whether Chancellor Blank decided eight or ten petitions). The Court should deem the proposed fact undisputed.**

365. The two petitions involving expulsions for non-academic misconduct both concerned sexual assault—one was Player 1's petition, and the other petition related to a different male student. (Blank Decl. ¶ 53.)

> **RESPONSE:** Admit that Chancellor Blank's Declaration at paragraph 53 contains this information.

> **REPLY: Undisputed.**

366. At Chancellor Blank's deposition, she testified that she was not sure if she had two or three petitions that involved sexual assault, but based on her review of the records, the number is two. (Blank Dep. Tr. 77:10-18 (Dkt. 93:20).)

> **RESPONSE:** Admit that Chancellor Blank's deposition states that she was unsure if she had been involved in two or three petitions that involved sexual assault. There is no cited evidence in this paragraph regarding the number of petitions involving sexual assault.

> **REPLY: Chancellor Blank's declaration paragraph 53 contains the information. Doe cites no evidence to dispute it, so the Court should deem it undisputed. (Dkt. 112:13, ¶ 53).**

367. The other male student was expelled in October 2016, and he filed his petition in October 2017, based in part on the county sheriff's office decision not to charge him. (Blank Decl. ¶ 54.)

**RESPONSE:** Admit that Chancellor Blank's Declaration states the information in this paragraph.

**REPLY: Undisputed.**

368. Chancellor Blank denied the other male student's petition in December 2017 because the student did not submit new evidence, nor did he identify a compelling basis for Chancellor Blank to restore his rights. (Blank Decl. ¶ 54.)

**RESPONSE:** Admit that Chancellor Blank's Declaration states the information in this paragraph. Whether that decision was proper is conjecture.

**REPLY: Undisputed. Doe cites no evidence to support her allegation about whether Chancellor Blank's decision (denying the other male student's petition) was proper is conjecture. The Court should disregard it.**

369. There was not the same urgency in deciding the other male student's petition since it came in during the middle of the semester, so even if it had been decided quickly, he could not have enrolled in fall semester. (Blank Decl. ¶ 54.)

**RESPONSE:** Dispute. The school year for 2019 began on September 4, 2019. Doe Decl., Response Exhibit 3 at ¶ 2. This was almost a full month after Player 1 submitted his Petition on August 6, 2019. Moreover, the "urgency" for Chancellor Blank to re-admit Player 1 was because of his status as a football player, as previously set forth. *See* PPFF ¶¶ 137-166, 196-216.

REPLY:  The Board objects to Doe's response for several reasons: First, Doe's response is not responsive to the fact concerning the other male student petitioner.

Second, Doe failed to cite evidence in support of her purported dispute in accordance with the Preliminary Pretrial Packet, *Summary Judgment Procedures* II(C) & (E). Procedure II(E)(1) allows a party to use evidence in the form described in Procedure I(C)(1)(a)-(f). Procedure I(C)(1)(a)-(f) does not include citations to other proposed facts as a form of evidence.

Third, there is evidence in the record of the timing of Chancellor Blank's decisions when she *granted* other petitions for restoration before an academic semester. Doe had this information before she responded to this proposed fact, so she was well aware of the timeline of Chancellor Blank's prior decisions. (Hoechst Decl. Ex. 171 (dkt. 140-6).). The Defendant's Response to Plaintiff's Second Interrogatories, Interrogatory No. 13, which Chancellor Blank verified and signed under 28 U.S.C. § 1746, shows Chancellor Blank granted two other petitions for restoration of rights to enable the students to enroll in the next academic semester. (Dkt. 140-6:2-3). Petitioner 1 petitioned for restoration of rights on January 9, 2015, and Chancellor Blank granted the petition by letter dated January

16, 2015, which allowed Petitioner 1 to enroll in the spring 2015 semester at UW-Madison. (Hoechst Decl. Ex. 171 at 2-3, Resp. to Interrogatory No. 13 (Dkt. 140-6:2-3)). Petitioner 2 petitioned for restoration of rights on May 27, 2015, and Chancellor Blank granted the petition on July 7, 2015, which allowed Petitioner 2 to enroll in the fall 2015 semester at UW-Madison. (Hoechst Decl. Ex. 171 at 3, Resp. to Interrogatory No. 13 (Dkt. 140-6:3)).

Fourth, Doe's conclusory statement that Chancellor Blank granted Player 1's petition because of his status as a football player is irrelevant. Fed. R. Evid. 401-402. The Board also objects to this portion of the response because Doe cites no evidence to assert that Player 1 was a football player *at the time of Chancellor Blank's petition decision.* Player 1 was not even a student at UW-Madison at the time of the petition decision because he was expelled, much less a football player for UW-Madison. (April 8, 2022, Blank Decl. ¶¶ 25, 48, 50 (dkt. 112:6, 12)). Indeed, Doe does not dispute the Board's proposed facts relating to Player 1's return to the football team, including the fact that he was deemed eligible for the team on August 23, 2019. (Dkt. 147:96-98, ¶¶ 314-320).

Subject to the objections, the Board replies: to the extent the Court overrules the Board's objections, this is an immaterial

dispute because both men and women play college football, and there is no rule precluding a woman from being part of the UW-Madison football team. (Hoechst Decl. Ex. 166-169 (dkt. 140-1, 140-2, 140-3, 140-4); Smith Decl. ¶¶ 7-8 (dkt. 117:2-3).). Since at least 1998, no women have tried out for the football team at UW-Madison. (Smith Decl. ¶¶ 4, 7 (dkt. 117:2-3).). Doe's evidence purporting to show bias in favor of football players—like evidence purporting to show bias in favor of sexual-misconduct victims—is irrelevant under the law. 20 U.S.C. § 1681(a); *see Johnson v. Marian Univ.*, 829 F. App'x 731, 732-33 (7th Cir. 2020); Fed. R. Evid. 401-402. Chancellor Blank knew Player 1 was a football player when she upheld the expulsion on March 13, 2019. (Blank Decl. ¶¶ 17, 20 (dkt. 112:5), Ex. 140 (dkt. 112-7)). There is no evidence that Blank made the decision to readmit Player 1 "on the basis of sex." 20 U.S.C. § 1681(a).  What matters under Title IX is bias based on sex. And there is no evidence of that in this case.

Because Doe's response does not genuinely dispute the proposed fact, the Court should deem it undisputed in accordance with the Preliminary Pretrial Packet, *Summary Judgment Procedures* II(C), (D), & (E), and Federal Rule of Civil Procedure 56(e).

Dated this 13th day of May, 2022.

Respectfully submitted,

JOSHUA L. KAUL
Attorney General of Wisconsin


s/Rachel L. Bachhuber
RACHEL L. BACHHUBER
Assistant Attorney General
State Bar #1052533

s/Catherine R. Malchow
CATHERINE R. MALCHOW
Assistant Attorney General
State Bar #1092705

s/Jonathan J. Whitney
JONATHAN J. WHITNEY
Assistant Attorney General
State Bar #1128444


Attorneys for Defendant Board of Regents

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-0188 (Bachhuber)
(608) 267-1311 (Malchow)
(608) 266-1001 (Whitney)
(608) 294-2907 (Fax)
bachhuberrl@doj.state.wi.us
malchowcr@doj.state.wi.us
whitneyjj@doj.state.wi.us