IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JANE DOE,

                      Plaintiff,                          OPINION AND ORDER

        v.                                               20-cv-856-wmc

BOARD OF REGENTS,
THE UNIVERSITY OF
WISCONSIN.

                      Defendants.

        Plaintiff Jane Doe was a freshman at University of Wisconsin- Madison ("UW")
when she reported to the Madison Police Department that she had been sexually assaulted
by a UW football player ("Player 1") at an off-campus apartment on April 21, 2018.  In
addition, Doe's father contemporaneously contacted the UW Dean of Students Office
("DoSO") to report the assault.  Within days of that report, the UW suspended Player 1
from the football team and ordered he have no contract with Doe.  After a Title IX
investigation in the fall of 2018, the UW further determined there was evidence
substantiating Doe's report of non-consensual sex and harassment, resulting in a
recommendation that Player 1 be expelled from the UW altogether.  Following a formal
administrative hearing in early 2019, the UW then expelled Player 1.

        However, in early August of 2019, a Dane County jury found Player 1 not guilty of
criminal sexual assault, and less than three weeks later, then-UW Chancellor Rebecca
Blank vacated the administrative finding of sexual assault as well and granted his petition
for reinstatement without seeking any input from Doe or her counsel.  Plaintiff Jane Doe

filed this lawsuit against the Board of Regents for the University of Wisconsin, alleging that these actions violated Title IX in the treatment of her claim of sexual assault.[1]

Now before the court are the parties' cross motions for summary judgment. While sympathetic to plaintiff's hurt and distrust about the UW's sudden about-face, particularly after rebuffing requests by plaintiff's counsel to be able to respond to Player 1's petition, the court will grant defendants' motion for summary judgment because she has articulated no viable legal grounds for judicial relief under the circumstances.

## UNDISPUTED FACTS

Two members of the UW football team, Player 1 and Player 2, were present in the apartment at the time of the reported sexual assault, as were two other women, one of whom also reported an assault stemming from the same events that evening.  After receiving her father's report of the assault, the DoSO promptly contacted Doe directly to discuss what resources and accommodations were available to her through the UW.  In particular, Kate Dougherty, a member of the DoSO staff, helped Doe reach out to her professors on April 24, 2018, in order to receive academic accommodations.  The next day, April 25, Title IX Coordinator Lauren Hasselbacher followed up with Doe to offer further assistance.

By April 27, 2018, the UW had also suspended Player 1 from the UW football team, and Hasselbacher notified Doe of this fact on April 30, 2018.  On May 1, the UW

---

[1] The court previously dismissed Doe's claim of a violation of the of the Due Process Clause because she did not plead a property interest in her education sufficient for a due process claim.  (Dkt. #47.)

next issued a directive that Players 1 and 2 were to have no contact with Doe or the other complainant, and on May 29, Hasselbacher opened a formal, Title IX investigation into the underlying charges by mailing "Notices of Charge" to the two, accused football players. Hasselbacher then investigated the assault over the period from May 30 to October 9, 2018.  Both accusers and the two players had their own attorney representation, and while Hasselbacher conducted several interviews, Player 1 and Player 2 declined to be interviewed, no doubt because at the same time, Player 1 was being investigated by local law enforcement with regard to possible criminal charges.  For that reason, Hasselbacher was unable to review certain pieces of evidence from the criminal investigation, including some surveillance videos, as the Madison Police Department would not disclose them to Hasselbacher.  The parties dispute whether Player 1 had access to those videos at this point, but agree that Hasselbacher did not review them before concluding her investigation.

On October 30, 2018, the UW made a Title IX determination finding Player 1 responsible for second- and third-degree sexual assault.  Specifically, Assistant Dean of Student Life Ervin Cox wrote in the determination that "Complainant 1 witnessed [Doe] tell [Player 1] she was 'too tired,' which reflects a lack of consent, and then [Player 1] proceed[ed] to have sexual intercourse with [Doe] anyway."  (Pl.'s Rep. to Def.'s Resp. to Pl.'s PFOF (dkt. #171) ¶ 104.)    The determination also found Player 1 had sexually harassed Doe.  Cox further wrote in his determination letter that Player 1's conduct created a hostile learning environment for Doe, such that she would feel uncomfortable sharing a campus with Player 1, and therefore, found his expulsion from the UW was appropriate.

Before being formally expelled, Player 1 was entitled to a hearing on this disciplinary determination under UW procedures, and though he tried to delay the hearing until after his criminal trial, that hearing was held on January 15, 2019.  During the hearing, Player 1 and his lawyer were allowed to cross examine witnesses, although all questions were filtered through the Hearing Committee.  Player 1 was also given the opportunity to testify but declined to do so.  On January 28, 2019, the Hearing Committee found Player 1 responsible for third-degree sexual assault and harassment and upheld his expulsion.  Player 1 appealed that decision, but Chancellor Blank also upheld it on March 13, 2019, based on the hearing record.  Player 1 subsequently appealed his expulsion to defendants UW Board of Regents, which denied his final appeal on June 7, 2019.

In July 2019, Player 1 was tried on criminal charges stemming from his interaction with Doe, after which the jury found him not guilty on August 2, 2019.  The jury's verdict was obviously reached under the heightened standard of "beyond a reasonable doubt," as opposed to the Title IX determination made under a "preponderance of the evidence" standard.  Nevertheless, Player 1 submitted a Petition for Restoration of Rights to UW on August 6, 2019 ("the petition"), asking to have his Title IX finding of responsibility vacated and be readmitted to the UW.  Under Wisconsin Administrative Code § UWS 17.18, UW Chancellor Blank was responsible for deciding whether to grant the petition.  Although Blank was on vacation in Hawaii from August 6 to August 16, 2019, she reviewed the petition and other materials filtered through the UW General Counsel's Office, before making her decision on Player 1's readmittance.

After the criminal trial, there was significant public support for Player 1, including a hashtag which UW monitored.  Members of the public also emailed Chancellor Blank in support of Player 1.  In addition, UW Football coach Paul Chryst made a public statement that he would "love" to have Player 1 back on the team, a statement that had apparently been proposed by UW representatives based on talking points Chryst had drafted before his statement to the press.  Members of the UW football team also appeared at a press conference with Player 1 and wrote letters to Blank in support of his readmission.  Soon after Player 1's petition, Chancellor Rebecca Blank similarly received letters written by five major UW donors in support of Player 1's readmission.[2]  A personal letter from one major donor to the UW specifically urged "Becky" to "fast-track and readmit [Player 1] to our university in the next two weeks."  (Pl.'s Rep. to Def.'s Resp. to Pl.'s PFOF (dkt. #171) ¶ 164.)[3]  And Player 1 was readmitted within two weeks.

After submitting his petition, Player 1's legal team further met directly with UW General Legal Counsel Ray Taffora for at least an hour, had several follow up calls with Taffora, and provided supplemental evidence to UW in support of his petition.  In contrast, when Doe's counsel, Amy Bogost, found out about Player 1's petition through media

---

[2] As with other, major Division I football programs, UW's program generates millions of dollars of excess revenues for the UW, most of which is used to cover the expenses of other, non-revenue sports.  In addition, the Chancellor and other UW Department heads try to attend UW football home games, during which they network with donors, board members, and other important alumni to promote the UW and its educational programs.  Also emphasized by plaintiff is the fact that football coach Paul Chryst's compensation is substantially greater than the Chancellor herself, although this, too, is hardly unique to the UW.

[3] In fact, the record in this case reflects that, among other large contributions to the UW sports programs, this donor, Ted Kellner, had pledged $25 million dollars toward the UW's $3 billion comprehensive fundraising campaign in the year just before Player 1's expulsion.

coverage and reached out to Attorney Nancy Lynch in the UW-Madison Office of Legal Affairs, she was simply told the UW had not finished reviewing the petition.  Similarly, Taffora did not contact Doe or her attorney.

In her review, UW's Chancellor also did not reach out to Doe or ask her to respond to the petition.  In particular, Doe and her counsel were never notified that the Chancellor was even considering a reversal of the UW's original findings.  With his petition, Player 1 provided certain video evidence and police reports that UW had not previously seen, some of which Blank did review along with the petition, although just those videos that UW General Counsel Taffora thought she needed to review to make her decision.  Taffora had also reached out to the prosecutor in Player 1's criminal case to inquire about getting the trial transcripts.  The prosecutor, Matthew Brown, understood from this call that Taffora needed the transcripts on an expedited basis because the football season was beginning. Ultimately, however, the UW never ordered transcripts from the criminal trial, nor asked Doe's counsel about her view of any new evidence introduced at trial.

Under § 17.18, Chancellor Blank was required to make her readmission decision "in consultation" with the Title IX coordinator, although it appears that she may have already decided how she would rule on the petition before calling Hasselbacher to discuss it. During their discussion, Hasselbacher recommended that the Chancellor "provide complainants an opportunity to respond to the petition," which she believed would be more consistent with the rest of the UW's Title IX process.  (Pl.'s Rep. to Def.'s Resp. to Pl.'s PFOF (dkt. #171) ¶¶ 222-223.)  Blank did not follow this recommendation, however, choosing instead to make her ruling on the petition without Doe or her attorney being

given any opportunity to review and respond to the petition or to any of the so-called "new" evidence.  In explaining that decision later, Blank stated that she treated the petition "like an appeal," despite the fact that she considered new evidence and additional input from only one side of the dispute.

On August 19, 2019, following her consultation with Title IX Coordinator Hasselbacher, Chancellor Blank officially granted Player 1's Petition for Restoration of Rights.  Specifically, based on the new evidence, Blank thought that it was reasonable for Player 1 to assume he had consent from Doe.  In her tenure, Blank had reviewed 10 petitions for restoration of rights, including at least one other petition involving sexual harassment or abuse.  Of those 10 petitions, Blank only reversed the findings against Player 1.  As a result, the UW's finding of sexual assault was vacated and Player 1's expulsion was converted into a suspension.  However, the finding of sexual harassment *and* Player 1's May 1, 2018, no-contact directive remained in effect.

OPINION

Summary judgment must be granted against a party who fails to make a showing sufficient to establish the existence of an essential element and on which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If there is any genuine issue as to any material fact on an essential element, however, the court cannot grant summary judgment.  *Id*.  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted).  Finally, "[t]he evidence of the

non-movant is to be believed, and all justifiable inferences are to be drawn in [that party's] favor." *Id*. at 255.

Title IX mandates that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C.A. § 1681. As a preliminary matter, the parties generally discuss Doe's Title IX claims under an "erroneous outcome" or "deliberate indifference" standard. However, the Seventh Circuit has not adopted separate standards for those claims; instead, the court has explicitly disclaimed such distinctions:

> We see no need to superimpose doctrinal tests on the statute. All of these categories simply describe ways in which a plaintiff might show that sex was a motivating factor in a university's decision to discipline a student. We prefer to ask the question more directly: do the alleged facts, if true, raise a plausible inference that the university discriminated against [the plaintiff] 'on the basis of sex'?

*Doe v. Purdue Univ.*, 928 F.3d 652, 667–68 (7th Cir. 2019). The Seventh Circuit reaffirmed this approach in a later opinion, emphasizing "that tests or categories labeled 'erroneous outcome' or 'selective enforcement' or 'deliberate indifference' or 'archaic assumptions' need not be considered because at bottom they all ask the same question." *Doe v. Columbia Coll. Chicago*, 933 F.3d 849, 854–55 (7th Cir. 2019). The *Columbia* court reiterated that question is "whether 'the alleged facts, if true, raise a plausible inference that the university discriminated ... 'on the basis of sex'?" *Id*. (*citing Purdue*, 928 F.3d at 668-69).

The Seventh Circuit itself discusses two different Title IX standards that broadly encompass plaintiff's principal claims here. In particular, having largely eschewed other

8

doctrinal tests, the Seventh Circuit now reviews Title IX claims under a "direct" and "indirect" rubric. *Jauquet v. Green Bay Area Cath. Educ., Inc.*, 996 F.3d 802, 807 (7th Cir. 2021), sometimes also referred to as "discrimination" and "sexual harassment" claims, *Columbia Coll.*, 933 F.3d at 854. Even in *Jauquet* and *Columbia*, however, the Seventh Circuit describe identical elements for those claims, albeit using different nomenclature.

Accordingly, however one might refer to Doe's claims of discrimination on the basis of sex, the question at summary judgment is whether plaintiff has advanced sufficient proof that the UW violated Title IX by rushing the readmission process forward without giving Doe a chance to participate in any way, leading to a decision to vacate its original finding of sexual assault and readmit Player 1. Hewing to the language in *Jauquet*, the court will examine plaintiff's evidence in support of that claim under "indirect" and "direct" methoda of proof.

## I.       Indirect Discrimination

For the indirect discrimination (sometimes referred to in the past by one part of its three elements, "deliberate indifference") claim, "[t]he Supreme Court has set a high bar for plaintiffs seeking to hold schools and school officials liable for student-on-student harassment." *Doe v. Galster,* 768 F.3d 611, 617 (7th Cir. 2014). The Court has "conclude[d] that funding recipients are properly held liable in damages only where they are deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Davis Next*

*Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999). Said another way, plaintiff can prove indirect discrimination by proving: (1) "the school or school officials must have had actual knowledge of sex-based harassment"; (2) "the harassment must have been 'so severe, persuasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school'"; and (3) "the school must have been deliberately indifferent to the harassment." *Jauquet*, 996 F. 3d at 808 (quoting *Davis*, 526 U.S. at 650) (other citations omitted).

Here, defendants concede actual knowledge of sexual harassment, having never vacated that finding, but argue that Doe offers insufficient evidence for a reasonable jury to find deliberate indifference to sexual harassment *or* deprivation of access, warranting summary judgment in its favor. While the court agrees with defendants as to the latter under current case law, it cannot as to the former. To begin, after promptly suspending Player 1 from the football team and instituting a no-contact directive, the UW engaged in a fulsome process of investigation, formal hearing and ruling, which took more than a year to complete counting appeals, *and* found in plaintiff's *favor* at each step along the way. During all of this time, Player 1 was suspended from playing or practicing with the football team, and at least for the Spring semester of 2019, from even attending school. To ensure flexibility on behalf of administrators, "funding recipients are deemed 'deliberately indifferent' to acts of student-on-student harassment *only* where the recipient's response to the harassment or lack thereof is *clearly unreasonable* in light of the known circumstances." *Davis*, 526 U.S. at 648 (emphasis added). Even with the UW Chancellor's precipitous grant of Player 1's petition for reinstatement to the football team and to campus life more

than a year later, therefore, defendants argue that no reasonable jury could find the UW's response was clearly unreasonable in light of all known circumstances.

If the court were only considering the outcome (a suspension for a year and expulsion for six months), the court might agree that the UW's response was not "clearly unreasonable." Indeed, "even if the school's response to the harassment was not as fulsome as a parent would want for her child, '[a] negligent response is not unreasonable, and therefore will not subject a school to liability [under Title IX].'" *Jauquet*, 996 F.3d at 809 (quoting *Johnson*, 972 F.3d at 911–12.) Given the Supreme Court's direction that "courts should refrain from second-guessing the disciplinary decisions made by school administrators," plaintiff has not shown sufficient evidence to find UW's actions in reinstating Player 1 was *clearly* unreasonable. *Davis*, 526 U.S. at 648.

However, the heart of Doe's argument now is that the UW's refusal to let Doe participate in the *truncated readmission process* amounts by itself to deliberate indifference to Doe's sex-based harassment, as it went against the UW's own central principle in Title IX cases of allowing both sides of a dispute to be heard. Indeed, the UW had repeatedly emphasized this driving principal throughout its Title IX investigation and proceedings leading up to Player 1's expulsion the previous Spring. Defendants' best response to this argument centers on the language of Wisconsin Administrative Code § UWS 17.18, which only required the Chancellor to consult with the Title IX Coordinator before making a decision. Specifically, § 17.18 states as follows:

> A respondent who has been expelled may petition for the right
> to apply for readmission. The petition shall be in writing and
> directed to the chief administrative officer of the institution
> from which the respondent was suspended or expelled or from

11

> a different University of Wisconsin institution to which the respondent seeks admission. The chief administrative officer shall make the readmission decision. In cases of sexual misconduct, the readmission decision shall be made in consultation with the Title IX Coordinator and reasonable attempts shall be made to notify the complainant of any change to the disciplinary outcome.

Wis. Admin. Code UWS § 17.18.  As defendants emphasize repeatedly, *nothing* in this text requires that the chief administrative officer (here, the UW Chancellor) notify the complainant *before* making her decision to reinstate Player 1, only that the officer must notify her if a change has been made.  Additionally, *nothing* in the code specifically requires that the complainant be given the chance to respond to new evidence.  Of course, because *at least* "sexual misconduct" *was* involved, the code requires that the reinstatement decision be made "in consultation with" the Title IX coordinator.  Even then, however, there is no indication as to what that consultation should entail nor the extent to which the chief administrative officer should consider, much less follow, any input from the Title IX coordinator, including as here advocating for giving the plaintiff an opportunity to be heard before deciding whether reinstatement is appropriate.

As the court previously advised in its denial of defendants' motion to dismiss, however, a Title IX claim does not turn on proving "that the UW failed to follow its own procedures in overturning its prior decision and readmitting Player 1." *Doe v. Bd. of Regents of Univ. of Wisconsin*, No. 20-CV-856-WMC, 2021 WL 5114371, at *4 (W.D. Wis. Nov. 3, 2021).  Here, since nothing in the UW's own procedures for ordering Player 1's reinstatement *required* the school to involve complainants like Doe in the readmission process, the Chancellor followed the UW's administrative code for readmission to the

12

letter.  Still, having emphasized the importance of and actually hearing from each party at every other stage of the disciplinary process, the suddenness of the reversal without any input from plaintiff *appears* to have been driven by at best a desire to avoid any arguable liability for having suspended and expelled Player 1 in response to his acquittal on criminal sexual assault charges less than two weeks before, *or* at worst, a desire to get an important player back on the football field in time for the opening of UW's football season.

While poor optics are not actionable under Title IX, the UW's haste in reversing field without even considering input from plaintiff may be enough for a reasonable trier of fact to find the UW acted with deliberate indifference to Doe's having suffered from sexual harassment *and* what may still have been civilly actionable, sexual assault.  In fact, this was not just a case of reinstatement, but of reinstatement following the Chancellor's formally *vacating* an administrative finding that Doe *had been* sexually assaulted under a "preponderance of the evidence" standard.  While the UW's finding that Doe had been sexually harassed still stands, one cannot but credit the likely sting of that vacatur to Doe, particularly having just participated in a jury trial resulting in Player 1 being found not guilty of sexual assault under a higher criminal standard of "beyond a reasonable doubt." Whether the ultimate ruling would have been the same, to impose it without allowing plaintiff the chance to respond to evidence filtered by one side must have felt like a betrayal.[4]

---

[4] The court is *not* finding that the UW Chancellor acted with deliberate indifference to Doe's claim of sexual assault -- indeed, she may well have taken that into consideration when trying to properly balance the interests of Doe, Player 1 and the UW -- just that a reasonable jury *could* find under the circumstances that she acted with deliberate indifference to the administrative finding that Doe has been sexually assaulted.

Even if Player 1's unseemly rapid reinstatement were found to amount to deliberate indifference to Player 1's sexual misconduct, however, Doe has not proffered any proof that her harassment was "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Davis*, 526 U.S. at 650. As a preliminary matter, the court emphasized at the motion to dismiss stage that the harassment necessary to satisfy this prong of her Title IX claim is not met by her understandable sense of betrayal in the process the UW adopted to reinstate Player 1, but rather the hostile environment Doe had to endure in pursuing her education. *Doe*, No. 20-CV-856-WMC, 2021 WL 5114371, at *4. In response, Doe *claims* that she was deprived of educational opportunities due to her fear on campus, and the hostile environment to which she was exposed, once Player 1 was reinstated as a student. However, she offers no concrete examples of *specific* impacts on her or examples of harassment, other than that she took affirmative steps to avoid places on campus where she might encounter Player 1.

In contrast, examples of sufficiently severe impacts on education "may include dropping grades, becoming homebound or hospitalized due to harassment, or physical violence." *Gabrielle M. v. Park Forest-Chicago Heights, IL. Sch. Dist. 163*, 315 F.3d 817, 823 (7th Cir. 2003) (internal citations omitted). In fairness, plaintiff need not "show *physical exclusion* to demonstrate that [she has] been deprived by the actions of another student or students of an educational opportunity on the basis of sex." *Davis*, 526 U.S. at 629. (emphasis added). Here, Doe argues her emotional reaction to Player 1's reinstatement alone is sufficient to constitute severe deprivation, citing other federal circuits that have

14

found going to school with a sexual harasser may deprive a student of educational opportunities. *See Hayut v. State Univ. of New York*, 352 F.3d 733, 748 (2d Cir. 2003) ("Hayut also testified that she felt humiliation and emotional distress, did not want to attend classes, and was unable to sleep. That is enough to render this issue one for the trier of fact"); *see also Doe ex rel. Doe v. Derby Bd. of Educ.*, 451 F. Supp. 2d 438, 444 (D. Conn. 2006) ("even absent actual post-assault harassment by [the accused], the fact that he and plaintiff attended school together could be found to constitute pervasive, severe, and objectively offensive harassment"). To date at least, the Seventh Circuit has in contrast actively disclaimed such broad bases for liability. Instead, the Seventh Circuit has suggested that emotional harm *alone* is not enough, finding it dispositive that "[a]lthough [the victim] was diagnosed with some psychological problems, the record shows that her grades remained steady and her absenteeism from school did not increase." *Gabrielle*, 315 F.3d at 823.

While perhaps specific proof of declining grades or absenteeism are not prerequisites to create a disputed issue of fact as to severe impacts on Doe's education, something more than a general sense of unfairness or discomfort is, especially considering that Player 1 was off campus for the better part of a year, and *never* interacted with Doe again after her report of a sexual assault, either before or after his reinstatement on campus, whether because of his or her efforts to avoid that from happening. (Def.'s Rep. to Pl.'s Opp'n to Def.'s PFOF (dkt. #165) ¶ 335.) Even at the original Title IX hearing, Player 1 saw Doe, but was not allowed to speak to her. (Pl.'s Rep. to Def.'s Opp'n to Pl.'s PFOF (dkt. #171) ¶ 113.) Doe also admits that she never even *saw* Player 1 on campus after that hearing. (Def.'s Rep. to

Pl.'s Opp'n to Def.'s PFOF (dkt. #165) ¶¶ 335-39.)   In terms of emotional harm, Doe continued to study at UW, participated in several student groups and successfully graduated college with a good GPA in under four years.   (Def.'s Rep. to Pl.'s Opp'n to Def.'s PFOF (dkt. #165) ¶¶ 353-55.)

This court is particularly sympathetic to Doe's argument that she achieved all of these milestones *in spite of* her suffering through a sexual assault and harassment, as well as its inordinately long aftermath that still has not ended, rather than because she was unaffected.   Even so, there is *no* support in Seventh Circuit caselaw for a reasonable jury to find that her general anxiety was "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience" that it amounted to a Title IX violation, especially given that:   Doe's grades and attendance never suffered measurably; and Player 1 was kicked off campus for at least a semester, then only allowed back under restrictions for one semester.[5]   *Davis*, 526 U.S. at 651 (1999).   Perhaps somewhat ironically, Doe's success in school may well have been a product of exceptional personal fortitude to overcome the ordeal that Player 1 (and even the UW) caused, but because plaintiff has not carried her burden of proof that it materially undermined and detracted from her educational experience as required under Title IX, summary judgment for defendants on a claim of indirect discrimination is warranted.

---

[5]   Although Player 1 was reinstated briefly, the facts are that he left campus for good and turned pro immediately after the football season that fall.   (Def.'s Rep. to Pl.'s Opp'n to Def.'s PFOF (dkt. #165) ¶ 349.)

## II.      Direct Discrimination

A direct discrimination (sometimes referred to as "erroneous outcome") claim "requires a plaintiff allege (1) the educational institution received federal funding, (2) plaintiff was excluded from participation in or denied the benefits of an educational program, and (3) the educational institution in question discriminated against plaintiff based on gender." *Columbia Coll.*, 933 F.3d at 854.   Here, plaintiff has not provided sufficient evidence to support either the second or third prongs of a direct discrimination claim, warranting summary judgment on behalf of defendants on this claim as well.

As an initial matter, plaintiff is again unable to show that she was excluded from the benefits of her educational program for the reasons already discussed.   Generally, this second element is established by an alleged *perpetrator* later bringing a direct discrimination claim after being unfairly suspended or expelled.   *Id.*   Perhaps because the claimed adverse educational effects on Doe were more subtle than suspension or expulsion suffered by Player 1, this prong is specifically disputed by defendants.   Notably, the language for this prong with respect to direct discrimination claims is slightly different than the commensurate requirement for indirect discrimination claims.   *Compare id.* (requiring that Doe be "excluded from participation in or denied the benefits of an educational program") *with Davis*, 526 U.S. at 650 (requiring that the harassment "deprive the victims of access to the educational opportunities or benefits provided by the school").   However, the difference in language is minor, and the Seventh Circuit has not articulated any meaningful difference between the two standards in theory or practice.

To the contrary, for a direct discrimination claim, as with indirect discrimination claims, the Seventh Circuit has emphasized that plaintiff's "complaint does not specify what program or benefit Student A was not able to access . . . [i]n fact, the complaint repeatedly emphasizes that Student A is an honor roll student and does not suggest her academic status changed as a result of the practices and policies alleged." *Jauquet*, 996 F.3d at 810.  Thus, the Seventh Circuit has been similarly unwilling to find that a student was barred from educational opportunities without some kind of concrete proof of harm, such as dropping grades or increased absenteeism, with respect to both direct and indirect discrimination claims.  Without such evidence, Doe has not shown that she was denied any benefits of UW's educational programs.

Finally, although a closer question than being denied an educational benefit, plaintiff's assertion that she was discriminated against during the reinstatement process "based on gender" is tenuous on the record before the court on summary judgment.  To show discrimination, "[a] plaintiff cannot rely on . . . generalized information alone; [s]he must combine it with facts creating an inference that, in [her] specific case, the institution treated [her] differently because of [her] sex." *Johnson v. Marian Univ.*, 829 F. App'x 731, 732 (7th Cir. 2020).  Doe's main claim is that because Player 1 was a successful football player on an all-male team, the UW was incentivized to treat Doe's claim differently.  There is some support for this argument, including that football appears to have played a role in Player 1's petition for readmission being handled so quickly, if not in its outcome.  However, defendants identify at least two strong arguments against Doe's assertion of bias: (1) the UW did not seem to favor Player 1, and in fact, found him liable despite his

importance to the football team until a jury acquitted him of the criminal charges; and (2) the UW had a clear, non-discriminatory reason to readmit Player 1.

Plaintiff rightly emphasizes throughout her briefing that UW found Player 1 liable both at his original hearing *and* upheld that decision twice upon appeal, but that is a double-edged sword for Doe.  (Pl.'s Op. Br. (dkt. #127) 8.)  Indeed, the UW persuasively argues that Doe's direct discrimination claim is wholly undermined where the university found Player 1 liable of both sexual assault and harassment, expelled him, *and* upheld that decision on two appeals.  (Pl.'s Rep. to Def.'s Opp'n to Pl.'s PFOF (dkt. #171) ¶ 127.)  Only after his criminal acquittal, at which the introduction of *new*, arguably exculpatory evidence was considered, did the school reconsider; and even then, while reinstating him, the UW did *not* vacate the finding against him of sexual harassment or restrictions on his having *any* interaction with the plaintiff.  (Pl.'s Rep. to Def.'s Opp'n to Pl.'s PFOF (dkt. #171) ¶ 130.)  Were the school biased in favor of males, or at least male football players, a reasonable trier of fact might expect the administration would *not* have acted as firmly and decisively to punish Player 1 as they did here initially.  If anything, a reasonable trier of fact would seem compelled to find that the UW was predisposed to rule against Player 1 permanently, given that he was immediately suspended and then expelled.  If Player 1's status as a male football player were truly a motivating factor, the UW might have found him not liable, or at least decided on a punishment of suspension rather than expulsion. These facts suggest, therefore, that Player 1's sports acumen, as a proxy for his gender, was not a motivating factor in UW's decision-making.

Moreover, the UW had a clear, non-discriminatory reason to reevaluate its original position:  Player 1's criminal acquittal was preceded by the submission of new evidence to the jury, including surveillance videos documenting her interactions with Player 1 that arguably suggested Doe *may* have been less intoxicated or tired than previously thought (and therefore, more capable of consenting to sex).  With Player 1 being acquitted by a jury just days before petitioning for readmission, the Chancellor at least had reason to reconsider the UW's earlier decision to expel Player 1 consistent with its own regulations.  (Pl.'s Rep. to Def.'s Opp'n to Pl.'s PFOF (dkt. #171) ¶¶ 129-30.)  In fairness to Doe, nothing in Seventh Circuit caselaw suggests that gender bias needs to be the *sole* motivating factor for a school's action to exclude a student from participating in or the benefiting from an educational program.  However, Player 1's acquittal and new evidence is an obvious reason for UW to reconsider its earlier ruling for Doe across the board, such that ascribing the Chancellor's reconsideration to gender bias begs credulity on this record.  If anything, to credit Doe's argument, a trier of fact would have to make broad leaps in logic and ignore the reasonable explanations that UW provided.

Specifically, rather than the Chancellor being swayed by new evidence and a criminal acquittal -- or the less laudatory, but no more actionable, goal of pleasing wealthy donors and football fans -- the jury would have to find that she had been partially motivated by Player 1's gender in the face of the school's contrary, consistent actions, including the Chancellor's own, original denial of his appeal from the expulsion order.  Doe has not provided the kind of evidence that would make this finding more than rank speculation, while UW has given legally sufficient explanations for each action.

Regardless, Doe has not met her burden to prove adverse educational effects caused by Player 1's reinstatement as required for both direct and indirect discrimination claims under Title IX, her motion for summary judgment must be denied.  Additionally, because defendants moved for summary judgment on the same arguments, and neither party successfully raised any genuine disputes of material fact, but rather disputed the proper application of Seventh Circuit case law, defendants' motion for summary judgment will be granted.

ORDER

IT IS ORDERED that:

1) Plaintiff's motion for summary judgment (dkt. #126) is DENIED.

2) Defendants' motion for summary judgment (dkt. #101) is GRANTED.

Entered this 19th day of July, 2022.

BY THE COURT:

_/s_____
WILLIAM M. CONLEY
District Judge